# 24-2847

## United States Court of Appeals for the Second Circuit

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC., SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellees,*

JOHN BORON,

*Plaintiff,*

v.

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police

*Defendant-Appellant,*

MICHAEL J. KEANE, in his official capacity as District Attorney for the County of Erie, New York,

*Defendant.*

On Appeal from the United States District Court for the Western District of New York

## BRIEF FOR APPELLANT & SPECIAL APPENDIX

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
SARAH COCO
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-6312

Dated: January 3, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ...................................................... 1

JURISDICTIONAL STATEMENT ............................................... 3

ISSUE PRESENTED ....................................................................... 3

STATEMENT OF THE CASE ......................................................... 4

    A.   New York's Private-Property Provision .................................... 4

    B.   Procedural Background ........................................................... 5

         1.   The State's appeal from the preliminary injunction .......... 5

         2.   The district court's summary judgment decision .............. 7

STANDARD OF REVIEW ............................................................... 9

SUMMARY OF ARGUMENT ...................................................... 10

ARGUMENT ................................................................................... 12

    THE PRIVATE-PROPERTY PROVISION COMPORTS WITH THE
    HISTORICAL TRADITION OF FIREARM REGULATION ............................... 12

    A.   The State Identified Ample Historical Precedents for
        the Private-Property Provision. .............................................. 12

    B.   The Historical Analogs Are Relevantly Similar to the
        Private-Property Provision. .................................................... 16

         1.   The historical analogs and the private-property
            provision share common purposes. .................................. 17

i

**Page**

    2.    The historical analogs and the private-property provision impose comparable burdens on the Second Amendment right, all of them restricting firearms in places open to the public. .............................................. 23

  C.   The District Court's Remaining Objections to the State's Historical Evidence Have No Basis. ....................................... 35

CONCLUSION ........................................................................... 41

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alexander v. State,*
11 S.W. 628 (Tex. Ct. App. 1889) ....................................... 37

*Andrews v. State,*
50 Tenn. 165 (1871) .......................................................... 36

*Antonyuk v. Chiumento,*
89 F.4th 271 (2d Cir. 2023) ........................................... passim

*Antonyuk v. James,*
120 F.4th 941 (2d Cir. 2024) ................................................ 7

*Antonyuk v. James,*
144 S. Ct. 2709 (2024) ......................................................... 7

*Atkins v. Chilson,*
50 Mass. 52 (1845) ............................................................ 26

*Beatty v. Kurtz,*
27 U.S. 566 (1829) ............................................................ 30

*Beaver v. Filson,*
8 Pa. 327 (1848) ............................................................... 33

*Brody v. Village of Port Chester,*
345 F.3d 103 (2d Cir. 2003) ............................................ 9-10

*Cayuga Indian Nation of N.Y. v. Seneca Cnty.,*
978 F.3d 829 (2d Cir. 2020) ................................................ 9

*Cedar Point Nursery v. Hassid,*
594 U.S. 139 (2021) .......................................................... 20

*Davis v. Shah,*
821 F.3d 231 (2d Cir. 2016) ................................................ 9

**Cases**                                                     **Page(s)**

*Deare v. Carr,*
    3 N.J. Eq. 513 (N.J. Ch. 1836) .......................................... 26

*Eaton v. Whitaker,*
    18 Conn. 222 (1846) ........................................................ 26

*Farmer v. Commonwealth,*
    35 Va. 741 (1837) ..................................................... 30, 33

*Gates & Colvin v. Green,*
    4 Paige Ch. 355 (N.Y. Ch. 1834) ................................... 32

*Hildreth v. Sands,*
    2 Johns. Ch. 35 (N.Y. Ch. 1816) ................................... 26

*Lammot's Heirs v. Bowly's Heirs,*
    6 H & J 500 (Md. 1825) ................................................. 33

*Maupin v. State,*
    89 Tenn. 367 (1890) ....................................................... 36

*McFarland v. Hughling,*
    1 Tenn. 263 (1807) ........................................................ 33

*Moss v. Rossie Lead Mining Co.,*
    5 Hill 137 (N.Y. Sup. Ct. 1843) .................................... 30

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ................................................. 1, 10, 16

*Parker v. Smith,*
    17 Mass. 413 (1821) ...................................................... 26

*Perrine v. Hankinson,*
    11 N.J.L. 181 (N.J. 1829) .............................................. 33

*Reynolds v. Swain,*
    13 La. 193 (1839) ...................................................... 32-33

iv

**Cases**                                                                      **Page(s)**

*State v. Commissioners of Cross Roads for Charleston Neck*,
   21 S.C.L. 149 (S.C. Ct. App. L. 1836) .................................................. 30

*State v. Hopping*,
   18 N.J.L. 423 (1842) ..................................................................... 30-31

*State v. Langford*,
   12 N.C. 253 (1827) ........................................................................... 30

*Swan v. State*,
   11 Ala. 594 (1847) ........................................................................... 32

*United States v. Rahimi*,
   602 U.S. 680 (2024) ................................................................... passim

*University of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ...................................................................... 9-10

*Wolford v. Lopez*,
   116 F.4th 959 (9th Cir. 2024) ..................................................... passim

*Wooley v. Inhabitants of Groton*,
   56 Mass. 305 (1848) ........................................................................ 30

**Federal Laws**

28 U.S.C.
   § 1292 ............................................................................................. 3
   § 1331 ............................................................................................. 3
   § 1343 ............................................................................................. 3

**State Laws**

*New York*

Ch. 371, 2022 McKinney's N.Y. Laws 1447 ............................................. 4

N.Y. Penal Law § 265.01-d .............................................................. 1, 4, 17

**State Laws** **Page(s)**

*Other Jurisdictions*

Cal. Penal Code § 26230 ........................................................................ 17

Haw. Rev. Stat. § 134-9.5 ...................................................................... 17

**Miscellaneous Authorities**

1 Samuel Johnson, *A Dictionary of the English Language* (1755) ......... 39

3 William Blackstone, *Commentaries* (10th ed. 1787) ........................... 28

*A Digest of the Laws of the State of Alabama*
    (C.C. Clay ed., 1843) ..................................................................... 31-32

*A New Law-Dictionary* (G. Jacob comp.; enlarged eds. 1744,
    1756, 1762, 1782) ............................................................................ 39

Assembly Debate on A. 41001 (July 1, 2022) ......................................... 17

Assembly Sponsor's Mem. in Supp. of A. 41001 (2022) ........................... 17

*Black's Law Dictionary* (12th ed. 2024) (Westlaw) ........................... 27-28

Ch. 142, § 15 (1759), in 2 *The Acts of the General Assembly of
    the Province of New Jersey* 287 (S. Nevill comp. 1761) ..................... 24

Decl. of Hendrik Hartog, *Koons v. Platkin*, No. 1:22-cv-7464
    (D.N.J. Feb. 13, 2023), ECF No. 84 .......................................... 20-21, 28

John Purdon, *A Digest of the Statute Law of the State of
    Pennsylvania from the Year 1700 to 1894* (F. Brightly ed.,
    12th ed. 1894) ................................................................................. 29

2 Noah Webster, *An American Dictionary of the English
    Language* (1828) .................................................................. 26, 31, 33

Senate Debate on S. 51001 (July 1, 2022) ........................................ 17-18

Senate Sponsor's Mem. in Supp. of S. 51001 (2022) ............................... 17

## PRELIMINARY STATEMENT

In July 2022, the New York Legislature enacted the Concealed Carry Improvement Act (CCIA) to update New York's firearm licensing and possession laws following the U.S. Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). As relevant to this case, the CCIA's private-property provision prohibits a person from entering others' private property with a firearm when he knows or reasonably should know that the owner or lessee has not expressly consented to the presence of firearms on the property. *See* Penal Law § 265.01-d.

Plaintiffs Brett Christian and two gun-advocacy organizations sued to challenge the private-property provision as unconstitutional under the Second and Fourteenth Amendments. The U.S. District Court for the Western District of New York (Sinatra, J.) preliminarily enjoined enforcement of the provision with respect to private property that is open to the public. A panel of this Court affirmed the preliminary injunction but emphasized that its decision was made on the limited historical record developed at the preliminary injunction stage. On remand, the parties cross-moved for summary judgment and the State presented substantial additional historical evidence in support of the private-property provision.

The district court nevertheless entered a permanent injunction without considering the State's new evidence and without applying the standard for Second Amendment challenges clarified by the U.S. Supreme Court in *United States v. Rahimi*, which requires courts to "consider[] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition," rather than to search for a historical "dead ringer" or "twin." 602 U.S. 680, 692 (2024) (emphasis added). This Court should reverse.

There is a robust and unambiguous line of statutes, from the colonial era through Reconstruction and beyond, that have restricted carrying guns onto others' private premises without advance consent. Contrary to the district court's conclusions, these laws were enacted for the same purposes as the private-property provision: to protect public safety and to vindicate the rights of property owners to exclude individuals carrying firearms from their property. Moreover, following this Court's decision on the preliminary injunction, the State adduced substantial historical evidence demonstrating that these historical statutes applied broadly to all property, including property open to the public. The district court's decision to cast aside all of these sources reflects the very methodological

2

error the Supreme Court warned against in *Rahimi*: by disregarding the State's historical evidence, the district court treated the Second Amendment analysis as trapped in amber rather than motivated by the broad principles underlying the Nation's regulatory tradition.

## JURISDICTIONAL STATEMENT

The district court had original subject-matter jurisdiction over this Second Amendment action under 28 U.S.C. §§ 1331 and 1343. This Court has appellate jurisdiction over the district court's order entering a permanent injunction under 28 U.S.C. § 1292(a)(1). The district court's decision was entered on October 10, 2024, and appellant filed a timely notice of appeal on October 24, 2024. (*See* Joint Appendix (J.A.) 1748.)

## ISSUE PRESENTED

Whether the private-property provision, Penal Law § 265.01-d, is consistent with the Second Amendment.

## STATEMENT OF THE CASE

### A.    New York's Private-Property Provision

In July 2022, the New York Legislature passed the Concealed Carry Improvement Act (CCIA), which made changes to New York's firearm licensing and carrying laws in compliance with the Supreme Court's ruling in *Bruen*. *See* Ch. 371, 2022 McKinney's N.Y. Laws 1447 (eff. Sept. 1, 2022). As pertinent to this appeal, the CCIA includes a provision prohibiting a person from possessing "a firearm, rifle, or shotgun" in a "restricted location," which is defined as private property where the person possessing the weapon "knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or by otherwise giving express consent." Penal Law § 265.01-d(1). This private-property provision does not apply to law enforcement officers, military personnel, certain armed security guards, and persons lawfully hunting. *Id.* § 265.01-d(2).

4

## B.     Procedural Background

Shortly after the CCIA took effect, plaintiffs Brett Christian and two gun-advocacy organizations filed suit under 42 U.S.C. § 1983 in the Western District of New York and sought a preliminary injunction against the Superintendent of the New York State Police and the district attorney of Erie County, arguing that the Second and Fourteenth Amendments prohibit the private-property provision, as well as restrictions on possessing firearms in public parks and on public transit. (*See* J.A. 13-43.) As to the private-property provision, Christian alleged that it improperly prevented him from carrying a firearm into gas stations and hardware stores where the owners of these businesses had not posted signs or expressly consented to the carrying of firearms on their property. (*See* J.A. 38-39.)

### 1.     The State's appeal from the preliminary injunction

After an expedited briefing schedule, the district court issued a preliminary injunction barring defendants from enforcing the private-property provision as to private property open to the public, and reserved ruling on the portions of the motion seeking an injunction as to the public parks and public transit restrictions. (*See* Decision & Order at 26-27 (Nov. 22, 2022), WDNY ECF No. 49.) The State appealed and sought a

5

stay pending appeal, which was granted. *Antonyuk v. Chiumento*, 89 F.4th 271, 294 (2d Cir. 2023).

In December 2023, this Court issued a single opinion addressing four appeals from district court injunctions against enforcement of various provisions of the CCIA, including the State's appeal of the preliminary injunction entered in this case. *See id.* at 288. As relevant here, the Court upheld the preliminary injunction enjoining enforcement of the private-property provision as to private property open to the public.

As an initial matter, the Court found that three of the historical analogs cited by the State in support of the private-property provision were enacted for a purpose other than promoting public safety, namely to deter unlicensed hunting. *Id.* at 385. The Court further concluded, based on the limited historical record before it, that *all* of the State's historical analogs applied only to private property closed to the public. *See id.* at 385. The Court explained that the State had not provided historical evidence to show that the words used in the State's historical analogs to describe the scope of the prohibition—"land," "improved or inclosed land," and "premises or plantations"—would have been understood at the relevant time to apply to property open to the public. *Id.* at 385-86. How-

6

ever, the Court emphasized that its review was "at a very early stage of this litigation," and explained that its decision did not "determine the ultimate constitutionality" of the provision, which would require "further briefing, discovery, and historical analysis" on remand.[1] *Id.* at 388 n.116.

### 2. The district court's summary judgment decision

Following remand, plaintiffs and the State filed cross motions for summary judgment as to the private-property provision.[2] (*See* J.A. 9.) Accepting the Second Circuit's invitation to further develop the historical

---

[1] The plaintiffs in *Antonyuk v. James*, one of the cases decided in the same opinion, filed a petition for certiorari. The Supreme Court granted the petition, vacated this Court's decision as to *Antonyuk*, and remanded for further consideration in light of *Rahimi*. *See Antonyuk v. James*, 144 S. Ct. 2709 (2024) (mem.). In October 2024, this Court issued a revised decision reaffirming its prior conclusions and analysis. *See Antonyuk v. James*, 120 F.4th 941, 955 (2d Cir. 2024). Because no party in this case sought review of the original decision, the Court explained that its December 2023 opinion remains applicable to the parties in this appeal. *See id.* at 955 n.3. Accordingly, the State cites the Court's original opinion throughout this brief.

[2] The parties also cross-moved for summary judgment with respect to plaintiffs' challenge to the CCIA's restriction on possessing firearms in public parks. The district court reserved decision on that issue. (*See* Special Appendix (S.A.) 2 n.1.) The district court separately stayed adjudication of plaintiffs' challenge to the CCIA's restriction on possession of firearms on public transit pending this Court's decision in *Frey v. Bruen*, No. 23-365 (2d Cir. argued Jan. 30, 2024). (*See* Order (Jan. 25, 2024), WDNY ECF No. 72.)

7

record, the State presented new historical evidence, including from historical dictionaries, contemporaneous case law, and other historical regulations, showing that the State's historical analogs are relevantly similar to the private-property provision because they burdened the Second Amendment right for comparable purposes and to a comparable degree. In particular, the State introduced a wealth of evidence demonstrating that the terms "land," "improved" or "inclosed" land, and "premises or plantations," were understood at the time to apply to private property open to the public. (State Opp'n Mem. to Pls.' Mot. for Summary J. & Mem. in Supp. of State Mot. at 23-30, WDNY ECF No. 77-1.)

In October 2024, the district court issued a decision and order permanently enjoining enforcement of the private-property provision as to private property open to the public. The court concluded that the State's historical evidence did not establish a relevant regulatory tradition because the historical laws were enacted for different purposes or burdened Second Amendment rights to a lesser extent than the private-property provision. (*See* S.A. 39-41.) In reaching that conclusion, the district court did not address in any depth the additional historical evidence provided by the State. (*See* S.A. 37 n.21.) For example, the district

court continued to assume that the State's historical analogs were limited to private property closed to the public, without addressing any of the State's new historical evidence showing that the laws were not understood that way at the time they were enacted.

## STANDARD OF REVIEW

This Court reviews the district court's order granting summary judgment de novo and may affirm only where "the movant is entitled to judgment as a matter of law." *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016). The district court's grant of a permanent injunction is reviewed for abuse of discretion, which mandates reversal where the decision "rests on an error of law or a clearly erroneous factual finding." *Id.* (quotation marks and alterations omitted).

In its review, this Court is not bound by its previous decision affirming the district court's preliminary injunction. *See Cayuga Indian Nation of N.Y. v. Seneca Cnty.*, 978 F.3d 829, 834 (2d Cir. 2020); *Brody v. Village of Port Chester*, 345 F.3d 103, 110 (2d Cir. 2003). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly, "the findings of fact

9

and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id.* That is particularly true where the appellate court's original decision was made on a "limited record" and a "fuller record" is presented in the subsequent appeal. *See Brody*, 345 F.3d at 110, 113 (reaching different conclusion on appeal from summary judgment than preliminary injunction).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order granting a permanent injunction against enforcing the private-property provision as applied to property open to the public.

The historical evidence presented by the State amply demonstrates that the private-property provision is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692; *see Bruen*, 597 U.S. at 24; *Antonyuk*, 89 F.4th at 300. Specifically, the State presented historical examples from nine jurisdictions, from before the founding through the adoption of the Fourteenth Amendment, at least two of which are "historical 'dead ringers'" for the private-property provision. *See Wolford v. Lopez*, 116 F.4th 959, 995 (9th Cir. 2024).

10

Each of the State's historical examples is relevantly similar to the private-property provision because each burdened the Second Amendment right for comparable purposes and to a comparable degree. Like the private-property provision, these historical laws were enacted to protect public safety and to vindicate property owners' right to exclude. While the district court erroneously concluded that the historical state statutes regulated exclusively hunting and poaching, the record makes clear that many of these statutes did not address hunting at all, and those that did regulated *both* hunting *and* carrying firearms outside the hunting context.

The district court likewise erred in concluding that the State's historical examples applied only to private property closed to the public. The State adduced substantial historical evidence showing that the statutes' use of terms like "land," "improved" or "inclosed" land, and "premises or plantations" applied equally to property open to the public. The district court wholly ignored this evidence, committing the methodological error the Supreme Court warned against in *Rahimi* by demanding "identical" historical examples rather than considering whether New York's law is consistent with "the principles that underpin our regulatory tradition." *See* 602 U.S. at 692, 698.

11

# ARGUMENT

## THE PRIVATE-PROPERTY PROVISION COMPORTS WITH THE HISTORICAL TRADITION OF FIREARM REGULATION

### A. The State Identified Ample Historical Precedents for the Private-Property Provision.

In support of its summary judgment motion, the State presented evidence of laws from nine States or their colonial precursors, dating from before the founding and through the adoption of the Fourteenth Amendment, all of which forbade carrying guns onto others' property without their permission. As anticipated by this Court in the preliminary injunction decision, *see Antonyuk*, 89 F.4th at 388 n.116, the summary judgment record included additional historical evidence beyond that submitted during expedited briefing on the preliminary injunction.

In the colonial and founding eras, at least six laws from five jurisdictions made it illegal to carry a gun on private property without the consent of the owner. In 1715, for example, the Province of Maryland enacted a law imposing criminal penalties against anyone "of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated

12

plantation, without the owner's leave, having been once before warned." (J.A. 1223.)

In 1721, the Pennsylvania colony similarly made it unlawful for anyone "to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation." (J.A. 1228.) Pennsylvania's statute aimed to prevent and remedy the "divers[e] abuses, damages and inconveniencies" caused "by persons carrying guns and presuming to hunt on other people's lands." (J.A. 1228.) In 1722, the Province of New Jersey passed a nearly identical statute, recognizing that "divers[e] abuses have been committed, and great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to hunt on other Peoples Land." (J.A. 1234.)

In 1763, the Province of New York passed a law providing that nobody "other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants," shall "carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Cornfield, or other inclosed Land whatsoever, within the City of New-York, or the Liberties thereof, without Licence in Writing

13

first had and obtained for that Purpose from such Owner, Proprietor, or Possessor." (J.A. 1239 (emphasis omitted).) The statute was expressly intended "more effectually to punish and prevent" the practice of "idle and disorderly" individuals "to hunt with Fire-Arms . . . to the great Danger of the Lives of his Majesty's Subjects," and "the grievous Injury of the Proprietors." (J.A. 1238-1239.)

In 1771, the Province of New Jersey passed another statute making it unlawful for anyone "to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor." (J.A. 1242.) And in 1790, the Commonwealth of Massachusetts enacted a statute imposing penalties on any person "seen with any gun or guns upon" certain privately owned lands, "except such as shall have the special license of the proprietors . . . or shall be able to [show] sufficient reason therefor." (J.A. 1744.)

The understanding that the government could prohibit carrying firearms on the property of another without eliciting the consent of the property owner continued in the era when the Fourteenth Amendment was ratified. An 1865 Louisiana law declared that "it shall not be lawful

14

for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order." (J.A. 1252.) In 1866, Texas passed a law nearly identical in substance to Louisiana's.[3] (J.A. 1259.) The same year, Florida made it unlawful to "hunt or range with a gun within the enclosed land or premises of another without the permission of the owner." (J.A. 1536.)

Continuing this tradition, an 1893 Oregon law made it "unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." (J.A. 1266.)

---

[3] In its decision, the district court erroneously analyzed a *different* 1866 Texas law prohibiting the discharge of firearms in public squares, streets, and alleys, which the State does not argue is directly analogous to the private-property provision. (*See* S.A. 36.)

15

**B.    The Historical Analogs Are Relevantly Similar to the Private-Property Provision.**

In evaluating a Second Amendment challenge to a modern firearm restriction, courts must evaluate whether the historical precedents supporting the modern law are "relevantly similar"; that is, whether they burden an individual's Second Amendment rights for comparable reasons and in comparable respects. *See Bruen*, 597 U.S. at 28-29. As the Supreme Court clarified in *Rahimi*, a contemporary law may be "analogous enough to pass constitutional muster" even where "it does not precisely match its historical precursors"; in other words, the government need not identify a "dead ringer" or "historical twin" to support a modern firearm regulation, so long as the law "comport[s] with the *principles* underlying the Second Amendment." *Rahimi*, 602 U.S. at 692 (emphasis added); *see Bruen*, 597 U.S. at 30.

As explained in more detail below, the district court erred in finding (S.A. 40-41) that the extensive historical record described above was insufficiently similar to New York's private-property provision. Indeed, the Ninth Circuit recently reached the opposite conclusion in *Wolford v. Lopez*, examining a nearly identical historical record to find "an established tradition of arranging the default rules that apply specifically to the

16

carrying of firearms onto private property," such as the Hawaiʻi statute at issue in that case, which is nearly identical to New York's law.[4] 116 F.4th at 994-95. This Court should likewise find that New York's private-property provision comports with the historical regulation of firearms.

### 1. The historical analogs and the private-property provision share common purposes.

As explained in the legislative record, New York's private-property provision was enacted (i) to enhance public safety and (ii) to ensure that property owners are empowered to determine whether they wish to allow the carrying of firearms on their property. *See* Assembly Sponsor's Mem. in Supp. of A. 41001 (2022); Senate Sponsor's Mem. in Supp. of S. 51001 (2022); Assembly Debate on A. 41001 at 14, 96-97 (July 1, 2022); Senate

---

[4] Hawaiʻi's law makes it unlawful to "enter or remain on private property" while carrying a firearm unless an individual has obtained "express authorization" to carry from the owner of the property. *See* Haw. Rev. Stat. § 134-9.5(a). The *Wolford* Court separately affirmed a preliminary injunction enjoining enforcement of California's private-property provision, *see* Cal. Penal Code § 26230(a)(26), on the grounds that California's law requires owners to communicate consent to the carrying of firearms only through a sign of a particular size. 116 F.4th at 995-96. There is no dispute that New York's law, like Hawaiʻi's law, permits property owners to communicate consent through signage "or by otherwise giving express consent." Penal Law § 265.01-d(1); *see* Haw. Rev. Stat. § 134-9.5(a).

Debate on S. 51001 at 5669-70, 5673 (July 1, 2022). Both of these statutory purposes are consistent with the principles underlying the historical analogs cited by the State. *See Rahimi*, 602 U.S. at 692.

First, many of these historical laws were explicitly enacted to protect public safety, just as the private-property provision was. New York's 1763 law, for instance, was expressly intended to protect against "grievous Injury" and "great Danger of the Lives of his Majesty's Subjects," (J.A. 1238-1239) a clear reference to the risk to public safety posed by firearms. Pennsylvania's 1721 statute and New Jersey's 1722 statute similarly aimed to prevent "divers[e] abuses, damages and inconveniencies" (J.A. 1228) and the "great Damages and Inconveniences" (J.A. 1234) caused by people carrying guns on private property without permission. Maryland's 1715 law was part of a section addressing criminal law and applied specifically to those "of evil fame, or a vagrant, or dissolute liver," (J.A. 1221, 1223) indicating a concern that certain criminally irresponsible and dangerous people posed a risk if permitted to carry firearms on private property.

Second, each of these historical analogs was intended, as the private-property provision is, to protect private-property rights by empowering property owners to decide whether they wished to allow the carrying of

18

firearms on their property. Each of the State's historical analogs required the explicit consent of the owner, with the intention of protecting the owner's right to exclude by placing the burden on the individual carrying firearms to seek permission to enter. For instance, New Jersey's 1722 law required "License or Permission from the Owner." (J.A. 1234.) New York's 1763 law and New Jersey's 1771 law went even further, requiring that the license be "*in Writing*." (J.A. 1239, 1242 (emphases added).) Louisiana's 1865 statute and Texas's 1866 statute likewise required the "consent of the owner or proprietor."[5] (J.A. 1252, 1259.)

As explained by Professor Hendrik Hartog, an expert on the interpretation of eighteenth and nineteenth century statutes, "[t]he aim

---

[5] Many additional jurisdictions enacted provisions prohibiting *shooting* a firearm on others' property without eliciting their consent. For instance, a 1705 Virginia law made it unlawful to "shoot, hunt, or range upon the lands and tenements . . . of any other person or persons without lycence . . . first obtained of the owner and proprietor thereof." (J.A. 1555.) An 1873 Indiana law prohibited "hunting or shooting with any kind of firearm or firearms, on inclosed lands, without the consent of the owner or occupant thereof." (J.A. 1558.) In 1882, Rhode Island similarly made it unlawful to "discharge any rifle, musket, fowling-piece, pistol or other small arms, except . . . by permission of the owner or occupant of the land on or into which he may shoot." (J.A. 1564.) These provisions provide further historical support for a tradition of protecting a private-property owner's right to exclude individuals with firearms.

19

of these provisions was to protect the powerful right of the property owners to prevent armed individuals from coming on to their property without license." Decl. of Hendrik Hartog at 2, 5, *Koons v. Platkin*, No. 1:22-cv-7464 (D.N.J. Feb. 13, 2023), ECF No. 84 ("Hartog Decl."). Since the founding era, the right to exclude has been "a fundamental element of the property right," and "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021) (quotation marks omitted). These laws vindicated that right by giving property owners the exclusive right to decide who could enter their property with firearms.

The district court erred in concluding that, because some of the State's historical analogs reference hunting, these were exclusively antipoaching provisions. (*See* S.A. 28 n.17 (citing *Antonyuk*, 89 F.4th at 384-86); S.A. 35-36.) As an initial matter, four of the State's historical analogs—New Jersey's 1771 law and the laws from Louisiana, Texas, and Oregon—did not refer to hunting at all (J.A. 1242, 1252, 1259, 1266) but rather, "simply prohibited the carry of firearms on private property without consent." *Wolford*, 116 F.4th at 995. As the Ninth Circuit recognized, laws like these "are historical 'dead ringers'" for contemporary private-

20

property laws like New York's. *Id*. The district court also erroneously concluded (*see* S.A. 33) that the New Jersey law focuses on hunting because of its proximity to other rules regulating hunting. As the Ninth Circuit recognized, those rules were "found in a separate provision—Section 2 of the Act," and should not be interpreted to change the meaning of the cited section. *Wolford*, 116 F.4th at 995.

As to the State's remaining historical analogs, which did reference hunting, none was aimed solely at preventing hunting or poaching on private land. Instead, they generally regulated carrying firearms onto private property without consent and *also* regulated hunting.[6] Like statutes today, eighteenth and nineteenth century statutes commonly had multiple purposes, particularly in the case of public legislation. *See* Hartog Decl. at 5. Moreover, the text of each of the State's historical analogs plainly applies to individuals carrying guns on private property without the owner's permission, whether they are hunting or not. *See id*.

---

[6] Contrary to this Court's prior decision, *see Antonyuk*, 89 F.4th at 385, the State has never conceded that three of the historical analogs—the 1721 Pennsylvania statute, 1722 New Jersey statute, and 1763 New York statute—were focused exclusively on hunting. To the contrary, the State's position throughout this litigation has been that these statutes regulate both hunting *and* carrying firearms.

21

For example, Maryland's 1715 law imposed penalties on any person convicted of certain crimes or otherwise of ill repute who "shall shoot, kill or hunt, *or be seen to carry a gun*" on another's property absent consent. (J.A. 1223 (emphasis added).) Pennsylvania's 1721 law made it illegal to "*carry any gun* or hunt" on private property absent consent (J.A. 1228 (emphasis added)), as did New Jersey's 1722 law (J.A. 1234). New York's 1763 law similarly provided that no one shall "*carry, shoot, or discharge* any Musket, Fowling-Piece, or other Fire-Arm whatsoever" on private property without the owner's consent. (J.A. 1239 (emphasis added).) Massachusetts's 1790 law made it unlawful to be "*seen with a gun or guns.*" (J.A. 1744 (emphasis added).) Florida's 1865 law likewise made it illegal to "hunt *or range with a gun.*" (J.A. 1536 (emphasis added).) In a prosecution under each of these laws, it would be no defense for a violator to argue that they were not liable because they did not intend to hunt.

By contrast, other laws from the same time periods regulated hunting exclusively, using narrow language that did not encompass carrying firearms outside the hunting context. For example, a 1728 Maryland law made it unlawful "*to come to hunt with guns* . . . within any enclosed grounds . . . without leave or licence from the proprietors thereof first had

22

and obtained." (J.A. 1598 (emphasis added).) A nearly identical 1871 Illinois law provided "it shall be unlawful for any person or persons *to hunt with gun* . . . within the inclosed grounds or lands of another" without first obtaining the owner or occupant's permission. (J.A. 1605 (emphasis added).) In other words, where founding and Reconstruction-era drafters of legislation wished to prohibit only hunting with a gun, and not carrying a gun without regard to hunting, they knew how to do so.

2.   **The historical analogs and the private-property provision impose comparable burdens on the Second Amendment right, all of them restricting firearms in places open to the public.**

The historical analogs cited by the State and New York's private-property provision impose comparable burdens on the Second Amendment right because they all prohibit carrying firearms in places open to the public absent prior consent from the owner.

As an initial matter, it is indisputable that New Jersey's 1771 statute by its plain terms applied to private property whether open or closed to the public. New Jersey's law applied broadly to "any Lands . . . for which the Owner pays Taxes, or is in his lawful Possession." (J.A. 1242.) The owner of the land on which a shop or mill sat in New Jersey in 1771—

23

like the owner of a house—was required to pay taxes on his property, and thus was protected by New Jersey's provision. For instance, a 1759 New Jersey law listed as "rateables"—i.e., assets subject by law to taxation—"Merchants and Shop-keepers," "Grist-Mills," "Still-Houses," "Brew Houses," and "Ferries." Ch. 142, § 15 (1759), in 2 *The Acts of the General Assembly of the Province of New Jersey* 287, 299 (S. Nevill comp. 1761). The district court thus plainly erred in concluding that this law was limited to private property closed to the public. *See Wolford*, 116 F.4th at 995 ("New Jersey's 1771 law applied to <u>all</u> private property.").

The State's remaining historical analogs also, on close examination, use language that shows they apply to private property whether open or closed to the public. Those statutes use the terms "land," "improved" or "inclosed" land, and "premises or plantations" to describe the scope of the prohibition on entering private property armed without permission. Although this Court concluded in its preliminary injunction decision that the historical record, "[a]s it ha[d] been developed thus far," indicated that these terms would have applied only to private property closed to the public, *Antonyuk*, 89 F.4th at 385-86, the Court acknowledged that its ruling was preliminary and could change upon "further briefing, discov-

ery, and historical analysis" in the district court, *id.* at 388 n.116. Accepting this Court's invitation, the State presented new historical evidence on remand, including from historical dictionaries, contemporaneous case law, and other historical regulations, demonstrating that these terms were understood at the time to apply to private property open to the public as well as to property closed to the public. This evidence is described in detail below.

*Land.* Many of the State's historical analogs use the term "land," either alone or in conjunction with other terms, to describe the scope of the prohibition. (*See, e.g.*, J.A. 1223, 1228, 1234, 1242.) Contemporaneous dictionaries demonstrate that "land" was a broad term that encompassed private property open to the public. For instance, Timothy Cunningham's 1765 legal dictionary explained that "land [] in a general and legal signification, includeth not only all kinds of grounds, as meadows, pasture, arable, wood, &c. but houses *and all edifices whatsoever*." (J.A. 1540 (emphasis added).) Cunningham's reference to "all edifices whatsoever" easily encompasses business open to the public like taverns and shops.

Contemporaneous case law from the relevant jurisdictions also used "land" in this sense, to refer both to property and to businesses

located on that property, including taverns and stores. For instance, in *Hildreth v. Sands*, an 1816 New York court found that a conveyance of "land," including "a ropewalk and store on the land," was fraudulent because the same land had already been sold at a sheriff's sale to satisfy the owner's debts. 2 Johns. Ch. 35, 37-38 (syllabus), 45-46 (N.Y. Ch. 1816).[7] In a similar case, *Deare v. Carr*, an 1836 New Jersey court held that a mortgage for "a certain lot of land of about eleven acres, with a tavern upon it" was extinguished by a subsequent valid sheriff's sale. 3 N.J. Eq. 513, 513 (N.J. Ch. 1836). Many other decisions from the time likewise used "land" this way.[8] As these examples establish, there is no indication in the historical record that the term "land" was understood to refer

---

[7] A ropewalk was a commercial enterprise where ropes were manufactured. *Rope-walk*, 2 Noah Webster, *An American Dictionary of the English Language* 480 (1828).

[8] *See, e.g.*, *Parker v. Smith*, 17 Mass. 413, 413 (1821) (syllabus) ("The plaintiffs proved that they built their store on the land above described."); *Atkins v. Chilson*, 50 Mass. 52, 53 (1845) (syllabus) (action "to recover possession of a parcel of land, with a store thereon, situate[d] in Blackstone Street, in Boston"); *Eaton v. Whitaker*, 18 Conn. 222, 232 (1846) (describing lot of land containing a wharf and an agreement to "erect upon said lot of land a substantial brick store, suitable for the grocery business").

exclusively to property closed to the public. To the contrary, references to "land" broadly encompassed property both closed and open to the public.

*Improved or inclosed land.* Five of the State's historical analogs—Pennsylvania's 1721 statute, New Jersey's 1722 statute, New York's 1763 statute, Florida's 1866 statute, and Oregon's 1893 statute—prohibited carrying firearms without permission on "improved" or "inclosed" lands. (J.A. 1228, 1234, 1239, 1536, 1266.) Historical dictionaries demonstrate that "improved" or "inclosed" land was not limited to property closed to the public. Noah Webster's 1828 dictionary, for instance, defined "improved" broadly as "[u]sed; occupied; as *improved* land." (J.A. 1543.) Black's Law Dictionary, which provides historical definitions for certain legal terms, states that in the seventeenth century, "improved land" meant "[l]and that has been developed, esp[ecially] land occupied by buildings and structures." *Land*, *Black's Law Dictionary* (12th ed. 2024) (Westlaw). Farms and homes constituted improved land, but so did buildings open to the public like churches, stores, or inns.

"Inclosed" was likewise defined broadly in Webster's 1828 dictionary, as "[s]urrounded; encompassed; confined on all sides; covered and sealed; fenced." (J.A. 1549; *see* J.A. 1549 (defining "inclose" as "to separate from

common grounds by a fence; as to *inclose* lands").) *See also Land, Black's Law Dictionary* (12th ed. 2024) (in the seventeenth century, "enclosed land" meant "[l]and that is actually enclosed and surrounded with fences"). At minimum, the term applied to any kind of fenced in property, and was not limited to property closed to the public. Some legal commentators of the time went further, explaining that "every man's land is in the eye of the law inclosed and set apart from his neighbors . . . either by a visible and material fence . . . or, by an ideal invisible boundary." 3 William Blackstone, *Commentaries* 209-10 (10th ed. 1787).

Often the terms "improved or inclosed" were used in conjunction, such as in Pennsylvania's 1721 statute (J.A. 1228) and New Jersey's 1722 statute (J.A. 1234), to describe all land for which notice is given that the land is private property. Professor Hartog explained that "'improved or enclosed' . . . was not a limitation of the provision to fenced-in land" but rather "marked two ways an owner would have given notice of his possession of the property at issue." Hartog Decl. at 7. Owners could give notice by fencing in land, but also by "recording in county deed books and paying taxes," actions that would have been taken for private property both open and closed to the public. *Id.*

28

Contemporaneous statutes and case law further support this interpretation. For example, the Province of the Massachusetts Bay enacted a statute in 1694 allowing for taxation of "all real estates, as houses, warehouses, mills, cranes, wharffs, tanyards, arable, pasture and meadow ground, *and all other lands inclosed or under improvement*." (J.A. 1546 (emphasis added).) The use of "all other" indicates that "mills" and "wharfs" are examples of "lands inclosed or under improvement." In 1857, Pennsylvania enacted a statute forbidding slaughterhouses, soap factories, tanneries, and other noxious buildings "within two hundred yards of the enclosed grounds of any incorporated cemetery." John Purdon, *A Digest of the Statute Law of the State of Pennsylvania from the Year 1700 to 1894* 278 (F. Brightly ed., 12th ed. 1894). In the founding era and after, houses and fields were thus considered enclosed or improved land, but so too were mills, cranes, wharfs, tanyards, and cemeteries—properties of the time that permitted public access.

Case law from the same period likewise used these terms to refer to a wide variety of locations open to the public, from places of public recreation to burial grounds. For instance, an 1829 decision from the Supreme Court of the United States repeatedly used the term "enclosed"

29

to refer to a Lutheran church and schoolhouse, as well as a burying ground used by "the public generally." *See Beatty v. Kurtz*, 27 U.S. 566, 566-81 (1829). In 1836, the Court of Appeals of South Carolina noted that it was a common custom throughout the nation "to enclose and plant" public squares, which afforded "air, prospect, and agreeable walks for the health and recreation of the citizens." *State v. Commissioners of Cross Roads for Charleston Neck*, 21 S.C.L. 149, 153 (S.C. Ct. App. L. 1836). Land was similarly referred to as "improved" or "inclosed" where it was occupied by a store or other business open to the public.[9] There is no indication that these terms were used, as the district court concluded, to refer exclusively to land closed to the public.[10]

---

[9] *See, e.g., Moss v. Rossie Lead Mining Co.*, 5 Hill 137, 138 (N.Y. Sup. Ct. 1843) (syllabus) ("[F]ifty acres of improved land on which were several houses used as residences for workmen, stoves in the houses, a building which had been occupied as a store, a school-house, a threshing machine, &c."); *State v. Langford*, 12 N.C. 253, 256 (1827) (describing "the house and the shop" which were "both inclosed by the same fence"); *Wooley v. Inhabitants of Groton*, 56 Mass. 305, 309 (1848) ("[A] pound . . . is an enclosed piece of land."); *Farmer v. Commonwealth*, 35 Va. 741, 741 (1837) (syllabus) (barn "in a separate enclosure" from tavern was "a public place" when used for gambling).

[10] *State v. Hopping*, 18 N.J.L. 423, 424 (1842), cited by this Court in its prior decision, *see Antonyuk*, 89 F.4th at 386 n.113, is not to the contrary. There, an 1842 New Jersey court defined the term "improve-
*(continued on the next page)*

*Premises or plantations.* Four of the State's laws from around the time of the ratification of the Fourteenth Amendment—Louisiana's 1865 statute, Texas's 1866 statute, Florida's 1866 statute, and Oregon's 1893 statute—use the term "premises" or "plantation" to describe the scope of the prohibition. (J.A. 1252, 1259, 1536, 1266.) Webster's 1828 dictionary defined "premises" broadly as all "land or other things mentioned in the preceding part of the deed." *Premises*, 2 Noah Webster, *An American Dictionary of the English Language* 331 (1828). Nothing about that definition excludes land open to the public.

To the contrary, historical laws from the same time period demonstrate that the term "premises" applied broadly, including to businesses open to the public. For example, an 1843 Alabama statute regulated the sale of liquor and provided that "merchants and shopkeepers may retail liquors by the quart, without a license . . . so that the same be not drunk with their consent, and privity in their stores, *or on the premises where they reside or have their stores.*" *A Digest of the Laws*

_____

ments" to include "inclosures, or inclosed fields: lands fenced in, and thus withdrawn and separated from the wastes or common lands." *Hopping*, 18 N.J.L. at 424. That too is a broad definition that easily encompasses private property open the public.

31

*of the State of Alabama* 555 (C.C. Clay ed., 1843) (emphasis added). In 1847, the Supreme Court of Alabama held that "premises" in this statute encompassed a work bench outside a shopkeeper's store. *Swan v. State*, 11 Ala. 594, 595 (1847). As the court explained, the work bench was "as much his premises as a table within or adjacent to his place of doing business." *Id.* An 1859 New York City ordinance similarly provided that "[n]o tavern-keeper, keeper of a public house, garden or place of resort, nor any other person, shall suffer or permit any person to practice with or fire off any pistol, gun, fowling-piece or other fire-arms, *in or upon his or her premises*." (J.A. 1552.) In both statutes, "premises" explicitly encompassed businesses open to the public like a tavern or shop.

Case law similarly used "premises" to describe locations open to the public. For instance, in an 1834 decision, a New York court described a tavern house and out buildings as "premises" leased by defendant. *Gates & Colvin v. Green*, 4 Paige Ch. 355, 358 (N.Y. Ch. 1834). An 1839 decision of the Supreme Court of Louisiana similarly described as the "premises" a brick building rented by an apothecary firm. *Reynolds v. Swain*, 13 La. 193, 197 (1839). As these examples show, shops, taverns, apothecaries,

and other locations open to the public were all encompassed in the prohibition on carrying firearms on the premises of another without permission.

While "plantation" was defined in Webster's 1828 dictionary as "an estate, a tract of land occupied and cultivated," *see Plantation*, 2 Noah Webster, *An American Dictionary of the English Language* 292 (1828), these operations were nonetheless often open to the public, including for commercial purposes. For example, in 1807 a Tennessee court analyzed a lease in which the tenant agreed to rent "the plantation and tavern known by the name of New Market . . . which tavern-house shall be left in good repair." *McFarland v. Hughling*, 1 Tenn. 263, 263 (1807) (syllabus).[11] In any event, the State's historical regulations used "plantation" in conjunction with another term like "premises," to describe a broader prohibition than that encompassed by "plantation" alone.

In light of this extensive historical record, the district court was wrong to conclude that the historical analogs cited by the State were lim-

---

[11] *See also, e.g.*, *Lammot's Heirs v. Bowly's Heirs*, 6 H & J 500, 519 (Md. 1825) (syllabus) (discussing the tangled history of a "tract of land and plantation" containing "buildings and improvements" such as a "rope-walk"); *Farmer*, 35 Va. at 742 (syllabus) ("[A] barn on the plantation of . . . a licensed ordinary keeper, the tavern house being situated on the same plantation.").

ited to property closed to the public. (*See* S.A. 29-37 & n.21.) The record, including contemporaneous dictionary definitions, case law, and other historical statutes, demonstrates that the terms "land," "inclosed" or "improved" land, and "premises or plantations" were each understood to apply broadly to property open as well as closed to the public. The district court improperly dismissed this historical evidence without analysis as wholly irrelevant to determining the scope of the State's historical analogs (S.A. 37 n.21), ignoring this Court's contrary conclusion that such evidence would be determinative, *see Antonyuk,* 89 F.4th at 385-86 & n.113.

C. **The District Court's Remaining Objections to the State's Historical Evidence Have No Basis.**

The district court cited several additional purported flaws in the State's historical evidence, none of which is supported by the record.

First, the district court erred in concluding that the private-property provision is inconsistent with historical tradition simply because it establishes a default rule for carrying firearms that applies to locations individuals "frequent every day when they move around outside their homes." (S.A. 40 (emphasis omitted).) As the State demonstrated, the historical record is replete with examples of regulations barring the carrying of firearms *entirely* in many public places, including those frequented by citizens every day. *Cf. Wolford*, 116 F.4th at 988 (recognizing a tradition of barring firearms at places of social gathering).

Indeed, many jurisdictions prohibited carrying a firearm in any public setting with a social or educational purpose. In 1870, Texas made it unlawful to carry "fire-arms, whether known as a six shooter, gun or pistol of any kind" in any "place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen." (J.A. 1571.) In 1889 and 1890, Arizona and Oklahoma enacted nearly identical laws.

35

(J.A. 1587 (Arizona); J.A. 1284 (Oklahoma).) Other jurisdictions went further, prohibiting the carrying of firearms in *all* public assemblies. An 1869 Tennessee law prohibited the carrying of any "pistol . . . or other deadly or dangerous weapon" in any "fair, race course, or public assembly of the people." (J.A. 1567-1568.) An 1870 Georgia law made it unlawful to carry a "pistol or revolver" in any "public gathering." (J.A. 1575.) Missouri in 1883 prohibited carrying "any kind of fire arms" in any "public assemblage of persons met for any lawful purpose." (J.A. 1579.) An 1889 Idaho law made it unlawful to carry any "pistol, gun or other deadly weapons, within the limits or confines of any city, town or village or in any public assembly." (J.A. 1583.)

Moreover, there appears to have been no dispute about the constitutionality of these provisions. Courts frequently upheld such laws. *See, e.g.*, *Andrews v. State*, 50 Tenn. 165, 182 (1871) (holding, in the context of a Second Amendment challenge, that "a man may well be prohibited from carrying his arms to . . . [a] public assemblage"). State courts also regularly upheld convictions for violating the statutes. *See, e.g., Maupin v. State*, 89 Tenn. 367, 367 (1890) (carrying a pocket-pistol at a grist mill that was "a public place, [ ]a place to which customers were

36

constantly invited and daily expected to go"); *Alexander v. State*, 11 S.W. 628, 629 (Tex. Ct. App. 1889) ("[T]he defendant went into a place where persons were assembled for amusement, carrying about his person a pistol."). Indeed, this Court cited the very same provisions as support for the CCIA's restrictions on firearms in certain "sensitive" locations. *See Antonyuk*, 89 F.4th at 356-59.

While these examples are "by no means identical" to the private-property provision, they nonetheless show that New York's law is consistent with "the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692, 698; *see id.* at 703-04 (Sotomayor, J., concurring). Indeed, the private-property provision, by permitting the carrying of firearms on private property where the owner has given express consent, is far less burdensome than these historical provisions.

Second, the district court improperly relied on a number of minor distinctions to dismiss the State's historical evidence, even though the State need not identify "a dead ringer or a historical twin." *Rahimi*, 602 U.S. at 692 (quotation marks omitted); *see Antonyuk*, 89 F.4th at 302-03. For instance, the district court rejected one historical law because it imposed a civil fine rather than a criminal prohibition. (S.A. 29.) But

37

there is nothing improper about relying on historical regulations imposing penalties different from those imposed by modern enactments. *See, e.g.*, *Rahimi*, 602 U.S. at 681 (relying on surety statutes, which required forfeit of a bond, to support criminal prohibition on carrying firearms). The district court also dismissed some of the State's historical analogs because they applied to only a subset of the population. (S.A. 29-30, 33-34.) But this Court has similarly relied on laws that imposed restrictions on a subset of the population to support a broader historical tradition. In *Antonyuk*, for instance, the Court upheld a prohibition on carrying firearms in centers providing behavioral health or substance dependence services based in part on historical laws barring individuals with mental illness and alcohol addiction from serving in colonial-era militias. 89 F.4th at 339-40.

Third, the district court erred in concluding that some of the State's historical analogs are not relevantly similar because they applied only to long guns used for hunting, and not to handguns. (*See* S.A. 28 n.18.) As a threshold matter, four of the State's historical analogs explicitly regulated "firearms" and "pistols" (J.A. 1239 (New York), 1252 (Louisiana), 1259 (Texas), 1266 (Oregon)), thus plainly including handguns. Moreover, the

38

district court relied on a dictionary definition of the term "gun" from 1828, which post-dates nearly all of the historical analogs that use the word "gun" exclusively (*see* J.A. 1223, 1228, 1234, 1242 (statutes enacted between 1715 and 1771)). Definitions of the term "gun" from eighteenth-century sources demonstrate that the term was understood to include handguns. For example, Samuel Johnson's 1755 dictionary defines "gun" broadly as "[t]*he general name for firearms*; the instrument from which shot is discharged by fire." 1 Samuel Johnson, *A Dictionary of the English Language* (1755) (emphasis added). Four editions of the preeminent legal dictionary in that era, published between 1744 and 1782, similarly refer to a "gun" broadly as a "*Gun*, Hand gun, &c." *A New Law-Dictionary* (G. Jacob comp.; enlarged eds. 1744, 1756, 1762, 1782).

Finally, the district court faulted the State for failing to demonstrate a sufficiently continuous tradition. (S.A. 35, 37-38.) But the State provided examples from at least nine jurisdictions, spanning nearly two centuries, from 1715 (Maryland) to 1893 (Oregon). In any event, as this Court has explained, "comparable historical laws need not proliferate to justify a modern prohibition," where, as is the case here, there is no evidence of a dispute about their lawfulness. *Antonyuk,* 89 F.4th at 304. Indeed, this

Court has found that comparable historical regulations from just three States can be sufficient to establish a historical tradition. *Id.* at 339. Similarly, the district court improperly dismissed the State's analogs enacted between 1865 and 1893, close in time to the ratification of the Fourteenth Amendment, as largely irrelevant. (*See* S.A. 38.) That is directly contrary to this Court's instruction that laws enacted close in time to 1868 should be a "focal point" of the analysis when considering the constitutionality of state law. *Antonyuk,* 89 F.4th at 304.

# CONCLUSION

This Court should reverse the district court's order granting a permanent injunction against enforcement of the private-property provision as to property open to the public.

Dated:  New York, New York
        January 3, 2025

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellant

By:  */s/ Sarah Coco*
    SARAH COCO
    Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
SARAH COCO
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-6312

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Emily Paule, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,179 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ Emily Paule_

# APPENDIX

# TABLE OF CONTENTS

**Page**

Decision and Order, dated Oct. 10, 2024.............................................. SA1

N.Y. Penal Law § 265.01-d ................................................................SA44

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



---

BRETT CHRISTIAN,
FIREARMS POLICY COALITION,
INC., and SECOND AMENDMENT
FOUNDATION,

      Plaintiffs,

    v.

STEVEN G. JAMES, in his official
capacity as Superintendent of the New
York State Police, and MICHAEL J.
KEANE, in his official capacity as
District Attorney for the County of Erie,
New York,

      Defendants.

---

22-CV-695 (JLS)

## **DECISION AND ORDER**

A newly-enacted New York law makes it a felony for a concealed-carry license

holder to possess a firearm on *all private property*, unless the relevant property

holders actually permit such possession with a sign or by express consent. *See* N.Y.

Penal L. § 265.01-d. At least as to private property open to the public (the subject of

this motion), New York's restriction is unconstitutional—a result dictated by the

teaching of the Supreme Court's recent cases addressing individual Americans'

right to keep and bear arms.

Regulation in this area is permissible *only if* the government demonstrates

that the new enactment is consistent with the Nation's historical tradition of

sufficiently analogous regulations. New York fails that test here. Indeed, property

**SA1**

owners have the right to exclude. But *the state* may not unilaterally exercise that right and, thereby, interfere with the long-established Second Amendment rights of law-abiding citizens who seek to carry for self-defense on private property open to the public.

Before the Court are cross motions for summary judgment. *See* Dkt. 73 (Plaintiffs); Dkt. 77 (Defendants). Relevant here, Plaintiffs ask this Court to enjoin enforcement of the private property restriction as to places open to the public. *See* Dkt. 73. For the reasons below, Plaintiffs' motion seeking that relief is GRANTED. Defendants' corresponding motion is DENIED.[1]

## BACKGROUND

### I.   THE COMPLAINT

Plaintiff Brett Christian commenced this action in September 2022, joined by institutional Plaintiffs Firearms Policy Coalition, Inc. ("FPC"), and Second Amendment Foundation ("SAF") (collectively, "Plaintiffs"). Dkt. 1. Plaintiffs sue Defendants Steven G. James and Michael J. Keane (collectively, the "State" or "Defendants") in their official capacities—namely, as the Superintendent of the New York State Police and the Erie County District Attorney, respectively. *See id.*[2]

---

[1] The parties' motions separately address an additional restriction as to public parks. The Court holds these parts of the parties' motions in abeyance, pending the Second Circuit's consideration of the issue. *See Antonyuk v. James*, 144 S. Ct. 2709 (2024) (vacating and remanding for "further consideration in light of *United States v. Rahimi*, 602 U.S. ____, 144 S.Ct. 1889, ____ L.Ed.2d ____ (2024)").

[2] James is the acting Superintendent of State Police as of April 4, 2024. *See* Dkt. 77 at 1. He has been substituted as a party pursuant to Fed. R. Civ. P. 25(d).

**SA2**

Plaintiffs challenge three provisions of New York's Concealed Carry Improvement Act ("CCIA")—a 2022 enactment that adds to the New York Penal Law various restrictions on concealed carry of firearms. *See id.* Christian, who is licensed under New York law to carry a concealed firearm, "desires to carry his firearm for self-defense purposes when going about his day-to-day life." *See id.* ¶ 43. But because of the new restrictions, he is "prevented from doing so." *Id.*

In particular, the law prevents Christian from "carry[ing] for self-defense" in "local parks or when hiking on trails," and while using "public transportation" such as "NFTA Metro Rail." *Id.* Christian is also "unable to carry his firearm on his person throughout the State because of the State's designation of private property." *Id.* ¶ 44. He claims that the State's "designation of private property, including private property which is open to the public," as a restricted location "effectively prevents" Christian from "going about his daily life" while "lawfully carrying his firearm for purposes of self-defense." *Id.*

The statute adds to the Penal Law, as relevant here:

> § 265.01-d Criminal possession of a weapon in a restricted location. 1. A person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent. . . .[3]

---

[3] Section § 265.01-d(2) provides that this restriction does not apply to, among others, persons who are "lawfully engaged in hunting activity," persons who are "police officers" as defined in the criminal procedure law, persons who are

3

**SA3**

The Complaint seeks relief under 42 U.S.C. § 1983 for deprivation of the Constitutional right to keep and bear arms. *See id.* ¶¶ 47-54. Plaintiffs seek declaratory judgment, injunctive relief, as well as fees and costs. *See id.* at 30-31 (prayer for relief).[4]

## II.    PRELIMINARY INJUNCTION MOTION

Plaintiffs moved for a preliminary injunction. Dkt. 19. Christian, a resident of Cheektowaga, New York, stated that he was "licensed to carry a handgun pursuant to New York law with a license issued by Erie County." Dkt. 19-4 ¶¶ 1, 4. But to comply with the new law, Christian was forced to disarm "constantly" in "places [he] would otherwise carry." *Id.* ¶ 12. As a result, he was "left without the ability to defend [him]self" and was "suffering diminished personal safety on a frequent and ongoing basis." *Id.*

According to Christian, prior to the enactment of the private property restriction, he "would typically bring [his] firearm with [him] on private property open to the public, including weekly visits to gas stations and monthly visits to hardware stores." *Id.* ¶ 10. He "intended to continue to do so, but for the enactment and enforcement" of this restriction. *Id.* Christian also stated that he intended to carry a firearm for self-defense in parks and on public transportation—but could not do so in light of the new restrictions. *See, e.g., id.* ¶¶ 8-9. As such, Christian sought

---

"designated peace officers," as well as "security guards" and "active-duty military personnel."

[4] Page numbers refer to the CM/ECF generated pagination in the header of each page.

4

**SA4**

to enjoin Defendants from enforcing three restrictions on concealed carry: N.Y.

Penal L. §§ 265.01-e(2)(d) (public parks); 265.01-e(2)(n) (public transportation); and

265.01-d (private property).[5]  Dkt. 19.

On November 22, 2022, this Court issued a Decision and Order preliminarily

enjoining Defendants from enforcing the private property restriction (N.Y. Penal L.

§ 265.01-d) with respect to property open to the public.  Dkt. 49.  The Court stayed

resolution of the portions of Plaintiffs' motion addressing public parks and public

transportation.  Dkt. 60.

### III.  APPEAL

Defendants appealed, Dkt. 50, and the Second Circuit affirmed in a decision

addressing the appeal "in tandem" with three other appeals of similar district court

orders.  *See Antonyuk v. Chiumento*, 89 F.4th 271, 289 (2d Cir. 2023), cert. granted,

judgment vacated sub nom. *Antonyuk v. James*, 144 S. Ct. 2709 (2024).[6]

Relevant here, the Second Circuit issued a mandate on January 2, 2024,

ordering that "that the preliminary injunction enjoining enforcement of § 265.01-d

with respect to private property open to the public is AFFIRMED."  *See* Dkt. 70.

The Second Circuit concluded that the State "fails to place § 265.01-d within a

---

[5] Like their motion here, Plaintiffs' motion for a preliminary injunction of the
private property restriction was limited "to the extent it applies to property that is
already open to the public."  *See* Dkt. 19-1 at 13.

[6] The three other district court cases are: *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422
(W.D.N.Y. 2022) (Sinatra, *J.*); *Spencer v. Nigrelli*, 648 F. Supp. 3d 451 (W.D.N.Y.
2022) (Sinatra, *J.*); and *Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022)
(Suddaby, *J.*).

**SA5**

National tradition . . . ." *Antonyuk*, 89 F.4th at 385. And it explained that "the State's analogues fail to establish a National tradition motivated by a similar 'how' or 'why' of regulating firearms in property open to the public in the manner attempted by § 265.01-d." *Id.* Although the *Antonyuk* plaintiffs petitioned the Supreme Court for a writ of Certiorari—which was granted—the mandate as to the private property restriction in this case remains in effect. *See* Dkt. 87.

## IV.   CROSS MOTIONS FOR SUMMARY JUDGMENT

On March 1, 2024, Plaintiffs moved for summary judgment. Dkt. 73. They ask this Court to "declar[e] unlawful and permanently enjoin[] Defendants from enforcing N.Y. Penal L. §§ 265.01-e(2)(d) [public parks] and 265.01-d [private property], with respect to places open to the public." *Id.*

Plaintiffs argue that "there is no historical tradition supporting New York's ban on lawful firearm carry in public parks and on private property open to the public." Dkt. 73-1 at 8. Both "types of locations," they claim, "date back to the Founding era, but New York will be unable to point to any relevantly similar historical tradition of banning carry in them." *Id.* As such, they urge the Court to "permanently enjoin enforcement of the challenged restrictions." *Id.*

The State opposed Plaintiffs' motion and cross-moved for summary judgment. Dkt. 77. It maintains that the challenged restrictions are "fully constitutional" as "straightforward, common-sense public safety measures." Dkt. 77-1 at 12-13. Specifically, the State argue that there is a "broad body of historical precedent for laws prohibiting firearms in parks, in jurisdictions both urban and rural." *Id.* at 13.

And the private property restriction, it claims, is "perfectly consistent with the Nation's history and tradition of firearms regulation"—as there is a "robust historical tradition of states requiring consent to carry weapons on private property." *Id.* Indeed, according to the State, "states retain wide latitude to confront the regulatory challenges posed by modern firearms, including exercising the ability to set default rules for private property and to limit the possession of firearms in sensitive locations." *Id.* at 12.

Plaintiffs opposed the State's cross motion and replied in further support of their own motion. Dkt. 81, 82. The State also replied. Dkt. 86.[7] On September 12, 2024, the Court heard argument. *See* Dkt. 92.

## DISCUSSION

Plaintiffs' request that this Court enjoin enforcement of the private property restriction—as to places open to the public—is granted.[8] Defendants' cross motion on this issue is denied. As set forth below, the Nation's historical traditions have not countenanced such a curtailment of the right to keep and bear arms. Indeed, the right to self-defense is equally important—and equally recognized—on the vast swaths of private property open to the public across New York State.

---

[7] The parties also submitted supplemental briefing. *See* Dkt. 94, 97.

[8] The Court does not address the public parks restriction here because that issue (in the preliminary injunction posture) is currently before the Second Circuit. *See Antonyuk*, 144 S. Ct. 2709.

**SA7**

In the absence of historical tradition in support of the State's restriction, there is no genuine issue for trial. Indeed, on this record, the restriction violates the right of individuals to keep and bear arms for self-defense outside of their homes on private property open to the public. Judgment for Plaintiffs on this issue, therefore, is required.[9]

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment "is appropriate when, viewing the evidence favorably to the non-movant, there is no genuine issue of material fact and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Wiggins v. Griffin*, 86 F.4th 987, 992 (2d Cir. 2023) (citing Fed. R. Civ. P. 56(a)). A "genuine issue exists—and summary judgment is therefore improper—where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Id.* (internal citation omitted).

At summary judgment, "the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact." *B Five Studio LLP v. Great Am. Ins. Co.*, 414 F. Supp. 3d 337, 339 (E.D.N.Y. 2019) (citing *Celotex Corp.*

---

[9] The Court rejects Defendants' argument that Plaintiffs improperly assert a pre-enforcement, as-applied challenge. *See* Dkt. 77-1 at 19 ("binding precedent forecloses [Plaintiffs'] ability to bring an as-applied challenge against a law that has never been applied to them"). The Second Circuit has addressed this approach in this case. *See Antonyuk*, 89 F.4th at 384 ("these Plaintiffs . . . have properly pleaded an as-applied, pre-enforcement challenge to the restricted location provision's default presumption against carriage on private property open to the public"). Moreover, the Supreme Court has also permitted pre-enforcement, as-applied challenges. *See, e.g., Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010).

8

*v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the "movant meets that burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(c)).  The Court "is to view all such facts in the light most favorable to the non-movant, drawing all reasonable inferences in its favor." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

## II.    THE PRIVATE PROPERTY RESTRICTION

### A. The Right to Keep and Bear Arms

The Second Amendment to the Constitution, ratified in 1791, provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II. On several recent occasions, the Supreme Court has addressed this right and supplied the framework that resolves the issue here.  A thorough understanding of the Court's articulations is essential, so they are explored at length here.

#### 1. *Heller*

In *Heller*, the Supreme Court held that the District of Columbia's ban on handgun possession in the home, and its prohibition against rendering any lawful home firearm operable for the purpose of immediate self-defense, both violated the Second Amendment.  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

The Court methodically analyzed the issue, first noting that, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'  When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—

confrontation." *Id.* at 584 (citations omitted).  The Second Amendment, therefore,

"guarantee[s] the individual right to possess and carry weapons in case of

confrontation.  This meaning is strongly confirmed by the historical background of

the Second Amendment.  We look to this because it has always been widely

understood that the Second Amendment, like the First and Fourth Amendments,

codified a *pre-existing* right.  The very text of the Second Amendment implicitly

recognizes the pre-existence of the right and declares only that it 'shall not be

infringed.'"  *Id.* at 592 (emphasis in original).  The Court continued, "[t]here seems

to us no doubt, on the basis of both text and history, that the Second Amendment

conferred an individual right to keep and bear arms."  *Id.* at 595.[10]

 After addressing the history related to the Second Amendment's prefatory

clause, the Court concluded that, "[t]hat history showed that the way tyrants had

eliminated a militia consisting of all the able-bodied men was not by banning the

militia but simply by taking away the people's arms, enabling a select militia or

standing army to suppress political opponents.  This is what had occurred in

England that prompted codification of the right to have arms in the English Bill of

Rights."  *Id.* at 598.

---

[10] The Court noted that, "[o]f course the right was not unlimited, just as the First
Amendment's right of free speech was not . . . .  Thus, we do not read the Second
Amendment to protect the right of citizens to carry arms for *any sort* of
confrontation, just as we do not read the First Amendment to protect the right of
citizens to speak for *any purpose.*"  *Id.* (citation omitted) (emphasis in original).

**SA10**

Indeed, founding-era debate with respect to the right to keep and bear arms, "as with other guarantees in the Bill of Rights, was not over whether it was desirable (all agreed that it was) but over whether it needed to be codified in the Constitution." *Id.* It was understood "across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* at 599.[11]

Like most rights, "the right secured by the Second Amendment is not unlimited . . . . [the right is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626 (citations omitted). And although the Court indicated that it was not then undertaking "an exhaustive historical analysis" of the full scope of the Second Amendment, nothing in the Court's "opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws

---

[11] The Court continued, "[i]t is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution. Justice BREYER's assertion that individual self-defense is merely a 'subsidiary interest' of the right to keep and bear arms . . . (dissenting opinion), is profoundly mistaken. He bases that assertion solely upon the prologue—but that can only show that self-defense had little to do with the right's *codification*; it was the *central component* of the right itself." *Id.* (internal citation omitted) (emphasis in original).

**SA11**

imposing conditions and qualifications on the commercial sale of arms.  We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 626-27, 627 n.26.[12]

Striking down the handgun ban, and cementing the notion that the Second Amendment exists as a bulwark against attempts by governments to erode the right to self-defense, the Court concluded that, "the inherent right of self-defense has been central to the Second Amendment right.  The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Id.* at 628-29 (footnote, citation, and internal quotations omitted).

The Court also addressed D.C.'s additional requirement "that firearms in the home be rendered and kept inoperable at all times.  This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 630.[13]

---

[12] The Court also recognized another important limitation on the right, namely, that "the sorts of weapons protected were those 'in common use at the time.'  We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (citations omitted).

[13] The Court spoke to the very importance of the right when it rejected Justice Breyer's dissenting criticism of the Court's "declining to establish a level of scrutiny for evaluating Second Amendment restrictions.  [Justice Breyer] proposes . . . a judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id.* at 634.  In response, the Court wrote, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach.  The very enumeration of the right takes out of the hands of

**SA12**

And finally, acknowledging the problem of handgun violence in the country,
the Court concluded that, "[t]he Constitution leaves the District of Columbia a
variety of tools for combating that problem, including some measures regulating
handguns . . . . *But the enshrinement of constitutional rights necessarily takes
certain policy choices off the table.*  These include the absolute prohibition of
handguns held and used for self-defense in the home.  Undoubtedly some think that
the Second Amendment is outmoded in a society where our standing army is the
pride of our Nation, where well-trained police forces provide personal security, and
where gun violence is a serious problem.  That is perhaps debatable, but what is not
debatable is that it is not the role of this Court to pronounce the Second
Amendment extinct."  *Id.* at 636 (internal citations omitted) (emphasis added).

> 2. *McDonald*

Two years later, the Court ruled that the Second Amendment applies as well
to state governments by operation of the Fourteenth Amendment's Due Process
Clause.  *McDonald v. City of Chicago*, 561 U.S. 742, 750, 754, 791 (2010).  There,
the Court noted *Heller's* holding "that the Second Amendment protects the right to
keep and bear arms for the purpose of self-defense."  *Id.* at 791.

---

government—even the Third Branch of Government—the power to decide on a case-
by-case basis whether the right is really worth insisting upon.  A constitutional
guarantee subject to future judges' assessments of its usefulness is no constitutional
guarantee at all.  Constitutional rights are enshrined with the scope they were
understood to have when the people adopted them, whether or not future
legislatures or (yes) even future judges think that scope too broad."  *Id.* at 634-35.
The Second Amendment "is the very product of an interest balancing by the
people—which Justice BREYER would now conduct for them anew."  *Id.* at 635.

**SA13**

To answer the next question whether "the Second Amendment right to keep and bear arms is incorporated in the concept of due process[, the Court analyzed] whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty or . . . whether this right is deeply rooted in this Nation's history and tradition." *Id.* at 767 (emphasis in original) (internal quotation marks and citations omitted). Without hesitation, the Court answered the question in the affirmative: "*Heller* points unmistakably to the answer. *Self-defense is a basic right*, recognized by many legal systems from ancient times to the present day, and in *Heller,* we held that individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* (citations and footnote omitted) (initial emphasis added and second emphasis in original).

The Court continued, "citizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense.'" *Id.* (alteration in original) (quoting *Heller* at 630). And "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778. The Court rejected any attempt "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *Id.* at 780.

Public safety concerns are no reason to alter the Constitutional analysis. The *McDonald* Court made it clear that, "[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the

constitutional provisions that impose restrictions on law enforcement and on the

prosecution of crimes fall into the same category." *Id.* at 783.

     3.  *Bruen*

The Supreme Court returned to the Second Amendment two years ago,

invalidating the "proper cause" requirement in New York's conceal-carry licensing

regime. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

Starting where it left off in *Heller* and *McDonald*, the Court recognized that "the

Second and Fourteenth Amendments protect the right of an ordinary, law-abiding

citizen to possess a handgun in the home for self-defense." *Id.* at 1.  Next, the Court

held that the Second and Fourteenth Amendments also "protect an individual's

right to carry a handgun for self-defense *outside the home*." *Id.* (emphasis added).

The issue remaining, then, was whether New York's licensing regime

respected that right.  And the Court concluded that it did not.  *Id.*  Specifically,

"[b]ecause the State of New York issues public-carry licenses only when an

applicant demonstrates a special need for self-defense . . . the State's licensing

regime violates the Constitution." *Id.*

*Bruen* offers much to the disposition of this motion.  A close examination is

necessary, and follows.

In the years since *Heller* and *McDonald*, the Courts of Appeals had developed

a "two-step" framework for analyzing Second Amendment cases, which combined

history with a means-end scrutiny.  *Id.* at 17.  *Bruen* expressly rejected that

approach at the outset.  *Id.* at 17-18.  Instead, the Court set forth the proper test:

**SA15**

"when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, *the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation*.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 24 (citation and internal quotation omitted) (emphasis added).  In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.[14]

Highlighting the importance of the right, the Court stated that, "[i]f the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures.  But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—*it is not*

---

[14] The Court acknowledged that, "'[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.' *McDonald*, 561 U.S. at 803–804, (Scalia, J., concurring).  But reliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to make difficult empirical judgments about the costs and benefits of firearms restrictions, especially given their lack [of] expertise in the field." *Id.* at 25 (internal quotation marks and citation omitted) (emphasis and alteration in original).

16

**SA16**

*deference that the Constitution demands here.*" *Id.* at 26 (emphasis added).  The

Second Amendment, the Court continued, "'is the very *product* of an interest

balancing by the people' and it 'surely elevates above all other interests the right of

law-abiding, responsible citizens to use arms' for self-defense.  It is this balance—

struck by the traditions of the American people—that demands our unqualified

deference." *Id.* (citation omitted) (emphasis in original).

After setting this high bar, the Court supplied additional guidance.  The

applicable test "requires courts to assess whether modern firearms regulations are

consistent with the Second Amendment's text and historical understanding.  In

some cases, that inquiry will be fairly straightforward.  For instance, when a

challenged regulation addresses a general societal problem that has persisted since

the 18th century, the lack of a distinctly similar historical regulation addressing

that problem is relevant evidence that the challenged regulation is inconsistent

with the Second Amendment." *Id.*  Likewise, "if earlier generations addressed the

societal problem, but did so through materially different means, that also could be

evidence that a modern regulation is unconstitutional.  And if some jurisdictions

actually attempted to enact analogous regulations during this timeframe, but those

proposals were rejected on constitutional grounds, that rejection surely would

provide some probative evidence of unconstitutionality." *Id.* at 26-27.

Addressing the case before it, the Court noted that "New York's proper-cause

requirement concerns the same alleged societal problem addressed in *Heller*:

'handgun violence,' primarily in 'urban area[s].'  Following the course charted by

**SA17**

*Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation.  And, as we explain below, we find no such tradition in the historical materials that respondents and their *amici* have brought to bear on that question." *Id.* at 27 (internal citations to *Heller* omitted).[15]

The Court next considered the "sensitive places" doctrine, which addresses areas where weapons have historically been prohibited.  The Court first referenced *Heller's* "discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" *Id.* at 30 (citation omitted).  The Court noted that, "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions.  *See* D. Kopel & J. Greenlee, The 'Sensitive Places' Doctrine, 13 CHARLESTON L. REV. 205, 229–236, 244–247 (2018); *see also* Brief for Independent Institute as *Amicus Curiae*

---

[15] The Court acknowledged that, while the "historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.*  The Court continued, "[f]ortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted).  Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 27-28.

**SA18**

11–17. We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original).

Rejecting New York's broad "sensitive places" argument, the Court went on to state that, "[a]lthough we have no occasion to comprehensively define 'sensitive places' in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a 'sensitive-place' law. In their view, 'sensitive places' where the government may lawfully disarm law-abiding citizens include all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.' It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below." *Id.* at 30-31 (internal citations omitted).

**SA19**

With the rules and analytical tools articulated, the Court applied them to New York's proper-cause requirement, noting that the petitioners were two ordinary, law-abiding adult citizens and, as such, were part of "the people" whom the Second Amendment protects. *Id.* at 31. Neither party disputed that handguns are weapons in common use today for self-defense. *Id.* As such, the Court turned to whether the plain text of the Second Amendment protects the individuals' proposed course of conduct, namely, "carrying handguns publicly for self-defense." *Id.* at 31. The Court had "little difficulty concluding that it does," noting that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* at 32. The Second Amendment guarantees the individual right to possess and carry weapons in case of confrontation. *Id.* (citing *Heller*). And the right to "bear arms" refers to the right to carry for self-defense. *Id.* (citing *Heller*).

The Court then reasoned that the right to "bear" naturally encompasses public carry. *Id.* "Most gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Id.*

The Court continued, "[m]oreover, confining the right to 'bear' arms to the home would make little sense given that self-defense is 'the *central component* of the

[Second Amendment] right itself.'" *Id.* (quoting *Heller*, 554 U.S. at 599).  *See also*
*McDonald*, 561 U.S. at 767.  After all, "the Second Amendment guarantees an
'individual right to possess and carry weapons in case of confrontation,' *Heller*, 554
U.S. at 592, and confrontation can surely take place outside the home."  *Id.* at 33.
"*Many Americans hazard greater danger outside the home than in it.  The text of the
Second Amendment reflects that reality.*  The Second Amendment's plain text thus
presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public
for self-defense."  *Id.* (citation omitted) (emphasis added).

With that resolved, the Court next evaluated whether the State met its
burden to show that its proper-cause requirement is consistent with the Nation's
historical tradition of firearm regulation.  Only "if [the State] carr[ies] that burden
can [it] show that the pre-existing right codified in the Second Amendment, and
made applicable to the States through the Fourteenth, does not protect petitioners'
proposed course of conduct."  *Id.* at 33-34.

Rejecting the State's historical arguments, the Court reasoned that,
"[t]hroughout modern Anglo-American history, the right to keep and bear arms in
public has traditionally been subject to well-defined restrictions [evaluated at
length in the opinion] governing the intent for which one could carry arms, the
manner of carry, or the exceptional circumstances under which one could not carry
arms. But apart from a handful of late-19th-century jurisdictions, the historical
record compiled by [the State] *does not demonstrate a tradition of broadly*

21

**SA21**

*prohibiting the public carry of commonly used firearms for self-defense.*" *Id.* at 38 (emphasis added).

Nor is there any such historical tradition "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense . . . . We conclude that [the State has] *failed to meet [its] burden to identify an American tradition justifying New York's proper-cause requirement.* Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional." *Id.* (emphasis added). The Court later noted that "the history reveals a consensus that States could *not* ban public carry altogether." *Id.* at 52 (emphasis in original).

The Court's analysis of one part of the historical record is noteworthy. "To summarize: The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly. None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 59-60.

Moving to another historical period, the Court noted that, even "during Reconstruction the right to keep and bear arms had limits. But those limits were

22

**SA22**

consistent with a right of the public to peaceably carry handguns for self-defense."
*Id.* at 62. Rejecting the relevance of an outlier law and state-court decisions, the
Court stated that it "will not give disproportionate weight to a single state statute
and a pair of state-court decisions. As in *Heller*, we will not 'stake our
interpretation of the Second Amendment upon a single law, in effect in a single
[State], that contradicts the overwhelming weight of other evidence regarding the
right to keep and bear arms for defense' in public." *Id.* at 65-66 (citation omitted).

In conclusion, the Court reiterated that the Second Amendment is not a
second-class right subject to lesser rules. *Id.* at 70. The Court indicated that it
knew of "no other constitutional right that an individual may exercise only after
demonstrating to government officers some special need. That is not how the First
Amendment works when it comes to unpopular speech or the free exercise of
religion. It is not how the Sixth Amendment works when it comes to a defendant's
right to confront the witnesses against him. And it is not how the Second
Amendment works when it comes to public carry for self-defense." *Id.* In sum,
then, "New York's proper-cause requirement violates the Fourteenth Amendment in
that it prevents law-abiding citizens with ordinary self-defense needs from
exercising their right to keep and bear arms." *Id.* at 71.

    4. *Rahimi*

In *United States v. Rahimi*, 602 U.S.___, 144 S. Ct. 1889 (2024), the Court
rejected a challenge to 18 U.S.C. § 922(g)(8), which "prohibits an individual subject
to a domestic violence restraining order from possessing a firearm if that order

includes a finding that he 'represents a credible threat to the physical safety of [an]

intimate partner,' or a child of the partner or individual." 144 S. Ct. at 1894

(quoting 18 U.S.C. § 922(g)(8)).

The Court discussed *Bruen*'s framework, stating: "In *Bruen*, we directed

courts to examine our 'historical tradition of firearm regulation' to help delineate

the contours of the right." *Id.* at 1897 (quoting *Bruen*, 597 U.S. at 17). "We

explained that if a challenged regulation fits within that tradition, it is lawful under

the Second Amendment. We also clarified that when the Government regulates

arms-bearing conduct, as when the Government regulates other constitutional

rights, it bears the burden to 'justify its regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at

24).

The Court continued: "the Second Amendment permits more than just those

regulations identical to ones that could be found in 1791." *Id.* And a "court must

ascertain whether the new law is 'relevantly similar' to laws that our tradition is

understood to permit, 'apply[ing] faithfully the balance struck by the founding

generation to modern circumstances.'" *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 29).

Moreover,

> [w]hy and how the regulation burdens the right are central to this
> inquiry. For example, if laws at the founding regulated firearm use to
> address particular problems, that will be a strong indicator that
> contemporary laws imposing similar restrictions for similar reasons fall
> within a permissible category of regulations. Even when a law regulates
> arms-bearing for a permissible reason, though, it may not be compatible
> with the right if it does so to an extent beyond what was done at the
> founding. And when a challenged regulation does not precisely match
> its historical precursors, it still may be analogous enough to pass
> constitutional muster. The law must comport with the principles

**SA24**

underlying the Second Amendment, but it need not be a 'dead ringer' or
a 'historical twin.'

*Id.* (internal citations and quotation marks omitted).  Against this backdrop,

the Court held that, "[w]hen an individual poses a clear threat of physical

violence to another, the threatening individual may be disarmed."  *Id.* at

1901.  And "[i]ts prohibition on the possession of firearms by those found by a

court to present a threat to others fits neatly within the tradition the surety

and going armed laws represent."  *Id.*

### B. New York's Restriction on Private Property Open to the Public is Unconstitutional

The State's criminal enactment barring carrying of arms on private property

open to the public violates the Constitution.

Christian is an ordinary, law-abiding citizen to whom the Second

Amendment applies.  As it did for the petitioners in *Bruen,* the Second

Amendment's plain text thus presumptively guarantees Christian's right to "bear"

arms for self-defense on private property outside of his own home.  *See Antonyuk*, 89

F.4th at 383 ("We agree with the district court that, to the extent the restricted

location provision applies to private property open to the public, the regulated

conduct falls within the Second Amendment right to carry firearms in self-defense

outside the home").

To "justify its regulation," therefore, the State "must demonstrate that the

regulation is consistent with this Nation's historical tradition of firearm regulation."

*Bruen*, 597 U.S. at 17, 24.  *See also Rahimi*, 144 S. Ct. at 1896.  Only then may the

Court "conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen,* 597 U.S. at 17, 24 (internal citation and quotation marks omitted). *See also Antonyuk,* 89 F.4th at 384 ("the district court properly placed the burden on the State to demonstrate § 265.01-d's consistency with a well-established and representative National tradition").

The State maintains that there is "extensive historical support spanning the colonial era to Reconstruction and beyond that forbade carrying guns onto others' property without their permission." Dkt. 77-1 at 32.[16] But the State fails, on this historical record, to demonstrate that the challenged restriction is "consist[ant] with a well-established and representative National tradition." *Antonyuk,* 89 F.4th at 384.

### 1. Overview

This Court's analysis of the State's proffered enactments is guided by fundamental principles for interpreting legal texts. Specifically, under the "fair reading method," the Court "determin[es] the application of a governing text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *See* A. Scalia & B. Garner, Reading Law 33 (2012). This "endeavor requires aptitude in language, sound judgment," and the "suppression of personal preference regarding the

---

[16] Indeed, the Second Circuit instructs—guided by *Bruen*—that "time periods in close proximity to 1791 and 1868 are . . . relevant to our analysis." *Antonyuk,* 89 F.4th at 304. But it recognized that, "the farther we depart from these key dates, the greater the chance we stray from the original meaning of the constitutional text." *Id.*

outcome." *Id.* It also "requires an ability to comprehend the *purpose* of the text

. . . ." *Id.* (emphasis in original).

The Court must also construe each proffered enactment as a whole. *Id.* at

167. This entails consideration of "the entire text, in view of its structure and of the

physical and logical relation of its many parts." *Id.* And "[c]ontext is a primary

determination of meaning." *Id.* Indeed, a "legal instrument typically contains

many interrelated parts that make up the whole." *Id.* And the "entirety of the

document thus provides the context for each of its parts." *Id.* As such, the statutory

construction is a "holistic endeavor." *Id.* at 168 (citations omitted).

As discussed below, a fair reading of the historical enactments reveals that

the proffered enactments are not "analogous enough" to the State's new restriction

on private property open to the public to "pass constitutional muster." *Bruen*, 597

U.S. at 30. Each of these historical enactments—considered holistically and in

context—burdened law-abiding citizens' rights for "different reasons" and/or "to a

significantly lesser extent" than the challenged restriction here. *Antonyuk*, 89 F.4th

at 385.

The State, moreover, has not met its burden of showing continuity or

endurance (of any sort) over time. The enactments—considered together—are a far

cry from a *tradition* supporting a universal ban of firearms on all property open to

the public. And the Supreme Court instructs that "the bare existence of . . .

localized restrictions cannot overcome the overwhelming evidence of an otherwise

**SA27**

enduring American tradition permitting public carry." *Bruen*, 597 U.S. at 67. For these reasons, discussed in detail below, the State fails to meet its burden.

### 2. Founding-Era Enactments

The State identifies a handful of founding-era enactments: Maryland in 1715, Pennsylvania in 1721, New Jersey in 1722, New York in 1763, New Jersey in 1771, and Massachusetts in 1789. *See* Dkt. 77-1 at 31-33. As explored below, the proffered enactments are not "relatively similar" to the restriction here—which creates a default rule prohibiting concealed carry on *all* private property open to the public under the guise of "public safety"—in terms of "how and why" they "burden[ed] a law-abiding citizen's right to armed self-defense." *See Bruen*, 597 U.S. at 29; Dkt. 77-1 at 12.[17] None is a "proper analogue" for New York's restriction on private property open to the public.[18]

---

[17] The Second Circuit considered several of these enactments in *Antonyuk*—namely, Pennsylvania in 1721, New Jersey in 1722, New York in 1763, and Maryland in 1715—and concluded that they were "explicitly motivated by a substantially different reason (deterring unlicensed hunting) than the restricted location regulation (preventing gun violence)." *See Antonyuk*, 89 F.4th at 384-86.

[18] It also bears noting that several of the historical enactments are further limited to "guns," which seemingly excludes regulation of handguns. *See* WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (defining "gun" as: "An instrument consisting of a barrel or tube of iron or other metal fixed in a stock, from which balls, shot or other deadly weapons are discharged by the explosion of gunpowder. The larger species of guns are called cannon; and the smaller species are called muskets, carbines, fowling pieces, etc. *But one species of fire-arms, the pistol, is never called a gun*.") (emphasis added).

### a. *Maryland in 1715*

A 1715 Maryland enactment prohibited anyone that had been convicted of certain crimes, or that was "of evil fame, or a vagrant, or dissolute liver," from "shoot[ing], kill[ing] or hunt[ing], or to be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned . . . ." *See* Dkt. 77-6 at 4.

The enactment applied only to the specified groups of people. *See id.* It also governed carry of "guns" *only* on plantations, as opposed to *all* private property across the state that is open to the public. *See Koons v. Platkin*, 673 F. Supp. 3d 515, 621 (D.N.J. 2023) ("the Maryland law . . . applied to plantations alone"). Moreover, read as a whole, the enactment "appears to have been designed to prevent poaching." *Id.* Indeed, the text specifies the "why"—namely, that its purpose was to "prevent the abusing, hurting, or worrying of any stock of hogs, cattle or horses . . . ." *See* Dkt. 77-6 at 4. In addition, the enactment "required prior notice for a firearm carrier to be found in violation of the law." *Id.* And the penalty for violation appears to have been a civil fine. *See id.* (". . .shall forfeit and pay one thousand pounds of tobacco . . . .). This enactment is a far cry from the one at issue in this case.

### b. *Pennsylvania in 1721*

A 1721 Pennsylvania enactment made it unlawful "to carry any gun or hunt on the improved or [e]nclosed lands of any plantation other than his own, unless he

**SA29**

ha[d] license or permission from the owner of such lands or plantation. . . ." *See id.* at 9.

Again, this enactment, by its terms, was far more limited in scope than New York's current restriction. It "specifically applie[d] to the improved or enclosed lands of a plantation, not private property more generally." *Koons*, 673 F. Supp. 3d at 620. As for "un[e]nclosed lands" and "the woods," the restriction applied only to people who did not own "fifty acres of land," and were not "otherwise qualified." *See* Dkt. 77-6 at 10.

The Pennsylvania enactment, moreover, was "aimed at preventing the damages and inconveniencies caused by persons carrying guns and presuming to hunt on other people's land." *Antonyuk*, 89 F.4th at 385 (internal citation omitted). Indeed, by its text, the law sought "to prevent the killing of deer out of season, and against carrying of guns or hunting by persons not qualified." Dkt. 77-6 at 8.

The act further prohibited "shoot[ing] at or kill[ing] with a firearm any pigeon, dove, partridge, or other fowl in the open streets of the city of Philadelphia, or in the gardens, orchards, and [e]nclosures adjoining upon and belonging to any of the dwelling houses with the limits of the said city . . . ." *Id.* at 10. As such, there was no prohibition on carriage generally—rather, only a particular *use* of firearms in specifically enumerated locations. The enactment is also not sufficiently analogous to New York's current restriction—either as to the "why" or the "how" of the restrictions.

c.  *New Jersey in 1722*

A 1722 New Jersey enactment (nearly identical to the Pennsylvania enactment) made it unlawful for anyone "to carry any Gun or hunt on the improved or [e]nclosed Lands of any Plantation other than his own," unless he had license or permission from the owner of such lands or plantation. *See id.* at 15. Again, given its limited scope as to geography and conduct, this enactment is not aligned with the State's broad restriction in terms of the "how" and "why" metrics contemplated by *Bruen*.

d.  *New York in 1763*

A 1763 New York enactment provided that nobody "other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants," shall "carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Cornfield, or other [e]nclosed Land whatsoever, within the City of New York, or the Liberties thereof, without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor . . . ." *See id.* at 20.

Like the enactments discussed above, the land impacted by this law was limited—it only applied to enclosed lands of the City of New York, including in orchards, gardens, and cornfields. *See id.* At the same time, the law prohibited "passing through" such lands as well—even without firearms. *See id.* In this way, the enactment was broader *and* narrower than the restriction here.

Further, read in context, the law addresses bothersome hunting, and does not bar carriage in any way like the statue at issue here. Indeed, the Second Circuit concluded that this enactment—like the 1721 Pennsylvania statute and 1722 New Jersey statue—was "aimed at preventing the damages and inconveniencies caused by persons carrying guns and presuming to hunt on other people's land." *Antonyuk*, 89 F.4th at 385 (citation omitted). *See also Koons*, 673 F. Supp. 3d at 620 ("New York's law seeks to prohibit hunting on the enclosed lands of the City of New York, including in orchards, gardens, and cornfields").

  e. *New Jersey in 1771*

The State relies heavily on a 1771 New Jersey enactment that begins with a statement of purpose recognizing that previous laws "for the Preservation of Deer and other Game, and to prevent trespassing with Guns, Traps and Dogs, have, by Experience, been found insufficient . . . ." *See* Dkt. 93-1 at 1-2. (And the repealer language in Section 18 is similar. *See id.* at 5).

This enactment spans four single-spaced pages among eighteen sections. It addressed various topics, including hunting seasons, the sale of deerskins and venison, and trapping. It forbade a person "to hunt or watch for Deer with a Gun, or set in any Dog or Dogs to drive Deer, or any other Game, on any Lands not his own, and for which the Owner . . . pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor." *See id.* § 2. And it further provided that a person is subject to penalties if that person stands watching with a gun "within two Hundred Yards of any Road

32

**SA32**

. . . for shooting at Deer driven by Dogs . . . ." *See id.* § 16. The law, by its terms, was enacted "to prevent trespassing with Guns" and to "regulat[e] the Size of Traps." *See id.* § 18.

Among all of this then lies the cited provision about any person carrying a gun "on any Lands not his own." *Id.* § 1. Read as a whole, however, the New Jersey enactment addresses poaching, hunting, trapping, and trespass. And like the enactments already discussed, it excluded certain classes of people, and implicated "unimproved Lands." *See id.* § 6. In context, and taken as a whole, the law does not bar carriage to any extent similar to the current New York provision at issue here. (And there is nothing to suggest that it is any sort of gun control legislation. Indeed, the extent of any "gun safety" regulation is set forth in Section 10, which appears to address spring- or other self-firing guns. *See id.* § 10.) These few words deep within an enactment focused on hunting, poaching, trapping, and trespassing certainly help to prove no "tradition" relevant to New York's new private property inversion. And the same would be true even if this part about carrying any gun on any lands not his own were enacted in isolation. Even in that hypothetical case, its outlier status would reveal that no tradition exists.

      f. *Massachusetts in 1780*

A 1780 Massachusetts enactment applied to several islands in Dukes County, making it unlawful to "be seen with any gun or guns" unless one has "the special license of the proprietors of the said islands, or shall be able to [show] sufficient reason therefor." *See* Dkt. 93-2 at 3. The Commonwealth indicated that "great

numbers of sheep and deer have been killed and other damages sustained" by "gunners and hunters" on the Islands. *See id.* at 2-3.

The "Massachusetts law was . . . designed to prevent 'gunning' and 'hunting' and applied to relatively uninhabited islands in the Commonwealth, where 'few persons residing on said Islands cannot give proper security to the stock [of sheep and deer] thereon.'" *Koons*, 673 F. Supp. 3d at 620 (citation omitted). *See* Dkt. 93-2 at 2-3 (". . . there have been of late great depredations made by gunners and hunter [on certain islands] . . . which great numbers of sheep and deer have been killed . . . [and] whereas the few persons residing on said islands cannot give proper security to the stock thereon . . . ."). And the law *exempted* people from the restriction if they could demonstrate sufficient justification for a license to carry. *See id.* ("except such as shall have the special license of the proprietors of the said islands, or shall be able to show sufficient reason therefor"). This law, too, is no analog to New York's current restriction.[19]

### g. *Founding-Era Summary*

In sum, none of the proffered founding-era enactments, fairly read, burdened the individual's right to carry firearms in the same way, to the same extent, or for the same reasons as the restriction here—which imposes a default rule banning

---

[19] The State also references a 1702 Virginia enactment, which prohibits any person from "shoot[ing], hunt[ing] or rang[ing] upon the lands and tenements, or fish or fowl in any creeks or waters included within the lands of any other person or persons without [license] for the same, first obtained of the owner and proprietor thereof . . . ." *See* Dkt. 77-1 at 41-42; Dkt. 77-15 at 18. The enactment, by its terms, clearly regulates hunting.

**SA34**

firearms on *all* private property open to the public for "whatever reason and regardless of the nature of the land at issue." *See Koons*, 673 F. Supp. 3d at 621. Nor are the "why" and "how" metrics even remotely *similar.* As the Second Circuit observed in *Antonyuk,* "[n]o matter how expansively we analogize, we do not see how a tradition of prohibiting illegal hunting on private lands supports prohibiting the lawful carriage of firearms for self-defense on private property open the public." 89 F.4th at 385.

Finally, the notion of a "tradition" is the opposite of one-offs, outliers, or novel enactments. And "[t]radition" requires "continuity." *See Washington v. Glucksberg*, 521 U.S. 702, 723 (1997); *Tradition*, The American Heritage Dictionary of the English Language (5th ed. 2011).[20]  The State fails to show any relevant tradition.

### 3.  Reconstruction-Era Enactments

The State also points to various Reconstruction-era enactments passed between 1869 and 1890 in a handful of states, arguing that they are "historical analogues" because they "sought to accomplish similar goals in similar ways—including on private property open to the public." *See* Dkt. 77-1 at 41-45.  These enactments do not alter the outcome here.  Like the founding-era enactments discussed above, the Reconstruction-era enactments are not "relevantly similar" to

---

[20] The *Bruen* Court rejected several outliers and was looking for a "broad tradition" of states "meaningfully restrict[ing] public carry." *Bruen*, 597 U.S. at 70.  And it noted that courts are "not obliged to sift the historical materials for evidence to sustain" the challenged statute—as "that is [the State's] burden. *Id.* at 60.

**SA35**

the restriction here in terms of "how" or "why" they burden the right to carry firearms for self-defense. *See Bruen*, 597 U.S. at 29.

According to the State, "the newly-reintegrated Southern states, under federal supervision, re-enacted their fundamental laws." Dkt. 77-1 at 33. The State identifies the following examples: Louisiana in 1865, Florida in 1865, Texas in 1866, and Oregon in 1893. *See id.* And it argues that these enactments are "direct analogues" for challenged restriction here. *See id.* at 41.

But these enactments imposed nothing resembling a default rule prohibiting carry on all private property open to the public. Rather, the historical record demonstrates that, like the founding-era enactments, these too were limited in scope and/or generally aimed at regulating hunting or trespass on private property. *See* Dkt. 77-6 at 33 (1865 Louisiana) ("it shall not be lawful for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order . . ."); Dkt. 77-14 at 61 (1865 Florida) (". . . it shall not be lawful for any person to hunt or range with a gun within the enclosed land or premises of another without the permission of the owner . . . ."); Dkt. 77-6 at 40 (1866 Texas) ("It shall not be lawful for any person to discharge any gun, pistol, or firearms . . . on, or across any public square, street, or alley, in any city or town in this state . . . ."); *id.* at 47 (1893 Oregon) ("It shall be unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner

36

**SA36**

. . . ."). They do not, therefore, resemble in any way the broad prohibition of the lawful carriage of firearms for self-defense on private property open the public.[21]

The State also cites several additional Reconstruction-era enactments, which it broadly categorizes as (1) regulating discharge of firearms (Indiana in 1873, Rhode Island in 1883, Maryland in 1811); or (2) prohibiting firearms in places of public congregation (Tennessee in 1869, Texas in 1870, Georgia in 1870, Indiana in 1889, Missouri in 1883, Idaho in 1889, Arizona in 1889, and Oklahoma in 1890). *See* Dkt. 77-1 at 41-45. The State concedes that these are not "direct analogues" for the restriction here. *See id.* at 41. Indeed, by their terms, they serve different purposes. They lend no support for the State's restriction.

Moreover, the Reconstruction-era enactments—when considered with the founding-era enactments—do not demonstrate any *tradition* at all. Here, the cited enactments are also of unknown or limited duration, and the State has not demonstrated *endurance over time*. To the extent *any* "tradition" at all can be discerned from this amalgam of enactments, it would relate to regulation of hunting

---

[21] The State urges this Court to adopt a "broader interpretation" of certain terms appearing throughout the enactments—such as "land," "improved or [e]nclosed land," and "premises or plantations." Dkt. 77-1 at 35. But hyper-granular definitions of words and phrases do not alter their meaning *in context* and *in relation* to neighboring words and phrases—and thereby do not help meet the State's burden. The historical enactments, by their terms, generally prohibit trespass on another's land. And no matter how broadly certain words and phrases are read in isolation, the State cannot escape *contextual* meaning. The State, moreover, has not identified a single instance in which one of its proffered historical enactments was enforced against an individual carrying a firearm on private property open to the public.

**SA37**

and trespassing with guns on enclosed or improved lands of others. *See* Mark R.

Sigmon, *Hunting and Posting on Private Land in America*, 54 DUKE L.J. 549, 555–

58 (2004) (collecting early state court cases and state constitutional provisions);

JOSEPH CHITTY, TREATISE ON THE GAME LAWS 31-32 (2nd ed. 1826) (clarifying that,

while the common law sometimes allowed pursuit of noxious animals onto others'

land, "it was always held to be unlawful to enter the [enclosed] land of another,

without his consent" to hunt and that doing so "was subject to an action of

trespass"). The historical record, to be sure, does not "support the broader tradition

the State urges." *Antonyuk*, 89 F.4th at 385.

Finally, even if the State's collection of Reconstruction-era enactments

could—*separately* from the founding-era enactments—be read as creating some sort

of emergent tradition, that could not alter the outcome here. *Bruen* made it clear

that, "to the extent later history contradicts what the text says, the text controls."

597 U.S. at 36. Thus, "post-ratification adoption or acceptance of laws that are

inconsistent with the original meaning of the constitutional text obviously cannot

overcome or alter that text." *Id.* (internal citation and quotation marks omitted).

As discussed, "the Second and Fourteenth Amendments protect an individual's

right to carry a handgun for self-defense outside the home." *Id.* at 10 (citing *Heller*,

554 U.S. at 570; *McDonald* 561 U.S. at 742). And, on this historical record, that

right is equally recognized on private property open to the public. The cited

Reconstruction-era enactments, therefore, can serve only as "mere confirmation of

what the Court thought had already been established." *Id.* at 37 (internal citation

omitted).[22]

### 4. The State Fails to Meet its Burden

The State has not established that its sweeping prohibition of carriage on

private property open to the public "is part of the historical tradition that delimits

the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. New

York's current statute addresses a societal problem that has persisted since the

founding—namely, interpersonal firearm violence. But the State fails to identify a

single relevantly analogous law *addressing that problem*. Instead, the State

proffers a collection of enactments aimed at regulating hunting, poaching, and

trespassing essentially in relation to the homestead. The proffered analogues were

framed on different "why" concerns, and certainly had no "how" methodologies that

remotely resemble the State's expansive private property inversion challenged here.

Indeed, to the extent that the problem of such interpersonal violence *was*,

historically, addressed in the law, it was done through other means—such as surety

laws and other laws discussed in *Heller*, *Bruen*, and *Rahimi*. And such laws

imposed a *far less onerous* burden than the State's current restriction.

---

[22] New York's restriction also finds no analog in any recognized "sensitive place."
*See Bruen*, 597 U.S. at 30. Indeed, "legislative assemblies, polling places, and
courthouses" are civic locations sporadically visited, where a bad-intentioned armed
person could disrupt key functions of democracy. Legislative assemblies and
courthouses, further, are typically secured locations, where uniform lack of firearms
is generally a condition of entry, and where government officials are present and
vulnerable to attack. Such features are absent from the vast majority of public
places that ordinary citizens frequent as part of day-to-day life.

**SA39**

In sum, much of the land in New York is held privately and much of that is open to the public. It encompasses various businesses, hotels, parking lots and garages, grocery stores, pharmacies, medical offices, hospitals, cemeteries, malls, sports and entertainment venues, and so on. These are places that people, exercising their rights, frequent *every day* when they move around *outside their homes.* Confrontation for self-defense is certainly possible in these places. The State's restriction "functionally creates a universal default presumption against carrying firearms in public places, seriously burdening lawful gun owners' Second Amendment rights." *Antonyuk*, 89 F.4th at 386. And that "burden is entirely out of step with that imposed by the proffered analogues[.]" *Id.*

The Constitution *requires* that individuals be permitted to use handguns for the core lawful purpose of self-defense. *McDonald*, 561 U.S. at 767. And it protects that right *outside the home. Bruen*, 597 U.S. at 33. Nothing in the Nation's history or traditions closes the door on that right *across all private property* open to the public. New York's exclusion, therefore, violates "the general right to publicly carry arms for self-defense." *Id.* at 31 This is one of the policy choices taken "off the table" by the Second Amendment. *Heller*, 554 U.S. at 636.

For the reasons addressed above, New York's restriction "violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Bruen*, 597 U.S.

**SA40**

at 71. Plaintiffs' request to enjoin enforcement of the private property restriction as
to private property open to the public is granted.[23]

## III.   STAY PENDING APPEAL

The State requests a fourteen-day stay pending appeal. *See* Dkt. 97 at 3.
That request is denied. The factors "relevant to granting a stay pending appeal are
the applicant's 'strong showing that he is likely to succeed on the merits,'
irreparable injury to the applicant in the absence of a stay, substantial injury to the
nonmoving party if a stay is issued, and the public interest." *Uniformed Fire
Officers Ass'n v. de Blasio*, 973 F.3d 41, 48 (2d Cir. 2020) (citing *Nken v. Holder*, 556

---

[23] Defendants argue that the organizational Plaintiffs (FPC and SAF) lack standing.
*See* Dkt. 77-1 at 17 (citing *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th
439 (2d Cir. 2021)). Indeed, under Second Circuit caselaw, it "is the law of this
Circuit that an organization does not have standing to assert the rights of its
members in a case brought under 42 U.S.C. § 1983." *Nnebe v. Daus*, 644 F.3d 147,
156 (2d Cir. 2011). And Plaintiffs recognize that "Circuit precedent forecloses the
argument that FPC and SAF have a cause of action under § 1983 to assert the
rights of their members." Dkt. 81 at 16. But they "reserve the right to challenge
this holding." *Id. See also* Dkt. 94, 97. This Court, however, need not decide the
issue of organizational standing. It is undisputed that Plaintiff Christian has
standing. *See* Dkt. 95 at 9 ("we would concur with Mr. Bergstrom, that . . . Plaintiff
Christian should be the only person with standing"). And for "federal courts to have
jurisdiction . . . only one named plaintiff need have standing with respect to each
claim." *Comer v. Cisneros*, 37 F.3d 775, 788 (2d Cir. 1994) (citing *Village of
Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 263–64 (1977)).
*See also Kwong v. Bloomberg*, 723 F.3d 160, 162n.4 (2d Cir. 2013) ("Because we are
persuaded that the individual plaintiffs have standing, we need not address the
standing arguments, left unresolved by the District Court, regarding the two
organizational plaintiffs").

41

**SA41**

U.S. 418, 434 (2009)).  The first two factors "are the most critical, but a stay is not a matter of right, even if irreparable injury might otherwise result, it is an exercise of judicial discretion, and the party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."  *Id.* (internal citation and quotation marks omitted).

Here, a stay pending appeal is not warranted.  As discussed above, Plaintiffs' constitutional rights are violated absent an injunction.  The State has not established irreparable injury in the absence of a stay.  The preliminary injunction has been in place since November 22, 2022.  *See* Dkt. 49.  The balance of hardships and public interest weigh in favor of Plaintiffs, also as discussed above.  Finally, it is *Plaintiffs* who have demonstrated success on the merits.

## CONCLUSION

For the reasons above, it is hereby:

ORDERED that Plaintiffs' [73] motion is GRANTED with respect to the State's restriction on private property open to the public.  Defendants' [77] motion is DENIED as to this issue; and it is further

ORDERED that Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this Order are permanently enjoined, effectively immediately, from enforcing N.Y. Pen. L. § 265.01-d with respect to private property open to the public, and their regulations, policies, and practices implementing it; and it is further

ORDERED that the remaining aspects of the parties' motions at Dkt. 73 and

Dkt. 77—including as to the public parks restriction (N.Y. Penal L. § 265.01-

e(2)(d))—are held in abeyance pending further order from this Court; and it is

further

ORDERED that Defendants' request for a stay pending appeal is DENIED.


SO ORDERED.

Dated:      October 10, 2024
            Buffalo, New York

                              JOHN L. SINATRA, JR.
                              UNITED STATES DISTRICT JUDGE

### § 265.01-d Criminal possession of a weapon in a restricted location

1. A person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or by otherwise giving express consent.

2. This section shall not apply to:

(a) police officers as defined in section 1.20 of the criminal procedure law;

(b) persons who are designated peace officers as defined in section 2.10 of the criminal procedure law;

(c) qualified law enforcement officers who are authorized to carry concealed firearms pursuant to 18 U.S.C. 926B, or qualified retired law enforcement officers who are authorized to carry concealed firearms pursuant to 18 U.S.C. 926C;

(d) security guards as defined by and registered under article seven-A of the general business law who has been granted a special armed registration card, while at the location of their employment and during their work hours as such a security guard;

(e) active-duty military personnel;

(f) persons licensed under paragraph (c), (d) or (e) of subdivision two of section 400.00 of this chapter while in the course of his or her official duties;

(g) persons while lawfully engaged in taking of wildlife or attempts to take wildlife pursuant to a hunting permit or license issued by the department of environmental conservation, or as otherwise authorized pursuant to section 11-0707 and 11-0709 of the environmental conservation law; or

(h) persons, while acting in the scope of their official duties, who are employed in the revenue control and security departments of the metropolitan transportation authority, or the New York city transit authority or an affiliate or subsidiary thereof, who are authorized to carry a firearm as part of their employment.

Criminal possession of a weapon in a restricted location is a class E felony.