# 24-2847

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC.,
SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellees*,

*v.*

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police,

*Defendant-Appellant*,

MICHAEL J. KEANE, in his official capacity as
District Attorney for the County of Erie, New York,

*Defendant*.

On Appeal from the United States District Court
for the Western District of New York

**BRIEF FOR PROFESSORS OF PROPERTY LAW
AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLANT**

ALAN SCHOENFELD
JOSHUA M. FEINZIG
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
alan.schoenfeld@wilmerhale.com

January 10, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF AMICI CURIAE ............................................................1

INTRODUCTION ..............................................................................2

ARGUMENT ....................................................................................4

I.    THE RIGHT TO EXCLUDE IS FOUNDATIONAL TO AMERICAN PROPERTY
      LAW AND LONG ENABLED BY INTERPRETATIVE DEFAULT RULES .................4

II.   THERE IS NO CONSTITUTIONAL RIGHT TO A PRESUMPTION THAT
      FIREARMS ARE PERMITTED ON PRIVATE COMMERCIAL PROPERTY
      WHEN AN OWNER IS SILENT ........................................................11

      A.    The Right To Public Carry Does Not Extend Onto Private
            Commercial Property Over An Owner's Objection ...........................12

      B.    There Is No Right To The Presumption That A Private
            Commercial Owner Welcomes Firearms Until The Owner
            Announces Otherwise ......................................................16

            1.    The *presumption* formulation is constitutionally
                  unprecedented and incompatible with *Bruen* ...........................17

            2.    That private commercial property covers a substantial
                  area of New York does not provide a coherent reason to
                  establish a novel constitutional presumption ...........................19

      C.    *Bruen*'s References To "Public Carry" Indicate Public Property .......21

CONCLUSION ................................................................................26

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308 (1968) ....................................................17

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023)........................12, 19

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ............................12, 19

*Baker v. Howard County Hunt*, 188 A. 223 (Md. 1936) .........................13

*Breard v. Alexandria*, 341 U.S. 622 (1951).....................................8, 15

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ...........................4

*Central Hardware Co. v. NLRB*, 407 U.S. 539 (1972).............................24

*Central Hardware Co. v. NLRB*, 439 F.2d 1321 (8th Cir. 1971) ...........18

*Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971)..........................15

*Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972)..............................15, 17, 18

*Marsh v. Alabama*, 326 U.S. 501 (1946) .......................................14, 17

*Martin v. City of Struthers*, 319 U.S. 141 (1943) ...................................8

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)................................................................1, 2, 11, 18, 21, 23

*Philip v. United Force Security Corp.*, 516 F. App'x 38 (2d Cir. 2013).................5

*Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469 (1988) ...................25

*Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) ...............24

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) .........4, 15, 24

*Rowan v. U.S. Post Office Department*, 397 U.S. 728 (1970)..................15

*Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union*, 394 P.2d 921 (Cal. 1964)......................................18

*Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000)................................................................................24

*Shelly v. Kraemer*, 334 U.S. 1 (1948) .......................................14

*Shiffman v. Empire Blue Cross and Blue Shield*, 681 N.Y.S. 2d 511 (App. Div. 1998)........................................................6

*Siegel v. Platkin*, 2023 WL 1103676 (D.N.J. Jan. 30, 2023)................13

*Spanish Church of God of Holyoke, Massachusetts, Inc. v. Scott*, 794 F. Supp. 2d 304 (D. Mass. 2011).............................15

*Spokeo v. Robins*, 578 U.S. 330 (2016) ......................................24

*Sutherland v. Southcenter Shopping Center*, 478 P.2d 792 (Wash Ct. App. 1970) ....................................................18

*University of Texas v. Camenisch*, 451 U.S. 390 (1981)..................12

*Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150 (2002).................................................8

*Wolford v. Lopez*, 2023 WL 5043805 (D. Haw. Aug. 8, 2023)........22, 23

## STATUTORY PROVISIONS

Borough of Westville, N.J. General Legislation § 187-1, -2 (2007) ....................7

City of Jersey City, N.J. Code of Ordinances § 245-7 (1978)................7

Fla. Stat. § 934.50 (2022)................................................7

Haw. Rev. Stat. Ann. § 521-70 (2019) ....................................7

N.Y. Consolidated Laws § 11-2117 (2021)................................7

N.Y. Penal Law § 140.05................................................6

N.Y. Penal Law § 265.01-d .............................................1

## OTHER AUTHORITIES

Ayres, Ian & Fredrick Vars, *Weapon of Choice: Fighting Gun Violence While Respecting Gun Rights* (Harv. U. Press, 2020)................1

Ayres, Ian & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183 (Winter 2020) ...................................................9, 19, 20

Black's Law Dictionary (11th ed. 2019) ..................................................23

Blocher, Joseph & Darrell A.H. Miller, *What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295 (2016) .....................................................5

Ellickson, Robert, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623 (1986) ............................7

Lott, John, Opinion, *Did Colorado Shooter Single Out Cinemark Theater Because It Banned Guns?*, Fox News (May 7, 2015)......................10

Merriam Webster's Collegiate Dictionary (11th ed. 2014) ......................................24

Strahilevitz, Lior Jacob, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835 (2006) ........................................................5

## INTEREST OF AMICI CURIAE[1]

Amici curiae are law professors specializing in property law.  Ian Ayres is Oscar M. Ruebhausen Professor at Yale Law School.[2]  Fredrick Vars is Robert W. Hodgkins Chair of Law at University of Alabama School of Law.  Professors Ayres and Vars have researched and written extensively on the relationship between property law and firearm regulation, including in their book *Weapon of Choice: Fighting Gun Violence While Respecting Gun Rights* (Harv. U. Press, 2020).

Amici have an interest in the issues implicated by this case, particularly as they relate to the constitutionality of the restricted locations provision of New York State's Concealed Carry Improvement Act (CCIA), enacted in response to *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  N.Y. Penal Law § 265.01-d.  Because longstanding principles of property law clarify that an individual's constitutional right to carry ends at another's property line, this Court should find that the interpretative default rule does not implicate the text of the Second Amendment.

---

[1] No counsel for a party wrote this brief in whole or in part, and no one other than amici or their counsel contributed money to fund the preparation or submission of this brief.  The parties have consented to its filing.

[2] The views of the amici expressed here do not necessarily reflect the views of the institutions with which they are or have been affiliated, whose names are included solely for purposes of identification.

## INTRODUCTION

The legislative selection of interpretative default rules, including whether guns are presumptively permitted on private property, is part and parcel of States' enduring prerogative to reinforce private owners' right to exclude. This selection does not implicate the Second Amendment's "plain text," *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2129-2130 (2022), because the right to carry is not a right to trespass and thus does not extend beyond another's private property line. New York's private-property interpretative default rule, which construes a private commercial owner's silence on the permissibility of firearms as disallowance while preserving the owner's ability to welcome firearms if they so choose, is thus constitutional.

As explained in Part I, the right to exclude—including the right to exclude firearms—inheres in all private property and is given effect through State-created default rules. States have always been free to adjust default rules to suit private owners' expectations and preferences. Aligning interpretative default rules with owners' general understanding as to what their *own* silence implies gives content to the right to exclude by ensuring that a property's operative terms of entry are underwritten by the owner's informed consent. New York's private-property default rule should be understood within this American property tradition.

As explained in Part II, the Second Amendment does not guarantee a right to carry onto private commercial property over its owner's objection. And just as there is no individual right to bear arms on another's private property open to the public over an owner's objection, neither is there a freestanding constitutional right to a presumption that a private owner welcomes firearms until they say otherwise. Constitutional rights do not operate in such a conditional manner. Were there a right to carry firearms onto another's private commercial property, it would trump an owner's objection—not rise or fall with their preference. Such a sweeping right would vitiate the right to exclude and must be rejected.

Thus, New York's interpretative default rule should be upheld at *Bruen* Step One because Plaintiffs have not met their burden of demonstrating that the rule implicates the text of the Second Amendment. If this Court were to reach *Bruen* Step Two, it should still consider how New York's adoption of a presumption is consistent with the State's longstanding legislative prerogative to shape property owners' right to exclude—including the right to exclude firearms. This well-established tradition of legislating default rules to reinforce private owners' right to exclude provides essential background context and reinforces the validity of the State's *Bruen* Step Two historical analysis, *see* Appellant's Br. 12-41.

- 3 -

# ARGUMENT

## I. THE RIGHT TO EXCLUDE IS FOUNDATIONAL TO AMERICAN PROPERTY LAW AND LONG ENABLED BY INTERPRETATIVE DEFAULT RULES

The right of private commercial owners to exclude firearms from their properties is no less at stake in this constitutional challenge than is the right to public carry. Before Part II's examination of the private-property default rule under Bruen Step One (whether Plaintiffs have met their burden of demonstrating that the rule implicates the Second Amendment's text), it is helpful to begin by considering the connection between default rules and the right to exclude.

The right to exclude is "one of the most treasured" rights of property ownership. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021). It inheres in private commercial property as much as in private homes, because property does not "'lose its private character merely because the public is generally invited to use it for designated purposes.'" *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81 (1980). And it means that private owners retain broad authority over who or what to admit onto their premises, and generally cannot be forced by the State to grant access to unwanted entrants. *See Cedar Point*, 141 S. Ct. at 2080 (a regulation granting a person access to another's property is a *per se* taking).

But an individual's right to exclude is not self-actualizing or exercised in isolation. It is instead nested within a range of criminal, tort, and property laws that effectuate the right by regulating informational exchange between parties,

- 4 -

imposing liability on those who violate an owner's terms of entry, and clarifying interpretative default rules around which owners and potential entrants can negotiate access. Indeed, the *ur*-default rule of property law—and a cornerstone of the right to exclude—is that all (non-necessitous) entry constitutes trespassing absent an express or implied invitation from the property owner. Supplemental interpretative default rules, such as the restricted locations provision, further assist property owners in realizing their implied invitations in law.

*First*, States routinely shape how owners make decisions as to whom or what to exclude. Legislation promoting the disclosure of information by prospective entrants can lower costs associated with the discovery of that information, enabling owners to execute terms of entry that more closely align with their preferences. *See* Strahilevitz, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835, 1837-1838 (2006). Similarly, tort rules imposing liability for wrongdoing or injury arising on an owner's premises can influence owners' decisions to exclude certain forms of behavior. For instance, a private owner bears a duty to protect guests from foreseeable dangers. *See Philip v. United Force Sec. Corp.*, 516 F. App'x 38, 38 (2d Cir. 2013). In the context of firearms possession, such a liability rule shapes owners' decisions to admit guns onto their premises even though it does not explicitly regulate guns as such. *See* Blocher & Miller,

*What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295, 298 (2016).

*Second*, States have long enforced private exclusion decisions through the law of trespass.  Trespass statutes peg an entrant's lawful status to the informed consent of the private owner, enabling owners to enforce their chosen terms of entry with the backing of the State's sanction.  N.Y. Penal Law § 140.05 (criminal trespass statute provides that a "person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises").  Civil trespass similarly reinforces an owner's chosen terms by empowering owners to demand compensation for unlawful entry.  *See Shiffman v. Empire Blue Cross and Blue Shield*, 681 N.Y.S. 2d 511, 511-512 (App. Div. 1998).

*Third*, a private owner's right to exclude is enforced through interpretative default rules fashioned by State legislatures and courts.  These default rules codify interpretative presumptions about an owner's terms of entry that govern until the owner states otherwise.  As such, every State has—and *must have*—default rules of interpretation stipulating whether the absence of common signifiers of exclusion (*e.g.*, a physical fence) communicates consent to enter and, if so, what the scope of that implied invitation is (*e.g.*, a walkway to a front door and a doorbell indicate an invitation to remain at the door for a reasonably short time but not to loiter).  States have also long adopted and reformulated these interpretative rules calibrated to

specific actions and items. For example, most States over the course of the nineteenth century reversed the default rule as to whether domesticated cattle were permitted to graze on another owner's land, thereafter placing the burden on the visiting rancher to obtain that owner's express consent. *See* Ellickson, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623, 660-661 & n.95 (1986). Through to the present, States continue to realign default rules with the needs and preferences of owners to support the integrity of private property. *See, e.g.*, N.Y. Consolidated Laws § 11-2117 (2021) (prohibiting hunting on private property without owner's consent); Borough of Westville, N.J. General Legislation § 187-1, -2 (2007) (prohibiting graffiti on private property without owner's consent); Haw. Rev. Stat. Ann. § 521-70(c) (2019) (prohibiting tenant from using unit for a commercial purpose without owner's consent); City of Jersey City, N.J. Code of Ordinances § 245-7 (1978) (prohibiting solicitation on private property without owner's consent); Fla. Stat. § 934.50(3)(b) (2022) (prohibiting drones over private property without owner's consent).

The significant variation in interpretative default rules, across American history and between the fifty States, makes evident that default rules are not and have never been fixed by the federal Constitution. This flexibility is understandable considering that interpretative default rules do not ban private

behavior—they simply establish baseline terms from which owners can easily depart. It is also understandable considering that the regulation of private property is generally left to the States.

Indeed, States have always been free to tailor interpretative default rules to the expectations and preferences of private owners, to reduce opt-out costs (thereby producing more efficient arrangements) and to better ensure that the flow of people and objects onto property is backed by the informed consent of owners. The Supreme Court recognized this very point in *Breard v. Alexandria*, 341 U.S. 622 (1951), a decision upholding a municipal default rule that disallowed door-to-door solicitation (a constitutionally protected activity) unless a private owner expressly consented. The Court understood that the City's selected presumption, rather than its opposite, made it more likely that owners would have their preferred terms of entry enforced: "A householder depends for protection on his city board rather than churlishly guarding his entrances with orders forbidding the entrance of solicitors. A sign would have to be a small billboard to make the differentiations between the welcome and unwelcome that can be written in an ordinance once cheaply for all homes." *Id.* at 640.[3]

_____

[3] Such laws preserve an owner's authority to admit solicitors and receive speech and are thereby constitutionally distinguishable from no-solicitation *bans* or regulations that reappropriate authority over entry decisions to the *State*. *Compare Breard with Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150, 168 (2002) (striking down ordinance requiring that solicitors first obtain a City

New York's shift from a "yes-carry" to a "no-carry" default on private property open to the public was driven by a similar concern: that guns are being brought onto commercial property without informed consent from owners. There is abundant evidence that a substantial majority of Americans have been uninformed or misinformed about whether concealed weapons can be carried into businesses. For instance, over 64 percent of New York respondents in one study answered "I don't know" to the question of whether customers are allowed to bring guns without permission into private businesses. Ayres & Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, tbl.A6 (Winter 2020). And the small number of respondents who thought they knew the law were often mistaken—for instance, the 35 percent of New York respondents who thought they knew whether customers are allowed to bring guns into private businesses without affirmative permission were nearly evenly split. *Id.* The upshot of this confusion has been that owners who prefer not to have concealed guns inside their establishments are often unknowingly permitting them.

---

official's permission); *and Martin v. City of Struthers*, 319 U.S. 141, 147 (1943) (striking down ban on solicitation because it no longer "leav[es] to each household the full right to decide whether he will receive strangers as visitor").

Moreover, the "yes-carry" default raises a host of monitoring anxieties for commercial owners. For one, owners have reason to fear that some carrying visitors will fail to notice "no firearms" signs and surreptitiously carry inside, or that armed invitees may willfully ignore signs on the belief that they could always convince a court as much (which would be dispositive of trespass claims, which typically require knowledge for liability to attach). Owners may also fear that posting "no firearms" notices, even if reflective of their underlying preferences, would lead potential criminals to infer that the owner is unarmed and the business vulnerable. In a similar vein, the "yes-carry" default creates a first mover disadvantage. Being the first store on a block to post a sign prohibiting firearms might make that store a target for harassment or unwanted protest. *Accord* Lott, Opinion, *Did Colorado Shooter Single Out Cinemark Theater Because It Banned Guns?*, Fox News (May 7, 2015) (arguing that publicly stating that your property is gun-free will increase its odds of being targeted and pointing out that the Aurora, Colorado mass shooter selected a theater that "banned permitted concealed handguns").

Given these circumstances, the "yes-carry" default is not just bad policy; it also imperils the right to exclude and its foundational constitutional status. But the "no-carry" default enhances the possibility of meaningful consent between

commercial owners and entrants, thus bolstering the integrity of property ownership.

## II. THERE IS NO CONSTITUTIONAL RIGHT TO A PRESUMPTION THAT FIREARMS ARE PERMITTED ON PRIVATE COMMERCIAL PROPERTY WHEN AN OWNER IS SILENT

New York's private-property default rule does not ban the carrying of firearms onto commercial private property; it recasts the meaning of a private owner's silence on the issue. Because Plaintiffs bear the burden of demonstrating that "the Second Amendment's plain text covers [their] conduct," they must demonstrate that the act of carrying a gun onto another's private commercial property without first obtaining affirmative permission—the "conduct" encumbered by the rule—is "cover[ed]" by the plain text. *Bruen*, 142 S. Ct. at 2129-2130.

For that to be so, one of the following two propositions must be true: either (a) the Second Amendment provides a right to carry onto private commercial property that supersedes the objection of a private commercial owner, or (b) the Second Amendment provides a standalone right to the presumption that a private commercial owner welcomes firearms until the owner expressly states otherwise. As discussed in Section II.A and II.B, respectively, both of these formulations extending the Second Amendment into the private property domain would abrogate foundational principles of the Court's individual rights jurisprudence and

should be rejected. The Court's use of the term "public" in *Bruen* was not meant to force a Hobson's choice between these two flawed formulations. "Public" simply means that the right to carry extends onto *public* property—not that the Second Amendment's applicability turns on whether a given private owner has "opened" their property to some vague and undefined degree. *See* Section II.C.[4]

### A.    The Right To Public Carry Does Not Extend Onto Private Commercial Property Over An Owner's Objection

Recognizing a constitutional right to carry onto another's property that trumps or overrides that owner's objection would be an unprecedented abrogation of the right to exclude, as it would bar owners from leveraging trespass laws to keep firearms off their property. Understandably, this formulation of the right has

---

[4] This Court is not bound by its previous decision affirming the district court's preliminary injunction, *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), either with respect to *Bruen* Step One or Step Two. *See* Appellant's Br. 9-10; *see also University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). Nor is the Court bound by its analysis of Step One in *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), which is not applicable to the parties in this appeal, *see id.* at 955 n.3.

In any event, neither *Antonyuk v. Chiumento* nor *Antonyuk v. James* grappled meaningfully with the *Bruen* Step One question. Both decisions treat the issue in a conclusory fashion—noting only that "the regulated conduct falls within the Second Amendment" because "'the Second Amendment guarantees a general right to public carry'" and that "[o]therwise, because over 91 percent of land in New York state is privately held, the restricted location provision would turn much of the state of New York into a default no-carriage zone." *James*, 120 F.4th at 1044; *see Chiumento*, 89 F.4th at 383 (substantially similar).

been rejected by every court—including the district court below—to address the relationship between the Second Amendment and private property after *Bruen*. *See* SA1-SA2, *see also, e.g.*, *Siegel v. Platkin*, 2023 WL 1103676, at *16 (D.N.J. Jan. 30, 2023) ("[T]he Second Amendment does not include protection for a right to carry a firearm in a place … against the owner's wishes."). The district court instead seemed to formulate the public carry right as a right to a *presumption* that a commercial owner welcomes firearms *until the owner says otherwise*. *See* SA1-SA2. But that novel formulation fails for a host of reasons, *see infra* Section II.B, which become clear once the defects in this first formulation are appreciated.

In codifying a pre-existing common-law right, the Second Amendment did not enlarge the individual right to bear arms at the expense of other fundamental rights. Rather, the right was understandably limited by the right to exclude, which has never had a special carve-out for firearms. *See, e.g.*, *Baker v. Howard Cnty. Hunt*, 188 A. 223, 227-228 (Md. 1936) (surveying the history of "the relative rights of fox hunters" and finding "no doubt that … if the hunter himself goes on the lands of another against the owner's will, he is a trespasser").

The historical absence of any firearms-related exception to the right to exclude reflects the more general relationship between an owner's right to exclude and the rights of non-owners. Put simply, the constitutional rights of entrants have *virtually never* had any bearing on private commercial owners' uses of their

property. Amici are aware of only two potential instances where a private owner's use of their property had been constrained by the constitutional rights of non-owners: the enforcement of racially restrictive covenants and restrictions on street expression in company towns. But neither offers a rationale relevant to the Second Amendment.

In *Shelly v. Kraemer*, 334 U.S. 1 (1948), the Supreme Court prohibited the judicial enforcement of a racially restrictive covenant because the "[t]he owners of the properties were willing sellers" and that "but for the active intervention of the state courts, … petitioners would have been free to occupy the properties in question without restraint." *Id.* at 19. In other words, *Kraemer* did not concern the owners' right to exclude; it instead pitted the sellers' common-law right to disposition of the property and the buyers' constitutional right to equal treatment against the rights of the other neighborhood residents to enforce the covenant. That property rights were involved on both sides of the ledger makes it additionally difficult to isolate the role of the constitutional right in the Court's analysis.

*Marsh v. Alabama*, 326 U.S. 501 (1946)—which held that a company maintaining complete ownership over an Alabama town was barred by the First Amendment from forbidding street distribution of religious materials—is similarly inapposite. The Court later limited *Marsh*'s reach to the company towns of the past, having recognized that "this Court has never held that a trespasser or an

uninvited guest may exercise general rights of free speech on property privately owned." *Lloyd Corp.*, 407 U.S. at 568; *see PruneYard*, 447 U.S. at 81 ("[W]hen a shopping center owner opens his private property to the public for purpose of shopping, the First Amendment to the United States Constitution does not thereby create individual rights in expression."). Entrants thus do not have rights of expression on private property, regardless of whether the property is "open" or "closed" to the public. That remains true even though, of course, the text of the First Amendment—like that of the Second Amendment—does not draw a distinction between public and private property.

Other First Amendment rights likewise end at the private-property line, regardless of whether the property is "open" or "closed" to the general community. *See, e.g.*, *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 737-738 (1970) (holding that "[t]he asserted [First Amendment] right of a mailer [to send unwanted material to an unreceptive addressee] … stops at the outer boundary of every person's domain" because "[t]o hold less would tend to license a form of trespass"); *Breard*, 341 U.S. at 645 (upholding a municipality's no-solicitation default rule because "[i]t would be … a misuse of the great guarantees of free speech and free press to … force a community to admit the solicitors of publications to the home premises of its residents"); *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment [right to newsgathering] is not a license to trespass[.]"); *Spanish*

- 15 -

*Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp. 2d 304, 313 (D. Mass. 2011) (rejecting a defense to trespass based in the right to religious exercise).

In short, a private owner's fundamental control over their dominion means that they can prohibit firearms, just as they can prohibit handbill distributors, association members, newsgathering journalists, or religious observers.

**B. There Is No Right To The Presumption That A Private Commercial Owner Welcomes Firearms Until The Owner Announces Otherwise**

The district court reasoned that "property owners have the right to exclude" but that "*the state* may not unilaterally exercise that right and, thereby, interfere with the long-established Second Amendment rights of law-abiding citizens." SA1-SA2. The court insinuated, in other words, that there is no constitutional right to carry onto private commercial property over an owner's objection *but that there is a right* to the *presumption* that carrying is permissible until the owner affirmatively announces otherwise.

Formulating the right to public carry as a presumption may seem like a practical compromise between the interests of licensed carriers and those of private owners, one that avoids the doctrinal disorder wrought by a public carry right that supersedes a private owner's objection. But this *sui generis* formulation is analytically and doctrinally incoherent.

- 16 -

1.  **The *presumption* formulation is constitutionally unprecedented and incompatible with *Bruen***

Nothing in the Court's constitutional jurisprudence suggests that an individual right can exist in the partial or defeasible form of a rebuttable presumption conditioning exercise on the permission of another individual—here, a private commercial owner. Either there is a right to carry onto private commercial property, in which case States would be prohibited from enforcing an owner's opposition to firearms through the law of trespass, or there is no right to carry onto another's commercial property. There is no intermediate option.

Consider the brief historical period after *Marsh*, 326 U.S. 501, when the Court temporarily suggested that First Amendment rights can extend onto private commercial property in special circumstances. Before the Court reversed course and foreclosed any such possibility in *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972), it treated this right to free expression on private property as a *trump*—not a mere entitlement to a *presumption* in the pro-expression direction. That right supplied a constitutional defense to trespass actions and thereby prevented owners from invoking trespass laws to exclude unwanted forms of expression. *See Marsh*, 326 U.S. at 501 (overturning a criminal trespass conviction); *Amalgamated Food Emps. Union Loc. 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 319 (1968), *overturned by Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) (prohibiting the use of trespass laws "to exclude those members of the public wishing to exercise their First

- 17 -

Amendment rights on the premises").[5]  So too here:  If this Court were to recognize a right to public carry onto another's private commercial property, that right would likewise necessarily prevent commercial owners from invoking trespass laws to exclude unwanted firearms.

Indeed, *Bruen* commands that Second Amendment rights be treated as trumps not subject to means-end scrutiny.  The Court was clear that *Heller* and *McDonald* "expressly rejected the application of any 'judge-empowering' interest-balancing inquiry."  *Bruen*, 142 S. Ct. at 2129, 2130.  Courts are thus not free to balance the purported right to carry onto private commercial property against the commercial owner's right to exclude firearms, with the aim of fashioning a presumption that stops short of a trump.  Instead, considering that a Second Amendment right where it does apply is not to be modulated by competing individual rights or societal demands, lower courts must be careful to define the

---

[5] State courts and the lower federal courts similarly treated that right as a trump—never as a mere presumption—during this period.  *See, e.g.*, *Schwartz-Torrance Inv. Corp. v. Bakery & Confectionery Workers' Union*, 394 P.2d 921, 922 (Cal. 1964) (prohibiting owner from enjoining as trespass a union protest); *Sutherland v. Southcenter Shopping Center*, 478 P.2d 792, 793 (Wash Ct. App. 1970) (holding that "unconsented invasion of the property rights of owners … to solicit signatures for an initiative is protected"), *overruled by Southcenter Joint Venture v. National Democratic Policy Comm.*, 780 P.2d 1282 (Wash. 1989); *Central Hardware Co. v. NLRB*, 439 F.2d 1321, 1328 (8th Cir. 1971) (holding that solicitation on company premises in violation of employer's explicit prohibition was protected), *vacated by Lloyd Corp. v. Tanner*, 407 U.S. 539 (1972).

Second Amendment's textual scope without displacing other constitutional guarantees. Here that means rejecting the notion that the right to public carry extends onto private property, "open" and "closed" alike.

Finally, imaginatively recasting the public carry right as a *presumption* that gives way when a private commercial owner affirmatively speaks up hardly salvages the right to exclude. In theory, owners with legal knowledge might appreciate the need to announce their opposition to firearms in a world where an unwritten constitutional presumption exists over their property. But the widespread expectation that silence does not confer an implied license to bring firearms into one's home or business, *see* Ayres & Jonnalagadda, *Guests with Guns*, *supra*, tbl.A6, makes it unlikely that most commercial owners seeking to exclude firearms will take an action necessary to override the presumption.

**2.    That private commercial property covers a substantial area of New York does not provide a coherent reason to establish a novel constitutional presumption**

Plaintiff will likely contend that the restricted location provision raises a Second Amendment problem because a significant portion of New York land is privately owned, and as such, the provision will meaningfully impact where and how often individuals will choose to carry firearms. *Cf. Chiumento*, 89 F.4th at 294 (noting that "over 91 percent of land in New York state is privately held"— though not distinguishing between "open" and "closed" private property); *James*,

- 19 -

120 F.4th at 955 (same). However, the proportion of public versus private property in New York, and the provision's downstream effects on overall rates of gun-carrying outside private homes, does not justify the creation of a new form of constitutional right.

*First*, even if the overall effect of the provision on carrying rates were to matter constitutionally, the relevant measurement is the reduction in carrying caused by commercial owners who want to permit visitors to carry guns but for some reason would fail to contract around the "no-carry" default. But the size of this effect is likely limited given the broad support for a "no-carry" default. *See* Ayres & Jonnalagadda, *supra*, at 187-189, tbl.A6 (only 38% of New York respondents said that a customer should be allowed to bring a gun onto commercial property without express permission).

*Second*, an "effects" theory lacks a limiting principle—*how much* of an effect on gun-carrying rates can a law have before it implicates the Second Amendment text? Such a rule would sweep a vast array of State regulation into the Second Amendment context considering how countless laws and regulations, including those that facially have nothing to do with firearms like general tort or criminal liability for injuries caused by accidental discharges, have significant disincentivizing effects on gun carrying and ownership. *See supra* Section I.A. Even a general criminal-trespass statute when combined with the old "yes-carry"

- 20 -

interpretative default rule exerts a substantial disincentive on gun carrying (potential carriers may keep their guns at home rather than risk overlooking "no-carry" signage and face liability). The same is true for a "no-carry" interpretative default rule limited solely to "closed" private property, which is similarly likely to have an effect on gun-carrying rates (particularly considering the vague and unprincipled division between "open" and "closed" private property, *see infra* Section II.C).

*Third*, nothing in *Heller*, *Bruen*, or *Rahimi* suggests concern for a statute's downstream effects on ownership or carry rates. In fact, concern over a law's indirect impact is characteristic of the means-end analysis emphatically rejected in *Bruen*. *See* 142 S. Ct. at 2129.

## C.  *Bruen*'s References To "Public Carry" Indicate Public Property

The district court assumed that *Bruen* announced a right to carry that extends onto private commercial property because "the public right to carry" encompasses both public property and private commercial property where people congregate. *See* SA25. But this expansive (and sociological rather than property-law) understanding of the term "public" finds no support in *Bruen* itself. *Bruen* did not involve a request to carry onto another's private property and settled only that the right extends beyond the home into "public" areas. The district court's

understanding likewise strays from the standard meaning of "public" in constitutional jurisprudence.

To be sure, courts to date—with very limited explanation—have read the various mentions of "public" in *Bruen* to include private property open to the public. For example, the Ninth Circuit in *Wolford v. Lopez* noted that it was "unpersuaded that the Second Amendment is limited strictly to property that is publicly owned" because the Amendment's text "does not limit the right" and because of *Bruen*'s "repeated mention of 'public carry,'" and so "agree[d] with the Second Circuit and with the district court's thoughtful analysis in the Hawaii case." 116 F.4th 959, 993 (9th Cir. 2024).[6] The District of Hawaii district court's engagement with the question is by far the most sustained to date, *see Wolford v. Lopez*, 2023 WL 5043805, at *15-*16 (D. Haw. Aug. 8, 2023)—and its misapprehensions are instructive.

That court began by focusing on *Bruen*'s pronouncement that "[n]othing in the Second Amendment's text draws a home/public distinction." *Id.* at *15. If there is no distinction between home and public, the court reasoned, then neither can there be "a distinction between public places" and so *Bruen* must support the

---

[6] The Ninth Circuit, of course, upheld the constitutionality of private-property interpretative default rules under *Bruen* Step Two, as that test was clarified by the Supreme Court in *Rahimi*. 116 F.4th at 994.

right to carry onto private commercial property, too. *Id.* But this only begs the operative question of whether private commercial property is a "public" place. The district court next invoked *Bruen*'s references to "'areas'" and "'locations frequented by the general community.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2135, 2148). Because private commercial property is frequented by the general community, the court thought, it falls within the Second Amendment's scope alongside public property. But neither *Bruen* passage suggests that an area's being frequented marks it as a relevant Second Amendment location; in those passages the Court only rejected New York's proposal that a lower standard of scrutiny be applied in crowded areas where safety concerns are pronounced. In other words, the fact that *an area covered by the Second Amendment* is crowded does not give the State additional leeway to regulate that area (*e.g.*, the right is not necessarily weaker in a public town square than in a public library). This observation hardly sheds light on whether private commercial property is one such covered "public" area. As before, it only begs the question.[7]

---

[7] Recognizing that *Bruen* is underdetermining, the District of Hawaii district court went on to consult extrinsic sources for interpreting "public." It cited a Black's Law Dictionary definition that defines the term as "[o]pen or available for all to use, share, or enjoy." *Wolford*, 2023 WL 5043805, at *16 (citing *Public*, Black's Law Dictionary (11th ed. 2019)). But, setting aside the fact that no private commercial establishment is actually "available for all to use [or] share" (*e.g.*, one cannot have a picnic in a grocery store), many other definitions equate "public"

The answer—that "public" refers to public property—becomes clear in view of the background constitutional principles described above. *Cf. Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."). Further illuminating is the fact that the Court has been careful to use qualified language like "property open to the public" when referring to private commercial establishments in related constitutional contexts. *See, e.g.*, *Central Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972) ("The only fact relied upon for the argument that [private parking lots] have acquired the characteristics of a public municipal facility is that they are 'open to the public.'"); *PruneYard*, 447 U.S. at 81 (noting that private commercial property "does not 'lose its private character'"). And the construction "public *X*," as the Court used when referring to "right to public carry" or "public carry right" in *Bruen*, typically indicates that public property is at issue—as in "public right to navigability," "public forum," and "public trust." *See, e.g.*, *Spokeo v. Robins*, 578 U.S. 330, 345 (2016) (Thomas, J., concurring) (discussing "public rights" like "free navigation of waterways" and "passage on public highways"); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 96, 99

---

with "governmental." *See, e.g.*, *Public*, Merriam Webster's Collegiate Dictionary (11th ed. 2014) ("of or relating to a government").

& n.6 (1972) ("public forum"); *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 472 (1988) ("public trust").

Finally, drawing the Second Amendment's scope based on whether a given property is sufficiently "open" to invitees—as the district court's sociological reading of "public" would require—is unworkable. Every private establishment restricts access in some way, both explicitly and implicitly, raising the question of *how much* and *what type* of a restriction must exist before a property is considered "closed." For example, it remains unclear whether business offices, doctors' offices, boutique retail stores, barbershops that accept patrons by appointment, restaurants, or fitness centers would qualify as sufficiently "open" under a Second Amendment theory that equates "public" with private property "open" to the public.

\*     \*     \*

In summary, New York's private-property provision does not implicate the Second Amendment's text. Extending the public carry right onto private commercial property would be an unprecedented abrogation of the time-honored rights of owners to exclude firearms. And this result cannot be avoided by restyling the right as a *presumption* to carry *until the owner says otherwise*; that *sui generis* formulation is without precedent and affirmatively foreclosed by *Bruen*.

- 25 -

## CONCLUSION

Enduring principles of property law make clear that California's private-property default rule is constitutional.

Respectfully submitted.

/s/ Alan Schoenfeld

January 10, 2025

ALAN SCHOENFELD
JOSHUA M. FEINZIG
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
alan.schoenfeld@wilmerhale.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Circuit Rule 29.1(c).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 5,594 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft MSO 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ Alan Schoenfeld
ALAN SCHOENFELD

January 10, 2025