# 24-2847

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC., and
SECOND AMENDMENT FOUNDATION,
PLAINTIFFS-APPELLEES,

V.

STEVEN G. JAMES, in his Official Capacity as
Superintendent of the New York State Police,
DEFENDANT-APPELLANT,

(*Caption continues inside front cover.*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

**BRIEF FOR THE DISTRICT OF COLUMBIA, ILLINOIS, CALIFORNIA,
CONNECTICUT, DELAWARE, HAWAII, MARYLAND, MASSACHUSETTS,
MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, AND WASHINGTON AS *AMICI CURIAE* IN SUPPORT
OF APPELLANT AND REVERSAL**

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ANNE A. DENG
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 442-9807
ashwin.phatak@dc.gov

KWAME RAOUL
Attorney General for the State of Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

Office of the Attorney General for the
State of Illinois
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5502
sarah.hunger@ilag.gov

(*Additional counsel on signature page*)

JOHN BORON,
PLAINTIFF,

v.

MICHAEL J. KEANE, in his Official Capacity as
District Attorney for the County of Erie, New York,
DEFENDANT.

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI CURIAE ..................................... 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT .................................................................................... 4

    I.    The Second Amendment Allows States To Implement Varied Firearm Regulations To Address Their Local Needs ........................... 4

    II.    New York's Default Rule Reflects A Reasoned Policy Decision About How Best To Protect Public Safety And The Rights Of Property Owners ................................................................. 8

        A.    The private-property provision does not impair Second Amendment rights because it merely sets a default rule ........... 9

        B.    Property owners have good reason to prefer a default rule that bars firearms without explicit permission ......................... 11

        C.    Other states have adopted similar presumptions for the carry of firearms on private property ....................................... 15

CONCLUSION .................................................................................. 19

i

# TABLE OF AUTHORITIES

*Cases*

*Antonyuk v. Chiumento,*
    89 F.4th 271 (2d Cir. 2023) ................................................. 19

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) ..................................... 6, 19

*Antonyuk v. James,*
    144 S. Ct. 2709 (2024) ................................................... 19

*Bianchi v. Brown,*
    111 F.4th 438 (4th Cir. 2024) ........................................ 11

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) ....................................................... 15

*Cedar Point Nursery v. Hassid,*
    594 U.S. 139 (2021) ................................................. 13, 16

*Christian v. Nigrelli,*
    642 F. Supp. 3d 393 (W.D.N.Y. 2022) ...................... 14, 20

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................... 5, 8, 9, 10, 11

*GeorgiaCarry.Org, Inc. v. Georgia,*
    687 F.3d 1244 (11th Cir. 2012) ..................................... 14

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) .............................................. 8, 9, 10

*Medtronic Inc. v. Lohr,*
    518 U.S. 470 (1996) ......................................................... 8

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ..................................... 5, 8, 10, 11

*United States v. Morrison,*
    529 U.S. 598 (2000) ......................................................... 8

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) .................................................................. 8, 10

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024) ............................... 12, 13, 15, 16, 19, 20

*Statutes*

Alaska Stat. § 11.61.220 ................................................................. 20

Ark. Code Ann. § 5-73-306 ............................................................. 21

Conn. Gen. Stat. § 53-202d ............................................................. 20

D.C. Code § 7-2509.07 ................................................................... 20

Haw. Rev. Stat. Ann. § 134-9.5 ...................................................... 20

430 Ill. Comp. Stat. 66/65 .............................................................. 22

Kan. Stat. Ann. § 75-7c10 .............................................................. 22

Kan. Stat. Ann. § 75-7c24 .............................................................. 22

La. Rev. Stat. Ann. § 40:1379.3 ...................................................... 21

Me. Stat. tit. 17-A, § 402 ................................................................ 22

N.Y. Penal Law § 265.01-d .............................................................. 6

Neb. Rev. Stat. § 28-1202.01 .......................................................... 21

Okla. Stat. tit. 21, § 1290.22 ........................................................... 21

Tex. Penal Code § 30.05 ............................................................ 21, 22

Tex. Penal Code § 30.06 ............................................................ 21, 22

Tex. Penal Code § 30.07 ............................................................ 21, 22

Va. Code Ann. § 18.2-308.01 .......................................................... 21

Vt. Stat. Ann. tit. 10, § 5201 .................................................................22

## Other

Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727 (2018).................................... 16

FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017) ............ 11

*Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules*, 99 Yale L.J. 87 (1989) ........................................................ 14

*Firearm Deaths Grow, Disparities Widen*, CDC (Jun. 6, 2022) ............................ 11

*Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183 (Winter 2020) ........................................ 13

Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881 (2019)...... 17

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183 (Winter 2020)........................................................ 13, 15, 22

*The Sound of Silence: Default Rules and Contractual Consent*, 78 Va. L. Rev. 821 (1992) ................................................ 14

Tyler Fedor et al., *9 People Wounded in South Carolina Mall Shooting, Police Say*, N.Y. Times (Apr. 16, 2022)........................................ 17

*When Guns Threaten The Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139 (2021) .................................18

## INTRODUCTION AND INTEREST OF AMICI CURIAE

Amici the District of Columbia, Illinois, California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington (collectively, "Amici States") submit this brief in support of defendant-appellant pursuant to Federal Rule of Appellate Procedure 29(a)(2).

Amici States have a responsibility to protect the health, safety, and welfare of their communities, which includes protecting their residents from the harmful effects of gun violence and promoting the safe and responsible use of firearms. Amici States have historically fulfilled this responsibility by exercising their police powers to implement reasonable measures to regulate firearms, including by setting presumptions for the carry of firearms on private property. Such regulation does not conflict with the Second Amendment. As the Supreme Court has consistently recognized, the Second Amendment does not encompass the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," leaving states with the flexibility they need to protect their communities. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)).

Indeed, the Second Amendment "leaves [jurisdictions with] a variety of tools for combating [the] problem" of gun violence. *Heller*, 554 U.S. at 636. This

1

flexibility is an essential element of our federalist system, and it ensures that firearm regulations appropriately and effectively address the specific concerns in each locality. Although Amici States have taken different approaches to regulating firearms, they share an interest in addressing gun violence in ways that are tailored to the needs of their residents. Amici States seek to maintain their authority to address firearm-related issues through legislation that is consistent with historical tradition and responsive to the unique circumstances in their communities.

## SUMMARY OF ARGUMENT

In 2023, following the Supreme Court's opinion in *Bruen*, New York enacted the Concealed Carry Improvement Act ("CCIA"), which comprehensively reformed the statutory regime governing concealed carry within the State. *See Antonyuk v. James*, 120 F.4th 941, 955-56 (2d Cir. 2024). As relevant here, plaintiffs challenge a provision of the CCIA that criminalizes possession of a weapon on another person's private property (referred to as a "restricted location") when the person carrying the firearm "knows or reasonably should know that the owner or lessee of such property" has not given "express consent" to carry firearms on the premises. N.Y. Penal Law § 265.01-d(1).[1] But this provision does not violate the Second Amendment. Instead, it protects property owners' rights by allowing them to make

---

[1] Though the provision applies to private property whether it is open or closed to the public, plaintiffs' challenge is limited to private property that is open to the public. Compl. ¶ 37(c).

an informed decision about whether and how firearms are brought on their property, and it does so merely by setting an easily altered presumption. Research indicates that most people prefer a default requirement that no one can carry guns into residences, retail establishments, and private businesses without consent. And even property owners who do not object to the presence of guns on their property in general may have good reasons for barring them under some circumstances. Proprietors of spaces that tend to be crowded or volatile, that host vulnerable populations, or in which individuals may exercise other constitutionally protected rights may prefer a blanket policy barring firearms to protect their patrons from a heightened risk of violence.

New York's approach to empowering private property owners to make reasoned decisions about firearms on their property likewise accords with the laws adopted by other states. Although these measures vary in form, they collectively demonstrate that setting presumptions for the carry of firearms onto private property is well within the states' traditional regulatory role. Given their different circumstances, geographies, and populations, states should retain flexibility to implement measures that make sense for their communities. The Court should apply that principle here and uphold New York's commonsense default rule.

## ARGUMENT

I. **The Second Amendment Allows States To Implement Varied Firearm Regulations To Address Their Local Needs.**

Since the Founding, states have enacted restrictions on who may bear arms, where arms may be brought, and the manner in which arms may be carried. *See United States v. Rahimi*, 144 S. Ct. 1889, 1899-901 (2024); *Bruen*, 142 S. Ct. at 2145; *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010); *Heller*, 554 U.S. at 626-27. New York's private-property provision is one in a long line of government regulations designed to make gun possession and use safer for the public, and it is a lawful exercise of New York's regulatory powers.

States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks omitted). Enacting measures to promote public safety that are tailored to local circumstances falls squarely within the reasonable exercise of states' police powers. Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The Supreme Court has repeatedly affirmed the states' authority in this area, even as it has defined the scope and import of the rights conferred by the Second Amendment. In each of its major Second Amendment opinions—*Heller*,

*McDonald*, *Bruen*, and *Rahimi*—the Court expressly acknowledged the important role that states play in setting their own local policies to minimize the risk of gun violence, a role consistent with our Nation's historical tradition.

In *Heller*, the Supreme Court made clear that the Second Amendment right to keep and bear arms is "not unlimited." 554 U.S. at 626. Although government entities may not ban the possession of handguns by responsible, law-abiding individuals or impose similarly severe burdens on the Second Amendment right, states still possess "a variety of tools" to combat the problem of gun violence in a way that is responsive to the needs of their communities. *Id.* at 636. The Court reiterated this point in *McDonald*, emphasizing that the Second Amendment "by no means eliminates" the states' "ability to devise solutions to social problems that suit local needs and values." 561 U.S. at 785; *see id.* at 802 (Scalia, J., concurring) ("No fundamental right—not even the First Amendment—is absolute."). Recognizing that "conditions and problems differ from locality to locality," *id.* at 783, the Court made clear that "state and local experimentation with reasonable firearms regulations" could and should continue "under the Second Amendment," *id*. at 785 (brackets and internal quotation marks omitted).

*Bruen* confirmed these principles. There, the Court explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms . . . are, in fact, 'law-

abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). And, building on *Heller*, the Court "assume[d] it settled" that prohibiting firearms in sensitive locations—including "schools and government buildings," "legislative assemblies, polling places, and courthouses," and "new and analogous sensitive places"—is constitutional. *Id*. at 2133 (emphasis omitted).

Most recently, in *Rahimi*, the Court again explained that "the right secured by the Second Amendment is not unlimited" and should not be understood to protect the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 144 S. Ct. at 1897 (quoting *Heller*, 554 U.S. at 626-27). Indeed, the Court elaborated, "[a]t the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers" to "ban[s] [on] the carrying of dangerous and unusual weapons . . . [and] concealed firearms." *Id.* (internal quotation marks omitted).

These Supreme Court decisions make clear that states retain the power to enact laws to protect their residents, and that those laws need not be uniform: states are free to select "solutions to social problems that suit local needs and values," ensuring that firearm regulations appropriately and effectively address the specific circumstances in each state. *McDonald*, 561 U.S. at 785. As the Court in *Bruen* emphasized, the Second Amendment is not a "regulatory straightjacket." 142 S. Ct.

at 2133. Rather, states are permitted to enact a wide range of firearm regulations. S*ee id.* at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)).

Indeed, according to the Federal Bureau of Investigation, a wide variety of factors "affect the volume and type of crime occurring from place to place," including population density, variations in the youth concentration in the composition of the population, poverty level, job availability, modes of transportation, climate, criminal justice system policies, and educational and recreational characteristics. *See* FBI, *Uniform Crime Reporting Statistics: Their Proper Use* 1-2 (May 2017), https://tinyurl.com/yzh8v8up. These factors, which vary from state to state, produce disparities in the number and characteristics of firearm-related crimes. *See, e.g.*, *Firearm Deaths Grow, Disparities Widen*, CDC (Jun. 6, 2022), https://tinyurl.com/y6ezvacj. Given their unique needs, states must be able to implement tailored measures to address gun violence and protect the health and safety of their residents, as *Rahimi*, *Bruen*, *McDonald*, and *Heller* acknowledged.

In short, although the Supreme Court has defined the outer bounds of permissible regulations, the Court has not "disabled the ability of representative democracy to respond to an urgent public safety crisis." *Bianchi v. Brown*, 111 F.4th

438, 472 (4th Cir. 2024) (en banc). States retain not only the freedom, but the fundamental responsibility, to implement reasonable measures designed to respond to the needs of their communities and protect their residents from the harms of gun violence.

## II. New York's Default Rule Reflects A Reasoned Policy Decision About How Best To Protect Public Safety And The Rights Of Property Owners.

In adopting a default rule that firearms are not allowed on private property without express permission, New York has chosen an approach that is tailored to the needs and characteristics of its community and that does not violate the Second Amendment. As the Ninth Circuit recently explained in upholding Hawaii's similar provision, private property owners have "the right . . . to exclude others, including those bearing arms," and states have traditionally "regulated the default rules concerning private property." *Wolford v. Lopez*, 116 F.4th 959, 994 (9th Cir. 2024). New York's own private-property provision falls easily within this tradition: It is in line with the preference of most New Yorkers, and it reflects the interest of property owners in protecting public safety and preventing gun violence on their property. It also fits comfortably within the longstanding practice of states across the country, which have set similar presumptions for the carry of firearms on private property.

### A. The private-property provision does not impair Second Amendment rights because it merely sets a default rule.

The private-property provision does not violate the Second Amendment because it merely sets a default rule governing the way in which individuals enforce their right to exclude others from their own private property. All property owners possess "the right . . . to exclude others, including those bearing arms." *Wolford*, 116 F.4th at 994; *see Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021) ("[T]he right to exclude is universally held to be a fundamental element of the property right . . . ." (internal quotation marks omitted)). And "[n]othing in the text of the Second Amendment" displaces that right by *requiring* private property owners, "even owners who open their private property to the public," to "allow persons who bear arms to enter." *Wolford*, 116 F.4th at 994. Because New York's private-property provision does no more than channel and affirm proprietors' decisions about whether to allow public carriage on their property, it does not impair plaintiffs' Second Amendment rights.

The district court's contrary conclusion that the private-property provision "closes the door on [the Second Amendment] right across all private property open to the public," Special Appendix ("S.A.") 40 (Decision and Order) (emphasis omitted), misunderstands the operation of default rules. Default rules "govern parties in the absence of some explicit contrary agreement or altering action." Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry"*

9

*Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 183 (Winter 2020), https://tinyurl.com/4ke6hv8j. These types of rules are common—for example, the majority of legal rules governing contracts and corporations are default rules that can be altered by the parties. Ian Ayres & Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules*, 99 Yale L.J. 87, 87 (1989). Because individuals can change or opt out of default rules like the CCIA's private-property provision, it is "unrealistic" to view them "as being 'imposed upon' the parties." Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*, 78 Va. L. Rev. 821, 865 (1992). Rather, "one's silence in the face of default rules that one can change constitutes consent to the application of" rules like New York's. *Id.* at 906.

Thus, while the private-property provision sets a default rule, it does not allow the state to "unilaterally exercise" the right to exclude. *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 398 (W.D.N.Y. 2022). The right to exclude rests, as it always has, with the property owner or lessee, who is free to consent to the default rule or to alter it at will. New York's law simply regulates how property owners communicate their consent and clarifies the inference that can be drawn from a property owner's silence, which the Second Amendment permits. *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012) ("Quite simply, there is no constitutional infirmity when a private property owner exercises his, her, or its . . .

10

right to control who may enter, and whether that invited guest can be armed, and the State vindicates that right.").  As the Ninth Circuit explained in *Wolford*, states have long exercised the "ordinary police power to regulate the default rules concerning private property."  116 F.4th at 994.  Laws of this sort protect property owners' authority to make their own decision about whether to allow firearms on their property and ensure they have the information they need to make an informed choice.  These laws neither predetermine whether firearms will be barred on private property nor meaningfully impair the right to carry a firearm for self-defense.  *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[C]onstitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.").  Thus, even presuming that laws like New York's implicate the Second Amendment, they impose only a minor burden on the exercise of that right, one that—as the Ninth Circuit held in *Wolford*, 116 F.4th at 994-95— is consistent with history and tradition.

## B.   Property owners have good reason to prefer a default rule that bars firearms without explicit permission.

New York's default rule reflects public preferences.  In a national survey, a majority of respondents expressed support for a "no carry" default rule in residences, places of employment, and retail establishments.  Ayres & Jonnalagadda, *Guests with Guns* 186.  This preference was even more pronounced in New York—only 38% of respondents thought that customers should be allowed to carry firearms into

11

retail stores by default, and only 29% thought service providers should be allowed to carry firearms into homes by default. *Id.* at tbl.A4. Given these preferences, the private-property provision is an efficient policy choice, minimizing transaction costs by eliminating the need for most property owners to contract around the default (while leaving others free to allow firearms if they wish). *Id.* at 183.

The default rule set by the private-property provision also protects the numerous different property owners in the state, who may have distinct needs. The provision applies to a variety of locations: homes, offices, stores, malls, parking lots, hotels, business conference centers, and much more. *See* S.A. 40. Many of these locations have characteristics that make carriage of firearms more dangerous, giving property owners good reason to prefer a default that excludes such weapons.

For example, the crowded and confined conditions in spaces like malls, grocery stores, and fast-food restaurants make carrying firearms riskier to public health and safety. Physical jostling and emotional frustration are frequent occurrences in such spaces and can erupt into violence, a risk that is heightened by the presence of firearms. *See* Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727, 730-31 (2018), https://tinyurl.com/34cnpvmd (explaining that the "weapons effect" primes individuals to think and act more aggressively in the presence of a weapon). And in

dense, confined spaces, use of a firearm is likely to end in tragedy—not only for the innocent bystanders who may be shot, but also for other victims who may be crushed or trampled by a panicked crowd. *See, e.g.*, Tyler Fedor et al., *9 People Wounded in South Carolina Mall Shooting, Police Say*, N.Y. Times (Apr. 16, 2022), https://tinyurl.com/5n8y2w62 (noting that nine people were shot and five others were injured in the stampede that ensued during the gunfire). Given these concerns, a property owner could reasonably determine that it would be too dangerous to allow firearms in such an establishment.

Property owners may also choose to bar firearms to protect vulnerable populations, like children or the elderly, who frequent their property. Such individuals cannot easily defend themselves or escape a violent attack, should one occur. And even if they are not physically harmed by firearms, exposure to such violence can cause marked psychological harm. *See* Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881, 888 (2019), https://tinyurl.com/2vwsed8n (finding that indirect exposure to gun violence, including witnessing violence or hearing gunshots, can be traumatic to children).

Private property may also be the site of constitutionally protected activity, which a property owner might fear will be disrupted by the carry of firearms. For example, political meetings and conventions often take place in private offices or

business conference centers.  Not only are these locations often targets of violence, but the mere presence of firearms (and the implicit threat they communicate) could chill individuals' peaceful exercise of their rights.  *See* Joseph Blocher & Reva B. Siegel, *When Guns Threaten The Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 141 (2021) ("Gun laws protect people's freedom and confidence to participate in every domain of our shared life, from attending school to shopping, going to concerts, gathering for prayer, voting, assembling in peaceable debate, counting electoral votes, and participating in the inauguration of a President.").

Even though most privately owned spaces are not designated as "sensitive places" per se under New York law, private property owners may share the same concerns that motivate the state to restrict firearms in those locations.  Property owners may also have important reasons to want to implement firearm limitations of their own.  Setting a default rule allows them to do so while fostering clarity for members of the public.  The private-property provision therefore complements stricter sensitive-place restrictions, empowering individual property owners to make informed, context-specific determinations about the risks and benefits of allowing firearms on their property.  It is a sensible default rule—not a mandate or absolute bar—that leaves gun- and property-owners alike with myriad options for exercising their rights.  The district court erred in enjoining this reasonable provision.

14

**C.** **Other states have adopted similar presumptions for the carry of firearms on private property.**

Like New York, other state legislatures have made policy choices about what presumptions to set for carrying firearms on private property. While the default rules in different locations vary based on local needs and conditions, New York's private-property provision fits squarely within the "established tradition of arranging the default rules that apply specifically to the carrying of firearms onto private property." *Wolford*, 116 F.4th at 995. The Court should thus revisit its holding, at the preliminary-injunction stage, that New York had not carried its burden of establishing the existence of a historical tradition encompassing the private-property provision. *See Antonyuk v. Chiumento*, 89 F.4th 271, 385 (2d Cir. 2023).[2] To the contrary, as the Ninth Circuit explained in *Wolford*—and as New York has shown here based on the evidence it presented at the summary judgment stage—there are numerous examples of states regulating the default rules that accompany the carriage of weapons on private property, including multiple "historical dead ringers." 116 F.4th at 995 (internal quotation marks omitted). That tradition extends to the present, as discussed here.

---

[2]     *Cert. granted, judgment vacated sub nom. Antonyuk v. James*, 144 S. Ct. 2709 (2024)*, and reinstated in relevant part by Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024).

Numerous states have set a default rule governing whether individuals may carry firearms onto private property in the absence of any communication from the owner. For example, Hawaii, like New York, restricts the carry of firearms on private property "unless the person has been given express [written or verbal] authorization" by the owner or operator, Haw. Rev. Stat. Ann. § 134-9.5(a)-(b)—a law recently upheld by the Ninth Circuit, *see Wolford*, 116 F.4th at 995 (holding that "Hawaii's [private-property default] law falls well within the [nation's] historical tradition"). Connecticut likewise provides that assault weapons may only be carried "on property owned by another person with the owner's express permission." Conn. Gen. Stat. § 53-202d(f)(1). Similarly, several states require that individuals must have explicit permission before carrying a firearm into someone else's home.[3] Alaska, for example, provides that a person may not carry a concealed weapon into the residence of another person without the express consent of someone who lives there. Alaska Stat. § 11.61.220(a)(1)(B); *see also* D.C. Code § 7-2509.07(b)(1) (providing that the carrying of a concealed pistol "[o]n private residential property shall be presumed to be prohibited unless otherwise authorized by the property owner . . . and communicated personally to the licensee in advance of entry onto the

---

[3]     Although the district court limited its injunction to private property open to the public, *supra* note 1, it acknowledged that its reasoning would apply equally to private residences, *Christian*, 642 F.Supp.3d at 399 n.5.

16

residential property"); La. Rev. Stat. Ann. § 40:1379.3(O)(2) ("No individual to whom a concealed handgun permit is issued . . . may carry a concealed handgun into the private residence of another without first receiving the consent of that person.").

Other states have flipped the presumption. Nebraska, for instance, allows a permitholder to carry a concealed handgun "anywhere in Nebraska," excepting "any place or premises where the person, persons, entity, or entities in control of the place or premises or employer in control of the place or premises has prohibited the carrying of concealed handguns." Neb. Rev. Stat. § 28-1202.01(1)-(2); *see* Va. Code Ann. § 18.2-308.01(C) (noting that a concealed handgun permit does not authorize possession of a handgun "in places where such possession . . . is prohibited by the owner of private property"); Tex. Penal Code §§ 30.05(c), 30.06, 30.07 (criminalizing the open or concealed carry of a handgun on the property of another if the licensee does not have the owner's consent and has received notice that carry is forbidden); Okla. Stat. tit. 21, § 1290.22(C) (explaining that a property owner may prohibit the carry of concealed or unconcealed firearms on his property and that if the property is open to the public, he must post signs about the prohibition). And Arkansas sets a default that firearms are allowed in others' homes without express consent, but it requires that anyone who carries a concealed handgun into such a dwelling also notify the occupant. Ark. Code Ann. § 5-73-306(18)(A)(iv).

17

States have also set defaults for firearm-related activities on private property. For example, 25 states require that hunters obtain permission before entering private property. Ayres & Jonnalagadda, *Guests with Guns* 184. And again, other states have chosen the inverse default rule. Vermont, for example, requires that a property owner who wishes to ban hunting post signs around their property line. Vt. Stat. Ann. tit. 10, § 5201; *see* Me. Stat. tit. 17-A, § 402 (requiring that a property owner who wants to exclude individuals indicate that access is prohibited, either in general or for a specific activity like hunting).

In addition to setting default rules for the carry of firearms on private property, several states have adopted detailed requirements regulating the way in which a private property owner may communicate whether she allows firearms on her property. Texas, for example, requires that a notice prohibiting the carry of firearms use certain language, be posted conspicuously in both English and Spanish, and use print in contrasting colors with block letters at least one inch in height. Tex. Penal Code §§ 30.05(c), 30.06, 30.07. Kansas similarly regulates "the location, content, size and other characteristics" of signs barring firearms on private property, Kan. Stat. Ann. §§ 75-7c24, 75-7c10, as does Illinois, 430 Ill. Comp. Stat. 66/65(d) (requiring that signs prohibiting firearms be conspicuously posted at building's entrance, meet design requirements established by state police, and be four by six inches in size).

18

New York's private-property provision reflects the state's reasoned policy determination regarding the default rule for the carry of firearms on private property and how property owners should communicate their decision about whether to exclude such weapons. Although this provision is not identical to the presumptions adopted by other states, it is similarly informed by and tailored to local conditions and the needs of residents. The law therefore fits comfortably within both the longstanding practice of other states and the bounds of the Second Amendment.

## CONCLUSION

The Court should reverse the decision below.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for
the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK
Principal Deputy Solicitor General

ANNE A. DENG
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 442-9807
ashwin.phatak@dc.gov

January 2025

KWAME RAOUL
Attorney General for the State of
Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

Office of the Attorney General for the
State of Illinois
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
sarah.hunger@ilag.gov

ROB BONTA
*Attorney General*
State of California

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

ANNE E. LOPEZ
*Attorney General*
State of Hawaii

ANTHONY G. BROWN
*Attorney General*
State of Maryland

ANDREA J. CAMPBELL
*Attorney General*
Commonwealth of Massachusetts

DANA NESSEL
*Attorney General*
State of Michigan

KEITH ELLISON
*Attorney General*
State of Minnesota

AARON D. FORD
*Attorney General*
State of Nevada

MATTHEW J. PLATKIN
*Attorney General*
State of New Jersey

DAN RAYFIELD
*Attorney General*
State of Oregon

MICHELLE A. HENRY
*Attorney General*
Commonwealth of Pennsylvania

PETER F. NERONHA
*Attorney General*
State of Rhode Island

CHARITY R. CLARK
*Attorney General*
State of Vermont

ROBERT W. FERGUSON
*Attorney General*
State of Washington

## CERTIFICATE OF COMPLAINCE

I certify that this amicus brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,335 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Ashwin P. Phatak

ASHWIN P. PHATAK

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 10, 2025, an electronic copy of the foregoing was filed with the Clerk of Court using the electronic filing system and thereby served upon all counsel appearing in this case.

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK