# 24-2847

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BRETT CHRISTIAN; FIREARMS POLICY COALITION, INC.;
SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellees*,

v.

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police,

*Defendant-Appellant*,

MICHAEL J. KEANE, in his official capacity as
District Attorney for the County of Erie, New York,

*Defendant*.

On Appeal from the U.S. District Court
for the Western District of New York

## BRIEF OF AMICI CURIAE GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES IN SUPPORT OF DEFENDANT-APPELLANT

P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
Tel: (212) 841-1000
pbduke@cov.com

*Counsel for Amici Curiae Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................iii

INTEREST OF AMICI CURIAE ............................................................. 1

INTRODUCTION ................................................................................... 5

ARGUMENT ........................................................................................... 9

   I.   Section 265.01-d(1) Legitimately Protects Private Property Owners' Paramount Right to Exclude Firearms from Their Property, Even When the Property Is Otherwise "Open to the Public." ......................................... 9

      A.   Private Property Owners' Right to Exclude Is Foundational to American Law and Is Required by *Heller*'s Holding that Lawful Self-Defense Is Central to the Second Amendment ...................................... 10

      B.   Plaintiffs Have No Second Amendment Right to a Legal Presumption that Private Property Owners Consent to Firearms on Property Held Open to the Public. ................................................................................... 16

   II.   The Additional Evidence Submitted by the State on Remand Demonstrates that Section 265.01-d(1) Falls Squarely Within the Ambit of "Relevantly Similar" Historical Firearms Regulations. ........................................ 20

      A.   The Historical Evidence Satisfies *Rahimi's* "Relevantly Similar" Standard. ........................................................................................... 20

      B.   This Court Should Concur with the Ninth Circuit's Persuasive Decision in *Wolford* Upholding the Constitutionality of Hawaii's Functionally Identical Default-Rule Provision. ............................................. 25

   III.   Empirical Evidence Shows That Section 265.01-d(1) Promotes Public Safety. ........................................................................................... 27

CONCLUSION ..................................................................................... 30

CERTIFICATE OF COMPLIANCE ....................................................... 31

# TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Almeida v. Holder*,
  588 F.3d 778 (2d Cir. 2009) ................................................................. 10

*Antonyuk v. Chiumento*,
  89 F.4th 281 (2d Cir. 2023) ......................................................... *passim*

*Antonyuk v. James*,
  120 F.4th 941 (2d Cir. 2024) ........................................................ 5, 20

*Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) ..................................................................... 2

*Breard v. Alexandria*,
  341 U.S. 622 (1951) ................................................................................. 11

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) ................................................................................. 11

*Dietemann v. Time, Inc.*,
  449 F.2d 245 (9th Cir. 1971) ................................................................. 12

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ...................................................................... *passim*

*Garland v. Cargill*,
  602 U.S. 406 (2024) ................................................................................... 2

*GeorgiaCarry.Org v. Georgia*,
  687 F.3d 1244 (11th Cir. 2012) ................................................. 10, 12, 13

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  45 F.4th 306 (2022) ................................................................................... 3

*Hanson v. District of Columbia*,
  671 F. Supp. 3d 1 (D.D.C. 2023) ............................................................. 3

*Hanson v. Smith*,
  120 F.4th 223 (D.C. Cir. 2024) ................................................................. 3

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   417 F. Supp. 3d 747 (W.D. Va. 2019) ................................................................2

*Kaiser Aetna v. United States*,
   444 U.S. 164 (1979) ..........................................................................6, 10

*Kyllo v. United States*,
   533 U.S. 27 (2001) ..................................................................................12

*Libertarian Party v. Cuomo*,
   970 F.3d 106 (2d Cir. 2020) ....................................................................2

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ..................................................................................2

*Md. Shall Issue v. Hogan*,
   353 F. Supp. 3d 400 (D. Md. 2018) ........................................................2

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ............................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n v. City of New York*,
   590 U.S. 336 (2020) ..................................................................................4

*Nat'l Ass'n for Gun Rights, Inc. v. Lamont*,
   685 F. Supp. 3d 63 ....................................................................................3

*Peruta v. County of San Diego*,
   824 F.3d 919 (9th Cir. 2016) (en banc) ..................................................2

*PruneYard Shopping Ctr. v. Robins*,
   447 U.S. 74 (1980) ..................................................................................14

*Semayne's Case*,
   (1604) 77 Eng. Rep. 194; 5 Co. Rep. 91 a ......................................10, 11

*Siegel v. Platkin*,
   653 F. Supp. 3d 136 (D.N.J. 2023) ........................................................13

*Stimmel v. Sessions*,
   879 F.3d 198 (6th Cir. 2018) ....................................................................2

*United States v. Hayes*,
555 U.S. 415 (2009) .................................................................3

*United States v. Perea*,
986 F.2d 633 (2d Cir. 1993)...................................................11

*United States v. Rahimi*,
602 U.S. 680 (2024) ........................................................*passim*

*University of Texas v. Camenisch*,
451 U.S. 390 (1981) ...............................................................18

*Wade v. Univ. of Mich.*,
981 N.W.2d 56 (Mich. 2022) ..................................................4

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024)..........................................*passim*

## Statutes

1771 N.J. Laws 344 .........................................22, 23, 24, 25

1790 Mass. Acts 259 ................................................22, 24

1865 Fla. Laws 27 .............................................................22

1865 La. Acts 14 .......................................21, 23, 24, 25

Cal. Penal Code § 26230 (West 2024) ............................25

Haw. Rev. Stat. § 134-9.5 (2024)....................................25

New York's Concealed Carry Improvement Act section 265.01-d(1)............*passim*

Tex. Crim. Code § 6510 (Paschal 1874) ...............22, 24

## Other Authorities

Brad J. Bushman et al., *The Weapons Effect on Wheels: Motorists
Drive More Aggressively When There Is a Gun in the Vehicle*, 73 J.
EXPERIMENTAL SOC. PSYCH. 82 (2017) ..............................28

Charles A. Beard, *An Economic Interpretation of the Constitution of
the United States* (1913) ...........................................12, 13

Charles C. Branas et al., *Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034 (2009) .....................................30

Ctr. for Gun Violence Sols., *Firearm Violence in the United States*, JOHNS HOPKINS ..........................................................................28

Leonard Berkowitz & Anthony Lepage, *Weapons as Aggression-Eliciting Stimuli*, 7 J. PERSONALITY & SOC. PSYCH. 202 (1967).......................28

U.S. Const. amend. III .......................................................................12

U.S. Const. amend. IV .......................................................................12

U.S. Const. amend. V .........................................................................12

U.S. Const. amend. XIV .....................................................................12

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 58 (5th ed. 1984) ...............................................................................11

## INTEREST OF AMICI CURIAE[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence. Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, *United States v. Rahimi*, 602 U.S. 680 (2024); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022);

---

[1] No counsel for a party wrote this brief in whole or in part, and no one other than *amici* or their counsel contributed money to fund the preparation or submission of this brief. The parties have consented to its filing.

*McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Antonyuk v. Chiumento*, 89 F.4th 281 (2d Cir. 2023); *Libertarian Party v. Cuomo*, 970 F.3d 106 (2d Cir. 2020). Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *See, e.g.*, *Garland v. Cargill*, 602 U.S. 406, 432–33 (2024) (Sotomayor, J., dissenting); *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 121–22 (3d Cir. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403–05 (D. Md. 2018).

*Amicus curiae* Brady Center to Prevent Gun Violence ("Brady") is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady works to free America from gun violence by passing and defending gun violence prevention laws, reforming the gun industry, and educating the public about responsible gun ownership. Brady has a substantial interest in ensuring that the U.S. Constitution is construed to protect Americans' fundamental right to live. Brady also has a substantial interest in protecting the authority of democratically elected officials to address the nation's gun violence epidemic. Brady has filed *amicus* briefs

in many cases involving the regulation of firearms, including *Rahimi*, 602 U.S. 680; *Bruen*, 597 U.S. 1; *Heller*, 554 U.S. 570; *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306 (2022); and *Antonyuk*, 89 F.4th 281. Multiple courts have cited Brady's expertise on these issues. *See, e.g.*, *United States v. Hayes*, 555 U.S. 415, 427 (2009); *Hanson v. Smith*, 120 F.4th 223, 248, 249 (D.C. Cir. 2024); *Nat'l Ass'n for Gun Rights, Inc. v. Lamont*, 685 F. Supp. 3d 63, 85, 96, 97 n.30, 104, 110 & n.52 (D. Conn. 2023); *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 14, 19 n.10, 20, 23 (D.D.C. 2023), *aff'd sub nom. Hanson v. Smith*, 120 F.4th 223.

*Amicus curiae* March For Our Lives Foundation ("MFOL") is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives. Formed after the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, MFOL immediately began organizing the largest single day of protest against gun violence in the nation's history. From its Road to Change initiative that registered 50,000 new voters in 2018, to its successful advocacy for dozens of state, local, and federal laws, MFOL uses the power of youth voices to create safe and healthy communities and livelihoods for all. These young people— all too familiar with mass shootings and other forms of gun violence—have a vital interest in ensuring that the U.S. Constitution is correctly interpreted to allow for the

enactment of reasonable gun violence prevention measures, including public carry licensing regimes, to protect all Americans. MFOL has participated as *amicus curiae* in other cases that affect its core interest in preventing gun violence. It has filed *amicus* briefs in *Antonyuk*, 89 F.4th 281; *Bruen*, 597 U.S. 1; *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336 (2020); and *Wade v. Univ. of Mich.*, 981 N.W.2d 56 (Mich. 2022).

# INTRODUCTION

In *Antonyuk v. Chiumento*, 89 F.4th 271, 383–84 (2023),[2] this Court affirmed the grant of a preliminary injunction against section 265.01-d(1) of New York's Concealed Carry Improvement Act (CCIA), as applied to private property "open to the public." That preliminary decision was based on a limited record, including Plaintiffs' unsubstantiated allegation that such property was impliedly "open to the public" without restrictions and for all purposes. On remand, following substantial supplementation of the record, the District Court erred in granting Plaintiffs' motion for summary judgment by: (1) failing to recognize the hallowed American common-law tradition upholding private property owners' right to exclude entry by members of the public bearing arms; and (2) failing to acknowledge the State's compelling additional evidence of a historical tradition of firearm regulation establishing default rules that vindicate and protect that right to exclude. As set forth in the State's brief on this appeal—and as the Ninth Circuit recently concluded in upholding a functionally identical Hawaii statute in *Wolford v. Lopez*, 116 F.4th 959, 994 (9th Cir. 2024), *petition for reh'g denied*, No. 23-16164 (9th Cir. Jan. 15, 2025)—the

---

[2] As the State noted, *see* Appellant Br. 7 n.1, the plaintiffs in another of the cases decided in *Antonyuk* filed a petition for certiorari. Though the Supreme Court granted that petition, vacated *Antonyuk*, and remanded for further consideration in light of *United States v. Rahimi*, 602 U.S. 680 (2024), this Court's subsequent decision on remand did not affect the judgment in this case. *See Antonyuk v. James*, 120 F.4th 941, 955 n.3 (2d Cir. 2024). The Court's prior decision therefore "remains binding on the parties in" this case. *Id.*

analogues identified by the State clearly satisfy the requirement of "relevantly similar" historical regulation as set forth in *United States v. Rahimi*, 602 U.S. 680 (2024). For these reasons, and as further demonstrated below, the District Court's judgment should be reversed.

"The right to exclude others" is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979). This right, established at the common law and continuing throughout American legal tradition since the Founding, extends to the right "to exclude … those bearing arms." *Wolford*, 116 F.4th at 994. Plaintiffs do not—and cannot—contend that gun owners possess a Second Amendment right to carry weapons onto private property otherwise "open to the public" if the private property owner does not consent and instead restricts or prohibits members of the public from carrying firearms onto the property. Because the Second Amendment only "codified a *pre-existing* right" and did not create a new one, *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), the Second Amendment cannot validly be construed to preempt, displace, or override private property owners' right to exclude other individuals' firearms and open their property to the public *only to the extent that such owners consent.*

There is no evidence that the Framers of the Second and Fourteenth Amendments intended to override existing constitutionally protected private

property rights and enshrine in the Constitution a new right for individuals to carry firearms onto the property of others until and unless the owners of that property affirmatively override that supposed new right. The District Court nevertheless erroneously ruled that the Second Amendment affords individual gun owners a right to a legal *presumption* that they may carry their firearms onto private property open to the public, even though the property owner can instantly negate that presumption (and prohibit firearms on the property) at any time by expressly denying consent. This articulation of a merely permissive Second Amendment right to bear arms unless and until someone else with a superior right takes it away has no foundation in Second Amendment jurisprudence. It would make no sense for the Constitution to specifically ensure protection of private property rights, including the right to exclude, while *sub silentio* creating a Second Amendment right that undermines that fundamental prerogative of private property owners.

Moreover, there is no logical or other foundation for compelling the government to presume that private property owners who open their property to the public for commercial purposes thereby intend to also allow the public to bring firearms onto the premises. To the contrary, private property owners' Second Amendment interest in their *own* self-defense militates *against* the assumption that they would voluntarily relinquish their exclusive right to keep and bear arms on their own property. As a default rule, section 265.01-d(1) does not deprive Plaintiffs of

any indefeasible Second Amendment right. Rather, it protects the safety of private property owners and the public, and upholds such owners' time-honored rights against potentially unwanted intrusions by individuals bearing firearms on their property without their consent.

As the State demonstrated in the District Court, and as the Ninth Circuit in *Wolford* similarly concluded, the default rule established under section 265.01-d(1) falls squarely within the "historical tradition of firearm regulation" applicable to private property open to the public. Contrary to the District Court's erroneous characterization, the provision at issue here does not "unilaterally exercise" the right of private property owners to exclude firearms. SA 2. Rather, it preserves such owners' opportunity to grant or deny consent without potentially violent confrontation and before unwanted entries occur. The Second Amendment does not preclude private property owners from seeking, or the State from enacting, a statutory default rule which upholds that important interest without limiting such owners' right to consent.

The constitutional validity of section 265.01-d(1) is squarely supported not only by the historical analogues presented by the State here, but also by the extensive body of empirical evidence showing that firearms escalate confrontation, including the confrontations that occur when property owners ask someone not to carry a firearm onto, or to remove a gun from, their property. The Second Amendment does

not bar the State from enacting public safety-enhancing legislation that vindicates the right of New York private property owners to exclude by establishing a default requirement of express consent to bring firearms onto their properties. Because section 265.01-d(1) falls well within what is permitted by the Second Amendment, this Court should reverse the District Court.

## ARGUMENT

### I. Section 265.01-d(1) Legitimately Protects Private Property Owners' Paramount Right to Exclude Firearms from Their Property, Even When the Property Is Otherwise "Open to the Public."

Section 265.01-d(1) is firmly supported by the well-established American history and tradition recognizing and upholding private property owners' paramount "right to exclude" others from their property, and to open their property to the public only subject to such restrictions—including but not limited to the exclusion of firearms—as the owner may impose. This centuries-old, fundamental common-law tradition pre-dates the Founding and makes clear that the Second Amendment affords people carrying guns no newly created constitutional right to bring a firearm onto someone else's property without their consent even when that property is otherwise held open to the public.

Consistent with that limitation, section 265.01-d(1) properly protects private property owners against unwanted intrusions onto their private property by armed members of the public who incorrectly infer that the absence of express prohibition

means that the owner has consented to the presence of firearms. The de minimis burden on gun owners—requiring them to ask permission to do what they have no constitutional right to do without owner consent—does not infringe their rights under the Second Amendment. At the same time, a default rule that inhibits people from bringing firearms onto private property without obtaining the owner's consent serves the important interest of private property owners in their own self-defense.

### A. Private Property Owners' Right to Exclude Is Foundational to American Law and Is Required by *Heller*'s Holding that Lawful Self-Defense Is Central to the Second Amendment.

As this Court has noted, "the right to exclude others ... has [been] recognized as 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Almeida v. Holder*, 588 F.3d 778, 788 (2d Cir. 2009) (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 393 (1994)); *see also Kaiser Aetna*, 444 U.S. at 176. The common-law doctrines of trespass[3] and related criminal and property rules undergird a hallowed Anglo-American principle: a person's home is their castle. Writing for the Court of King's Bench in 1604, Sir Edward Coke observed that "the house of everyone is to him as his castle and fortress, as well for

---

[3] Under this familiar doctrine, "if a person enters upon the land of another without the owner's permission or … remains on the land against the owner's wishes, then the person becomes a trespasser." *GeorgiaCarry.Org v. Georgia*, 687 F.3d 1244, 1262 (11th Cir. 2012). The property owner could then sue the trespasser. *Id.* A trespass suit allowed a property owner to vindicate this "most essential stick[] in the bundle of rights"—the right to exclude. *Almeida*, 588 F.3d at 788 (quoting *Dolan*, 512 U.S. at 393).

his defence against injury and violence, as for his repose." *Semayne's Case* (1604) 77 Eng. Rep. 194, 194; 5 Co. Rep. 91 a, 91 a. Coke's observation derived from the very core of what it means for private property to be private: "that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149–50 (2021) (quoting 2 William Blackstone, *Commentaries* *2 (1766)); *cf.* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 58, at 393 (5th ed. 1984) (property owner's right to exclude means that "no one has any right to enter *without his consent*, and he is free to fix the terms on which that consent will be given") (emphasis added).

The strength of the right to exclude remains undiminished to the present day. *See, e.g.*, *Cedar Point Nursery*, 594 U.S. at 149 ("The right to exclude is 'one of the most treasured' rights of property ownership." (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982))); *United States v. Perea*, 986 F.2d 633, 640 (2d Cir. 1993) ("One of the main rights attaching to property is the right to exclude others…." (quoting *Rakas v. Illinois*, 439 U.S. 128, 144 n.12 (1978))). Indeed, the right to exclude others includes a right to exclude people who seek to engage in what would otherwise be constitutionally protected activities. For example, the First Amendment does not confer an individual right to trespass on private property, even for expressive purposes. *See, e.g.*, *Breard v. Alexandria*, 341

U.S. 622 (1951) (upholding a default rule prohibiting door-to-door solicitation); *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) (noting that the First Amendment right does not give "license to trespass"). Traditional common-law private property rights are thus not subordinate or secondary to other individual rights granted in the Bill of Rights to the Constitution.

The boundaries of the Second Amendment right therefore must be drawn in accord with this context. "[T]he Second Amendment did not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights," including "a private property owner's right to be king of his own castle." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012) ("[P]roperty law, tort law, and criminal law provide[d] the canvas on which our Founding Fathers drafted the Second Amendment."). Indeed, several other amendments strongly reinforce the centrality of the right to exclude in safeguarding private property holders against government intrusion. *See, e.g.*, U.S. Const. amend. III (barring quartering of soldiers without consent); *id.* amend. IV (barring unwarranted searches and seizures); *id.* amend. V ("No person shall … be deprived of life, liberty, or property, without due process of law… nor shall private property be taken for public use, without just compensation."); *id.* amend. XIV ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law…."); *see also Kyllo v. United States*, 533 U.S. 27, 37 (2001) ("In the home, …

*all* details are intimate details…."); *cf.* Charles A. Beard, *An Economic Interpretation of the Constitution of the United States* 324 (1913) (arguing that the U.S. Constitution was "essentially an economic document based upon the concept that the fundamental private rights of property are anterior to government"). The individual's right to bear arms outside the home thus does not reduce or supersede private property owners' paramount right to exclude firearms absent their consent.

Consequently, "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place … *against the owner's wishes*." *Siegel v. Platkin*, 653 F. Supp. 3d 136, 158 (D.N.J. 2023) (quoting *GeorgiaCarry.Org*, 687 F.3d at 1264); *see also Wolford*, 116 F.4th at 994 ("Nothing in the text of the Second Amendment or otherwise suggests that a private property owner—even owners who open their private property to the public—must allow persons who bear arms to enter."). "An individual's right to bear arms as enshrined in the Second Amendment, whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land." *GeorgiaCarry.Org*, 687 F.3d at 1265.

Moreover, private property owners' right to exclude is not merely counterposed against other individuals' Second Amendment rights; it also reinforces such owners' discrete Second Amendment right by protecting their interest in self-defense. The characterization of private property as a fortress or "castle" recognizes

13

its central importance as a bulwark of safety and security. The "home [is] where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. A default rule that recognizes the primacy of private property owners' rights *on their own property* is fully in keeping with a Second Amendment right to keep and bear arms on one's own property for purposes of self-defense against potential intruders. In contrast, the opposite default rule could have the effect of undermining that right. When owners open their properties to the public for commercial or other designated purposes, they have no personal Second Amendment interest in, or obligation to, compromise their own or others' safety by accommodating the desire of those who want to carry guns onto their property. Given that lawful self-defense is "the *central component* of [a person's] right" under the Second Amendment according to the Supreme Court in *Heller*, 554 U.S. at 599, private property owners should not be presumed to have relinquished their right to keep and bear arms on their property absent clear evidence of the owner's intent.

That logic holds true even when private owners elect to open their property to the public for some commercial or other purpose. Private property does not "lose its private character merely because the public is generally invited to use it for designated purposes." *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81 (1980). Indeed, although property owners do not have absolute power to restrict public use on their property, they can restrict the scope of that use, including by preventing the

carrying of firearms. It bears emphasis that no private owners of property open to the public are challenging the constitutionality of section 265.01-d(1) here (or in any other case of which we are aware)—nor could they plausibly do so, since section 265.01-d(1) *enhances* their Second Amendment interest in self-defense by deterring armed individuals from entering their properties under a mistaken assumption of consent.

Private property owners undisputedly have a time-honored legal right to deny admission to people carrying guns onto their properties and maintain that prohibition when they choose to open property to the public subject to that limitation. Such owners also possess an exclusive Second Amendment right to keep and bear arms on their private property open to the public for their own self-defense, which the presence of other armed individuals would not support and could materially jeopardize or threaten. Conversely, as the District Court at least implicitly recognized, Plaintiffs have *no* Second Amendment right to bear arms on any private property open to the public without the owner's consent, which the owner may withhold for any reason or no reason at all. Against this backdrop, the default rule established by section 265.01-d(1) operates to *preserve* private property owners' long-established common-law property and constitutional Second Amendment rights. The history and tradition of the Second Amendment provide no warrant to undermine private property owners' fundamental common-law and constitutional

rights in favor of Plaintiffs' desire to roam freely on others' private property with their guns.

### B. Plaintiffs Have No Second Amendment Right to a Legal Presumption that Private Property Owners Consent to Firearms on Property Held Open to the Public.

Relying on the Supreme Court's decision in *Bruen*, the District Court declared that the Second Amendment's plain text "*presumptively* guarantees [Plaintiffs'] right to 'bear' arms for self-defense *on private property* outside of his own home." SA 25 (emphases added). But *Bruen* did not specifically address the scope of the right to bear arms "on private property." Nor did it consider whether the Second Amendment somehow imposes a legal presumption that private property owners impliedly consent to admitting armed individuals onto their property when it is otherwise open to the public. The District Court failed to analyze or explain how the Second Amendment can be construed to command a legal presumption when any private property owner's simple expression of non-consent may conclusively rebut the presumption at any time. This expansion of the Second Amendment to command recognition of a purely contingent right to bear arms in places where they may be legally prohibited (and where no consent was ever intended) is erroneous and should be reversed.

In acknowledging that "property owners have the right to exclude," SA 1–2, the District Court appeared to recognize that individual gun owners have no Second

Amendment right to bear arms on private property nominally "open to the public," unless the owner consents to that conduct. Nonetheless, the District Court concluded that section 265.01-d(1) "interfere[s] with the long-established Second Amendment rights of law-abiding citizens" because "*the state* may not unilaterally exercise that right" on private property owners' behalf. *Id.* at 2. That ruling, however, fundamentally mischaracterizes the nature of legal default rules such as section 265.01-d(1). The provision does not "exercise th[e] right" of private landowners to prohibit firearms on their property open to the public, any more than the opposite default rule "exercises" such owners' right to *permit* guns on their premises. As a default rule, section 265.01-d(1) merely specifies how the public must interpret private property owners' *silence* as to whether they allow or prohibit firearms on their property, thus guiding public conduct when the property owner's choice is unknown. Private property owners may each affirmatively exercise their exclusive right to make that choice—in either direction—by communicating their choice to members of the public at any time.

At the preliminary-injunction stage of this case, this Court summarily held that the conduct regulated by section 265.01-d(1) fell within the Second Amendment's plain text based upon *Bruen*'s holding that the Second Amendment protects a "'general right to public carry'" for self-defense "outside the home." *Antonyuk*, 89 F.4th at 383 (quoting *Bruen*, 597 U.S. at 33). That ruling, however, did

not consider the fundamental limitation on the individual's "general right to public carry" correctly acknowledged on remand by the District Court—namely, that private property owners have the exclusive right to *prohibit* carry by individuals on property otherwise "open to the public," without infringing those individuals' discrete Second Amendment rights.

While this Court's brief analysis may have been sufficient at the preliminary-injunction stage, *see University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (purpose of preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held"), it does not bind this Court in reviewing the more fully developed summary judgment record here, *see* Appellant's Br. 8–9; *see also Antonyuk*, 89 F.4th at 388 n.116 (noting that the Court's conclusion came "at a very early stage of … litigation," and remanding for "further briefing, discovery, and historical analysis"). Neither the plain text of the Second Amendment nor the Supreme Court's analysis in *Bruen* establishes an individual's Second Amendment right to a legal presumption that every private property owner who conditionally "opens" property "to the public" freely invites people to bear arms on that property. Nothing in *Bruen* dictates that this right must also extend "presumptively" to private property open to the public whenever the owner has not affirmatively announced otherwise. Indeed, the record here is devoid of any evidence that the Second Amendment was historically understood or intended to

authorize individuals to carry firearms onto private property open to the public absent express prohibition by the owner. This is unsurprising given that privately held property remains "private," not public, in all fundamental legal respects even when the owner conditionally opens that property to the public for limited commercial or other purposes.

The rights afforded by the Second Amendment under *Heller* and *Bruen* are "not unlimited." *Heller*, 554 U.S. at 595. They do not extend so far as to prohibit legislatures from setting provisional default rules to guide public conduct where private property owners have not affirmatively communicated their consent to include firearms within the scope of their invitations to the public. Such legislation is consistent not only with the State's police power to promote public safety by reducing unauthorized carrying of firearms on private property of non-consenting owners and the risks posed by such conduct, but also with the legitimate interest of private property owners in actualizing their traditional right to exclude (or affirmatively consent to, as they may prefer) arms-bearing on their premises. Indeed, this rule enhances private property owners' ability to defend themselves as they wish.

**II.  The Additional Evidence Submitted by the State on Remand Demonstrates that Section 265.01-d(1) Falls Squarely Within the Ambit of "Relevantly Similar" Historical Firearms Regulations.**

Even assuming that section 265.01-d(1) must pass muster under "step two"[4] of the *Bruen* analysis, the additional evidence submitted by the State on remand and the Supreme Court's clarifying recent guidance in *Rahimi* make plain that the New York provision falls squarely within the scope of "relevantly similar" historical firearms regulations distilled into principles, as *Rahimi* requires. Moreover, as the Ninth Circuit recently held in *Wolford*, there are even "historical twin" statutes on this issue, demonstrating that "the Nation has an established tradition of arranging the default rules that apply specifically to the carrying of firearms onto private property." 116 F.4th at 995. On the full record now before it, this Court should reach the same conclusion.

**A. The Historical Evidence Satisfies *Rahimi's* "Relevantly Similar" Standard.**

Since this Court did not revisit this case on remand from the Supreme Court in *Antonyuk v. James*, the Court's operative prior ruling here does not reflect the additional elaboration of the *Bruen* analysis provided by the Supreme Court in *Rahimi*. As *Rahimi* clarified, to comply with the Second Amendment, a challenged

---

[4] *Bruen's* two-part test asks (1) whether "the Second Amendment's plain text covers an individual's conduct"; and (2) if so, whether the Government has "justif[ied] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24.

regulation must fit within the nation's "historical tradition of firearm regulation"; but "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." 602 U.S. at 691–92. A historical analogue need only be "relevantly similar," and "need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 692. Even if "a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* The key question is "[w]hy and how the regulation burdens the [Second Amendment] right." *Id.*

Although this Court previously rejected the sufficiency of the State's historical analogues under the then-operative *Bruen* analysis, the State substantially supplemented the record on remand with additional historical analogues and other supporting documentary evidence.

At the preliminary-injunction stage, the State identified two laws particularly relevant to the analysis here. First, in 1865, Louisiana passed a law barring the "carry[ing] of fire-arms on the premises or plantation of any citizen, without the consent of the owner or proprietor." 1865 La. Acts 14. The only stated purpose of the law was "prohibit[ing] the carrying of fire-arms on premises or plantations of any citizen, without the consent of the owner." *Id.* The next year, Texas passed a

similar law. The 1866 Texas law also barred "carry[ing] firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor." Tex. Crim. Code § 6510 (Paschal 1874). Like section 265.01-d(1), both laws barred carrying firearms on the property of another without consent.

On remand, the State introduced evidence of additional laws to establish that its evidence at the preliminary-injunction stage was no outlier. For example, the State identified a 1771 New Jersey law prohibiting someone from "carry[ing] any Gun on any Lands not his own, and for which the Owner pays Taxes, ... unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor." 1771 N.J. Laws 344. One of the law's stated purposes, in addition to "Preservation of Deer and other Game," was "to prevent trespassing with Guns." *Id.* Likewise, the State put forth evidence of a 1789 Massachusetts law making it unlawful for people to "be seen with any gun or guns" on several islands in Dukes County unless they had "the special license of the proprietors of the said islands, or shall be able to shew sufficient reason therefor." 1790 Mass. Acts 259. The law's stated purpose was promoting "security" of flocks of sheep being watched on the islands. Finally, on remand, the State also introduced a Florida law making it unlawful "for any person to hunt or range with a gun within the enclosed land or premises of another." 1865 Fla. Laws 27.

The District Court erroneously concluded that the laws that referenced hunting were not analogous because they were antipoaching provisions. In reality, these laws expressly regulated not only hunting but also more generally the carrying of firearms onto private property without consent. As has always been the case, statutes are not limited to one purpose. And had a state wanted to regulate hunting exclusively, it could have done so. Further, several of the laws the State identified— for example, New Jersey's 1771 law, Louisiana's 1865 law, and Texas's 1866 law— did not mention hunting and were thus more comprehensive in scope. In requiring that a historical analogue have but one purpose identical to the challenged provision, the District Court imposed an improperly exacting standard by effectively demanding a "historical twin." *Rahimi*, 602 U.S. at 692. "'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold." *Id.* at 740 (Barrett, J., concurring).

The District Court also incorrectly concluded that the historical analogues did not impose a burden on the Second Amendment right comparable to that imposed by section 265.01-d(1) because the historical analogues applied only to private property closed to the public. To the contrary, the State presented extensive historical evidence demonstrating that the statutes applied to *all* private property—whether it was open to the public or not. For example, the 1771 New Jersey law applied to "any Lands not his own, and for which the Owner pays Taxes." 1771 N.J. Laws 344.

Likewise, the 1865 Louisiana law applied to "the premises or plantation of *any* citizen." 1865 La. Acts 14 (emphasis added). By their very terms, then, these laws were not limited only to private property open to the public. Thus, the State introduced even more laws on remand that worked similarly to section 265.01-d(1). The State's additional analogues entered on remand constitute a body of evidence showing that laws barring people from carrying firearms on the property of another without their consent do not offend the Second Amendment.

Indeed, section 265.01-d(1) is not only relevantly similar to the laws listed above; it is close to a historical twin. For example, the Louisiana law prohibited people from carrying firearms "on the premises or plantation of any citizen." 1865 La. Acts 14. The 1866 Texas law did so, too. Tex. Crim. Code § 6510 (Paschal 1874). The New Jersey law barred "carry[ing] any Gun on any Lands not his own" without consent. 1771 N.J. Laws 344. Moreover, the Massachusetts law made it unlawful to "be seen with any gun or guns" without a license from "the proprietors" of the relevant islands. 1790 Mass. Acts 259. Each of these laws stopped people from carrying firearms on private property without an owner's consent and placed the burden on the gun owner to seek consent, just as section 265.01-d(1) does.

The "[w]hy and how" of this burden are also the same. *Rahimi*, 602 U.S. at 692. The "how" is self-evident—most of these laws prohibit the carrying of firearms on land not owned by the carrier without consent, just like section 265.01-d(1). *See*

1771 N.J. Laws 344; Tex. Crim. Code § 6510 (Paschal 1874); 1865 La. Acts 14. And the "why" is similarly analogous. For example, the only stated purpose of Louisiana's law was "prohibit[ing] the carrying of fire-arms … without the consent of the owner." 1865 La. Acts 14. Likewise, though New Jersey's law had one stated purpose of "[p]reserv[ing] … [d]eer and other [g]ame," it also had another: "prevent[ing] trespassing with Guns." 1771 N.J. Laws 344. Promoting public safety by preventing trespassing with guns is indeed the purpose of section 265.01-d(1). Thus, because the "[w]hy and how" of New York's law match those of the State's historical analogues, section 265.01-d(1) is clearly constitutional under the *Rahimi* test.

### B. This Court Should Concur with the Ninth Circuit's Persuasive Decision in *Wolford* Upholding the Constitutionality of Hawaii's Functionally Identical Default-Rule Provision.

In *Wolford*, the Ninth Circuit recently decided challenges to two laws enacted in California and Hawaii and akin to New York's law. 116 F.4th at 973. Both laws reflect common-law principles by requiring a person to get consent to bring their firearm onto another's property. *Id.* California's law was stricter, as it required a property owner to "clearly and conspicuously post[] a sign at the entrance" of their

property to give consent. Cal. Penal Code § 26230(a)(26) (West 2024). However, as relevant here, Hawaii's law is identical. *See* Haw. Rev. Stat. § 134-9.5(a) (2024).

Considering many of the same historical analogues presented by the State here, the Ninth Circuit upheld Hawaii's law.[5] *Wolford*, 116 F.4th at 995. After surveying relevant colonial and state laws, the court focused on the 1771 New Jersey law and the 1865 Louisiana law. *Id.* at 994. Those two laws, it concluded, were "'dead ringers': … simply prohibit[ing] the carry of firearms on private property without consent." *Id.* at 995. The Ninth Circuit held that these laws also evidenced a tradition of "banning the carrying of firearms onto *any* private property without the owner's consent." *Id.* at 994.

Nor were these laws merely outliers. The Ninth Circuit noted that, as here, the parties introduced "no evidence whatsoever that these laws were viewed as controversial or constitutionally questionable." *Id.* Indeed, the laws "were viewed as falling well within the colony's or the State's ordinary police power to regulate the default rules concerning private property." *Id.* On that basis, the Ninth Circuit held that Hawaii's law fell into the Nation's "established tradition of arranging the default

---

[5] The Ninth Circuit did not reach the same conclusion as to California's law, which imposed detailed signage requirements on the private landowner's notice of consent. Rather, it concluded that "California's law falls outside the historical tradition," finding "no historical support" for California's law—but that was because of its "stringent limitation" dictating how consent must be communicated. *Wolford*, 116 F.4th at 995.

rules that apply specifically to the carrying of firearms onto private property." *Id.* at 995.

*Amici* respectfully submit that the Ninth Circuit's reasoned analysis of the historical statutes presented in *Wolford* is compelling and applies with equal force to New York's default rule under section 265.01-d(1). Like the Hawaii statute, that provision falls well within this established historical tradition of regulation and does not offend the Second Amendment. Because the District Court's contrary ruling was in error, this Court should reverse and reinstate section 265.01-d(1) consistent with the result in *Wolford*.

### III. Empirical Evidence Shows That Section 265.01-d(1) Promotes Public Safety.

New York had a simple goal in passing its law: promoting public safety while respecting Second Amendment rights. *See* Press Release, Governor Kathy Hochul, Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision (July 1, 2022), https://tinyurl.com/mtpt39d2. And New York's law achieves that goal. Empirical evidence supports that the law promotes public safety by preventing property owners from having to confront people with guns entering onto their property.

Studies show that guns can cause interactions and confrontations to escalate. For example, the "weapons effect" posits that having weapons leads to more

aggressive driving and road rage. Leonard Berkowitz & Anthony Lepage, *Weapons as Aggression-Eliciting Stimuli*, 7 J. PERSONALITY & SOC. PSYCH. 202, 202 (1967); Brad J. Bushman et al., *The Weapons Effect on Wheels: Motorists Drive More Aggressively When There Is a Gun in the Vehicle*, 73 J. EXPERIMENTAL SOC. PSYCH. 82, 82 (2017). It also increases the odds that an altercation will turn deadly. *See* Ctr. for Gun Violence Sols., *Firearm Violence in the United States*, JOHNS HOPKINS, https://tinyurl.com/4hjnh6jr (last visited Jan. 6, 2025); *see also* John H. Tucker, *As Gun Violence Spikes, Any Confrontation Can Turn Deadly; Innocent Bystanders Become Unlikely Victims*, CLEVELAND.COM (June 2, 2023, 11:39 AM), https://tinyurl.com/49w8hwr8.

And asking someone with a gun to leave your property can be dangerous—if you even get the chance to ask. *See, e.g.*, Katherine Scott, *New Surveillance Video Shows Moments Leading up to Deadly Gun Battle at Fairmount Gas Station*, 6ABC (Apr. 10, 2024), https://tinyurl.com/4aedu4nj; Jack Healy et al., *In a Nation Armed to the Teeth, These Tiny Missteps Led to Tragedy*, N.Y. TIMES (Apr. 20, 2023), https://tinyurl.com/4adfk6bk ("It's shoot first, ask questions later…."). New York's law obviates the need for a property owner to ask, thus avoiding potential confrontations that could turn dangerous or deadly.

Section 265.01-d(1) also protects property owners from being injured by the unsafe handling of firearms on their property. In an armed society, interactions can

turn deadly by accident. For example, in the heat of the moment, even trained gun owners can miss their target and put the lives of others at risk. *See, e.g.*, Sean Neumann, *Tenn. D.A. Tried to Fire Gun at Wanted Murder Suspect but Instead Hit Home with Mom and Kids Inside: Police*, PEOPLE (Dec. 18, 2024), https://tinyurl.com/5n7kunsm. Likewise, crime victims may misidentify their assailant and shoot an innocent bystander or someone attempting to help. *See, e.g.*, *Bystander Shot, Killed Trying to Break up Argument in Philadelphia's Kensington Section*, 6ABC (Aug. 26, 2024), https://tinyurl.com/m3zbabpt; Lisa Rozner et al., *NYPD Officer, 2 Bystanders Shot on Brooklyn Subway Platform When Police Fire on Armed Suspect, Authorities Say*, CBS NEWS (Sept. 16, 2024), https://tinyurl.com/2s3xr6pw.

Relaxed gun regulations increase the number of guns in spaces open to the public and make it more likely that interactions between the public and police will become violent. *See* Mitchell L. Doucette et al., *Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun-Violence Archive Data, 2014–2020*, 99 J. URB. HEALTH 373, 373 (2022) ("The increase in concealed gun carrying frequency associated with these laws may influence the perceived threat of danger faced by law enforcement."). Carrying a gun in public also makes it more likely that someone else will perceive the armed person as a threat. For example, one peer-reviewed study found that a person carrying a gun is 4.46 times

*more likely* to be shot during an assault than someone not carrying a gun. Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034, 2037 (2009), https://tinyurl.com/4xy88cc8.

In sum, empirical evidence supports not only the general public-safety rationale for section 265.01-d(1), but also the conclusion that the provision substantially advances private property owners' legitimate rights by deterring unwanted intrusions by people carrying guns and relieving such owners' self-defense burden on their property. Because New York's law falls within the well-established history and tradition of limitations on the right to keep and bear arms, it is constitutional and should be upheld.

## CONCLUSION

This Court should reverse the district court's order granting Plaintiff's motion for summary judgment and enjoining section 265.01-d(1).

/s/ P. Benjamin Duke
P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
Tel: (212) 841-1000
pbduke@cov.com

*Counsel for Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief contains 6982 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and has been prepared in proportionally spaced typeface using 14-point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word-processing system in preparing this certificate.

Dated: January 24, 2025

*/s/ P. Benjamin Duke*
P. Benjamin Duke

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2025, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished on them via the appellate CM/ECF system.


Dated: January 24, 2025

*/s/ P. Benjamin Duke*
P. Benjamin Duke