# 24-2847

## United States Court of Appeals
### *for the*
## Second Circuit

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC.,
SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellees*,

JOHN BORON,

*Plaintiff*,

– v. –

STEVEN G. JAMES, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE
NEW YORK STATE POLICE,

*Defendant-Appellant*,

MICHAEL J. KEANE, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY FOR
THE COUNTY OF ERIE, NEW YORK,

*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK, No. 1:22-cv-00695 (Sinatra, Jr., J.)

## BRIEF FOR PLAINTIFFS-APPELLEES

| | |
|---|---|
| Nicolas J. Rotsko | David H. Thompson |
| FLUET & ASSOCIATES PLLC | Peter A. Patterson |
| 1751 Pinnacle Drive | William V. Bergstrom |
| Suite 1000 | COOPER & KIRK, PLLC |
| Tysons, VA 22102 | 1523 New Hampshire Ave., N.W. |
| (703) 590-1234 | Washington, DC 20036 |
| nrotsko@fluet.law | (202) 220-9600 |
| | dthompson@cooperkirk.com |

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iii

INTRODUCTION ........................................................................... 1

STATEMENT OF THE CASE ........................................................ 3

   I.   The Challenged Law ............................................................ 3

   II.   Procedural History ............................................................. 4

        A. Preliminary Injunction Proceedings .................................. 5

        B. Summary Judgment ........................................................ 6

SUMMARY OF ARGUMENT ....................................................... 7

ARGUMENT ............................................................................... 10

   I.   The Second Amendment Protects the Right to Carry Firearms
      in Public............................................................................. 10

   II.   The No-Carry Default Rule Has No Basis in Historical
      Tradition........................................................................... 11

        A. Historical Analysis Under *Bruen* and *Rahimi*. ................. 12

        B. The State Has, At Most, Identified A Historical Tradition
          of Defining Hunting Rights................................................ 19

        1. Colonial and Pre-Founding Statutes ................................ 21

            i.   From the Colonial Era to the Founding, Americans
               Redefined the Balance Between Private Property
               Rights. .................................................................. 21

i

ii.     Each of the State's Purported Analogues Fits into
        This Tradition of Advancing Freedom to Hunt and
        Limiting the Rights of Property Holders.....................27

iii.    The State's Attempts to Tether the No Carry Default
        Rule to These Hunting Regulations Must Be
        Rejected. ....................................................................43

2.  The State's Post-Civil War Laws Provide No Support
    Either..........................................................................48

3.  The State's Remaining Historical Evidence and Argument
    Is Similarly Unavailing...........................................56

C.  The No-Carry Default Rule Is A Modern Novelty.................60

CONCLUSION ...........................................................................63

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                          **<u>Page(s)</u>**

*Andrews v. State*,
    50 Tenn. 165 (1871) ................................................................59

*Antonyuk v. James*,
    120 F.4th 941 (2d Cir. 2024) .............2, 11, 14, 17, 18, 27, 36, 40, 49

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011) ............................................................. 47, 48

*Christian v. Nigrelli*,
    642 F. Supp. 3d 393 (W.D.N.Y. 2022) .........................................5, 6

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ............................................... 10, 13, 15, 29, 45

*Duncan v. Bonta*,
    695 F. Supp. 3d 1206 (S.D. Cal. 2023) .........................................16

*Espinoza v. Mont. Dep't of Revenue*,
    591 U.S. 464 (2020) ...............................................................15

*Kachalsky v. Cnty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012) .......................................................45

*Kipke v. Moore*,
    695 F. Supp. 3d 638 (D. Md. 2023) ............................................54

*Koons v. Platkin*,
    673 F. Supp. 3d 515 (D.N.J. 2023) ......................................... 18, 40

*Lara v. Comm'r Pa. State Police*,
    91 F. 4th 122 (3d Cir. 2024) ................................................. 13, 16

*Lara v. Comm'r Pa. State Police*,
    No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024) ........................13

*Macon & W.R. Co. v. Lester*,
    30 Ga. 911 (1860) .................................................................26

*Maupin v. State*,
    89 Tenn. 367 (1890) ...............................................................59

*McConico v. Singleton*,
    9 S.C.L. (2 Mill.) 244 (1818) .....................................................26

*McKee v. Gratz,*
260 U.S. 127 (1922) ................................................................ 26

*Moore v. Madigan,*
702 F.3d 933 (7th Cir. 2012) ............................................ 13, 16

*New York State Rifle & Pistol Association v. Bruen,*
597 U.S. 1 (2022) ..................................... 1, 10, 11, 13, 14, 15, 16, 17,
18, 42, 43, 45, 46, 55, 57, 58, 59, 60

*Timbs v. Indiana,*
586 U.S. 146 (2019) ................................................................ 55

*United States v. Daniels,*
77 F.4th 337 (5th Cir. 2023) ............................................. 13, 17

*United States v. Daniels,*
No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024) ...................... 13

*United States v. Rahimi,*
602 U.S. 680 (2024) ................................. 11, 14, 17, 18, 19, 43, 44

*Wolford v. Lopez,*
116 F.4th 959 (9th Cir. 2024) .................................. 36, 38, 51, 63

*Worth v. Jacobson,*
108 F.4th 677 (8th Cir. 2024) .................................................. 16

*Worth v. Harrington,*
666 F. Supp. 3d 902 (D. Minn. 2023) ..................................... 16

## Statutes, Constitutions & Codes

N.Y. PENAL LAW § 265.01-d(1) ................................................... 4

VT. CONST. ch. 2, § 39 (1777), https://perma.cc/SP8W-7QEH ................ 24

Florida Constitution of 1868 *in* BENJAMIN PERLEY POORE, THE
FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS,
AND OTHER ORGANIC LAWS (2d ed. 1878) ................................ 50, 51

1879 TEX. PENAL CODE (1887) https://perma.cc/Z54D-WEBY ............... 50

1729 LAWS OF MARYLAND 11, 13 ............................................... 33

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA,
1800 Ga. Laws 157 (Watkins ed. 1800) ................................... 31, 32

Act of Dec. 20, 1763, § 1, 1763 N.Y. Laws 442 ............................. 35

Act of Dec. 6, 1769, § 3, 1769 N.J. Laws 317, 320 ........................................

Act of May 28, 1746, ch. XI *in* ACTS & LAWS OF MASSACHUSETTS BAY ... 31

An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4 *in* 1823 LAWS OF THE STATE OF NEW HAMPSHIRE ........................................................ 32

## Other Authorities

19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND REVOLUTIONARY (1768–1773) .............. 31

*A Test Case for the President,* N.Y. TRIB. (Mar. 7, 1866) ........................ 54

ALBANY WEEKLY HERALD (Sept. 28, 1893), https://perma.cc/H5AC-ENC8 ...................................................... 56

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L., MED. & ETHICS 183 (2020).............................................. 1, 60, 61, 62

3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1803) ...................................................... 23, 41

Nathaniel Breading et al., *The Address and reasons of dissent of the minority of the convention, of the state of Pennsylvania, to their constituents* (Philadelphia: Printed by E. Oswald, 1787), https://perma.cc/HD7R-U7WN ...................................................... 24

ALLEN BUSH, A DIGEST OF THE STATUTE LAW OF FLORIDA (1872) https://perma.cc/VWF8-98W6 ...................................................... 51

Catie Carberry, *What's in a name? The Evolution of the Term 'Gun'*, CTR. FOR FIREARMS L. AT DUKE UNIV. (July 24, 2019), https://perma.cc/VG2C-K4YC ...................................................... 32

Frame of Government of Pennsylvania, § 22 (1683), (William F. Swindler ed., 1979), https://perma.cc/538U-PR2N ........................ 24

*Gun,* 1 WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) .................................................................... 29, 30

Thomas A. Lund, *Early American Wildlife Law*, 51 N.Y.U. L. REV. 703 (1976) ...................................................... 22

New York State Senate Debate on S. 51001 (July 1, 2022)
(Sen. Myrie), https://perma.cc/332Q-HF4M ............................. 62, 63

*Report of George F. Hoar, W. A. Wheeler, Wm. P. Frye, reprinted in*
Charles H. Jones, An Abridgment of the Debates of Congress
(H. Holt & Co. 1875) ................................................................. 53, 54

Brian Sawers, *Keeping Up with the Joneses: Making Sure Your*
*History Is Just as Wrong as Everyone Else's,*
111 MICH. L. REV. FIRST IMPRESSIONS 21 (2013).... 25, 26, 33, 35, 37

Brian Sawers, *Race and Property After the Civil War: Creating*
*the Right to Exclude*, 87 MISS. L.J. 703 (2018) ................. 52, 53, 54

Brian Sawers, *The Right to Exclude from Unimproved Land,*
83 TEMP. L. REV. 665 (2011) ............................................... 23, 26, 33

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE
INTERPRETATION OF LEGAL TEXTS (2012) ........................................ 28

Mark W. Smith, *Attention Originalists: The Second Amendment Was*
*Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER
CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD ........................... 14

THE EUGENE GUARD (May 15, 1893),
https://perma.cc/7MHJ-QC4A?type=standard .............................. 56

## INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court held that the Second Amendment protects a general right to carry firearms in places "frequented by the general public" subject to "well-defined" and "exceptional" circumstances in which carry can be restricted. 597 U.S. 1, 33, 38 (2022). The Court accordingly held that New York's "may-issue" licensing regime violated this right by restricting carry to those with special self-defense needs. In response, New York has sought to resurrect its restrictive carry regime by shifting its focus from *who* can carry to *where* carry is allowed. And a centerpiece of this effort is the restriction at issue in this case: a law making the right to carry presumptively *unavailable* in all of the private establishments open to the public in the state. As the scholars pushing this novel concept have made clear, the motivation is to drastically expand the spaces where firearms cannot be carried by relying on the reality that many private property owners will not disturb the default. *See* Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for 'No carry' Defaults and Private Land*, 48 J. L., MED. & ETHICS 183, 184 (2020).

The district court properly held that a no-carry default is unconstitutional. The restriction implicates the plain text of the Second Amendment by regulating where firearms may lawfully be carried. And it cannot be reconciled with the historic principles underlying the Second Amendment. This Court already has held that the State is unlikely to be able to justify the law historically. *See Antonyuk v. James*, 120 F.4th 941, 1047 (2d Cir. 2024). The Court should now hold that its prediction was correct. The State relies principally on the same hunting regulations that it relied on at the preliminary injunction stage, and it is even clearer now that those laws cannot justify New York's no-carry default. The handful of colonial laws that New York cites arose in the context of hunting regulation in America. The general understanding at the time was that individuals were at liberty to hunt on unenclosed open fields, even if those fields were owned by another person, but that individuals were not entitled to enter, much less hunt on, the improved or enclosed lands of another without permission. The laws restricting the carrying of firearms on private, enclosed lands therefore essentially were aggravated trespass laws that sought to combat the problem of people hunting on land where they were not entitled to be in the first place. They provide zero

2

justification for New York's law requiring express permission to carry for self-defense in establishments open to the public.

The Civil-War-era laws cited by New York fare no better. While they resemble the colonial laws, their purpose was more sinister. They were part of the "Black Codes" adopted by recalcitrant southern legislatures seeking as much as possible to recreate the pre-Civil-War racial hierarchy. To the extent they really did make no-carry a default rule, they were aimed at cutting off opportunities for free persons of color to hunt and provide food for themselves, with the ultimate goal of forcing them to rely for support on jobs at the plantations from which they had recently been freed. This shameful episode in our Nation's history should have no part in defining the scope of our fundamental rights.

This Court should affirm the decision of the district court.

## STATEMENT OF THE CASE

### I. The Challenged Law

Following the Supreme Court's decision in *Bruen*, New York enacted the Concealed Carry Improvement Act, updating New York's firearms laws in light of the fact that, after *Bruen*, the State could no longer use licensing to constrict the rights of its citizens to carry firearms

3

in public. In doing so, it not only altered its licensing rules, but also declared a wide variety of places "sensitive" and forbid carriage of firearms in those places. The specific provision at issue in this appeal is N.Y. PENAL LAW § 265.01-d(1) (hereinafter, the "No Carry Default Rule"), which makes it a crime to carry a firearm onto any property, including property open to the public such as grocery stores, bookstores, and hair salons, where the owner has not given express permission (either through "conspicuous signage" or otherwise) that the carriage of firearms is permissible in that location.

## II.  Procedural History

Plaintiff-Appellant Brett Christian, alongside Firearms Policy Coalition and Second Amendment Foundation, two organizations that seek to promote and defend the Second Amendment protected rights of their members, filed this suit on September 13, 2022, shortly after the CCIA took effect, challenging the constitutionality of the No Carry Default Rule as applied to private-property open to the public, as well as other provisions of the CCIA barring the carry of firearms in public parks and on public transportation. J.A. 17–18, 26. Plaintiff Christian, a member of both FPC and SAF, alleged that, as a result of the No Carry

4

Default Rule, he would no longer be able to carry his firearm with him when he ran errands to certain businesses open to the public, such as gas stations and hardware stores. J.A. 17, 38–39.

## A. Preliminary Injunction Proceedings

As relevant to the claim currently on appeal, Plaintiffs moved for a preliminary injunction. On November 22, 2022, after an abbreviated briefing schedule, the district court enjoined enforcement of the No Carry Default Rule "with respect to private property open to the public." *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 411 (W.D.N.Y. 2022). The State appealed, and on December 8, 2023, in a single opinion addressing this case alongside three similar challenges to various provisions of the CCIA, this Court upheld the district court's grant of an injunction against the No Carry Default Rule. *See Antonyuk,* 120 F.4th at 1047. Applying the *Bruen* framework, the Court began with the text of the Second Amendment and held that, at least as applied "to private property open to the public," conduct regulated by the No Carry Default Rule "falls within the Second Amendment right to carry firearms in self-defense outside the home." *Id.* at 1044.

5

Turning to history, the Court rejected the State's argument that five of the same nine laws it chiefly relies upon now "support the broad[] tradition the State urges" and held rather that they were "inconsistent with the restricted location provision's default presumption against carriage on private property open to the public." *Id.* at 1046. This Court specifically criticized the State for relying chiefly upon laws that were aimed at deterring unlawful hunting and which, by targeting lands *not open to the public*, exacted a significantly lesser burden on the right of armed self-defense than the No Carry Default Rule. *Id.* at 1046–47. After a GVR in a related case, this Court adhered to its ruling that the No Carry Default Rule likely violates the Second Amendment. *See Id.* at 1047.

### B. Summary Judgment

On remand, the parties filed cross-motions for summary judgment as to the lawfulness of the No Carry Default Rule. S.A. 6. Although the State fleshed out its historical record by adding additional examples of historical statutes that were similar to those this Court rejected in *Antonyuk*, the district court held that the No Carry Default Rule violates the Second and Fourteenth Amendments to the Constitution. S.A. 25.

Indeed, the district court noted that its conclusions on the State's complete record closely tracked this Court's decision on the preliminary record: "[N]one of the proffered founding-era enactments, fairly read, burdened the individual's right to carry firearms in the same way, to the same extent, or for the same reasons as the restriction here[.]" S.A. 34. And the story was the same for the Reconstruction-era laws as well. S.A. 35–36. The State timely appealed. J.A. 1752.

## SUMMARY OF ARGUMENT

The State summarizes its evidence as "a robust and unambiguous line of statutes, from the colonial era through Reconstruction and beyond, that have restricted carrying guns onto others' private premises without advance consent," which it asserts "were enacted for the same purposes as the private-property provision: to protect public safety and to vindicate the rights of property owners to exclude individuals carrying firearms from their property." Doc. 38, Appellant Br. (Jan. 3, 2025) at 2 ("State Brief"). The record bears out none of those claims.

Beginning in 1715 and continuing through 1790, the State has identified pre-Ratification examples of an entirely different historical tradition: statutes that exemplify the American colonies' rebalancing of

the opposed rights of landowners to exclude, and of hunters to hunt on open land, in a way that deviated from prior English practice and favored the rights of hunters over those of landowners. Every single one of the State's statutes from this period operated this way, and each should be understood by this Court as nothing more than a hunting regulation—in fact, a hunting regulation that actually *preserved* the right to hunt on undeveloped land and declared such property *open* to the gun-bearing public. These laws, therefore, can lend no support to the State's attempt to presumptively ban carrying handguns for self-defense, not hunting, in places that are generally held open to the public. Neither the "how" nor the "why" of such historical analogues match the State's law.

The State next points for support to laws from the 19th century: three laws from immediately after the Civil War in Louisiana, Texas, and Florida, and one from Oregon in the 1890s. The Oregon law can be rejected for the same reason as the 18th century laws, but the postbellum laws can be rejected for even stronger reasons. The State omits to note that each law was passed by an unintegrated legislature before the state had been readmitted to the Union, and each was part of the infamous "Black Codes" that sought to diminish any practical benefit black

Americans might have received from emancipation. In fact, the specific laws the State cites here were critical components in advancing the Black Codes' aim of keeping former slaves in a state of practical servitude by denying them both the ability to defend or to hunt for themselves, seeking to force them back into a life of subservient labor if they were to be able to continue to eat and drink. Such laws, which deviated from the earlier tradition of *promoting* a freedom to hunt so that all Americans would have means to feed themselves, are more indicative of what a state may *not* do, consistent with the Second Amendment, than they are of what a state may do.

In fact, the State's law has no historical basis whatsoever. It was enacted immediately following the Supreme Court's decision in *Bruen* in a naked attempt to blunt the effect of that ruling, self-consciously reversing hundreds of years of permitting firearms to be carried on private lands open to the public, a tradition that was honored in all 50 states until the passage of the CCIA. This Court should declare this deviation unconstitutional under *Bruen*.

## ARGUMENT

### I. The Second Amendment Protects the Right to Carry Firearms in Public.

Under *Bruen*, the threshold issue for this Court's consideration is whether the conduct plaintiffs wish to engage in is covered by the plain text of the Second Amendment. 597 U.S. at 17. In this case, the State wisely does not attempt to dispute this issue, so Plaintiffs will not belabor the point: the plain text of the Second Amendment, which enshrines a right to "keep and bear arms," protects the right to carry firearms in private businesses open to the public.

This follows directly from the Supreme Court's decisions in *Bruen* and *Heller*. In *Heller*, the Supreme Court defined the Second Amendment's key terms. "[T]he people," includes "all Americans"; "arms" includes "all firearms"; and to "bear" simply means to "carry." *District of Columbia v. Heller,* 554 U.S. 570, 580–82, 584 (2008); *see Bruen*, 597 U.S. at 32–33. The Second Amendment itself makes no distinction with respect to any particular location where a holder of the right might exercise it, *see Bruen*, 597 U.S. at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."), and the term "bear" "naturally

10

encompasses public carry" for self-defense, *id.* Indeed, as this Court recognized in *Antonyuk*, "public" must include private property open to the public, because "over 91 percent of land in New York State is privately held," and if the Second Amendment did not apply on private property, it would apply in very few actual "public" settings. 120 F.4th at 1044.

## II. The No-Carry Default Rule Has No Basis in Historical Tradition.

Given this backdrop, the No Carry Default Rule is presumptively unconstitutional, and it can only be saved if the State can show a tradition of historical restrictions on the right to carry firearms in public that is "relevantly similar," *Bruen*, 597 U.S. at 29, such that New York's law "is consistent with the principles that underpin our regulatory tradition," *United States v. Rahimi*, 602 U.S. 680, 692 (2024). New York has failed to make such a showing.

The State claims that the No-Carry Default Rule is "relevantly similar" to "laws from nine States or their colonial precursors, dating from before the founding and through the adoption of the Fourteenth Amendment, all of which forbade carrying guns onto others' property without their permission." State Br. at 11–12. It argues that the No Carry

Default Rule, and these historical laws, all imposed the same burdens on the right to bear arms, and were enacted to serve the same twin aims of "enhanc[ing] public safety" and "ensur[ing] that property owners are empowered to determine whether they wish to allow the carrying of firearms on their property." *Id.* at 17; *see also id.* at 18 (arguing the historical restrictions served these same purposes).

The State's story is incorrect in every aspect. The historical tradition it has identified is not one of requiring permission to carry firearms on property held open to the public. It consists, rather, of trespass laws and hunting restrictions, with a history that is profoundly opposed to the rationale behind the State's law. The State's own law is manifestly a modern deviation from the two-hundred-year-old traditions of our country that was specifically devised as a novel means of diminishing the Second Amendment rights of Americans, unconnected to *any* legitimate historical tradition.

## A. Historical Analysis Under *Bruen* and *Rahimi*.

Under *Bruen* and *Rahimi*, three general considerations should guide this Court's consideration of the State's historical evidence.

First, evidence from the Founding era, when the Second Amendment was ratified, has controlling weight. *See id.* at 34–35; *accord United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023) ("A tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later."), *cert. granted, judgment vacated*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024); *Lara v. Comm'r Pa. State Police*, 91 F. 4th 122, 133–136 (3d Cir. 2024), *cert. granted, judgment vacated*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024) (holding that 1791 is the most probative period when evaluating restrictions on carry by 18-to-20-year-olds); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (calling 1791 the "critical year for determining the [Second] [A]mendment's historical meaning"). *Bruen* was explicit that "not all history is created equal." 597 U.S. at 34; *see also id.* at 36 (Sources originating "75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources." (quoting *Heller*, 554 U.S. at 614)). This is so because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" *Heller*, 554 U.S. at 634–35. The people adopted the Second Amendment in 1791, so the public understanding of the right around that time is

crucial to understanding any questions surrounding content of the right. *Bruen*, 597 U.S. at 37; *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD. Consequently, evidence that long pre- or post-dates 1791 is less probative, *Bruen*, 597 U.S. at 35–37, and laws from the 20th-century are categorically too late to matter. *Id*. at 66 n.28.

To be sure, this Court in *Antonyuk* concluded that the understanding of the right in 1868, at the Ratification of the Fourteenth Amendment, could also serve as a "focal point[]" of analysis and is another "relevant consideration" to be weighed in determining the meaning of the Second Amendment, 120 F.4th at 972, 974. But this is true only to the extent that evidence of the 1868 understanding *confirms* evidence of the 1791 understanding. *Bruen*'s reasoning underscores that evidence from 1868 cannot overcome evidence (or the lack thereof) from 1791 as to the permissibility of a given restriction on the right. After initially rejecting "medieval English regulations," 597 U.S. at 40; *accord Rahimi*, 602 U.S. at 694 (rejecting English traditions that failed to make it to "this side of the Atlantic"), *Bruen* turned to sources leading up to the

ratification of the Second Amendment, including the 1689 English Bill of Rights, *see* 597 U.S. at 44–45. After finding these sources somewhat probative of the Amendment's *general* original meaning, the Court focused on "the history of the Colonies and early Republic," plus "the first decade after [the Second Amendment's] adoption." *Id.* at 46, 50. And it found that the challenged law had "no historical basis" because no analogue in that relevant historical period supported it. *Id.* at 50. Later evidence was much less important. Only after canvassing the historical evidence from English, colonial, Early Republic, and Reconstruction periods did the Court discuss post-1868 sources and the late-19th century. *Id.* at 60–70. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect 'the origins and continuing significance of the Second Amendment.' " *Id.* at 67 (quoting *Heller*, 554 U.S. at 614). Thus, the Court declined to rely on such laws and regulations. *See Bruen*, 597 U.S. at 66–68; *accord Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (holding that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the

Free Exercise Clause" when those provisions were not grounded in Founding era practice). *Bruen* thus cautioned lower courts to "guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35.

*Bruen*'s reasoning therefore strongly supports the conclusion that the Founding era is the primary benchmark against which historical evidence from later time periods must be measured, even if the Court formally left open the question whether 1791 or 1868 is the controlling date for constitutional analysis. *See id.* at 37 (noting that "19th-century evidence [has been] treated as mere confirmation of what the Court thought had already been established" (internal quotation marks omitted)); *accord Moore*, 702 F.3d at 935; *Lara*, 91 F.4th at 134–36; *Duncan v. Bonta*, 695 F. Supp. 3d 1206, 1237 (S.D. Cal. 2023) ("*Bruen* teaches the most significant historical evidence comes from 1791"); *Worth v. Harrington*, 666 F. Supp. 3d 902, 919 (D. Minn. 2023), *aff'd sub nom.*, *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters" (quoting *Bruen*, 597 U.S. at 38)). Restrictions on

16

the right to keep and bear arms adopted prior to or during the Reconstruction era may be confirmatory of earlier legislation but cannot alone establish the historical tradition of regulation required by *Bruen*. *See Daniels*, 77 F.4th at 348 ("When 19th-century practice is inconsistent with the categorical protection of the Second Amendment, the text controls." (cleaned up)). Only "enduring" and "well-established" restrictions with roots in the Founding are relevant in assessing whether the challenged restrictions comport with the text's "unqualified command." *Bruen*, 597 U.S. at 17, 30–31 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see also Rahimi*, 602 U.S. at 692.

Second, *Bruen* held that forming a historical tradition requires proof of representative, relevantly similar analogues. As *Rahimi* explained, such historical laws must evidence the "principles that underpin our regulatory tradition" and that "underly[] the Second Amendment." 602 U.S. at 692. Analogues are representative, therefore, if they are broadly applicable and widely accepted. While, as this Court noted in *Antonyuk*, it is possible that it would be inappropriate in some cases to infer from legislative silence that legislators necessarily viewed a type of regulation as inconsistent with the right to bear arms, 120 F.4th

17

at 972, on the other hand, a couple of state laws that are disconnected, in principle, to earlier or later enactments is not a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding, *Bruen*, 597 U.S. at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" (emphasis omitted) and rejecting regulations applying to only 1% of the population). Put differently, laws existing in only a few jurisdictions—historical "outliers"—should be disregarded. *Id.* at 30 (internal quotation marks omitted); *see also Koons v. Platkin*, 673 F. Supp. 3d 515, 622 (D.N.J. 2023) (finding three Reconstruction era laws non-representative); *see also id.* at 642 (finding one state law and 25 local ordinances, covering less than 10% of nation's population, insufficient).

Third, any analogues must be "relevantly similar" based on "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Bruen,* 597 U.S. at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id*. The analysis of this relevant similarity yields, under *Rahimi*, the sort of "principles" to

18

be applied in assessing a modern statute's constitutionality. 602 U.S. at 692. This requirement means that Founding era laws arising in different contexts, and for different reasons, will be inapt comparators to a modern law, since they are not motivated by the same underlying principles. *See, e.g.*, *id.* ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.").

### B. The State Has, At Most, Identified A Historical Tradition of Defining Hunting Rights.

The State cites to ten historical statutes from nine states enacted across the better part of two centuries, which it claims required individuals to seek permission to carry firearms on any privately held land, including that land that was open to the public, just like the No-Carry Default Rule. *See* J.A. 1220 (Maryland 1715); J.A. 1225 (Pennsylvania 1721); J.A. 1231 (New Jersey 1722); J.A. 1236 (New York 1763); J.A. 1241 (New Jersey 1771); J.A. 1742 (Massachusetts 1790); J.A. 1249 (Louisiana 1865); J.A 1256 (Texas 1866); J.A. 1530 (Florida 1866); J.A. 1261 (Oregon 1893). But a close examination of these laws reveals that they are all a part of a singular tradition (or more accurately, dialogue), that redefined both the property and hunting rights of

Americans in a way that charted a distinct course from those traditions inherited from England. The State's analogues enacted between 1715 and 1790 demonstrate the dominant historic tradition of American history of rebalancing the adverse rights of landholders and hunters to favor hunters, going so far as to permit hunting even on private land and against the owner's wishes so long as the private land is unenclosed and unimproved. The State's later laws mark a continuation and, in critical respects, an alteration of this tradition, as former slaveholders in the South sought to buttress private property rights and diminish the hunting rights of former slaves, in an attempt to circumscribe their liberty and ensure they remained dependent upon the landholding elite for their food under the sharecropping system. Neither set of laws suggests that it is consistent with the liberties protected by the Second Amendment for the State to presumptively declare carrying firearms for self-defense on private property open to the public a crime.

### 1. Colonial and Pre-Founding Statutes

### i. From the Colonial Era to the Founding, Americans Redefined the Balance Between Private Property Rights.

The State's earliest proposed historical analogue comes from Maryland in 1715, and it can serve as a basis for understanding what is happening with all of the State's pre-1791 laws. The statute declares at its outset that its purpose is "to prevent the abusing, hurting or worrying of any stock of hogs, cattle or horses, with dogs, or otherwise," and, in furtherance of that purpose, it forbids anyone convicted of certain crimes, or "of evil fame, or a vagrant, or dissolute liver" to "shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned." J.A. 1223.

The State, reading this statute, narrows its focus to just a few words in the act, summarizes it as making it illegal to " '*be seen to carry a gun*' on another's property absent consent." State Br. at 22 (quoting J.A. 1223 (emphasis in State Br.)). But this obviously misses important context. The statute contains many indications it is focused specifically on the evils of *hunting* on someone else's *improved farmland*, from the concern

about "hurting or worrying of any stock," to the fact that "or be seen to carry a gun" is prefaced with "shoot, kill or hunt" and the note that this applies only to land "whereon there shall be seated a plantation." J.A. 1223. In fact, these features of the law, which the State ignores, are *the* critical features to understanding it.

Neither this Maryland 1715 statute nor any of the other colonial statutes the State relies upon, can be fully understood unless they are put in proper historical context as a species of game laws that were in dialogue with (or in reaction to) much earlier English traditions regarding hunting. Going back to the fourteenth century in England, hunting and trapping were treated as appropriate diversions for gentlemen and the elite, and laws were constructed in such a way as to specifically preclude anyone other than "qualified prominent citizens" from partaking, so as to ensure that lower classes "could neither consume game, nor interfere with the beasts that ravaged their crops," thereby ensuring that the poor remained dependent on their labor for their food. Thomas A. Lund, *Early American Wildlife Law*, 51 N.Y.U. L. REV. 703, 704 (1976) (citations omitted). These restrictions went hand in hand with the English conception of the right to exclude. The State itself cites

22

Blackstone as stating that "every man's land is in the eye of the law inclosed and set apart from his neighbors … either by a visible and material fence … or, by an ideal invisible boundary." 3 WILLIAM BLACKSTONE, COMMENTARIES 209–10 (1803), Add. 2–3.

Neither of these views, however—that hunting was a rich man's sport and that any landowner could entirely close his whole property to any intrusion—would last long on a new continent. In America, where land and game were both far more abundant, "[b]y statute, the colonials reversed the English rule, invariably within a few years of settlement," by limiting the traditional right of landowners to exclude anyone they chose from their property only to actually enclosed lands, where the landowner constructed a fence or some other building. Brian Sawers, *The Right to Exclude from Unimproved Land*, 83 TEMP. L. REV. 665, 675, 677–78 (2011). Everywhere else, even on "private property," the right to hunt, and even graze animals, was given to landowners and non-landowners alike. *Id.*

Indeed, the colonists viewed the right of hunting even on the "private property" of others as so critical, that it was enshrined in two state constitutions from the pre-Second Amendment colonial and

23

American periods, with Pennsylvania's 1683 constitution providing "that the inhabitants of this province and territories thereof may be accommodated with such food and sustenance, as God, in his providence, hath freely afforded … the inhabitants of this province and territories thereof" were given "liberty to fowl and hunt upon the lands they hold, *and all other lands therein not inclosed*." Frame of Government of Pennsylvania, § 22 (1683), https://perma.cc/538U-PR2N (emphasis added). Vermont's 1777 constitution similarly declared "[t]hat the inhabitants of this State, shall have liberty to hunt and fowl, in seasonable times, on the lands they hold, *and on other lands (not enclosed)*." VT. CONST. ch. 2, § 39 (1777), https://perma.cc/SP8W-7QEH (emphasis added). Indeed, the right to hunt on others' lands not enclosed was suggested by some for inclusion in the Bill of Rights. *See* Nathaniel Breading et al., *The Address and reasons of dissent of the minority of the convention, of the state of Pennsylvania, to their constituents* at 1 (Philadelphia: Printed by E. Oswald, 1787), https://perma.cc/HD7R-U7WN ("Eighth. The Inhabitants of the several states shall have liberty to fowl and hunt in seasonable times, on the lands they hold, and on *all other lands in the United States not inclosed*.") (emphasis added).

24

Though it was not ultimately included in the Constitution, through statute and caselaw, the general rule was nevertheless established that unless a landowner enclosed his land (which was expensive to do), other Americans had a right to enter the property and hunt on it with firearms. Indeed, "[a]t ratification, only one state granted landowners any right to exclude hunters from open land, while six other states authorized hunting on open land, regardless of landowner permission." Brian Sawers, *Keeping Up with the Joneses: Making Sure Your History Is Just as Wrong as Everyone Else's*, 111 MICH. L. REV. FIRST IMPRESSIONS 21, 25 (2013); *see also id.* at 24 ("[U]nfettered public access to open land was the norm, even if it did not receive constitutional protection.").

Caselaw attests to the strength of this attitude toward public access to unenclosed lands. In 1922, the United States Supreme Court recognized that American law had diverged from Blackstone's conception of an invisible boundary when it explained that "[t]he strict rule of the English common law as to entry upon a close must be taken to be mitigated by common understanding with regard to the large expanses of unenclosed and uncultivated land in many parts at least of this country. Over these it is customary to wander, shoot and fish at will until

the owner sees fit to prohibit it." *McKee v. Gratz*, 260 U.S. 127, 136 (1922) (Holmes, J.). And, at least in some cases at earlier periods, the owner's right to prohibit it was denied. In 1818, the South Carolina Supreme Court held that a landowner entirely lacked the power to tell hunters to leave his "unenclosed and uncultivated land," noting that the hunter's own right to enter such putatively "private" property "ha[d] never been disputed," but rather was "universally exercised." *McConico v. Singleton*, 9 S.C.L. (2 Mill.) 244, 351 (1818); *see also* Sawers, *The Right to Exclude*, *supra* at 678 & nn.115–17. Similarly, in 1860 the Georgia Supreme Court noted that prohibiting entry upon unenclosed lands "would require a revolution in our people's habits of thought and action" and that "[o]ur whole people, with their present habits, would be converted into a set of trespassers," and that, instead, "he who wishes to protect his land from [such intrusions], must enclose it[.]" *Macon & W.R. Co. v. Lester*, 30 Ga. 911, 914 (1860); *see also* Sawers, *Keeping Up with the Joneses*, *supra* at 23–24 & nn.17–18.

With this backdrop in view, the State's case hits a dead end—it is clear that on even the most generous possible reading of this exemplary 1715 Maryland law that this Court's earlier conclusions that the

references to "land," "improved or inclosed land" and "premises or plantations" in the State's proposed analogues "would have been understood to refer to private land not open to the public." *Antonyuk*, 120 F.4th at 1047. Indeed, history shows that what these statutes were doing was specifically *defining* what land is private and not open to the public—and it was only on such land that hunting and carrying firearms was prohibited by them. This "tradition" had nothing to do with regulating the carriage of firearms in places open to the public for self-defense.

> ### ii. Each of the State's Purported Analogues Fits Into This Tradition of Advancing Freedom to Hunt and Limiting the Rights of Property Holders.

The State's 1715 Maryland law is entirely legible as a contribution to this evolution of property law that was slowly transforming the American landscape in favor of general hunting rights. The State mistakenly reads "shoot, kill, or hunt, or be seen to carry a gun," as discrete prohibitions, with "be seen to carry a gun" read as a broader prohibition that expanded the scope of the statute beyond hunting and "generally regulated carrying firearms onto private property without consent" *in addition* to regulating hunting. State Br. at 21–22. Of course, knowing what we know about the background of this law, reading that

phrase separate from those that come before it is inappropriate—the law was a hunting regulation through and through. But even without that historical backdrop and only judging by its plain text, the State's reading of the statute is a poor one. In 1715, as now, it was understood that associated words in a single statute are to be read as informing one another's meaning (*noscitur a sociis*), and similarly that catch-all phrases that conclude lists should be read as limited by the listed items that preceded them (*ejusdem generis*). ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195–213 (2012); *see also id.* at 200 (noting that *ejusdem generis* has been a recognized tool of statutory construction since at least 1596). Here, the State's attempt to give the statute a broad meaning requires wrenching "or be seen to carry a gun" out of the context of what came immediately before it (three different phrasings of prohibitions on poaching or hunting). It is an unnatural reading of the statute on its own terms, and the State does not buttress its reading with *any* historical source suggesting the statute was actually ever applied so broadly.

 There are other strong textual hints that the statute was only about hunting. The declared purpose of the Act was "to prevent the abusing,

hurting or worrying of any stock of hogs, cattle or horses, with dogs, or otherwise." J.A. 1223. From the State's perspective, the reference to "dogs" is confusing—if, after all, the statute is merely about prohibiting the carrying of firearms, it is hard to see what dogs have to do with the prohibited conduct at all. But if the concern is with hunting, the preamble to the prohibition is easily understood.

Then there is the fact that even the allegedly broad provision on which the State chiefly relies still only restricts the carriage of "guns." While the term is often understood more broadly now to include all firearms, that has not always been the case. Indeed, Noah Webster's American Dictionary of the English Language in 1828, cited by the majority in *Heller* for its definitions of the terms "arms," "keep," "carry," and "militia," *see* 554 U.S. at 581–84, 595, provided the following definition of "gun":

> GUN, noun. An instrument consisting of a barrel or tube of iron or other metal fixed in a stock, from which balls, shot or other deadly weapons are discharged by the explosion of gunpowder. The larger species of guns are called cannon; and the smaller species are called muskets, carbines, fowling pieces, etc. *But one species of fire-arms, the pistol, is never called a gun.*

29

*Gun*, 1 Webster's American Dictionary of the English Language (1828) (emphasis added). The Maryland statute, by its plain terms then, applies only to long guns typically used for hunting, and would not have banned the carriage of smaller arms that might be employed for self-defense. The State disputes this, and responds that Samuel Johnson's 1755 English Dictionary defined "gun" more broadly as "the general name for firearms." *See* State Br. at 39 (emphasis omitted). While Johnson's definition comes earlier than Webster's, there are significant reasons in this context to favor Webster. Webster, unlike Johnson, was American and was relating what may have been a particularly American, use of the term. And a review of historical statutes backs that up. For one thing the State's own 1721 Pennsylvania law (discussed in detail below), enacted just six years later, draws a distinction between "guns" which are hunting implements, and "firearms" which connotes a broader set of weapons that discharge a shot by means of an explosive. That law made it unlawful "to carry *any gun or hunt* on the improved or inclosed lands of any plantation," but when it referred to *shooting* in "the open streets of the city of Philadelphia" or the "gardens, orchards and inclosures adjoining upon and belonging to any of the dwelling houses" in the city it

did not similarly ban "guns" but rather made it unlawful to, in those locations, "shoot at or kill *with a firearm* any pigeon, dove, partridge, or other fowl." J.A. 1228–29 (emphases added). Thus, at this period, it appears that Webster's limited understanding of the word "gun" was already employed by American legislators, given that Pennsylvania distinguished between the mode of weapon useful to hunting and any firearm that individuals might have with them within a city with which they might wantonly target birds for sport.

Other statutes, not cited by the State here, also evidence this distinction. In 1746, Massachusetts provided that "no person shall … discharge any gun *or* pistol, charged with shot or ball, in the town of Boston." Act of May 28, 1746, ch. XI *in* Acts & Laws of Massachusetts Bay 208, Add. 7 (emphasis added). In 1770, Georgia mandated that individuals on Sundays carry arms to "any church, or other place of divine worship," providing that an individual met the obligation by "carry[ing] with him a gun, *or* a pair of pistols, in good order and fit for service." 19 The Colonial Records of the State of Georgia: Part I, Statutes, Colonial and Revolutionary 138 (1768–1773), Add. 10 (emphasis added); A Digest of the Laws of the State of Georgia, 1800

31

Ga. Laws 157 (Watkins ed., 1800), Add. 14. And in 1832, New Hampshire made it unlawful "within the compact part of the town of Portsmouth" to "fire or discharge any cannon, gun, pistol, or other fire arms." An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4 *in* 1823 LAWS OF THE STATE OF NEW HAMPSHIRE 73– 74, Add. 17–18. These examples demonstrate two things that undermine the State's reliance on the 1715 Maryland statute. First, that even if given its broadest reading "[s]tatutes that only prohibited guns during this time period may have implicitly included an exception for pistols," Catie Carberry, *What's in a name? The Evolution of the Term 'Gun',* CTR. FOR FIREARMS L. AT DUKE UNIV. (July 24, 2019), https://perma.cc/VG2C-K4YC, meaning that the 1715 Maryland statute, even on its broadest reading, would not have applied to carrying *handguns* on private land of any sort. Second, the use of "gun" itself cautions against giving the statute that broad reading, as "nearly all laws that mention guns but not pistols" in the Repository of Historical Gun Laws maintained by the Duke Center for Firearms Law "address hunting." *Id.* The use of "gun" therefore, in and of itself, supports reading the statute as aimed at regulating hunting.

And of course, as already discussed, these textual clues align with the broader historical perspective that makes this law easily intelligible as an attempt by Maryland to rebalance the relationship between the private property right to exclude and an increasing appreciation for the rights of hunters to make use of this Country's unenclosed lands, regardless of ownership. That is because, as the district court noted, by its plain terms the law only applied "*only* on plantations," not on undeveloped lands held by landowners. S.A. 29. Lest there be any doubt that that is what that phrase means, just a few years later, Maryland made perfectly clear that its prohibitions on hunting applied to *enclosed* lands. *See* 1729 LAWS OF MARYLAND 11, 13, Add. 20, 22; *see also* Sawers, *Keeping Up with the Joneses*, *supra* at 25 n.34. There is simply no possible reading of this law as anything other than a hunting regulation, with nothing to say at all about the right to be armed in public for self-defense.

The State's next historical analogue, from 1721 Pennsylvania, is similarly best read as a law that is codifying the American view of where *hunting* specifically, may take place. Remember, Pennsylvania had, in 1683, granted a constitutional *right* to its citizens to hunt on unenclosed lands. *See, e.g.*, Sawers, *The Right to Exclude*, *supra* at 678. Consistent

33

with that understanding, like the Maryland statute, the Pennsylvania statute's prohibition on "carry[ing] any gun or hunt[ing]" applied only "on the improved or inclosed lands of any plantation." J.A. 1228. As discussed above, the reference only to "gun" here, in distinction to the use of the more broad "firearm" elsewhere, solidifies this reading of the statute, as does the title of the act, which leaves little doubt as to its purpose: "An Act to Prevent the Killing of Deer Out of Season, and Against Carrying of Guns or Hunting By Persons Not Qualified." J.A. 1227; *see also* J.A. 1228 (noting that the specific section of the statute was aimed at curtailing "divers abuses, damages and inconveniencies [which] have arose by persons carrying guns and presuming to hunt on other people's lands").

The State's 1722 New Jersey enactment is irrelevant for the same reasons as the Pennsylvania law. The New Jersey law has the same title, and same statement of purpose, as the 1721 Pennsylvania law, which ties it directly to hunting. *See* J.A. 1233–34. And it describes its relevant restriction—prohibiting anyone "to carry any Gun, or hunt on the improved or inclosed Lands in any Plantation, other than his own"—in materially identical language that identifies it as part of the tradition of

34

defining the right to hunt on unenclosed lands and the countervailing right to exclude from enclosed lands. J.A. 1234.

Moving on to New York 1763, the story is much the same. The statute applied only in "any Orchard, Garden, Corn-Field, or other inclosed Land whatsoever, within the City of *New-York*," which shows that it is part of the tradition identified above. Act of Dec. 20, 1763, § 1, 1763 N.Y. Laws 442, Add. 25; *see* Sawers, *Keeping Up With the Joneses*, *supra* at 25 (citing this law, in particular, as an example of a statute "shap[ing] the boundaries of private property law by enacting statutes that defined trespasses and acknowledged the right to hunt on private land"). Further undercutting the State's expansive reading of the statue as covering the carrying of firearms for any purpose, *see* State Br. at 22, is the title of the law, which could hardly be clearer: "An ACT to prevent hunting with Fire-Arms in the City of New-York, and the Liberties thereof." J.A. 1238.

Indeed, as this Court previously recognized, each of the 1721 Pennsylvania, 1722 New Jersey, and 1763 New York statutes "were explicitly motivated by … deterring unlicensed hunting," rendering them utterly unlike the No Carry Default rule. *Antonyuk*, 120 F.4th at 1046.

35

As Plaintiffs have explained, there is considerably *more* reason to endorse that view now than the Court had before it when it decided *Antonyuk*, not less.

In light of *Antonyuk*, the State places particular emphasis on its next analogue, from 1771 New Jersey, which it claims not only "applied to private property whether open or closed to the public," State Br. at 23, but "did not refer to hunting at all," *Id.* at 20. It points to the Ninth Circuit's decision in *Wolford v. Lopez*, which placed decisive importance on this law (along with the 1865 Louisiana law, discussed below) as a "dead ringer[]" for a modern No Carry Default rule because it "applied to <u>all</u> private property." 116 F.4th 959, 995 (9th Cir. 2024). In contrast, this Court previously held that even this law appeared to apply, at most, to private property that was not open to the public. *Antonyuk*, 120 F.4th at 1046–47.

This Court got it right in *Antonyuk*, and the State and *Wolford* are both mistaken. The law in question made it unlawful "to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner." J.A. 1242. The State suggests that this must have

36

applied to all real property, and points out that New Jersey at the time taxed private buildings that were open to the public, like "Merchants and Shop-Keepers," or "Brew Houses." State Br. at 24. But the State's narrow focus on the plain language of a single section of this statute leads it astray. In fact, in New Jersey in 1771, saying "Lands … for which the Owner pays Taxes" was the same as saying "improved" or "inclosed" lands, as the State's other analogues did; New Jersey, at the time, taxed only improved land. *See* Sawers*, Keeping Up with the Joneses, supra* at 25–26. Given that critical fact, it is clear that the statute is doing precisely the same thing as the others already analyzed here—it is codifying the American rule that hunters could hunt on unimproved lands not their own, while improved lands remained off limits. *Id*. at 25–26 & nn.36–38 (discussing this specific law as another example of a law redrawing this balance). This is further evidenced by the fact that Section 6 of the 1771 New Jersey statute set property qualifications for hunting on "waste and unimproved Lands"—suggesting clearly that the earlier provision had not prohibited hunting on unimproved private land. *See id.*; *see also* J.A. 1243.

Finally, there are other good textual reasons to reject the State's reading. The statute applied to carrying "any Gun" not firearm, and as discussed above, that meant the statute implicitly did not restrict pistols and was likely specifically regulating *hunting*. Furthermore, the State is totally wrong to claim this law "did not refer to hunting at all." State Br. at 20. Though the version the State cites to in the Joint Appendix omits the preceding page, the district court correctly noted that the act "begins with a statement of purpose recognizing that previous laws 'for the Preservation of Deer and other Game, and to prevent trespassing with Guns, Traps and Dogs, have, by Experience, been found insufficient …' " S.A. 32 (quoting J.A. 1737–38). And the other provisions of the enactment, which *Wolford* disregarded because they were contained in other subsections of the same statute, *see* 116 F.4th at 995, and which the State apparently ignores here, were very clearly focused on regulating the time and manner of hunting. *See, e.g.*, J.A. 1245 (repealing, in § 18, "all former Laws made in this Colony for the Preservation of Deer and other Game, and to prevent trespassing with Guns, and regulating the Size of Traps"); *see also* S.A. 32 (noting the same)).

The State's final pre-ratification law comes from Massachusetts in 1790, and it too, is plainly a hunting regulation. It begins by stating its purpose to respond to "great depredations made by gunners and hunters on *Tarpaulin Cove*, or [several islands in Duke County], by which great numbers of sheep and deer have been killed, and other damages sustained." J.A. 1743–44. The law's operative provisions are focused on hunting (or the killing and stealing of stock animals). The first section makes it a crime to "unlawfully take away, shoot, kill or destroy … any sheep or other stock creatures." J.A. 1744. The second section, on which the State focuses, then provides for the seizure of the firearm of any person who "shall be seen with any gun or guns upon either of the said islands" and further provides for liability for anyone caught "collecting, driving, or in any way molesting any of the sheep" or other stock animals, or anyone who is caught in possession of the skin or carcass of a killed stock animal. J.A. 1744. Again, the State's only hope here is in attempting to wrench this quoted language totally out of context, and read it as a broad prohibition on being "seen with any gun," but the context is critical as it makes clear that the prohibition merely provides a way to prevent someone who is there to unlawfully attempt to kill and

39

steal a sheep, by disarming them before they commit the crime—or punishing them if they are caught too late. *See* S.A. 34; *see also Koons*, 673 F. Supp. 3d at 620.

The State offers one other argument in favor of reading each of these laws (and the post-Civil War laws discussed below) more broadly. It claims that this Court erred in *Antonyuk*, when it concluded that many of the words in the statute referring to the locations where firearms are prohibited—"land," "improved or inclosed land," and "premises or plantations"—"would have been understood to refer to private land not open to the public." *Antonyuk*, 120 F.4th at 1047; *see* State Br. at 24. To try to refute this notion, the State goes to some length to show that, either in dictionary definitions or in other contexts, those words could be used to connote land or property more generally, and not just private property that is closed to the public. *See* State Br. at 25–34.

This argument is even more anathema to the principle that words in a statute must be read in context than the rest of the State's argument. Plaintiffs do not doubt that "land" is, in some contexts, such a broad concept as to encompass all *terra firma*, and might mean that legally *in other contexts* but as the district court cautioned below, "hyper-granular

definitions of words and phrases do not alter their meaning *in context* and *in relation* to neighboring words and phrases—and thereby do not help meet the State's burden." S.A. 37 n.21. The only example of a word's use that the State cites that could plausibly be relevant to its meaning in these particular statutes is the statement by Blackstone, discussed above, that "every man's land is in the eye of the law inclosed and set apart from his neighbors … by an ideal invisible boundary." State Br. at 28 (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES 209–10 (10th ed. 1787)). But as Plaintiffs have explained above, Blackstone's view was specifically rejected by the very statutes the State cites (which instead allowed hunting on private property that was not physically enclosed or improved), and relying on that language to expand their meaning would be totally ahistorical. And in any event, Blackstone also refutes the State's position. The discussion cited by the State concerns trespass law, and this case is limited to property open to the public. Blackstone himself qualified his discussion by stating that it was *not* a trespass to enter "into an inn or public house, without the leave of the owner first specially asked; because, when a man professes the keeping of such inn or public house, he thereby gives a general licence to any person to enter his doors."

41

3 BLACKSTONE, COMMENTARIES 211–12, Add. 4–5. The same is true of every property at issue in this case—they all are held open to the public, and the public therefore has a general license to enter them.

The State notably does not have a *single* case in which the words of the statute were given the expansive reading the State urges this Court to adopt. In fact, it offers no examples of historical enforcement of these statutes that could buttress its case in the slightest. That fact strongly undercuts the claim that these laws ever applied as broadly as the State claims. Because the burden is on the State to prove what these laws meant, "the barren record of enforcement" against people for carrying firearms in public in a non-hunting context provides "one additional reason to discount their relevance." *Bruen*, 597 U.S. at 58 n.25.

Finally, to the extent that the State is able to muster any doubt that these statutes might have had relevance beyond the hunting context, that doubt *must* be resolved in Plaintiffs' favor. The text of the Second Amendment indisputably extends to cover carriage of firearms in public, and the State must *prove* that the Amendment means something other than what it says to succeed in defending the No Carry Default Rule. Even if these laws are susceptible to "multiple plausible

interpretations"—and on this record, Plaintiffs do not think that is the case at all—this Court must favor Plaintiffs' as "the one that is more consistent with the Second Amendment's command." *Id.* at 44 n.11.

### iii. The State's Attempts to Tether the No Carry Default Rule to These Hunting Regulations Must Be Rejected.

In sum, the State has offered several examples of the same sort of regulation, and identified a tradition of firearm rights that might well be useful to understanding the scope of the Second Amendment in a case involving hunting rights, but it has no application here. In light of the clear evidence that the State's evidence from 1715 Maryland to 1790 Massachusetts was entirely a part of an ongoing effort in America to revise English conceptions of the rights of private property holders and hunters and to confer on hunters significant rights related to the private, but unimproved lands of others, the State's claim that such laws are "relevantly similar," *Bruen*, 597 U.S. at 29, or are applications of the same "principles that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692, as the modern law must be rejected. Start with the aims of the statutes. As for "how" the historical laws regulated the carrying of arms, it is sufficiently clear at this point that they applied, at most, to

hunters, and they dealt with questions of on what land long guns could be carried for a hunting purpose. They came nowhere near "prohibit[ing] carrying firearms in places open to the public absent prior consent to the owner" as the State claims, but rather delineated a particular type of private property that could, in some cases, not even be closed by the owner if he wished to. State Br. at 23. The No Carry Default Rule's banning New Yorkers from carrying handguns at the grocery store or the hair salon, without express permission from the owner of those establishments, is nothing like these early hunting restrictions.

The analogy does not improve when comparing the historical and modern justifications for the statutes, or the "why." The State claims that its law "was enacted (i) to enhance public safety and (ii) to ensure that property owners are empowered to determine whether they wish to allow the carrying of firearms on their property." *Id.* at 17. Taking these in turn, the first goal, to "enhance public safety," is much too broad a justification to be at all useful to this analysis. *Rahimi* cautioned that a law should not only be "consistent with the principles that underpin our regulatory tradition," but must also "comport with the principles underlying the Second Amendment." 602 U.S. at 692. And a key principle

44

underlying the Second Amendment is that carriage of firearms in public by law abiding citizens itself contributes to public safety. *See Bruen*, 597 U.S. at 29. Furthermore, it is hard to imagine any modern firearm law that its proponents would not say is intended "to enhance public safety." Indeed, in *Heller*, Justice Breyer in dissent extolled the District of Columbia's unconstitutional ban on handguns for seeking "to further the sort of life-preserving and public-safety interests that the Court has called 'compelling.' " 554 U.S. at 705 (citation omitted) (Breyer, J., dissenting). This court found "public safety" was the justification for the unconstitutional law in *Bruen* too. *See Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 94–95 (2d Cir. 2012) ("There is a longstanding tradition of states regulating firearm possession and use in public because of the dangers posed to public safety."). That rationale was obviously rejected in *Bruen*. *See* 597 U.S. at 27 ("[W]e find no such tradition," attempting to curb the public safety threats of "handgun violence, primarily in urban areas," "in the historical materials that respondents and their *amici* have brought to bear on the question." (internal quotation marks omitted)). Indeed, the ease of making a claim to such a justification was part of the reason that the Supreme Court was critical, in *Bruen*, of the interest-

balancing regime that had grown up in the wake of *Heller*. Justice Alito, in his concurrence, was specifically critical of New York's previous law restricting the ways that New York City residents could transport their firearms for training, noting that while "[t]he Second Circuit [had] held that the law was constitutional, concluding, among other things, that the restriction was substantially related to the city's interest in *public safety* and crime prevention. … [A]fter we agreed to review that decision, the city repealed the law and admitted that it did not actually have any beneficial effect on public safety." *Bruen*, 597 U.S. at 77 (Alito, J., concurring) (emphasis added) (discussing *New York State Rifle & Pistol Ass'n v. New York*, 883 F.3d 45 (2018)).

"Public safety" is simply too general a concept to be a historical principle that could support any law, and the State's argument demonstrates this fact. The State claims that "many of these historical laws were explicitly enacted to protect public safety," State Br. at 18, but even granting, for argument's sake, that that is true in some sense, the sky-high view of the statutes necessary to divine that purpose elides the many serious differences between the No Carry Default Rule and the historical laws. The "public safety" threat posed by people "of evil fame,

or a vagrant, or dissolute liver," J.A. 1223 (Maryland 1715), or by those who cause "great Damages and Inconveniencies," J.A. 1234 (New Jersey 1722), and pose "great Danger [to] the Lives of his Majesty's Subjects," J.A. 1238 (New York 1763), when they "trespass[]," J.A. 1737 (New Jersey 1771), on lands where they have no right to be in the first place, is *completely different* from the perceived threat posed by law-abiding New Yorkers, who have been granted carry licenses by the state, opting to carry firearms in public places and at businesses they patronize. The State's attempt to compare the two should be rejected out of hand.

As to the second alleged purpose of the statute—vindicating the private property rights of people who own businesses open to the public— the Statute itself does not actually advance that aim at all. It was true *before* the law was enacted that an owner had the right to bar the carriage of firearms into his store if he wanted to—that authority needed no further support. Rather, what the State has done here is arrogate to itself the owner's right to exclude and has presumptively exercised that right, requiring the owner to specifically *excuse* an individual's decision to carry a firearm into a place where *the State* wishes to ban them. *Cf. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (rejecting the claim that

47

an age restriction law on the purchase of violent video games advanced parental authority, noting that "[s]uch laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to parental veto.").

Even if there was a way of looking at the State's law that could plausibly make it an exercise of a property owner's preferences, that is most certainly *not* the same as the purposes advanced by the historical laws on which the State has built its case. In fact, in the way that they embodied an American *rejection* of the strongest sense of a property owner's right to exclude in favor of a regime that granted, in some cases, an entirely superseding right of non-landowners to hunt on another's unimproved property, the historical analogues the State has chosen did very nearly the opposite of what the State claims, by actually *disempowering* "property owners to decide whether they wished to allow the carrying of firearms on their property." State Br. at 18–19. They therefore cannot support the No Carry Default Rule, even if the State is right about what it does.

48

## 2. The State's Post-Civil War Laws Provide No Support Either.

The State's remaining analogues fare even worse. As noted above, the key period for analyzing the original public meaning of the Second Amendment following *Bruen* and *Rahimi* should be 1791, but even accepting for the sake of argument that 1868 represents a second "focal point" for this Court's analysis, *Antonyuk*, 120 F.4th at 972, there are *extremely* good reasons for this Court to entirely disregard the State's laws from the period just before the ratification of the Fourteenth Amendment in this case. Indeed, if the purpose of looking to 1868 is to ascertain what the ratifiers of the Fourteenth Amendment intended the Second Amendment to protect, *see id.* (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010)), the State's laws from just before the ratification can only be useful for seeing the sort of evils those ratifiers sought to curtail—not the sort of practices they sought to enshrine in our Nation's foundational charter.

The State cites three statutes from this period. The 1865 Louisiana statute makes it unlawful for "any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of civil or military

order." J.A. 1252. The 1866 Texas law is very much the same with the critical distinction that it was explicitly limited, by its terms, like the earlier statutes, to "inclosed" lands, making it unlawful "for any person or persons to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty." J.A. 1259. The 1866 Florida law is like the Texas law, but even weaker support for the State as it specifically mentions hunting when it prohibits "any person to hunt or range with a gun within the enclosed land or premises of another without … permission." J.A. 1536.

Given the background above, the clear indication that at least the Florida and Texas law were specifically about hunting in places a person had no right to be should hopefully be clear. Florida's statute applies only to "guns" and specifically mentions hunting, and both Florida and Texas draw a distinction between *enclosed* lands, where such activities are forbidden, and unenclosed lands, where the prohibition does not apply. And neither the Texas nor the Florida law persisted for long. Texas's was "stricken out by the legislature" in 1879. *See* 1879 TEX. PENAL CODE 90, 114 (1887), https://perma.cc/Z54D-WEBY. Florida's was even more

50

ephemeral; when Florida ratified a new constitution in 1868, it broadly nullified and voided all statutes inconsistent with federal law or the federal (and new state) constitution, Article XVI, Section 1. Florida Constitution of 1868 *in* BENJAMIN PERLEY POORE, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS 359 (2d ed. 1878), https://perma.cc/L24Q-Q8DC. Plaintiffs are not aware of any similar law being enacted following the ratification of Florida's 1868 constitution, and the law does not appear to have been included in the first digest of existing Florida statutory law printed after 1868. *See generally* ALLEN BUSH, A DIGEST OF THE STATUTE LAW OF FLORIDA (1872), https://perma.cc/VWF8-98W6.

The State, for this reason, focuses on the 1865 Louisiana law as its primary authority, and argues that the others should be read to share its characteristics. *See* State Br. at 15 ("Texas passed a law nearly identical in substance to Louisiana's."). It points out that *Wolford* referred to the Louisiana law, given its broad scope, as a " 'historical dead ringer[]' for contemporary private property laws like New York's." *Id.* at 21 (quoting *Wolford*, 116 F.4th at 995).

Plaintiffs do not dispute that the Louisiana law is, in its terms, broader than the others at issue here—but it is not part of any valid historical tradition. It is rather part of a shameful attempt to deviate from the previously established tradition of welcoming hunting on undeveloped lands in order to limit the rights of former slaves and to reduce them, as nearly as possible, to their former state. As detailed extensively above, the property rights regimes that had been developed by the colonists upon their arrival on this continent "allowed the landless to hunt, fish, forage, and even graze their livestock on private land" so long as it was not enclosed or improved. Brian Sawers, *Race and Property After the Civil War: Creating the Right to Exclude*, 87 MISS. L.J. 703, 706 (2018). Those regimes continued to exist until the Civil War, but after the Civil War, the calculus in favor of these free rights to the land and its animals changed decisively, as hunting, fishing, and foraging all offered "alternatives to sharecropping that would have allowed many blacks to live somewhat independently, even without their own land," an obvious "threat to planters, who had no alternatives to black labor, since planters were unwilling to offer wages or working conditions that would attract immigrant labor." *Id.* As a result, state governments "overturned

centuries of law to prevent black people from prospering," "expand[ing] landowner rights at the expense of public rights precisely to deprive blacks of the essence of freedom." *Id.* at 706–07. Though they were limited in their ability to enact explicitly racial laws, "legislatures used the pretense of game laws to restrict hunting and fishing by blacks. Laws requiring landowner permission were the most transparent limits." *Id.* at 749.

It is into this shameful tradition, and none other, that New York's Louisiana law fits. Indeed, the specific law the State now cites as support for its view of the proper scope of Plaintiffs' constitutional rights was mentioned by then-Representative George F. Hoar, a Massachusetts Republican, in a congressional report on the state of racial violence and racial discrimination in Louisiana. As Hoar explained, "[a]fter the war closed the whites of Louisiana were permitted to elect a Legislature, which sat during the years 1865, 1866, and 1867. They enacted a series of laws which must have been designed to restore the negro to a state of practical servitude." *Report of George F. Hoar, W. A. Wheeler, Wm. P. Frye*, *reprinted in* Charles H. Jones, An Abridgment of the Debates of Congress 1369 (H. Holt & Co. 1875), Add. 29. The very first statute

highlighted by Rep. Hoar as part of this "series of laws," was none other than the one the State now makes the cornerstone of its case: "Statute of 1865, chapter 10, provides that under penalty of fine or imprisonment, no person shall carry fire-arms on to the premises or plantation of any citizen without the consent of the owner, thus depriving the great mass of the colored laborers of the State of the right to keep and bear arms, always zealously prized and guarded by his white employers." *Id.*; *see also A Test Case for the President,* N.Y. TRIB. (Mar. 7, 1866), Add. 35 (similarly describing Louisiana law as part of "a code of laws" aimed at "reenacting Slavery in fact").

In this, at least, the State is correct that the Louisiana statute belongs alongside the Texas and Florida laws. All three were enacted by legislatures *prior to* the creation of integrated governments following the adoption of the 14th Amendment and *prior* to the readmission of their respective states to the Union. *See* Sawers, *Race and Property*, *supra* at 764 tbl. 1. These statutes were passed "as part of their discriminatory 'Black Codes,' which sought to deprive African Americans of their rights." *See Kipke v. Moore*, 695 F. Supp. 3d 638, 659 (D. Md. 2023); *see also* Sawers, *Race and Property*, *supra* at 745–46 & nn.283, 294 (discussing

Florida's laws specifically as racially motivated). Another section of the Florida 1866 law, for instance, prohibits "any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge." J.A. 1534. "The centerpiece of the [Black] Codes was their 'attempt to stabilize the black work force and limit its economic options apart from plantation labor.'" *Timbs v. Indiana*, 586 U.S. 146, 168 (2019) (Thomas, J., concurring in judgment) (quoting E. FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION 1863–1877, 199 (1988)). As just explained, that was precisely the goal of these statutes when they were enacted.

These laws are insufficient, to say the least, to support the State's case, *see Bruen*, 597 U.S. at 58 (concluding that two discriminatory statutes were "surely too slender a reed on which to hang a historical tradition"), and would better be treated as evidence of what states are *not* permitted to do consistent with the Fourteenth Amendment. And they are, properly understood, poor fits even for the State's rationales. Far from promoting "public safety," these laws were intended to make certain places decidedly *unsafe* for newly freed slaves, by denying them the

55

ability to bear arms for their defense. And rather than reinforcing existing private property rights of landowners, they expanded those rights in a direct attempt to curtail the Second Amendment rights of those who had just received the ability to exercise them.

### 3. The State's Remaining Historical Evidence and Argument Is Similarly Unavailing.

The State offers one final statute that it claims is part of the same "tradition" as the preceding examples, a law from 1893 Oregon which made it a crime for "any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." J.A. 1266. This law can be dismissed in the same way as the State's 18th century analogues and it clearly does not further the State's argument that there is a well-established tradition of banning carriage of firearms in places open to the public, given the by-now familiar references to "trespass" and "enclosed lands" that indicate this law too, is about hunting in a place where the offender has no right to be. And while law does not specifically mention hunting, the broader context makes the link to hunting clear. *See, e.g.,* THE EUGENE GUARD at 2 (May 15, 1893), https://perma.cc/7MHJ-QC4A ("Trespass Law. The last

legislature passed a very stringent hunting law"); ALBANY WEEKLY HERALD at 3 (Sept. 28, 1893), https://perma.cc/H5AC-ENC8 ("The Trespass Law. Hunters Will Find Its Provisions Very Rather Stringent[.]"). Also going against the Oregon law is its extreme lateness. *Bruen* treated "late-19th century" evidence last in its historical catalogue, and it ascribed it very little weight, warning that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." 597 U.S. at 66. The Oregon law is simply too late to alter our understanding of the contours of the Second Amendment.

Finally, the State relies on a wide variety of other laws which, as the district court noted below, it has conceded "are not 'direct analogues' for the restriction here." S.A. 37 (citation omitted). These laws, which include additional laws from the postbellum South that greatly restricted the places where firearms could be carried in public by, for example, forbidding carriage at any "place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen," State Br. at 35 (quoting J.A. 1571), or, in the case of one particularly stringent

Idaho law, banning carriage entirely "within the limits or confines of any city, town or village," State Br. at 35 (quoting J.A. 1583). Taking these in reverse order, the Idaho law was specifically rejected as an outlier by the Supreme Court in *Bruen*, and it is obviously contrary to that decision to suggest that firearms can be totally banned in cities. *See* 597 U.S. at 66–67. As to the restrictions on firearms at educational or scientific buildings, or ball rooms, as the district court recognized, "by their terms, they serve[d] different purposes." S.A. 37. In addition to coming too late and, again, being disproportionately from the post-war South, they did not seek to curtail carrying firearms in every public place absent specific permission, as the State's law does. Indeed, if anything these laws highlight the degree to which the No Carry Default Rule departs from our historical tradition. Following *Bruen*, New York took an expansive view of the "sensitive place" tradition and banned firearms in a wide variety of places, such as public parks, zoos, places serving alcohol, and banquet halls. The No Carry Default therefore is only material in locations that New York *does not* deem sensitive. It therefore cannot be supported by statutes that allegedly underlie the sensitive place tradition.

Nor is the State correct that its three citations to historic cases prove that these laws formed a well-established tradition barring the carrying of firearms in many public places at all. *See* State Br. at 36–37. Two of its cases merely stand for the proposition (irrelevant here) that *concealed* carriage can be restricted where open carriage is allowed. That is the reading the Supreme Court gave to the State's first case, *Andrews v. State*, 50 Tenn. 165, 182 (1871), in which the Tennessee Supreme Court specifically read a broad Tennessee statute "to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would 'violat[e] the constitutional right to keep arms.' " *Bruen*, 597 U.S. at 54 (quoting *Andrews*, 50 Tenn. at 187). It is also the lesson of the State's second case, *Maupin v. State*, 89 Tenn. 367 (1890), in which the dispute between the parties was whether the defendant had hidden his two pistols on himself or carried them openly, and the court concluded that the State had made out a violation of the "statute against carrying weapons" because he had carried them concealed in "a place to which customers were constantly invited and daily expected to go" and "[i]n such a place a man, though he be the proprietor, may not lawfully carry pistols *concealed about his person*." *Id.* at 367 (emphasis added). That

59

Maupin was, in fact, the proprietor of the grist mill, who under the CCIA would have the authority to grant himself or anyone else the right to carry a firearm at his establishment, further demonstrates how poorly the case, and these laws, map onto the State's own.

The State's third case, from Texas, standing alone, does not support the idea that the historical restrictions on carrying at places of amusement is consistent with our historic tradition of firearm regulation, especially given that the Supreme Court noted two Texas Supreme Court decisions from the time period actually supported the State in *Bruen*, but rejected relying on them as an outlier. *Bruen*, 597 U.S. at 64–65. And of course, even if it does evidence that fact, the No Carry Default Rule applies far beyond such places.

### C. The No-Carry Default Rule Is a Modern Novelty.

The State's attempt to prove that its law has roots reaching back to 1715 in Maryland is unavailing because it simply is not the case. To our knowledge, no one in the New York legislature, in enacting the law, suggested it was carrying on an American tradition of banning firearms in enclosed premises or plantations. The actual genealogy of the law is straightforward to delineate and undermines its constitutionality

60

because it demonstrates the law was instead a conscious deviation from our traditions that had reigned for centuries.

In 2020, the Journal of Law, Medicine and Ethics published an article that set out to measure public support for presumptively banning carriage of firearms on all private land unless the owner specifically consents to the carrying of firearms. *See* Ayres & Jonnalagadda, *supra* at 183. This was, the authors noted, decidedly *not* what the state of the law was at the time. While four jurisdictions had "flipped defaults for private dwellings" to require owner consent to carry a firearm into a private home, the other forty-six states required that even with regard to an individual's home, an invitee could bring a firearm barring specific objection. *Id.* at 184. Even more unambiguously, with the exception of some specific rules the authors identified regarding churches or places selling alcohol, "no state [had] adopted generalized 'no carry' defaults for retail establishments" and, in fact "States that recognize[d] the rights of private property owners to control the carry of firearms onto their premises often ma[d]e it burdensome to do so by imposing strict and specific" rules for how to inform an individual they were not welcome to carry a firearm into their establishment. *Id.* Practically speaking, even

posting such signs was actively discouraged by laws in some states that immunized retail establishments from tort liability if they allowed, but not if they forbid, carrying firearms. *Id.* & n.20.

Reversing the established tradition and flipping those defaults, the authors hypothesized, could have a powerful effect on the practical realities of bearing arms for self-defense in America: "Given the inertial tendency to stick with the status quo, lawmakers should expect that a 'prohibited-unless-permitted' default would radically expand the private spaces where guns could not be carried" and have, as a downstream effect, the possibility of "reducing preferences to carry and possess firearms more generally, as it becomes increasingly inconvenient to do so." *Id.*

The idea was not immediately taken up because, at the time, states like New York had other options for limiting the ways its citizens could exercise their Second Amendment rights. Then, on June 23, 2022, the Supreme Court struck down New York's "good cause" requirement to acquire a handgun in *Bruen* and the most important of those options disappeared. Hardly a week later, the New York Legislature was debating CCIA and determined that now was the time to flip the

presumption. In doing so, New York's legislators sounded very much like Ayres & Jonnalagadda: "[T]here's going to be a 3,000 percent increase in the amount of people carrying these weapons—that changes the dynamic on the default on why we should be thinking about being more affirmative in welcoming individuals with concealed carry." New York State Senate Debate on S. 51001 at 5669 (July 1, 2022) (Sen. Myrie) https://perma.cc/332Q-HF4M; *see also id.* at 5672–73 ("We are flipping that default for—in part because of the reasons I mentioned earlier. There will be more concealed carry. There will be more firearms in circulation."). It is, of course, not a coincidence that other states have also followed suit *after Bruen. See Wolford*, 116 F.4th at 971 (discussing no-carry default rules passed in Hawaii and California in 2023). It could hardly be clearer that New York's law is, far from firmly rooted in our history, a modern deviation spurred by a desire to blunt the effect of the Supreme Court's decision in *Bruen*. That is fatal to its constitutionality.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: March 4, 2025          Respectfully submitted,

                              /s/David H. Thompson
                              David H. Thompson
Nicolas J. Rotsko             Peter A. Patterson
FLUET & ASSOCIATES PLLC       William V. Bergstrom
1751 Pinnacle Drive           COOPER & KIRK, PLLC
Suite 1000                    1523 New Hampshire Ave., N.W.
Tysons, VA 22102              Washington, DC 20036
(703) 590-1234                (202) 220-9600
nrotsko@fluet.law             dthompson@cooperkirk.com

*Attorneys for Plaintiffs-Appellees*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of March 2025, I filed the foregoing via the Court's ACMS appellate system, which will electronically notify all counsel requiring notice.


Dated: March 4, 2025         /s/David H. Thompson
                                  David H. Thompson

                                  *Attorney for Plaintiffs-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 13,382 words.

Pursuant to FED. R. APP. P. 32, this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: March 4, 2025    /s/David H. Thompson
          David H. Thompson

          *Attorney for Plaintiffs-Appellees*