# 24-2847

## United States Court of Appeals
*for the*
## Second Circuit

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC.,
SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellees*,

JOHN BORON,

*Plaintiff*,

– v. –

STEVEN G. JAMES, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE
NEW YORK STATE POLICE,

*Defendant-Appellant*,

MICHAEL J. KEANE, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY FOR
THE COUNTY OF ERIE, NEW YORK,

*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK, No. 1:22-cv-00695 (Sinatra, Jr., J.)

## ADDENDUM

Nicolas J. Rotsko
FLUET & ASSOCIATES PLLC
1751 Pinnacle Drive,
Suite 1000
Tysons, VA 22102
(703) 590-1234
nrotsko@fluet.law

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**<u>Page</u>**

3 WILLIAM BLACKSTONE, COMMENTARIES 209–212 (1803) ............... Add.1

Act of May 28, 1746, ch. XI *in* ACTS & LAWS OF MASSACHUSETTS
  BAY 208 .................................................................................. Add.6

19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I,
  STATUTES, COLONIAL AND REVOLUTIONARY 138 (1768–1773)... Add.8

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA,
  1800 Ga. Laws 157 (Watkins ed. 1800) ................................. Add.13

An Act to Establish a System of Police in the Town of
  Portsmouth, and for Other Purposes, ch. 34, § 4 *in*
  1823 LAWS OF THE STATE OF NEW HAMPSHIRE 73–74 ............ Add.15

1729 LAWS OF MARYLAND 11, 13........................................................ Add.19

Act of Dec. 20, 1763, § 1, 1763 N.Y. Laws 442................................ Add.23

*Report of George F. Hoar, W. A. Wheeler, Wm. P. Frye, reprinted
  in* CHARLES H. JONES, AN ABRIDGMENT OF THE DEBATES OF
  CONGRESS 1369 (H. Holt & Co. 1875) ................................... Add.26

*A Test Case for the President,* N.Y. TRIB. (Mar. 7, 1866) ............... Add.35

# BLACKSTONE'S COMMENTARIES:

## WITH

## NOTES OF REFERENCE,

### TO

# THE CONSTITUTION AND LAWS,

#### OF THE

## FEDERAL GOVERNMENT OF THE UNITED STATES;

#### AND OF THE

## COMMONWEALTH OF VIRGINIA.

### IN FIVE VOLUMES.

#### WITH AN APPENDIX TO EACH VOLUME,

##### CONTAINING

SHORT TRACTS UPON SUCH SUBJECTS AS APPEARED NECESSARY
TO FORM A CONNECTED

#### VIEW OF THE LAWS OF VIRGINIA,

##### AS A MEMBER OF THE FEDERAL UNION.

### BY ST. GEORGE TUCKER,

PROFESSOR OF LAW, IN THE UNIVERSITY OF WILLIAM AND MARY, AND
ONE OF THE JUDGES OF THE GENERAL COURT IN VIRGINIA.

### PHILADELPHIA:

PUBLISHED BY WILLIAM YOUNG BIRCH, AND ABRAHAM SMALL,
NO. 17, SOUTH SECOND-STREET.

ROBERT CARR, PRINTER.

1803.

Add.1

HeinOnline -- 4 St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia [i] 1803

an action of trespass *vi et armis* will lie; but, if the injury is only consequential, a special action of trespass *on the case* may be brought[1].

But in the limited and confined sense, in which we are at present to consider it, it signifies no more than an entry on another man's ground without a lawful authority, and doing some damage, however inconsiderable, to his real property. For the right of *meum* and *tuum*, or property, in lands being once established, it follows as a necessary consequence, that this right must be exclusive: that is, that the owner may retain to himself the sole use and occupation of his soil: every entry, therefore, thereon without the owner's leave, and especially if contrary to his express order, is a trespass or transgression. The Roman laws seem to have made a direct prohibition necessary, in order to constitute this injury: "*qui alienum fundum ingreditur, potest*" "*a domino, si is praeviderit, prohiberi ne ingrediatur*[b]." But the law of England, justly considering that much inconvenience may happen to the owner, before he has an opportunity to forbid the entry, has carried the point much farther, and has treated every entry upon another's lands, (unless by the owner's leave, or in some very particular cases) as an injury or wrong, for satisfaction of which an action of trespass will lie; but determines the *quantum* of that satisfaction, by considering how far the offence was wilful or inadvertent, and by estimating the value of the actual damage sustained.

Every unwarrantable entry on another's soil the law entitles a trespass by *breaking his close;* the words of the writ of trespass commanding the defendant to shew cause, *quare clausum querentis fregit.* For every man's land is in the eye of the law

b Inst. 2, 1, 12,

---

1. See the distinction between immediate, and consequential injuries very fully discussed in the case of Scott *vs.* Shepherd, where the eye of the plaintiff was put out by a squib originally lighted and thrown into a market-house by the defendant, and afterwards thrown by two other persons in danger from it before it struck the plaintiff. 3. Wils. 403. 2 Blacks. Rep. 892, in which it was held that trespass *vi et armis* would lie against the person who first threw the squib.

Add.2

HeinOnline -- 4 St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia 209 1803

inclosed and set apart from his neighbours : and that either by a visible and material fence, as one field is divided from another by a hedge ; or, by an ideal invisible boundary existing only in the contemplation of law, as when one man's land adjoins to another's in the same field. And every such entry or breach of a man's close carries necessarily along with it some damage or other: for, if no other special loss can be assigned, yet still the words of the writ itself specify one general damage, *viz.* the treading down and bruising his herbage [c].

210

One must have a property (either absolute or temporary) in the soil, and actual possession by entry, to be able to maintain an action of trespass: or at least, it is requisite that the party have a lease and possession of the vesture and herbage of the land [d]. Thus, if a meadow be divided annually among the parishoners by lot, then, after each person's several portion is allotted, they may be respectively capable of maintaining an action for the breach of their several closes [e] : for they have an exclusive interest and freehold therein for the time. But before entry and actual possession, one cannot maintain an action of trespass, though he hath the freehold in law [f]. And, therefore, an heir before entry cannot have this action against an abator : though a disseisee might have it against the disseisor, for the injury done by the disseisin itself, at which time the plaintiff was seised of the land : but he cannot have it for any act done after the desseisin, until he hath gained possession by re-entry, and then he may well maintain it for the intermediate damage done; for after his re-entry the law by a kind of *jus postliminii*, supposes the freehold to have all along continued in him [g]. Neither, by the common law, in case of an intrusion or deforcement, could the party kept out of possession sue the wrongdoer by a mode of redress, which was calculated for injuries committed against the land while *in the possession* of the owner. But now by the statute 6 Ann. c. 18, if a guardian or trustee for any infant, a husband seised *jure uxoris*, or a person having any estate or interest determinable upon a life or lives, shall, after the determi-

c F. N. B. 87, 88.        d Dyer, 285. 2 Roll. Abr. 549.
e Cro. Eliz. 421.        f 2 Roll. Abr. 553.
g 11 Rep. 5.

Add.3

nation of their respective interests, hold over and continue in posession of the lands or tenements, without the consent of the person intitled thereto, they are adjudged to be trespassers; and any reversioner or remainder-man, expectant on any life-estate, may once in every year, by motion to the court of chancery, procure the *cestuy que vie* to be produced by the tenant of the land, or may enter thereon in case of his refusal or wilful neglect. And by the statutes of 4 Geo. II. c. 28, and 11 Geo. II. c. 19, in case after the determination of any term of life, lives, or years, any person shall wilfully hold over the same, the lessor or reversioner is entitled to recover by action of debt, either at the rate of double the annual value of the premises, in case he himself hath demanded and given notice in writing to the tenant to deliver the possession; or else double the usual rent, in case the notice of quitting proceeds from the tenant himself, having power to determine his lease, and he afterwards neglects to carry that notice into due execution (1.)

A man is answerable for not only his own trespass, but that of his cattle also: for, if by his negligent keeping they stray upon the land of another (and much more if he permits, or drives them on) and they there tread down his neighbour's herbage, and spoil his corn or his trees, this is a trespass for which the owner must answer in damages. And the law gives the party injured a double remedy in this case; by permitting him to distrein the cattle thus *damage-feasant*, or doing damage, till the owner shall make him satisfaction; or else by leaving him to the common remedy *in foro contentioso*, by action. And the action that lies in either of these cases of trespass committed upon another's land either by a man himself or his cattle, is the action of trespass *vi et armis;* whereby a man is called upon to answer, *quare vi et armis, clausum ipsius A. apud B. fregit, et blada ipsius A. ad valentiam centum solidorum ibidem nuper crescentia cum quibusdam averiis depastus suit, conculcavit, et consumpsit, &c.*[h] for the law always couples the idea of force with that of intrusi-

[h] *Registr.* 94.

(1.) The statutes 6 Ann. c. 18....4 Geo. II, c. 28, and 11 Geo. II, c. 19, above referred to, were never in force in Virginia.

HeinOnline -- 4 St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia 211 1803

**212**        PRIVATE        BOOK III.

on upon the property of another. And herein, if any unwarrantable act of the defendant or his beasts in coming upon the land be proved, it is an act of trespass for which the plaintiff must recover some damages; such however as the jury shall think proper to assess [2].

In trespasses of a permanent nature, where the injury is continually renewed, (as by spoiling or consuming the herbage with the defendant's cattle) the declaration may allege the injury to have been committed by *continuation* from one given day to another, (which is called laying the action with a *continuando*) and the plaintiff shall not be compelled to bring separate actions for every day's separate offence [i]. But where the trespass is by one or several acts, each of which terminates in itself, and being once done cannot be done again, it cannot be laid with a *continuando;* yet if there be repeated acts of trespass committed, (as cutting down a certain number of trees) they may be laid to be done, not continually, but at divers days and times within a given period [k].

In some cases trespass is justifiable; or, rather, entry on another's land or house shall not, in those cases, be accounted trespass: as if a man comes thither to demand or pay money, there payable: or to execute, in a legal manner, the process of the law. Also, a man may justify entering into an inn or public house, without the leave of the owner first specially asked; because, when a man professes the keeping of such inn or public house,

i 2 Roll. Abr. 545. Lord Raym. 240.

k Salk. 638, 639. Lord Raym. 823. 7 Mod. 150.

---

2. If any beasts shall break into grounds inclosed with a sufficient fence, as described in the act concerning trespasses, the owner, for the first trespass, shall recompense the party injured for the true value of the damage; and double damages for every subsequent trespass. For a third offence, the party injured may, at his election, sue for his damages, or kill the beasts, without being answerable for them. But if the fence be not sufficient, within the act, the owner of the beast killed, or hurt, shall recover double damages and costs. V. L. Edi. 1794, c. 137.

HeinOnline -- 4 St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia 212 1803



# Acts and Laws

Paſſed by the Great and General Court or Aſſembly of HisMajeſty'sProvince of the *Maſſachuſetts Bay* in *New-England :* Begⁿ and held at *Boſton* upon Wednefday the twenty-eighth of *May* 1746. And continued by Adjournments to Wednefday the twenty feventh of *Auguſt* following.

## C H A P.  IX.

## An Act in further addition to an Act intitled *An Act for Highways.*

*W*HEREAS *in and by an Act made in the twelfth Year of the Reign of her lateMajeſty Queen* Ann, *intitled,* An Act *in*Addition to the Law of *this Province, intitled,* An Act for Highways, *made in the fifth Year of the Reign of the late King* William *and* Queen Mary ; *Proviſion is made for the laying out particular private Ways between any Inhabitants or Proprietors within their reſpective Towns to or for any original Lot, but no Power or Liberty is therein given for the laying out any ſuch Way to any Tract of Land that is not an original Lot,which is oftentimes equally neceſſary :* Wherefore, **Preamble.**

**Be it enacted by the Governour, Council and Houſe of Repreſentatives,** That the Select Men of eachTown reſpectively (and in Caſe of their Delay or Refuſal his Majeſty's Juſtices of the Peace within the feveral Counties of this Province at any of their General Seſſions) be and hereby are fully authorized and impowered by themſelves or others to lay out or cauſe to be laid out particular or private Ways as ſhall be thought neceſſary to or for any Tract of Land, not on original Lot,as they are by ſaid Act of Queen *Anne,* for an original Lot ; under the fame Regulations and Reſtrictions, and obſerving the fame Rules as are therein ſpecified directed and provided. **Select-men, and inCafe of theirRefufal, the Juſtices, impowred to lay outHighWays.**

This Act to continue in Force for the Space of three Years from the Publication thereof, and from thence to the End of the nextSeſſion of the General Court and no longer. **Limitation.**

[ D d d ] **CHAP.**

Digitized from Best Copy Available

### CHAP. X.

## An Act to prevent the firing of Guns charged with Shot or Ball in the Town of *Boſton.*

**Preamble.**

*WHEREAS by the indiſcreet firing of Guns laden with Shot and Ball within the Town and Harbour of* Boſton, *the Lives and Limbs of many Perſons have been loſt, and others have been in great Danger, as well as other Dammage has been ſuſtained.*

For the Prevention thereof for the future ;

**Penalty for firing off loaden Cannon.**

**Be it enacted by the Governour, Council and Houſe of Repreſentatives,** That no Perſon or Perſons from and after the Publication of this Act ſhall preſume to diſcharge or fire off any Cannon laden with Shot from any Wharff or Veſſel in that Part of the Harbour of ſaid Town which is above the Caſtle, on Pain of forfeiting the Sum of *fifteen Pounds* for each Gun ſo fired or diſcharged ; one Moiety of ſaid Penalty to be to and for the Uſe of the Poor of ſaid Town of *Boſton,* and the other Moiety to him or them who ſhall inform, complain and ſue for the ſame, to be recovered by Action, Bill, Plaint or Information, before any of his Majeſty's Courts of Record within the County of *Suffolk,* and upon Refuſal thereof ſuch Perſon ſhall ſuffer three Months Impriſonment without Bail or Mainprize.

**Penalty for diſcharging Guns or Piſtols loaden with Shot or Ball.**

**And be it further enacted,** That no Perſon ſhall from and after the Publication of this Act diſcharge any Gun or Piſtol charged with Shot or Ball in the Town of *Boſton* (the Iſlands thereto belonging excepted) or in any Part of the Harbour between the Caſtle and ſaid Town, on Pain of forfeiting *forty Shillings* each Gun or Piſtol ſo fired or diſcharged, to be recovered before one or more of his Majeſty's Juſtices of the Peace for the County of *Suffolk,* and diſpoſed of in Mannor as aforeſaid, or ſhall ſuffer ten Days Impriſonment. And for the more effectual Conviction of any Perſon or Perſons ſo offending, it ſhall be lawful for any Perſon to ſeize and take into Cuſtody any Gun ſo fired off, and deliver the ſame to one of the next Juſtices of the Peace in ſaid Town of *Boſton,* in order to its being produced at Time of Trial.

**Proviſo.**

*Provided nevertheleſs,* That this Law ſhall not be ſo conſtrued or underſtood as to prevent Soldiers in their common Training Days with the Leave and by Order of the Commiſſion Officers of the Company to which they belong, or other Perſons at other times with the Leave of one or more of the Field Officers of the Regiment in *Boſton,* from firing at a Mark or Target for the Exerciſe of their Skill and Judgment, provided it be done at the lower End of the Common ; nor from firing at a Mark from the ſeveral Batteries in the **Town of** *Boſton,* with the Leave of the Captain General, and no where elſe.

**Limitation.**

This Law to continue and be in Force for the Space of three Years and no longer.

**CHAP.**

Digitized from Best Copy Available

# THE
# COLONIAL RECORDS
### OF THE
# STATE OF GEORGIA

---

## VOLUME XIX.
## PART I.

---

## STATUTES, COLONIAL AND REVOLUTIONARY, 1768. TO 1773.

---

COMPILED AND PUBLISHED UNDER AUTHORITY

OF

# THE LEGISLATURE
### BY
## ALLEN D. CANDLER, A. M., LL. D.

---

ATLANTA, GA.
CHAS. P. BYRD, STATE PRINTER.
1911.

Add.8

Generated on 2023-01-20 14:49 GMT / https://hdl.handle.net/2827/hvd.32044032388223
Public Domain in the United States, Google-digitized / http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

Original from
HARVARD UNIVERSITY

Security Against Internal Dangers and Insurrections.

And be it further Enacted that the Fine & <span style="font-weight:bold">Fine and penalties to his Majesty.</span> Penalties by this Act Inflicted not herein before Disposed of shall be to his Majesty & applied in Aid of the General Tax.

By order of the Commons House of Assembly

N. W. JONES Speaker.

By order of the Upper House

JAMES HABERSHAM President.

Council Chamber

24ᵗʰ December 1768.

Assented to

JA: WRIGHT.

————————

(State Archives.)

*An act for the better security of the inhabitants by obliging the male white persons to carry fire arms to places of public worship.*

WHEREAS it is necessary for the security and defence of this province from internal dangers and insurrections, that all persons resorting to places of public worship shall be obliged to carry fire arms. **Preamble.**

Be

Generated on 2023-01-20 14:44:47 GMT / https://hdl.handle.net/2027/hvd.32044032308223
Public Domain in the United States, Google-digitized / http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google          Original from
HARVARD UNIVERSITY

138                    COLONIAL RECORDS

Security Against Internal Dangers and Insurrections.

**All male white inhabitants to carry arms to places of worship under penalty of ten shillings.**

1. BE IT ENACTED, That immediately from and after the passing of this act, every male white inhabitant of this province, (the inhabitants of the sea port towns only excepted who shall not be obliged to carry any other than side arms) who is or shall be liable to bear arms in the militia, either at common musters or times of alarm, and resorting, on any Sunday or other times, to any church, or other place of divine worship within the parish where such person shall reside, shall carry with him a gun, or a pair of pistols, in good order and fit for service, with at least six charges of gun-powder and ball, and shall take the said gun or pistols with him to the pew or seat, where such person shall sit, remain, or be, within or about the said church or place of worship, under the penalty of ten shillings for every neglect of the same, to be recovered by warrant of distress and sale of the offender's goods, under the hand and seal of any justice of the peace for the parish where such offence is committed, one half to be paid into the hands of the church wardens, or where there is no church wardens, to any justice for the use of the poor of the said parish, and the other half to him or them that shall give information thereof.

**How to be recovered and applied.**

2. And for the better and more effectual carrying this act into execution, BE IT FURTHER ENACTED, That the church warden or church wardens of each respective parish, and the deacons,

**Church wardens, deacons, &c. to examine persons liable to carry arms.**

elders

Generated on 2023-01-20 14:48 GMT / https://hdl.handle.net/2027/hvd.32044083280223
Public Domain in the United States, Google-digitized / http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

Original from
HARVARD UNIVERSITY

Security Against Internal Dangers and Insurrections.

elders or select men, of other places of public
worship, shall be obliged, and they are hereby
empowered to examine all such male persons,
either in or about such places of public worship,
at any time after the congregation is assembled,
on Christmas and Easter days, and at least
twelve other times in every year, and if, upon
finding any person or persons liable to bear
arms, and being then to places of public wor-
ship as aforesaid, without the arms and am-
munition by this act directed, and shall not,
within fifteen days after such offence is com-
mitted, inform against such person or persons so
offending, in order to recover the penalty as
aforesaid, said church warden or church war-
dens, deacons, elders, or select men, shall, for
every such neglect of duty, or giving informa-
tion as aforesaid, forfeit and pay the sum of
five pounds, to be recovered and applied as in
this act is before directed.

3. AND BE IT FURTHER ENACTED, That any
such person or persons thus liable to bring their
arms, and being at any church or place of public
worship, as aforesaid, that shall refuse to be ex-
amined in or about such places of public wor-
ship, or neglect, on demand of the church warden
or church wardens, deacons, elders, or select
men respectively, to produce and shew his or
their arms and ammunition by this act required
to be brought by such person or persons, to the
intent it may be known whether the same be

*Persons re-
fusing to be
examined to
forfeit ten
shillings, to
be recovered
and applied
as aforesaid.*

fit

Add.11

Digitized by Google

Original from
HARVARD UNIVERSITY

Case: 24-2847, 03/04/2025, DktEntry: 50.1, Page 14 of 37

Prohibiting Exportation Indian Corn.

fit for immediate use and service, such person or persons so refusing or neglecting shall severally, and for every such offence, forfeit the sum of ten shillings, to be recovered and applied in such manner as the penalty for not bringing such arms in and by this act directed.

4. AND BE IT FURTHER ENACTED, That this act

Continuation.

shall be and continue in force for and during the term of three years, and from thence to the end of the next session of the General Assembly, and no longer.

N. W. JONES, *Speaker.*

JAMES HABERSHAM, *President.*

JAMES WRIGHT.

February 27, 1770.

---

(State Archives.)

An Act.

*To Prohibit for a certain Time the Exportation of Indian Corn.*

WHEREAS the shortness of the last Crop of Indian Corn in this Province makes it greatly to be apprehended that a Scarcity of that Article may ensue

Digitized by Google            Original from HARVARD UNIVERSITY

Generated on 2023-01-20 14:49 GMT / https://hdl.handle.net/2027/hvd.32044032308223
Public Domain in the United States, Google-digitized / http://www.hathitrust.org/access_use#pd-us-google

*Augustus S. Clayton*

*Printed*
*March 1, 180..*

A

# DIGEST

OF THE

# L A W S

OF THE

# State of Georgia.

FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN
TO THE YEAR 1798, INCLUSIVE

AND THE

## PRINCIPAL ACTS OF 1799:

IN WHICH

Is comprehended the declaration of Independence; the State Constitutions of 1777 and 1789, with the
alterations and amendments in 1794.

ALSO THE

*Constitution of* 1798.

IT CONTAINS

As well all the Laws in force, as those which are deemed useful and necessary, or which are explanatory
of existing Laws; together with the

## TITLES OF ALL THE OBSOLETE AND OTHER ACTS.

AND CONCLUDES

WITH AN APPENDIX containing the original Charters and other Documents, ascertaining and defining the
Limits and Boundary of the State; all the Treaties with the southern tribes of Indians; the articles of
Confederation and perpetual union; the Constitution of the United States, and a few Acts of Congress.

Together with a copious Index to the whole.

BY

## ROBERT & GEORGE WATKINS.

Philadelphia:

PRINTED BY R. *AITKEN*, No. 22, MARKET STREET.

........................

1800.

Add.13

## LAWS OF GEORGIA.

*An Act for granting to his majesty the sum of £3046 16 8¼ for the use and support of the government of Georgia for the year 1779, to be raised at certain rates and after the method therein mentioned; and for the more effectual collecting of arrears.*

A. D. 1768.
No. 190.

December 24.

*Obsolete.*

———

A. D. 1770.
No. 191.

*An Act for the better security of the inhabitants, by obliging the male white persons to carry fire arms to places of public worship.†*

WHEREAS it is necessary for the security and defence of this province from internal dangers and insurrections, that all persons resorting to places of public worship shall be obliged to carry fire arms :

Preamble.

I. *Be it enacted*, That immediately from and after the passing of this act, every male white inhabitant of this province, (the inhabitants of the sea port towns only excepted, who shall not be obliged to carry any other than side arms) who is or shall be liable to bear arms in the militia, either at common musters or times of alarm, and resorting, on any Sunday or other times, to any church, or other place of divine worship within the parish where such person shall reside, shall carry with him a gun, or a pair of pistols, in good order and fit for service, with at least six charges of gunpowder and ball, and shall take the said gun or pistols with him to the pew or seat where such person shall sit, remain, or be, within or about the said church or place of worship, under the penalty of ten shillings for every neglect of the same, to be recovered by warrant of distress and sale of the offender's goods, under the hand and seal of any justice of the peace for the parish where such offence is committed, one half to be paid into the hands of the church wardens, or where there is no church wardens to any justice, for the use of the poor of the said parish, and the other half to him or them that shall give imformation thereof.

Enacted.

All male white inhabitants to carry arms to places of divine worship under penalty of 10/.

How to be recovered and applied.

II. And for the better and more effectual carrying this act into execution, *Be it further enacted*, That the church warden or church wardens of each respective parish, and the deacons, elders, or select men, of other places of public worship, shall be obliged, and they are hereby empowered to examine all such male persons, either in or about such places of public worship, at any time after the congregation is assembled, on Christmas and Easter days, and at least twelve other times in every year, and if, upon finding any person or persons liable to bear arms, and bring them to places of public worship as aforesaid, without the arms and ammunition by this act directed, and shall not, within fifteen days after such offence is committed, inform against such person or persons so offending, in order to recover the penalty as aforesaid, such church warden or church wardens, deacons, elders, or selectmen, shall, for every such neglect of duty, or giving information as aforesaid, forfeit and pay the sum of five pounds, to be recovered and applied as in this act is before directed.

Church wardens, &c. empowered to examine persons liable to carry arms.

III.

† *Query*—Whether this act can be enforced by any religious association, unless expresly authorised under the present government. See note, page 52.

# LAWS

OF THE

# STATE OF NEW-HAMPSHIRE,

PASSED

## June Session....1823.

PUBLISHED BY AUTHORITY.

CONCORD :

PRINTED BY JACOB B. MOORE,

FOR THE STATE.

1823.

72        *Dalton Bridge....Portsmouth Police.*

A. D. 1823.

## CHAP. XXXIII.

Passed June 28, 1823.

*AN ACT in addition to an act entitled " an act to incorporate certain persons by the name of the proprietors of Dalton bridge," approved June 27, 1818.*

Preamble.

**W**HEREAS the time allowed to said proprietors in and by said act for the completion of said bridge, has been found to be insufficient for that purpose ; Therefore,

*BE it enacted by the senate and house of representatives in general court convened,* That there be granted and allowed to the proprietors of the said Dalton bridge the further time of three years from the twenty-seventh day of June instant, to complete the building of said bridge ; and that the said act to which this is in addition, be, and continue to remain in full force the said farther term of three years, in the same manner as if the said original act had been limited to the term of eight years instead of five years from the passing thereof ; any thing therein to the contrary notwithstanding.

Further time allowed to build bridge.

*Approved June 28, 1823.*

---

## CHAP. XXXIV.

Passed June 28, 1823.

*AN ACT to establish a system of police in the town of Portsmouth, and for other purposes.*

Officers of police, how appointed.

**S**ECTION 1. **B**E *it enacted by the senate and house of representatives in general court convened,* That it shall be the duty of the selectmen of the town of Portsmouth, every year, within ten days after the annual town meeting for the choice of town officers, to appoint and commission in writing under their hands, or the hands or the major part of them, a suitable number of persons, not exceeding seven, who shall be reputable freeholders and inhabitants of said town of Portsmouth, to be police officers within said town. And said police officers shall be sworn to the faithful discharge of their duty, and shall be, by virtue of said appointment, constables and conservators of the peace ; and shall hold their offices for one year, and until their successors shall be appointed and duly qualified ; and shall receive such compensation for their services as the said town of Portsmouth shall vote at any legal town meeting.

To be sworn

Term of office, compensation, &c.

Persons guilty of riotous, wan-

SEC. 2. *And be it further enacted,* That if any person, or persons, shall, in any street, lane or alley, or in any public place in the town of Portsmouth, be guilty of any

Add.16

rude, indecent or disorderly conduct, or shall insult or wantonly impede any person or persons passing therein, or shall sing or repeat, or cause to be sung or repeated, any lewd, obscene or profane songs, or shall speak or repeat any lewd, obscene or profane words; or shall, within said town of Portsmouth, write or mark in any manner any obscene or profane word, or obscene and lascivious figure or representation on any building, fence, wall, post, or other thing whatsoever, or shall wantonly injure or deface any building, fence, wall, post, signboard or sign ; or shall wantonly cut and injure any tree standing in the streets or highways of said town ; or shall rob any garden or field of fruit or vegetables, or shall wantonly injure any trees, shrubs or bushes growing therein ; or shall, without lawful permission, climb on, or over the fences of any garden or yard ; or shall be found drunk in any street, lane, alley or public place ; or shall within said town use any juggling or unlawful games or plays ; or shall be a common night-walker or prostitute, or shall make any brawls or tumult, or shall wantonly or knowingly raise or repeat any false cry of fire ; that every such person, for every such act shall be taken and deemed to be an offender against the police of Portsmouth, and shall be liable to the penalties hereinafter expressed.

SEC. 3. *And be it further enacted,* That if any person or persons shall in any public place, or at any wharf in the town of Portsmouth, or within the view of any dwelling house, or of any public street, road or wharf in said town, in the day time, bathe or swim, without necessity, or expose his or her person indecently in dressing or undressing for the purpose of bathing or swimming, or otherwise without necessity ; every such person, for every such act shall be taken and deemed to be an offender against the police of Portsmouth, and shall be liable to the penalties hereinafter expressed.

SEC. 4. *And be it further enacted,* That if any person or persons shall within the compact part of the town of Portsmouth, that is to say, within one mile of the courthouse, fire or discharge any cannon, gun, pistol or other fire arms, or beat any drum, (except by the command of a military officer, having authority therefor) or fire or discharge any rockets, squibs, crackers, or any preparation of gunpowder, (except by the permission of the police officers, or of a major part of them first had in writing) or shall make any bonfire ; or shall in any street, lane, alley, or other public place within the aforesaid limits, throw any stones, bricks, snowballs or dirt, or play at ball or any game in which ball is used, or play at any game whatsoever for money ; or smoke any pipe or cigar ; every such person,

*[margin notes:]*
A. D. 1823.

ton or indecent conduct, liable to penalty.

Offences defined.

Offences defined.

A. D. 1823. for every such act shall be taken and deemed to be an of-
fender against the police of Portsmouth, and shall be liable
to the penalties hereinafter expressed.

Offences de-
fined.
    Sec. 5. *And be it further enacted,* That if any person or
persons shall place and leave, or cause to be plac-
ed and left in any street, lane or alley, or other public place
within the compact part of said town for the term of two
hours by day, or for the term of one hour by night, without
inevitable necessity, any sled, wheelbarrow, cart, trucks,
chaise or other carriage, or any boxes, crates, casks, tubs or
other vessel ; or shall suffer any cord-wood or fuel to remain
in any such street, lane, or alley for more than three hours,
without inevitable necessity ; or shall place or throw, or
cause to be placed or thrown into any such street, lane or al-
ley, any dung, dirt or other matter, that may impede the
free passage of said street, and suffer the same to remain
therein without inevitable necessity for more than two hours
at a time ; or shall without such necessity drive any wheel
carriage or sled or wheelbarrow on or over the side pave-
ments or walks of such street, lane or alley ; or ride or lead
any horse thereon ; every such person, for every such act,
shall be taken and deemed to be an offender against the po-
lice of Portsmouth, and shall be liable to the penalties here-
inafter expressed.

Officers of
police, with
consent of
selectmen,
may estab-
lish regula-
tions.
    Sec. 6. *And be it further enacted,* That the police officers
of said town of Portsmouth be, and they hereby are author-
ized to make from time to time, such regulations as they may
deem expedient for the stands of hacks, trucks, and carts in
any street, lane or alley within the compact part of said
town ; and for the height and position of any awning, shade
or other fixture that may be erected or placed in any such
street, lane or alley in front of or near any building ; and al-
so respecting any obstructions or nuisances in any street,
lane or alley within the compact part of said town of Ports-
mouth, provided that said regulations be first approved by
the selectmen of said town, for the time being, or a major
part of them ; and every violation of such regulations, so
made and approved as aforesaid, shall be taken and deemed
to be an offence against the police of Portsmouth ; and eve-
ry person so offending shall be liable to the penalties here-
inafter expressed ; *Provided, always, however,* that no prose-
Proviso.
cution shall be sustained for any such violation unless notice
be given of the passing of such regulations, by causing the
same to be published in the newspapers printed in said town
a reasonable time before they shall take effect.

Penalty for
offences.
    Sec. 7. *And be it further enacted,* That every person
duly convicted of an offence against the police of Ports-
mouth shall be punished by a fine not exceeding five dollars,

3

# LAWS of Maryland,

### ENACTED

At a Session of Assembly, begun
and held at the City of *Annapo-
lis*, on *Thursday* the Tenth Day of
*July*, in the Fifteenth Year of the
Dominion of the Right Honou-
rable *CHARLES*, Lord Baron
of *Baltemore*, Absolute Lord and
Proprietary of the Provinces of
*Maryland* and *Avalon*, &c. Annoq;
*Domini* 1729.



## By AUTHORITY.

### ANNAPOLIS:

Printed and Sold by WILLIAM PARKS. M,DCC,XXIX.

( 11 )

large and commodious, for the Members of the said House : The said several Pews to be built and erected at the Publick Charge of this Province.

*AND BE IT ENACTED, by the Authority, Advice, and Consent aforesaid,* That one full Fourth Part of all the Charges and Expences, which shall be laid out and expended in and about the said Enlargement and Reparation of the said Church, shall, upon the Application of the Vestry and Churchwardens of the said Parish, to the General Assembly, be levy'd by a publick Assessment on the Inhabitants of this Province ; to be collected in the same Manner as other publick Assessments, and paid to the said Vestry and Churchwardens, towards the said Enlargement and Reparation.

---

## An ACT for erecting a Town on the North Side of Patapsco, *in* Baltemore *County* ; *and for laying out in Lots Sixty Acres of Land, in and about the Place where one* John Fleming *now lives.*

WHEREAS, several of the Inhabitants of *Baltemore* County, have, by their Petition to this General Assembly, set forth, That a Town is much wanting on the North Side of *Patapsco* River ; and that it is generally agreed, that Part of a Tract of Land, whereon a certain *John Fleming* now lives, and suppos'd to be the Right of the Heirs of *Charles Carroll,* Esq; deceas'd ; which said Tract is commonly known by the Name of *Cole's Harbour :*

*BE IT THEREFORE ENACTED, by the Right Honourable the Lord Proprietary, by and with the Advice and Consent of His Lordship's Governour, and the Upper and Lower Houses of Assembly, and the Authority of the same,* That Mr. *Thomas Tolley,* Mr. *William Hamilton,* Mr. *William Bucknar,* Doctor *George Walker,* Mr. *Richard Gist,* Doctor *George Buchanan,* Mr. *William Hammond,* or any Three of them, shall be, and are hereby appointed Commissioners for *Baltemore* County aforesaid ; and are hereby authorized and impowered, as well to agree for the Buying and Purchasing Sixty Acres of Land out of the Tract aforesaid, and such Part, not exceeding Sixty Acres, as lies most convenient to the Water, as for Surveying and Laying the same out in the most convenient Manner into Sixty equal Lots, to be erected into a Town.

*AND BE IT FURTHER ENACTED,* That the Commissioners aforesaid, herein before nominated and appointed, or the major Part of them, are hereby impowered sometime before the last Day of *September,* which shall be in the Year of our Lord God, One Thousand Seven Hundred and Thirty, to meet together on the Tract of Land aforesaid, or some other convenient Place thereto ; and shall then and there treat and agree with the Owner or Owners, and Persons interested in the said Sixty Acres of Land, for the same ; and after Purchase thereof, shall cause the same to be surveyed and laid out ; and after the same be so survey'd and laid out, shall cause the same Sixty Acres to be mark'd, stak'd out, and divided into convenient Streets, Lanes, and Allies, as near as may be into Sixty equal Lots, mark'd by some Posts or Stakes towards the Streets, or Lanes, with Number One, Two, Three, Four, and so on to Sixty, to be divided and laid out ; of which Lots the Owner or Owners of the said

Land

( 12 )

Land fhall have his or their firft Choice for one Lot; and after fuch Choice, the remaining Lots may be taken up by others; and that no Perfon fhall prefume to purchafe more than One Lot within the faid Sixty Acres, during the firft Four Months after laying out the fame: And that the faid Lots fhall be purchafed by the Inhabitants of the County aforefaid. And in Cafe the faid Inhabitants fhall not take up the faid Lots within Six Months after fuch laying out as aforefaid, it fhall then be lawful for any Perfon or Perfons whatfoever to take up the faid Lot or Lots paying the Owner or Owners proportionally for the fame. And in Cafe the Owner or Owners of the aforefaid Sixty Acres of Land, fhall wilfully refufe to make Sale of the fame, or that through Nonage, Coverture, or any other Difability or Impediment whatfoever, are difabled to make fuch Sale as aforefaid, that then the Commiffioners aforefaid, or the major Part of them, fhall; and are by Virtue of this Act, authorized, impowered, and required, to iffue Warrants under their Hands and Seals, to the Sheriff of the faid County; which faid Sheriff is alfo hereby required and impowered, upon Receipt of fuch Warrants, to impannel and return a Jury of the moft fubftantial Freeholders, Inhabitants within the faid County, to be and appear before the faid Commiffioners, at a certain Day and Time by them to be limited; which Jury, upon their Oaths, fhall enquire to whom the faid Land belongs, and affefs and return what Damages and Recompence they fhall think fit to be awarded to the Owners of the faid Sixty Acres of Land, and all Perfons interefted therein, according to their feveral and refpective Interefts: And what Sum of Tobacco the faid Jury fhall adjudge the faid Sixty Acres to be worth, fhall be paid to the Owners fo found by their Verdict, and all Perfons they find interefted therein, by fuch Perfon or Perfons as fhall take up the faid Lots, proportionally to their Lot or Lots; which fhall give the faid Purchafer or Purchafers, their Heirs and Affigns, an abfolute Eftate of Fee Simple, in the faid Lot or Lots; he or they complying with the Requifites in this Act mentioned.

*AND BE IT FURTHER ENACTED*, That the Surveyor of *Baltemore* County, for the Time being, fhall have and receive for Surveying and Laying out the Town aforefaid, the Sum of Fifteen Hundred Pounds of Tobacco, and no more, to be paid and allowed him in the County Levy; and that he return a Plat thereof to the County Clerk, to be by him kept amongft the County Records. And in Cafe the Taker-up of fuch Lot or Lots, refufe and neglect to build upon fuch Lot or Lots within Eighteen Months after he fhall cover Four Hundred fquare Feet; that then it fhall and may be lawful for any other Perfon or Perfons whatfoever, to enter upon the faid Lot or Lots, fo as aforefaid not built upon, paying fuch Sum of Tobacco as fhall be firft fet and affeffed upon fuch Lot to the Commiffioners aforefaid, or fuch other Perfon as the faid Commiffioners, or the major Part of them, fhall nominate and appoint to receive the fame, for the publick Ufe and Benefit of the faid Town, and to be taken up a fecond Time.

*PROVIDED ALWAYS*, That fuch Taker-up or Purchafer build and finifh, within Eighteen Months after fuch his Entry made, fuch Houfe as in this Act is before limited and appointed to be built by the firft Taker-up; which Houfe fo built, fhall give and fettle as good Eftates to all Intents and Purpofes to fuch fecond Taker-up and Builder as aforefaid, his Heirs and Affigns as is in and by this Act before limited and fettled upon the firft Taker-up and Builder. And in Cafe any of the faid Lots
fhall

## ( 13 )

shall be neglected to be taken up in the Town aforesaid, during the Term of Seven Years next after the Publication of this Act, that then, and in such Case, the Owner or Persons interested at the first in such Land, shall, after such Time expired, be possess'd and interested in the said Lot or Lots, as in their first and former Estate : Any Thing in this Act to the contrary, notwithstanding.

*AND BE IT FURTHER ENACTED, by the Authority aforesaid, by and with the Advice and Consent aforesaid,* That the Town aforesaid, be called by the Name of *Baltimore* Town.

*AND BE IT FURTHER ENACTED, by the Authority aforesaid, by and with the Advice and Consent aforesaid,* That the Commissioners aforesaid, or the major Part of them, employ some sufficient Person for their Clerk ; and that they cause such Clerk to take an Oath, that he shall make true and impartial Entries of their Proceedings ; and assess reasonable Fees for the said Clerk, to be paid him by the several Takers-up of the said Lots; which said Entries they shall cause to be made up in a well bound Book, and lodged with the Clerk of *Baltemore* County Court, for the Inspection of any Person.

SAVING to His Most Sacred Majesty, his Heirs and Successors, the Right Honourable the Lord Proprietary, his Heirs and Successors, and to all Bodies Politick and Corporate, and all Persons not mentioned in this Act, their several and respective Rights : Any Thing in this Act to the contrary thereof in anywise, notwithstanding.

---

## An ACT for the Assessment of Ten per Poll on the Taxable Persons in Saint Paul's Parish, in Queen Anne's and Talbot Counties, the next Levy, and Ten per Poll the ensuing: Also for the assessing Ten per Poll, Yearly, on the Taxable Persons in St. Luke's Parish, in Queen Anne's County, until they shall have raised Sufficient to compleat a Church in the said Parish.

WHEREAS, by a late Act of Assembly made at a Session of Assembly, begun and held at the City of *Annapolis*, the Third Day of *October*, *Anno Domini* One Thousand Seven Hundred and Twenty Eight, Intituled, *An Act for dividing of St.* Paul*'s Parish, in* Queen Anne*'s County and Part of* Talbot *County*, amongst other Things, it was enacted, that it might be lawful for the Justices of *Queen Anne's* and *Talbot* Counties, to cause to be levy'd on the Taxable Persons in St. *Luke's* Parish, any Quantity of Tobacco, not exceeding Thirty Thousand Pounds of Tobacco, for the building of a Church in the said Parish : And it appearing to this General Assembly, that Thirty Thousand Pounds of Tobacco is not sufficient to erect a Church in said Parish : It also appearing that the Inhabitants of St. *Luke's* Parish were assessed towards building or repairing Two Brick Churches in St. *Paul's* Parish aforesaid, (one of which Churches, and Part of the Parish, lies in *Talbot* County,) whereof they now have no Benefit ; and it being thought reasonable that the Taxable Persons in St. *Paul's* Parish should contribute something towards the building a Church in St. *Luke's* Parish,

E

*BE*

# L A W S

OF

# *N E W - Y O R K,*

FROM

The Year 1691, to 1773 inclusive.

---

PUBLISHED ACCORDING TO AN ACT OF THE
## G E N E R A L   A S S E M B L Y.

---

### V O L U M E the S E C O N D.

---



---

QUUM LEGES ALIÆ SUPER ALIAS ACCUMULATÆ, EAS DE INTEGRO
RETRACTARE, ET IN CORPUS SANUM ET HABILE REDIGERE, EX
USU SIT.             BACON.

---

## N E W - Y O R K:

Printed by HUGH GAINE, Printer to the King's Moſt Excellent Majeſty in the
Province of New-York,
MDCCLXXIV.

also be necessary to annex to the said Certificate, an Affidavit of the following Tenor, sworn to before any Magistrate in the City of *New-York*: A. B. *being duly sworn, deposeth and saith, That he certainly knows* [or has Affidavits to prove, as the Case may be] *that the Hemp mentioned in the above, or the annexed Certificate, was all raised after the first of March, One thousand seven hundred and sixty-four, in the Colony of* New-York, *in the County of* [here mentioning the County] *and that no Bounty has yet been paid for it, or any Part of it, to the best of his Knowledge and Belief: And further saith not.* The Inspectors above mentioned, before they enter on the Execution of their Office, shall take an Oath, faithfully to discharge the Duty of Inspectors, according to the Meaning of this Act.

[ The Rest of this Act is Obsolete.]

*4th GEORGE III. A. D. 1763.*

Form of Affidavit to be sworn to before the Bounty shall be paid.

---

### C H A P.  MCCXXIX.

*An* A C T *to regulate the guaging of Wine, Rum, and other Spirituous Liquors, Molasses, and other Purposes therein mentioned.*
Pass'd the 20th December, 1763.

Expired 1st January, 1771.

---

### C H A P.  MCCXXX.

*An* ACT *to lay a Duty of Tonnage on Vessels for defraying the Expence of the Light-House on* Sandy-Hook.
Pass'd the 20th December, 1763.

Continued Chap. 1277. Expired 1st January, 1772. Provided for Ch. 1515.

---

### C H A P.  MCCXXXI.

*An* ACT *impowering* John Cruger, Robert R. Livingston, Philip Livingston, Leonard Lispenard, *and* William Bayard, *Esquires, to receive from the Colony of* Pennsilvania, *the Sum of* Four Thousand Three Hundred and Sixty-eight Pounds Two Shillings and Six-pence, *Sterling, overpaid to the said Colony, out of the Parliamentary Grant for the Service of the Year One thousand seven hundred and sixty.*
Pass'd the 20th December, 1763.

This Money being received and paid into the Treasury, the Act is therefore Obsolete.

---

### C H A P.  MCCXXXII.

*An* ACT *to continue an Act, entitled, An Act for the Relief of Insolvent Debtors, and for repealing the acts therein mentioned, with an Addition thereto.*
Pass'd the 20th December, 1763.

See Chap. 1148. Continued Ch. 1309.

---

### C H A P.  MCCXXXIII.

*An* A C T *to prevent hunting with Fire-Arms in the City of* New-York, *and the Liberties thereof.*
Pass'd the 20th December, 1763.

WHEREAS it has long been the Practice of great Numbers of idle and disorderly Persons in and about the City of *New-York*, and the Liberties thereof, to hunt with Fire-Arms, and to tread down the Grass, and Corn and other Grain standing and growing in the Fields and Inclosures there, to the great Danger of the Lives of his Majesty's Subjects, the Ruin and Destruction of the most valuable Improvements, the grievous Injury of the Proprietors, and the great Discouragement of their Industry.

Preamble.

5 T                                                    I. In

442      LAWS of *NEW-YORK.*

4th *GEORGE* III.
A. D. 1763.

I. In order therefore the more effectually to punish and prevent such Abuses as foresaid, **Be it Enacted** *by his Honour the Lieutenant Governor, the Council, and the General Assembly, and it is hereby Enacted by the Authority of the same,* That if any Person or Persons whatsoever, other than

Penalty for enter-
ing with Fire-Arms
into any inclosed
Land within this
City or its Liberties.

the Owner, Proprietor, or Possessor, or his or her white Servant or Servants, do and shall, at any Time or Times from and after the Publication of this Act, carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclosed Land whatsoever, within the City of *New-York,* or the Liberties thereof, without Licence in Writing first had and obtained

Or passing thro' Or-
chards, &c. without
Arms.

for that Purpose from such Owner, Proprietor, or Possessor of such Orchard, Garden, Corn-Field, or other inclosed Land ; or shall enter into, or pass through any Orchard, Garden, Corn-Field or Mowing-Ground, in any of the aforesaid Places without Fire-Arms, and thereof shall be convicted be-

Before whom Offen-
ders to be convicted.

fore any Member of his Majesty's Council, either of the Justices of the Supreme Court, or the Mayor, Recorder, or any one of the Aldermen of the City of *New-York,* for the Time being, by the Oath of one credible Witness, or by Confession of the Party offending, he, she, or they so offending, shall severally forfeit and pay for every such Offence, the Sum of *Twenty Shillings*; to be recovered and applied in the Manner herein after directed.

Forfeitures how to
be recovered and
applied.

II. **And be it further Enacted** *by the Authority aforesaid,* That every Fine and Forfeiture, which shall accrue upon or by Virtue of this Act, shall be recovered, with reasonable Costs, not exceeding *Ten Shillings,* by any Person or Persons who shall and will sue, and prosecute for the same ; One Half of such Fine and Forfeiture when recovered and received, to be applied to his, her, or their own Use; and the other Half thereof to be paid by him, her, or them, to the Church Wardens of the said City for the Time being, for the Use of the Poor thereof.

Offenders to be
imprisoned if the
Fines are not paid.

III. **And be it further Enacted** *by the Authority aforesaid,* That every Offender, who shall incur any such Fine or Forfeiture as aforesaid, shall, by Warrant under the Hand and Seal of any Member of his Majesty's Council, Justice of the Supreme Court, or the Mayor, Recorder, or Aldermen before whom he or they shall be convicted, stand and be committed to the Common Goal of the said City, there to remain for the Space of three Months, unless the Fine or Forfeiture, with Costs, be sooner paid. **Pro-**

Proviso.

**vided always,** That the Members of his Majesty's Council, and the Justices of the Supreme Court, shall be at Liberty to act in the Execution of this Law or not, as to them shall seem fitting.

### C H A P. MCCXXXIV.

Expired 1st Ja-
nuary, 1770.
Provided for Ch.
1441.

*An* ACT *to establish the Rates to be taken for Wharfage of Ships and other Vessels using the Wharfs within the Limits therein mentioned,*
Pass'd the 20th December, 1763.

### C H A P. MCCXXXV.

Obsolete.

*An* ACT *to raise, levy, and collect, the Sum of* Sixty-one Pounds Nineteen Shillings, *in the City and County of* New-York, *for Services performed by the Coroner of the said City and County.*
Pass'd the 20th December, 1763.

**C H A P.**

AN

# ABRIDGMENT

OF THE

# DEBATES OF CONGRESS

*(FROM THE CONGRESSIONAL RECORD)*

TO WHICH ARE ADDED

THE PRESIDENT'S ANNUAL AND SPECIAL MESSAGES AND
PROCLAMATIONS, TREATIES, A LIST OF ACTS PASSED
BY CONGRESS, AND IMPORTANT REPORTS
OF CONGRESSIONAL COMMITTEES

BY

CHARLES H. JONES

**FORTY-THIRD CONGRESS—SECOND SESSION**



NEW YORK
HENRY HOLT AND COMPANY
1875

Add.26

Digitized by Google

swallow the white men if the white men would swallow the colored." These causes and feelings naturally united to swell the conservative vote in such localities exactly as indicated by the returns.

Fifth. The entire want of any direct evidence to show any general intimidation of the colored voters.

Of course in so large a State it would be impossible there should be no instances of refusal to employ nor of intimidation. Such occur in every State. But the evidence certainly indicates no general intimidation of colored voters, and that such intimidation as did exist in the State was rather in the interest of the republicans than of the conservatives. The United States marshals, whose chief was chairman of the republican State committee, armed in some cases by blank warrants, and aided by Federal troops, made constant arrests before election, but not afterward. The oversight of the elections and of the returns was in the hands of Governor Kellogg's officials. Their count and return did show 29 majority of members of the lower house elected by the conservatives without any protest whatever, except in three parishes, although it was their province and duty to protect in any case where violence or intimidation or fraud existed.

Indeed, the direct evidence as to the election of 1874, as well as the circumstances, clearly indicate a peaceable and fair election. In fact, after the visit of the first committee and the revisit of the special committee, the Kellogg party, with all their machinery for collecting evidence, were unable to produce in the entire State more than half a dozen persons to testify to anything impeaching the freedom and fairness of the late elections who were not office-holders or connected with office-holders.

Against such facts it seems to us idle to assume that the disturbances so vividly pictured by the minority could have kept up throughout this State such a feeling of intimidation as would justify the assumption that but for that feeling the State would have gone republican. All experience shows that the result of the election of 1874 in Louisiana, as returned to the returning board, was natural and to be only accounted by the reasons we have given.

We hold, therefore, that in November, 1874, the people of the State of Louisiana did fairly have a free, peaceable, and full registration and election, in which a clear conservative majority was elected to the lower house of the Legislature, of which majority the conservatives were deprived by the unjust, illegal, and arbitrary action of the returning board.

To the resolution reported to the House from the committee, as to the action of the returning board, we are all agreed.

We understand the committee to be unanimous in finding the fact that the action of the returning board has defeated the will of the people as expressed by them at the polls on the 3d of November, 1874. The people then elected to the lower house of their Legislature a majority of conservative members; a portion of the conservative members thus elected were refused their certificates. This is an act of great injustice to the individuals, of gravest danger to the State and free government, and ought to be immediately corrected by any power competent to correct it.

The resolution recommending the recognition of Governor Kellogg is based upon general information and not upon evidence. On this point no testimony was taken, either by the committee or any part of it. Kellogg may or may not have been elected in 1872, but there is no evidence to show the fact, or if there be, it has been neither sought nor found by this committee. Messrs. Foster and Phelps think that the popular belief, taking both conservative and radical circles, inclines on the whole to justify Kellogg and Penn's claims; and that as Kellogg is and has been the acting governor of Louisiana for the past two years, to deny his right and install another in his place, after this lapse of time, might involve much mischief to the legal and political interests of the State.

To avoid the mischief and confusion of change, a majority of the citizens of Louisiana seem willing to accept as a compromise Kellogg's recognition and the restoration to the conservatives of the control of the lower house.

For these reasons Messrs. Foster and Phelps do not wish to oppose the recommendation that the administration of Governor Kellogg be recognized; neither, in view of the case as judged by competent evidence, do they wish to be understood as urging it. They only wish to record their agreement with those of their associates who believe that such a compromise might, by making a termination of the uncertainty in Louisiana, be on the whole less intolerable than the present distress.

But to any resolution recognizing Kellogg Messrs. Potter and Marshall are utterly opposed. They find nothing to justify the belief that Kellogg was elected. That he seized the government by the aid of Federal troops, through a void and fraudulent order which prevented the counting and return of the votes, should be a standing presumption against him. When the people, outraged by the abuses of his government, had successfully regained the office he had usurped, he was again reseated by Federal power. By the forms of legislation with which he had intrenched himself, he once more sought, to nullify the choice of the people at the late election, and to that end called on the Federal troops to break up the meeting of a legislature.

For Congress to recognize usurpation so gross and so oppressive is, they think, to establish a precedent by which, under pretexts that can readily be found, any State government may be overthrown, the will of the people nullified, fraud and violence made permanent, and republican forms perverted to destroy liberty.

In their judgment all that is needed in Louisiana is to withdraw the Federal troops and leave the people of that State to govern themselves.

CHARLES FOSTER.
WILLIAM WALTER PHELPS.
CLARKSON N. POTTER.
SAMUEL MARSHALL.

## The following was submitted by Mr. G. F. Hoar:

The undersigned, a portion of the special committee to whom was referred so much of the President's message as relates to the condition of the South, respectfully report:

The matters embraced in the reference to the committee are of the most serious and important character. In several of the Southern States a condition of affairs is said to exist which not only impairs the welfare of those States, but greatly endangers the peace and safety of the whole country. It seemed specially important to investigate and report to the House the state of things in Louisiana, as all parties there are agreed, for different reasons, in demanding the immediate interposition of Congress to redress grievances of which they bitterly complain.

One party in Louisiana assert that there is a conspiracy in that State, large in numbers and strength, though a minority of the legal voters, to take possession by force and fraud of the State government; to drive out of the State all white men who will not join in their schemes or refrain from any active resistance ; to deprive the negro of the political and legal rights conferred on him by the fourteenth and fifteenth amendments, and in some mode hereafter to be more fully made manifest to reduce him to such a condition of political and personal dependence upon the whites that the will of the latter shall be the law which determines his personal rights and fixes the price and condition of his labor. It is further charged that in the execution of this purpose vast numbers of murders have been committed; that the enforcement of the law has ceased over large districts; and that by terror, violence, and fraud the holding of fair and peaceable elections and fairly ascertaining the result has been rendered impossible.

The other party, denying these charges, claim that the State of Louisiana has fallen into the control of the negro population, under the lead of a few white persons, mostly adventurers from other States, who have possessed themselves of the State and local offices, which they have administered corruptly and wastefully for their personal gain, wasting the public revenues until taxes have become an intolerable burden and the commerce of the State almost destroyed; that the people of the State have twice fairly elected other officers ; but that the popular will has been frustrated by fraud, which would have been ineffective but for the forcible interference of the National Government. They claim that whatever violence has been used on their side is but the natural action of freemen endeavoring to assert their political rights, or at least is to be pardoned to men smarting under a sense of wrong and tyranny.

Both sides agree that the party who do not now hold the State government of Louisiana are physically the strongest. It is only the National Government that keeps in place for an hour the governor, the Legislature, a large portion of the local officers (and perhaps the judiciary) of Louisiana. Their opponents are prepared and able to take possession of the State government at once, whenever the National Government will not interfere. It is further claimed that a condition not unlike that of Louisiana exists in several other Southern States.

In our judgment this condition of things is fraught with the gravest peril to the whole country. That the people of any State should be unwilling or unable to

Digitized by Google

determine by peaceful and legal means the result of their elections, and that the President should be compelled to interpose the military force of the Government to prevent civil war, is itself a terrible misfortune. But the evil goes much further. Upon the elections in Louisiana, as in other States, depends the right to their seat of Senators and Representatives who are to aid in making laws for the whole country, and the choice of presidential electors, upon whose vote may depend the title to office of the President of the United States himself.

No party in the United States will like to submit to a result decided by the votes of electors chosen by such means. Each party will be likely to credit charges of fraud and violence made against its opponent, and to discredit like charges made against its own side. There is, in our judgment, the greatest danger that these elements may enter into the next national election to so great an extent that it may leave the real expression of the will of the people in doubt. In such case an appeal to force, like that which has been made in Louisiana, must result in civil war, spreading throughout the entire country.

That this result is desired and expected by some persons who are largely responsible for the troubles in Louisiana, we have great reason to believe. We append an article published in the New-Orleans Bulletin of February 6, 1875, which exhibits the purposes of the contributors of that journal, and, we fear, faithfully reflects the views of many men who are active and influential in the State of Louisiana.

The committee have had access to the reports made and evidence taken by various committees of one or the other of the two Houses of Congress since the close of the war, and have taken into consideration well known and uncontested facts in the recent history of the country. A sub-committee visited the State of Louisiana, where they took oral and documentary evidence, reporting their conclusions in writing. Afterward the whole committee determined to proceed to Louisiana to make fuller investigation, which purpose they have executed, a quorum being in attendance during their entire stay. In discharging their delicate and responsible duties they have been deeply impressed with the importance of the questions which they had to consider to the people of Louisiana and to the whole country, and have endeavored to approach them without partisan bias.

The question with which the American people have to deal will be best understood not by fixing the attention upon the details of particular acts of outrage on the one side, or of special and extraordinary exertions of national power to prevent them on the other, both calculated to stir deeply the feelings of large masses of the people, but by a dispassionate consideration of the indisputable facts of history.

The people of the States which engaged in the rebellion were composed in large part of two classes—a dominant race of slave-holders and those who approved and sustained slavery, and a subject race of slaves.

Each of these classes possessed the virtues and the faults which might be expected from its condition. The dominant class were unsurpassed among the nations of the earth in courage, spirit, hospitality, and generosity to their equals. They were apt to command and apt to succeed. Constantly on the look-out for the dangers which attended the presence in their community of a large servile class, they acquired the habit of acting in concert in all matters which concerned their class interests. They were able politicians. With the love and habit of truth which becomes brave men in all common concerns, they were subtle and skillful diplomatists when diplomacy was needed to accomplish any political end. Their whole society could unite as one man in attempting to create an impression which it was their interest to give, and to stifle all expressions of dissent. On the other hand, they were domineering, impetuous, impatient of restraint, unwilling to submit to any government which they did not themselves control, easily roused to fierce anger, and when so roused, both as individuals and as masses, cruel and without scruple. They never had learned to respect human rights, as such, or to tolerate the free expression of opinions which differed from their own, or to see dignity in manhood beyond their own class. It was such a people that engaged in the rebellion, and such a people who were required to live under a new order of things to which they had been led not by change of character or their opinion, but by mere force of arms.

They had submitted to the national authority, not because they would, but because they must. They had abandoned the doctrine of State sovereignty which they had claimed made their duty to their States paramount to that due to the nation in case of conflict, not because they would, but because they must. They had submit-

ted to the constitutional amendments which rendered their former slaves their equals in all political rights, not because they would, but because they must. The passions which led to the war, the passions which the war excited were left untamed and unchecked, except so far as their exhibition was restrained by the arm of power.

On the other hand, the negro was, in his ordinary condition, gentle, patient, docile, affectionate, and grateful. His confidence was easily won. The fear of the whites and habit of submission had been implanted in him by ages of slavery. The virtues of frugality, of honesty, of respect for justice either in private or public concerns, had never been exhibited toward him by his superiors, and he was not likely to be an example of them in himself, or to be very exacting in demanding them in those whom he regarded as his friends.

It was to these classes, varying in numbers, in the various Southern States, just about equal in the State of Louisiana, that the experiment of republican government was intrusted on their readmission to the Union at the close of the war. To these were added a small number of persons who had, in the exercise of their undoubted privilege as American citizens, moved into the South from other States. The whole spirit and policy of American institutions has been to encourage immigration in the fullest and freest manner. In all our States the native of foreign countries is not only welcomed and attracted by all possible inducements to take up his residence, but he is in a brief time clothed with citizenship and awarded quite his full share of political influence and consideration. But the citizen from the North who moved into the South was quite commonly opposed in opinion to the old residents on public questions. This opposition made him the natural ally, and his superior education made him the leader of the colored population. It was only to be expected, unless the nature of man were in this case to be thoroughly changed, that he should be regarded by the native white citizen of the South with distrust and dislike, especially if he came into their State for the purpose of engaging in politics, or held high State or national office without the consent of the white inhabitants.

A still greater difficulty attended the problem. In every Northern State the people had founded their institutions upon the theory that universal suffrage and universal education are inseparable. In some form of statement this axiom is declared in the constitution or laws of all of them. It has become a maxim too trite and familiar for repetition. No considerable number of American citizens of northern birth could be found who would not agree that their own institutions would have proved a disgraceful and disastrous failure but for the common school. Yet the Representatives of these same States, while imposing by national authority universal suffrage upon communities to all whose previous opinions and habits it was totally alien, made no provision for securing to the freedmen the defense of education. Of the number of males over twenty-one in the State of Louisiana in 1870, there were by the census, white 87,066, colored 87,121; total, 174,187. Of the whole colored population over twenty-one there were 157,049 who could not read and write. If half these were females, we have of colored voters who are reported as illiterate 78,524 out of 87,121.

These masses of illiterate voters must of necessity to a very large extent be instruments in the hands of others, who can influence their passions or excite their fears.

This condition has not improved since 1870. There is reason to believe that the illiteracy of the colored people is diminishing and that of the whites increasing; but the whole condition is not much, if any, improved. The total number of children in Louisiana between six and twenty-one years in 1874 is estimated by the State superintendent of schools at 280,387. The number of children enrolled in the public schools in 1874 is 74,309. The report of the State superintendent at the beginning of the last year shows an improvement in the educational condition of the State over the two or three previous years, but yet exhibits a sad array of facts. In some parishes there are no public schools; in others there are scarcely any. The enrollment above reported is a mere shell in many parishes, indicating an attendance of only a few weeks at school.

With these elements a great part of the political history of Louisiana for the past ten years might have been predicted by the most ordinary intelligence. Some of the occurrences which we are constrained to report are of a nature so cruel and barbarous as to excite astonishment in any people making the least pretense to civilization. But bloodshed, lawlessness, attempts by minorities to gain political power by force, delusions

Digitized by Google

inflaming great bodies of people, unrelenting hatred of opponents, and the use of these as instruments by designing and unprincipled leaders—all these things were almost inevitable. We find them existing to an extent which has almost overthrown republican government in one State, and if not checked are a dangerous menace to the peace of the whole country.

On the other hand, the interference of national authority, even where that was imperatively required by the Constitution and laws of the United States, and the expression of public sentiment at the North, did not tend toward a cure of the trouble. Our institutions and all the habits of our people are founded upon the principle of local self-government. The institutions of this country imply, for their successful and harmonious working, that in every vicinage throughout the whole country any twelve men placed upon a jury by lot will decide all causes, civil and criminal, according to the law and the fact ; and that every small local organization, ward, township, or parish, will elect local officers who will honestly and truly declare the result of all popular elections so far as their jurisdiction extends, and the whole body of members returned to any Legislative Assembly will honestly and fairly determine the right of every person claiming membership therein, as the question arises in each individual case. Whenever this presumption fails to be true, so far local self-government fails. In such cases the Constitution furnishes machinery by which the National Government may interfere for the protection of the rights of the people. But this machinery has been seldom used ; it is clumsy and difficult of management, and always tends to excite and alarm the whole people.

Whenever there is interposition of the National Government, either to guarantee republican government menaced in any State, to repress civil disorder on application of the State authority, to secure freedom of election, or the rights declared by the constitutional amendments, the political party in power in the National Government is, of course, properly held responsible. The party in opposition makes these exertions of power the especial points of its attack, and are disposed to deny or distort the occurrences that give rise to them.

The party in opposition is tempted to make the cause of those who are encountering the administration its own. Whether arrayed under the same party name or not, it looks for their votes in aiding it to displace its political opponents. It is thus naturally led to excuse or to deny all the facts on which the administration rests its justification for its extraordinary exercise of power. The supporters of the administration, on the other hand, are tempted to extenuate or overlook whatever may be wrong in the conduct of the State governments administered by their own political friends. So that the public sentiment of the rest of the country stimulates and aggravates the evil which it has so deep an interest to cure.

The committee have taken much evidence as to the opinion and purposes of the people of Louisiana, the history and conduct of her State administration, the acts of the local and State officials whose duty it was to conduct the late election and ascertain and declare the result, and upon the crimes and outrages which are said to have interfered with the freedom and fairness of the election. A great deal of this testimony is conflicting. We are aided in determining the probability of the story on each side by a recurrence to the previous history of the State.

After the war closed the whites of Louisiana were permitted to elect a Legislature, which sat during the years 1865, 1866, and 1867. They enacted a series of laws which must have been designed to restore the negro to a state of practical servitude. Statute of 1865, chapter 10, provides that under penalty of fine or imprisonment no person shall carry fire-arms on to the premises or plantation of any citizen without the consent of the owner, thus depriving the great mass of the colored laborers of the State of the right to keep and bear arms, always zealously prized and guarded by his white employers.

Statute 1865, chapter 11, punishes by fine and imprisonment the entering upon any plantation without the permission of the owner, thus preventing any person from seeking any intercourse with the negro for the purpose of giving political or other information except such as his master should approve.

Statute 1865, chapter 12, authorizes any justice of the peace, on complaint that any person is a vagrant, on summary process, to require such person to give bond for his good behavior and future industry for the period of one year. On failing to give such bond, the justice shall issue his warrant to the sheriff to hire out such person for the term of twelve months, under such regu-

lations as may be made by the municipal authorities : *Provided, That if the accused be a person who has abandoned his employer before his contract expired, the preference shall be given to such employer of hiring the accused.* Thus putting it into the power of any local magistrate, on summary process, to remand the laborer to a condition of practical slavery.

Statute of 1865, chapter 16, enacts that any person who shall persuade or entice away, *feed, harbor, or secrete* any person who leaves his employer without permission, shall be subject to a fine of not more than $500 or imprisonment of not more than twelve months, or both. Thus no laborer can leave his employer without leave without becoming an outcast, to whom food and shelter must be denied by all mankind.

Statute of 1865, chapter 20, imposes fine and imprisonment on any person who employs any laborer already under contract to another.

Statutes of 1867 authorized the imposition of a poll-tax for highway purposes to the amount of fifteen dollars. Under this law, it would be possible to raise the sum of $2,612,000 in the State in a single year, which should be divided *per capita* among the males over twenty-one, rich and poor paying the same sum. These laws perished with the overthrow of the government which enacted them, in 1867.

In 1864 a convention was held which framed the constitution of the State. It adjourned subject to the call of its president. In 1866 it was summoned to meet again in New Orleans, to consider some proposed amendments to the constitution, which had gone into effect. It was claimed that by the adoption of the constitution its functions were exhausted, and that its future assembling could have no official character. If this were true it would seem to have been harmless.

Its members were unarmed and unprepared for resistance. This body was set upon in the hall where it assembled by a mob consisting of citizens and policemen of New Orleans. In the language of the report of the congressional committee of the House of 1866, who fully investigated the whole transaction, "There has been no occasion in our national history when a riot has occurred so destitute of justifiable cause, resulting in a massacre so inhuman and fiendlike. The massacre was begun and finished at midday. An intention to disperse and slaughter the members of the convention and those persons, white and black, who were present and friendly to its purposes, was mercilessly carried into full effect." The police were active on the side of the rioters. Two hundred and sixty persons were killed. The report proceeds :

"The committee examined seventy-four persons as to the facts of violence and bloodshed upon that day. It is in evidence that men who were in the hall, terrified by the merciless attacks of the armed police, sought safety by jumping from the windows, a distance of twenty feet, to the ground, and as they jumped were shot by police or citizens. Some, disfigured by wounds, fought their way down stairs to the street, to be shot or beaten to death on the pavement. Colored persons at distant points in the city, peaceably pursuing their lawful business, were attacked by the police, shot, and cruelly beaten. Men of character and position, some of whom were members and some spectators of the convention, escaped from the hall, covered with wounds and blood, and were preserved almost by miracle from death. Scores of colored citizens bear frightful scars more numerous than many soldiers of a dozen well-fought fields can show, proofs of fearful danger and strange escape. Men were shot while waving handkerchiefs in token of surrender and submission. White men and black, with arms uplifted praying for life, were answered by shot and blow from knife and club ; the bodies of some were 'pounded to a jelly;' a colored man was dragged from under a street-crossing and killed at a blow ; men concealed in outhouses and among piles of lumber were eagerly sought for and slaughtered or maimed without remorse ; the dead bodies upon the street were violated by shot, kick, and stab ; the face of a man 'just breathing his last' was gashed by a knife or razor in the hands of a woman ; an old, gray-haired man, peaceably walking the street at a distance from the institute, was shot through the head ; negroes were taken out of their houses and shot ; a policeman riding in a buggy deliberately fired his revolver from the carriage into a crowd of colored men ; a colored man two miles away from the convention hall was taken from his shop by the police, at about four o'clock on the afternoon of the riot, and shot and wounded in side, hip, and back. One man was wounded by fourteen blows, shots, and stabs ; the body of another received seven pistol balls. After the slaughter had measurably ceased, carts, wagons, and drays, driven through the streets, gathered the dead, the dying, and the wounded

Digitized by Google

in ' promiscuous loads,' a policeman, in some cases, riding in the wagon, seated upon the living men beneath him. The wounded men, taken at first to the station-house or lock-up, were all afterwards carried to the hospital. While at the station-houses, until friends found them with medical aid, they were left to suffer; when at the hospital they were attended to with care and skill. But this was done at no cost to the city or to the State."

Without asking permission, so far as the committee learned, those wounded men were carried to the hospital under the care of the Freedmen's Bureau, and shelter, surgical treatment, and food were furnished at the cost of the United States.

In the year 1868, the year of the presidential election, occurred six bloody and terrible massacres : the Bossier Parish massacre, the Saint Landry massacre, the Orleans, the Caddo, the Jefferson, and the Saint Bernard. The following summary of testimony will be found in Mr. Poland's report, Forty-second Congress, second session, report No. 22, pages 21, 22.

The testimony shows that over two thousand persons were killed, wounded, and otherwise injured in that State within a few weeks prior to the presidential election ; that half the State was overrun by violence ; midnight raids, secret murders, and open riot kept the people in constant terror until the republicans surrendered all claims, and then the election was carried by the democracy. The parish of Orleans contained 29,910 voters, 15,020 black. In the spring of 1868 that parish gave 13,973 republican votes ; in the fall of 1868 it gave Grant 1,178, a falling off of 12,795 votes. Riots prevailed for weeks, sweeping the city of New Orleans and filling it with scenes of blood, and Ku-Klux notices were scattered through the city warning the colored men not to vote. In Caddo there were 2,987 republicans. In the spring of 1868 they carried the parish. In the fall they gave Grant 1 vote. Here also were bloody riots. But the most remarkable case is that of Saint Landry, a planting parish on the river Teche. Here the republicans had a registered majority of 1,071 votes. In the spring of 1868 they carried the parish by 678. In the fall they gave Grant no vote—not one, while the democrats cast 4,787, the full vote of the parish, for Seymour and Blair.

Here occurred one of the bloodiest riots on record, in which the Ku-Klux killed and wounded over two hundred republicans, hunting and chasing them for two days and nights through fields and swamps. Thirteen captives were taken from the jail and shot. A pile of twenty-five dead bodies were found half buried in the woods. Having conquered the republicans, killed and driven off the white leaders, the Ku-Klux captured the masses, marked them with badges of red flannel, enrolled them in clubs, led them to the polls, made them vote the democratic ticket, and then gave them certificates of the fact.

In the year 1873 occurred the transaction known as the Colfax massacre, to which the committee directed special attention. They had before them all the evidence on the trial of Cruikshank and others in the circuit court of the United States for conspiracy and murder, and the charge of the judge. They also called the district attorney and Mr. Marr, the counsel who defended the prisoners, who made full statements of the case as they claimed it to be. It seems to us there is no doubt as to the truth of the following narrative : In March, 1873, Nash and Cazabart claimed to be judge and sheriff of Grant Parish under commissions from Governor Warmoth. After Governor Kellogg succeeded Warmoth their friends applied to him to renew their commissions. He refused and commissioned Shaw as sheriff, and Register as judge. They went to the court-house, which they found locked, and Shaw and the other parish officers entered it through the window. Six days after, hearing rumors of an armed invasion of the town to retake the court-house, Shaw deputized in writing, from fifteen to eighteen men, mostly negroes, to assist as his posse in holding the court-house and keeping the peace. The next day, April 1, a company of from nine to fifteen mounted men, headed by one Hudnot, came into Colfax, some of them armed with guns ; and on the same day one or two other small armed squads also came into town. This day no collision occurred.

April 2, a small body of armed white men rode into the town, and were met by a body of armed men, mostly colored, and exchanged shots, but no one was hurt.

These proceedings alarmed the colored people, and many of them, with their women and children, came to Colfax for refuge, perhaps a majority of the men being armed.

April 5, a band of armed whites went to the house of Jesse M. Kinney, a colored man, three miles from Colfax, and found him quietly engaged in making a fence. They shot him through the head and killed him. This seems to have been an unprovoked, wanton, and deliberate murder. This aroused the terror of the colored

people. Rumors were also spread of threats made by them against the whites.

April 7, the court was opened and adjourned. The alarm somewhat subsided, and many colored people returned to their homes, the others maintaining their possession of the court-house, the whites maintaining an armed organization outside the town.

April 12, the colored men threw up a small earthwork near the court-house.

Easter Sunday, April 13, a large body of whites rode into the town and demanded of the colored men that they should give up their arms and yield possession of the court-house. This demand not being yielded to, thirty minutes were given them to remove their women and children. The negroes took refuge behind their earth-work, from which they were driven by an *enfilading* fire from a cannon which the whites had. Part of them fled for refuge to the court-house, which was a one-story brick building, which had formerly been a stable. The rest, leaving their arms, fled down the river to a strip of woods, where they were pursued, and many of them overtaken and shot to death.

About sixty or seventy got into the court-house. After some ineffectual firing on each side, the roof of the building was set fire to. When the roof was burning over their heads the negroes held out the sleeve of a shirt and the leaf of a book as flags of truce. They were ordered to drop their arms. A number of them rushed out unarmed from the blazing building, were met by a volley, and a number killed and wounded, others were captured. Fifteen of the blacks crept under the floor of the burning building, but were all captured. The number taken prisoners was about thirty-seven. They were kept till dark, when they were led out two by two, each two with a rank of mounted whites behind them, being told that they were to be taken a short distance and set at liberty. When all the ranks had been formed the word was given, and the negroes were all shot. A few who were wounded, but not mortally, escaped by feigning death.

The bodies remained unburied till the next Tuesday, when they were buried by a deputy marshal from New Orleans. Fifty-nine dead bodies were found. They showed pistol-shot wounds—the great majority of them in the head, and most of them in the back of the head.

Two white men only were killed in this whole transaction, Hodnet, the leader, and one Harris. It is pretended, and this pretense is used to give some palliation for the crime, that these men were bearing a flag of truce from the besiegers, and were shot from within the court-house. But among all the witnesses examined there was but one who pretended to have seen any flag of truce in their hands ; he was twelve to fifteen hundred feet off across the river. His evidence hardly bears that construction, as will be seen by referring to it. On the other hand, Hodnet was killed by a bullet which entered the back of his neck, and Harris by one that entered at the side. To believe this claim would require us to find that the negroes who, so far in the fight had been unable to harm a single one of their adversaries, pent up in the building to which they had fled for refuge, with the roof blazing over their heads, compelled to choose between death by fire and the tender mercies of the *fo-men*, fired on the men who were bringing the flag backward. No ; this deed was *without palliation or justification* ; it was deliberate, barbarous, cold-blooded murder. It must stand, like the *massacrs* of Glencoe or of Saint Bartholomew, a foul blot on the page of history.

Spread over all these years are a large number of murders and other acts of violence done for political ends. In reply to an inquiry of the committee, General Sheridan, who is gathering careful statistics of the number of persons killed and wounded in Louisiana up to February 8, 1875, since 1866, on account of their political opinions, reports the number so far ascertained to be as follows :

| | |
|---|---:|
| Killed | 2,141 |
| Wounded | 2,115 |
| | |
| Total | 4,956 |

Much evidence was taken by the committee from persons of both political parties in regard to this matter. Lists of homicides in different parishes were produced before the committee by persons familiar with the localities. On one side it was denied that these grew to any great extent out of politics. On the other, statements were made which would tend to show that the murders reported to General Sheridan fell far short of the truth.

But the statements on both sides left it beyond dispute that murders were events of the most ordinary occurrence, so as hardly to make an impression on the memory of intelligent men in whose neighborhood they

Digitized by Google

occurred ; and this not only in cities but in rural communities ; that there existed throughout a great part of the State an intense degree of political heat and hatred ; that as a rule, homicide, murder, and assault with intent to kill went without legal punishment ; that the white men generally went armed. Under all the circumstances we do not doubt the substantial truth of General Sheridan's statement.

We have recapitulated these events which took place before the campaign of 1874, not because we desire to keep alive their painful and odious memory, but because it is absolutely necessary to do so to interpret the events of that campaign. In determining whether the negro voter was intimidated in 1874 to an extent which seriously affected the result of the election, we cannot agree with those who think no evidence should be weighed but that of matters since September of that year, and who deem it of no consequence that two thousand political murders had been committed and the murderers were at large. In determining whether the Coushatta and other like deeds were the outbreaks of freemen smarting under a sense of oppression, or were enacted for the purpose of establishing a minority in power by the strong hand, it is of some consequence to know whether the same men did the same thing before the matters of which they complain as invasions of their own rights took place. In deciding whether their assertions are true, that they desire that the negro shall enjoy all his constitutional rights to freedom, to the suffrage, to equality before the law, it is important to know whether they tried to wrest them from him on the last occasion when they had undisputed legislative sway.

We now come to the events of 1874. The campaign was inaugurated by the formation of a party designed to divide the people of Louisiana on the line of race. Its convention at Baton Rouge begins its address, " We the white men of Louisiana." This party assumed various names in various localities, almost always indicating a purpose to make the race issue distinct.

Agreements were entered into in various parishes, signed by hundreds of planters, to employ no laborer who did not vote their ticket. Handbills like the following were circulated in French and English :

" *Louisianais : Pour sauver votre patrie, il faut renvoyer les negres. (Par la faim, animal le plus feroce est dompté.*")

" Louisianians : To save your country do not employ the negro. Wild beasts can only be tamed by hunger."

After the White League rising of September 14, 1874, an account of which is given hereafter, risings took place in many parishes. The Kellogg officers were driven from power and compelled to fly for their lives. After the re-establishment of the Kellogg government, in some cases the officers were not permitted to resume their functions.

The speeches at public meetings and leading articles in the press urged the people to deeds of violence. We submit a collection of extracts taken from many leading and influential journals published in various parts of the State. We have not space to make extracts from them in this report. They are enough of themselves to establish its conclusions as to the purposes and conduct of the leaders of the white men's party in the campaign of 1874.

It is impossible to state in the space which this report can properly cover the details of the deeds of lawless violence which were proved before the committee. In many parishes the legal officers were driven out by force. Republicans were murdered or compelled to fly for their lives. Whatever the pretext, the real offense was their political opinions.  *    *    *

We were anxious to obtain the facts in the terrible tragedy of Coushatta, and were able to do so from several witnesses, but principally from Mr. Abney, a brother of one of the victims, and from Mr. Abney, a merchant of that town, whose reluctant admissions, under a rigid cross-examination, satisfied us was the chief conspirator. This is the fearful story proven to our satisfaction.

The Twitchell brothers, from New Hampshire, both young and active men of business, one a man some time married, the other but a short time before his death, with five or six other men from the North with their families, settled in this little town, bringing with them earnestness of purpose, integrity, economy, and habits of industry. The reasonably expected results followed ; the hamlet grew into a prosperous and flourishing New-England village, with its saw and grist mills its factory, its stores and store-houses, its pleasant white-painted houses with their lawns and gardens, its churches and school-houses. Business flourished. About twelve hundred colored men were gathered into the village. Their labor was in demand, their wages good, and promptly paid. Their children eagerly availed themselves of the school privileges abundantly afforded. The colored voters finding that these men never betrayed their confidence, but in all things were aiding them, elected them to the several parish offices ; and they, thus elected, from a sense of duty, honestly and faithfully administered the same. Everything in the village was prosperous, peaceable, and happy. But there was there a small party of white conservatives, headed by Mr. Abney, who determined to rule ; who acknowledged no right to the black man but that of service ; who had no feeling toward their white neighbors recognizing in the black a citizen other than intense jealousy and hatred. The usual result followed.

August 25, 1874, these officers were waited upon and ordered to resign ; they declined ; then they were informed that death alone was the alternative. Knowing that the inexorable decree had gone forth, that nothing, neither service to the town, to the State, to their neighbors, nor the faithful performance of duty, nor virtue, nor integrity, nor prayers of themselves, of wives, of little children could save, they besought their cruel neighbors to send them in safety out of the State, promising never to return. An escort was raised by this man Abney of twenty mounted men, the prisoners taking all their ready money, about $2,000, placed themselves in the hands of the guards. Abney issued military orders to what he called political clubs, but we believe white-leaguers, along the route, to furnish aid, supplies, &c. The march was commenced, and within, thirty miles of their homes these prisoners were all murdered, terribly mutilated, buried, and no father, widow, brother, or son was permitted even to visit their graves until the bodies were decomposed. None of the white men's party have ever sought the murderers ; no pursuit has ever been made, no inquiries ever set on foot by them. A man riding one of the horses of one of the dead men has been seen in the parish, but no one arrested his course or asked him about the bloody deed. No republican, white or black, has dared to commence proceedings. Abney was arrested and admitted to bail in a small sum, and with impunity insults the majesty of outraged law by boldly appearing as a witness before this committee. More, he was introduced by the conservatives to the witness-stand with a flourish of trumpets as a leading merchant of that section of the State.

Now, against those murdered men no crime was charged, no dishonesty alleged, no malfeasance of office proved. Abney alone said they had educated in certain contracts, but your committee gave no credit whatever to his testimony.

⊨ Thus by the murderous hands of neighbors, of men who pride themselves upon their position in society, of those who had never received from the victims other than kindness, were these men deliberately slain ; and there is practically no law in Louisiana to bring them to punishment.

## WHITE LEAGUE.

The White League is an organization which exists in New Orleans, and contains at least from twenty-five hundred to three thousand members, armed, drilled and officered as a military organization. Organizations bearing the same name extend throughout many parts of the State. It was pretended that this organization in the city was simply as a volunteer police force, the regular police being inefficient ; that it has no connection with associations of the same name in other parts of the State, and that these latter are large political clubs without military organization or arms. A brief examination and a brief cross-examination effectually dispelled this pretension. Several of its members and officers were examined before the committee. So far as was shown this organization in no single instance performed police functions. Its organization, equipment, drill, and discipline were wholly military. Its name was not appropriate to a volunteer police, but was appropriate to an association designed to put the whites of the State into power by force. It had cannon. On the 14th of September, 1874, it rose upon and attacked the police of the city, the pretext of the attack being the seizure of arms which it had imported from the North, and having defeated them with considerable slaughter, it took possession of the State-house, overthrew the State government, and installed a new governor in office, and kept him in power until the United States interfered. This rising was planned beforehand. Its commanding officer, Ogden, published an elaborate and pompous report of his military movements, in which he expresses his thanks to his aids and other officers for their important and valuable services before and during the day of action. In other parts of the State organiza-

tions under the same name existed, and we have no doubt their purposes and methods were also identical. In one parish their meetings were called by notices, headed "Attention, White League," and signed by an officer in his military capacity. Abney, the leader of the band at Coushatta, when he sent off the republican prisoners under a guard, gave a military order for supplies and guard to the highest officer of a club in another town, on obedience to which, if his story were true, the safety of the lives of the prisoners depended. Yet he professed to have no other power than that of president of an ordinary democratic club addressing the president of a subordinate or branch club of the same organization.

The White League of New Orleans itself was and is a constant menace to the republicans of the whole State. Its commander can in a few hours place bodies of men, armed and drilled, in any of the near parishes, or those on the coast, or into Mississippi, Alabama, or Texas. It doubtless contains many persons of property and influence. It also contains many persons of very different character. It would be desirous and able to overthrow the State government at any time, if not prevented by the power of the United States. They still retain more than one thousand stand of arms, taken from the State on September 14, and never returned. •

We cannot doubt that the effect of all these things was to prevent a full, free, and fair election, and to intimidate the colored voters and the white republicans. The very formation of a white man's party was a menace of terrible import to those who remembered Colfax and Bossier and the convention. The press was filled with threats of violence. The agreement to discharge laborers, the suggestion that wild beasts are tamed by hunger, was evidence of the same spirit. The overthrow of the State government by the White League on the 14th of September, the turning out large numbers of parish officials in the country, compelling them to flee for their lives; the fearful lesson of Coushatta, the formation, arming, and drilling of the White League, the natural successors of the Knights of the White Camelia—these things in a community where there is no legal punishment for political murder must, in the nature of things, have filled with terror a people timid and gentle like the colored population of Louisiana, even if we had not taken abundant evidence as to special acts of violence and crime and their effects on particular neighborhoods.

Mr. Moncure, the conservative candidate for State treasurer, claims a majority in the whole State of about 5,000. A far greater number of republicans than enough to overcome this majority must have been prevented from registration or driven by terror from the polls.

In view of these facts, we do not hesitate to find that the election of 1874 was neither full, free, nor fair; that in large portions of the State the usual means of instructing and persuading the people, of organizing and conducting a campaign, could not be carried on by republicans without danger to their lives; and that many more voters than were needed to give the republican party a complete victory were prevented from voting at all or coerced into voting the white man's ticket.

It was to declare the result of such an election that the returning board met at New Orleans in 1874. In expressing our dissent from the view they took of their own powers and duties, and our emphatic disapprobation of their proceedings, we desire to state as emphatically our unwillingness to do them any injustice, and our full appreciation of all the considerations which may tend to palliate their conduct. Several of them have held high position. Governor Wells, the President, had been a large and wealthy planter before the war, had remained loyal through the rebellion, had been true to the flag of his country when driven to the swamps and hunted with dogs. Such a record entitles him to our warmest sympathy and respect.

But we must declare the law and the fact as we find it. The Louisiana election laws provide the following machinery for elections :

First. A registration of the voters, to be completed ten days before the election, by a supervisor to be appointed in each parish by the governor.

Second. The fixing in each parish suitable polling places by a police jury chosen by the people of the parish.

Third. Three commissioners of elections, appointed by the police juries, to preside at each poll.

Fourth. A returning board of five persons appointed by the governor, to whom the returns from the whole State are made by the local officers, and who are to canvass and compute them and promulgate the result.

Section 44, statute 1872, provides for the organization of the Legislature.

Upon this statute we are all clearly of opinion that the returning board had no right to do anything except

to canvass and compile the returns which were lawfully made to them by the local officers, except in cases where they were accompanied by the certificates of the supervisor or commissioner provided in the third section. In such cases the last sentence of that section shows that it was expected that they would ordinarily exercise the grave and delicate duty of investigating charges of riot, tumult, bribery, or corruption on a hearing of the parties interested in the office. It never could have been meant that this board, of its own motion, sitting in New Orleans, at a distance from the place of voting, and without notice, could decide the right of persons claiming to be elected.

The board took a different view of its powers, and proceeded to throw out the votes from many polls where they found intimidation and violence to have existed. The result was to defeat persons whom, on the returns, they should have declared elected, and to elect persons who should have not been declared elected. In regard to four parishes they declared no result whatever, but referred the matter to the Legislature.

The result of this action was to change the political majority of the persons who, by the constitution and laws of Louisiana, are entitled to organize the house of representatives.

The returning board claims that in this proceeding they acted under an honest belief that they were right in their construction of the law, and that they were giving effect to the true will of a majority of the people of Louisiana, and that in their construction they followed the precedent set by the democratic or fusion returning board of 1872. We believe they did follow such a precedent. We have no doubt that they believed they were defending the people of Louisiana against a fraud on their constitutional rights. But there is no more dangerous form of self-delusion than that which induces men in high places of public trust to violate law to redress or prevent what they deem public wrongs.

We are not prepared to declare without further examination how many persons obtained a *prima facie* title to seats in the Legislature through this wrongful action. In some of the cases there were defects either of form or substance in the returns themselves which the board claimed required their rejection without regard to the evidence of intimidation.

But the method adopted to set right this wrong was totally objectionable. When the Legislature assembled on the 4th of January, 1875, the minority of the persons entitled to organize the house repaired to the Statehouse, prepared to possess themselves of the organization by force. Numbers of persons prominent in the White League were on hand to assist. Even long ladders were provided, in readiness for the entry of accomplices from without, who would, in all probability, after the seizure of the house, have displaced the existing senate, and put in its place the other body claiming to be the rightful senate. When the clerk of the last house began to call the roll, one of the minority moved that Mr. Wiltz be declared speaker, and the motion was declared carried by the person who made it—it was not in fact carried, but was opposed by a majority. Thereupon Mr. Wiltz took the gavel. A motion was made to seat five members from the four vacant parishes, which he declared carried, though it was not carried, but was opposed by a majority. He then declared a Mr. Flood elected sergeant-at-arms, who appointed a number of deputies, who at once appeared with badges on which were printed "assistant sergeant-at-arms." Simultaneously a large number of persons in the crowd in the street outside the State-house exhibited the same badges. There being symptoms of violence and disorder, a committee requested General De Trobriand, a military officer of the United States, to aid in preserving order. He came into the hall, spoke to the persons in the lobby at the desire of Wiltz, and order was restored. Subsequently, at the request of the majority of the persons entitled to organize the body and of the governor of the State, General De Trobriand caused his soldiers to remove the five persons who had been forced into seats as above. Wiltz and his friends then, after protest, withdrew, and the majority remained and organized the house by the choice of Mr. Hahn as speaker, and remains now in session as the house of representatives of Louisiana.

We do not here express a judgment of the lawfulness of the act of the military officer. We believe his interference alone prevented a scene of bloodshed like that which attended the convention of 1866, and the scenes of September 14, 1874. His act was not an interference with an organized legislative body. It was a body which had been declared organized by one man contrary to the truth, and contrary to the protest of a majority of its members. It was in no sense a legislative body, but was an illegal assembly, attempting to thrust out the legal

Digitized by Google

house from its place and to usurp its functions. The fact that it was composed in part of a minority of those entitled to seats did not alter its character, nor did the fact, if it be true, that the five members ought to have been declared entitled to seats by the returning board, alter the character of the proceeding. A contestant is not entitled to seat himself in a legislative body by force, however just may be his claim to his seat. Nor is a minority of such a body entitled to seat him by force against the will of the majority.

The law of Louisiana provides various processes and safeguards for conducting elections and determining who are chosen to the Legislature: First, supervisors to make the registration; second, commissioners to preside and conduct elections, and receive only registered votes, and report it through the supervisors; third, returning board to canvass and compile statements of local officers, with judicial powers in certain cases, where local officers certify there was illegality affecting the result; fourth, those persons who are declared elected by the returning board, and those only who may organize the houses; fifth, the house so organized, who are to take up each contested seat, case by case, and determine as final judges who is entitled to it.

Persons who are not declared elected by the returning board have no more right to force themselves in to take part in organizing that house, a minority of those holding such certificates have no more right to organize it over the majority, or to force others in, merely because they claim that they ought to have been declared elected, than persons who claim that the house did wrong in judging of their cases have a right to force themselves in, or than persons who claim that supervisors defeated their election by wrong-doing in registration, or commissioners did wrong in conducting or certifying the election. The act of each set of officers in the successive steps, right or wrong, is binding until the next tribunal has reversed or corrected its action. When, therefore, the minority of those borne on the secretary's roll undertook to overcome the majority in organizing the house, they were wrongdoers. When the five members were brought in they were brought in not by the house, but by wrong-doers overthrowing the will of the house and prepared and able to support their wrong by force. When the military officer removed them he removed at the request of the true majority of the assembly persons who were interfering with their right and duty to organize the same under the constitution and laws of Louisiana. Whether the officer had warrant for his action or not, he was interfering not against but in aid of a legislative body at its own request, and at the request of the governor of the State; and his interference prevented a scene of blood which the previous and recent history of that State warrants us in believing would have been of the most fearful character.

We should be extremely glad if any method we could devise or suggest would correct the wrong that we think has been done in organizing the house of representatives. But this must be accomplished, if at all, by the concerted action of those persons in Louisiana of both parties who sincerely desire peace and order and do not wish their State to suffer, to advance the schemes of designing politicians.

We do not overlook the causes which tend to excite deep feelings of discontent in the white native population of Louisiana. There has been great maladministration; public funds have been wasted, public credit impaired, and taxation is heavy. These facts combine with the general prostration of business through the country and with the diversion of business from New Orleans by reason of the construction of railroads northerly from Texas to create gloom and discontent.

But the ballot, not violence or assassination, is the peaceful remedy for so much of these evils as is due to the State administration. Every national administration, nearly every State and city administration, has been charged by its opponents with like faults. We have not been able to investigate all the charges which have been made against the State administration, although we have received both documentary and oral evidence on the subject. So far as has appeared to us, Governor Kellogg is chargeable with no dishonesty, and has set himself as faithfully as he could to remedy the great evil bequeathed to him by his predecessor.

Charges of corruption are made by the conservatives against republican officials without the slightest discrimination. They assume that the acceptance of office is a badge of fraud. No matter how high the position hitherto occupied socially, how spotless the reputation, the moment of acceptance of office witnesses an entire reverse. The gentleman suddenly becomes a blackguard, the honest man a thief. Four or five cases of alleged defalcation were clearly shown to be a mistake during our session. That there was great wrong and

corruption, that much bad legislation was enacted, that grievous monoplies were created during Governor Warmoth's term of office is undeniable. That the democrats purchased him at the earliest possible moment for the purpose of converting to their own use his powers of corruption, his skill and cunning in manipulating the machinery of election, was asserted by some of their own witnesses. That there has been decided improvement under Governor Kellogg all admit.

It is said that large numbers of the white people of Louisiana believe that Governor Kellogg is a usurper, and, acting on that belief, are prepared and able to drive him from power if not prevented by the National Government. This may be true. But it is equally true that as large numbers of the voters of Louisiana believe Kellogg and his associates to have been lawfully elected, and that if McEnery were established in power he would be a usurper. The difference between the two parties being that the latter do not propose to settle questions of law by bloodshed. It is further said that this is a question which concerns the people of Louisiana alone, and that they should be left to fight out the question among themselves. But this is an erroneous view both of the rights and duties of the people of the United States under the Constitution. They have an interest in the question whether Senators and Representatives for Louisiana, thrust into their seats by illegal means, shall sit in Congress to make laws for them, and whether electors, gaining their office in like manner, shall turn the scale in the choice of a President of the United States. The President and Congress are bound to recognize, and if need be to support the true government of Louisiana against all usurpers; and the American people will abandon their rights and flinch from the performance of their duties when they leave these questions to be settled either by the mob or the assassin.

We are of opinion that the union of nearly all the blacks in one political party, and of nearly all the whites in another, is a fact deeply to be deplored. Party spirit bears evil fruit in abundance when animosities of race and class do not mingle with it. But we cannot doubt that whether the white republican leaders have sought to foster this discussion on the color line or not, it would long since have disappeared if the leaders of the white people of Louisiana had not hammered and welded together the masses of the colored population by a system of conduct calculated to excite in the highest degree their fears for their freedom or their political and social rights.

The people who would persuade us and to some degree persuade themselves that they are willing to give the negro all his rights under the Constitution seem to lose all their understanding of what justice and equality really mean when the negro is concerned. They think, and very justly, that it is a great evil to mass all the colored votes on one side. It never occurs to them that it is an equal evil to mass all the white votes on the other. On the contrary, their animosity is specially directed against those whites who act with negroes. They have little reprobation for those leaders who advise the whites to band together in an agreement not to employ negro laborers who vote the radical ticket, or for the planters who followed the advice. The life of no man would be safe, as one of their witnesses very frankly admitted, who, when it was time to gather the cotton crop, should advise negroes to refuse to work for planters who are not republicans. The white who kills a negro goes unpunished. A fearful vengeance overtakes the negro who snaps a cap at a white man. In parish after parish the whites turn out public officers whom they dislike by force, and no punishment follows. The assembling of a body of negroes at the command of the sheriff to maintain his lawful authority is followed by the Colfax massacre.

In addition to the testimony taken in public hearings, your committee enjoyed much opportunity of conversing in private with the people of New Orleans and with persons from other parts of Louisiana. The conservatives, as they called themselves, gentlemen of culture and refinement, courteously extended to the committee offers of the elegant hospitality for which their city is famed. They were all deeply excited by the political condition, and made it the constant topic of their discourse. They were unanimous in declaring that the people of their State desired nothing but peace and good government; that they were willing to leave the colored man undisturbed in his new constitutional rights; and that it was their desire and their interests that the laborer and the employer should live together in confidence and amity. They declared that no honest republican would be affected in his social or personal relation by his political opinions. On the other hand, men in great numbers sought private interviews with the republican members of the committee to declare that a reign of terror

44'

Digitized by Google

existed worse than existed during the war; that they did not dare to express openly republican sentiments; that destruction to their business and risk to their lives would result. These men were, some of them, known to members of the committee. They were not politicians, held and desired no office, and were in many cases business men of high standing and character. They urged the committee not to require them to testify, saying they did not dare to risk the consequences.

The American people are now brought face to face with this condition of things. In the State of Louisiana there is a governor in office who owes his seat to the interference of the national power, which has recognized his title to his office, not by reason of any ascertainment of the facts by legal process, but has based its action solely on the illegal order of a judge. In the same State there is a Legislature, one branch of which derives its authority partly from the same order, the other being organized by a majority who have been established in power by another interference of the National Government, and which majority derives its title, not from any legal ascertainment of the facts, but from the certificates of a returning board which has misconceived and exceeded its legal authority. It is not strange that the republicans of Louisiana should delude themselves by any plausible views of laws which will enable them to occupy the places which they believe the will of a majority of the legal voters of the State, if free from violence and intimidation, would award to them. It is not strange that the democrats of Louisiana should believe the whole State government a usurpation, should give it no credit for its best acts, should seek to embarrass and thwart and resist it to the extent of their power, and should be unwilling to wait for the slow but sure operation of lawful remedies to cure whatever evil really belongs to it.  *   *   *   *   *

The first need of Louisiana is to know who should be treated as the lawful governor until the end of the term which will expire in 1876. It has been suggested that there should be a new election under the authority of Congress. This is not desired, so far as we learn, by any considerable number of persons in Louisiana. Its legality is doubtful. The authority of the person chosen would be denied quite as strenuously as that of Governor Kellogg. Without the presence of United States troops we do not believe a fair election could be had. In the presence of troops we believe the democrats would refuse to take part. It would be a great calamity to Louisiana to excite at this time the violence and bitterness which an election contest would kindle. A government so elected would be in substance only a provisional government. The only alternative seems to be to recognize one or the other of the claimants to the office of governor.

Kellogg is now in fact in office. The President has recognized him, and states to Congress that from the best information he can obtain he believes him to have been elected. The Kellogg government is a fact; its legality is sustained by the judicial tribunals of the State; it is in active operation in all its departments. Under it the late State election has been held, and on its certificates must depend, *prima facie,* the right to their seats of the Representatives chosen from Louisiana for the next Congress. The McEnery government exists only on paper. Its recognition would create the most perplexing questions as to the legality of all public proceedings had in Louisiana for two years past. The recognition of Kellogg by the House will give peace and quiet to Louisiana until the next election.

Some of us are inclined further to recommend additional legislation to protect the peaceable citizens of Louisiana in the freedom of elections, and in the rights declared by the constitutional amendment. The law passed at the short session of 1871, designed to suppress the acts known as the Ku-Klux outrages, was adopted with great hesitation, and was denounced in some quarters as dangerous to the liberties of the people. Yet it proved an effective remedy, powerful for good, but harmless for ill, and commanded the general approval of the country.

We feel as deeply as anybody the objection to suspending the writ of *habeas corpus,* even for a limited time, or for special emergencies, or for a limited extent of territory. But when every other legal safeguard is overthrown; when to peaceable, honest, law-abiding men is neither freedom of election, of speech, of the press, of action, or of opinion; when there is no legal redress for injuries or legal punishment for murder, it is but a mockery to leave this writ to be used only as an instrument to enable wrong-doers to escape punishment for their crimes. So much of the statute of 1871 as authorized the suspension of the writ of *habeas corpus* in certain cases has expired by its own limitation. Some of us believe that it will be necessary to re-enact those sections with some modifications, and with careful restriction of time and occasion. We do not include any recommendation on that subject in this report.

On the whole case we are of opinion—

First. That there has been and is on the part of the party calling themselves the white men's party in Louisiana a purpose to take possession by force and fraud of the State government, without regard to the question of who may have the numerical majority at a fair election.

Second. That in the execution of this purpose they have refrained, and will refrain, from the use of no instruments which they think designed to accomplish it, whether those instruments be murder, fraud, civil war, or coercion of laborers by employers.

Third. While there are many men in their party of more moderate views, who do not themselves use or approve these unlawful means, such men desire the accomplishment of the same end, and are powerless to restrain their more violent associates.

Fourth. Three causes have made it easier to unite so large a number of the whites of Louisiana in these purposes, and have rendered more difficult to unite the best men among them in opposition :

The fact that the administration party of Louisiana is made up by massing together almost the whole negro vote with a few whites, largely from other States ;

The fact that there has been great maladministration by republican officials ;

The belief, honestly entertained by large numbers of the white people of Louisiana, that they have been twice defrauded of the results of elections in which they had been successful.

Fifth. While all these things are great evils, much to be deplored, and likely to exasperate any people, the course of the whites themselves has tended to bring them about and to inflame them. The simple and peaceful remedies of obedience to law, argument, decent treatment of their opponents, would, if they had pursued them, have proved effectual long ago.

Sixth. While we believe Governor Kellogg to have received a majority of the votes in 1872, and while we believe there was violence and fraud which frustrated the will of the people in many parishes in 1874, the illegal order of Judge Durell, and the illegal conduct of the returning board in attempting to cure one wrong by another, naturally inflamed the popular discontent and lent plausibility to the complaints.

Seventh. There has been much dishonesty, much corruption, in State and local administration in Louisiana. For this the republicans, especially under Warmoth's rule, are largely responsible, although in numerous instances their opponents have been equally to blame.

Eighth. The effect of all this has been to put an end to the authority of law, and in a large portion of Louisiana to deprive the negro of his freedom of suffrage, and wholly to destroy the value of the methods provided by law for securing fairness in elections or ascertaining their result. This state of things overthrows republican government in Louisiana, and seriously menaces it in the whole country.

Ninth. A new election held at this time under national authority is not desirable. It is not wished for by either side, and would inflame and aggravate the evils now existing.

Tenth. It is the duty of Congress to use such powers as are vested in it by the Constitution. It should recognize the lawful governor of Louisiana by express resolution. We think William Pitt Kellogg the choice of a majority of the voters of Louisiana, and that he should be recognized accordingly. It should provide further safeguards for holding elections and ascertaining the result, if any can be devised.

Eleventh. But these remedies are at best temporary and superficial, curing the symptoms, not the disease. Efficient aid to the State to establish public education would have gone far to prevent the evil, and may yet do much to effect a cure. The public sentiment of the rest of the country, without distinction of party, may do much to remove, as it has already unfortunately done much to aggravate, the evil in Louisiana. That people should be made to understand that all the authority lodged in the National Government to preserve republican government and to protect the rights of all its citizens will be kindly but fearlessly and steadily exerted, and that no party in this country will accept the alliance of men who are seeking power by such methods as we have been compelled to describe. Unless this can be done the free institutions of the whole United States will not long survive the destruction of those in the South.

GEORGE F. HOAR.
W. A. WHEELER.
WM. P. FRYE.



## New-York Daily Tribune.

### WEDNESDAY, MARCH 7, 1860.

## TRIPLE SHEET.

### Terms of the Tribune.

DAILY TRIBUNE.
Mail subscribers,
1 copy, 1 year—311 numbers, . . . . . $10.00
SEMI-WEEKLY TRIBUNE
1 copy, 1 year—104 numbers, . . . . . $3.00
2 copies, do. . . . . . . . . . . . . . . . . . 5.00
5 copies, or over, for each copy . . . . . 2.00
WEEKLY TRIBUNE.
1 copy, 1 year—52 numbers, . . . . . . . $2.00
TERMS OF ADVERTISING IN THE TRIBUNE.
DAILY TRIBUNE, ordinary advertisements, standard
measure of eight lines, 14 cents per line, each
insertion.
WEEKLY TRIBUNE, 25 per line, each insertion.
SEMI-WEEKLY TRIBUNE, 25 cents per line, each
insertion.

### NEWS OF THE DAY.

#### FOREIGN NEWS.

#### GENERAL NEWS.

#### CONGRESS.

##### SENATE.

##### HOUSE.

#### LEGISLATURE.

## THE PUBLIC HEALTH.

## A TEST CASE FOR THE PRESIDENCY.

## THE ALDEN MACHINE.

## PENNSYLVANIA—CLYMER.

## FRIENDS IN COUNCIL.

## MORE TAXES.