# 24-2847

## United States Court of Appeals for the Second Circuit

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC., SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellees,*

JOHN BORON,

*Plaintiff,*

v.

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police

*Defendant-Appellant,*

MICHAEL J. KEANE, in his official capacity as District Attorney for the County of Erie, New York,

*Defendant.*

On Appeal from the United States District Court for the Western District of New York

### CORRECTED REPLY BRIEF FOR APPELLANT

BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
SARAH COCO
 *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-6312

Dated: June 24, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................ii

PRELIMINARY STATEMENT ................................................................... 1

ARGUMENT ............................................................................................... 3

THE PRIVATE-PROPERTY PROVISION COMPORTS WITH THE
HISTORICAL TRADITION OF FIREARM REGULATION ................................. 3

   A.   The Private-Property Provision Is Supported by
Numerous Relevantly Similar Historical Analogs. ................. 3

      1.   The historical analogs and the private-property
provision share common purposes. ................................... 3

      2.   The historical analogs and the private-property
provision impose comparable burdens on the Second
Amendment right............................................................. 12

   B.   Plaintiffs' Remaining Challenges to the State's Evidence
Have Been Squarely Rejected by This Court and by the
Supreme Court. ...................................................................... 18

CONCLUSION ........................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**                                                     **Page(s)**

*Antonyuk v. Chiumento,*
89 F.4th 271 (2d Cir. 2023) .................................................... 2-3, 20-22

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .............................................................. 12

*Kanter v. Barr,*
919 F.3d 437 (7th Cir. 2019) ............................................ 17

*Lara v. Commissioner Pa. State Police,*
125 F.4th 428 (3d Cir. 2025) ............................................ 21

*Lara v. Commissioner Pa. State Police,*
91 F.4th 122 (3d Cir. 2024) .............................................. 21

*Moore v. Madigan,*
702 F.3d 933 (7th Cir. 2012) ............................................ 21

*Neal v. Clark,*
95 U.S. 704 (1877) ............................................................ 10

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ....................................................... 3, 21, 23

*Sturges v. Crowninshield,*
17 U.S. 122 (1819) ........................................................... 8-9

*United States v. Daniels,*
77 F.4th 337 (5th Cir. 2023) ............................................ 20

*United States v. Fisher,*
6 U.S. 358 (1805) .............................................................. 9

*United States v. Jones,*
565 U.S. 400 (2012) .......................................................... 14

*United States v. Rahimi,*
602 U.S. 680 (2024) ................................................... passim

| **Case** | **Page(s)** |
|---|---|

*Wolford v. Lopez,*
   116 F.4th 959 (9th Cir. 2024) ...........................................5-6, 19-20, 23

## State Laws

*New York*

Penal Law § 265.01-d ................................................................. 1

*Other Jurisdictions*

Alaska Stat. Ann. § 11.61.220 ..................................................23

Conn. Gen. Stat. § 53-202d ......................................................23

D.C. Code Ann. § 7-2509.07 .....................................................23

Haw. Rev. Stat. Ann. § 134-9.5 ...............................................23

La. Stat. Ann. § 40:1379.3 ........................................................23

S.C. Code Ann. § 23-31-225 .....................................................23

## Miscellaneous Authorities

Adam Winkler, *Racist Gun Laws and the Second Amendment,*
   135 Harv. L. Rev. F. 537 (2022)............................................17

Antonin Scalia & Bryan A. Garner, *Reading Law: The
   Interpretation of Legal Texts* (2012) .............................. 9, 12

Catie Carberry, *What's in a Name? The Evolution of the Term
   "Gun,"* Duke Ctr. for Firearms L. (July 24, 2019),
   https://perma.cc/VG2C-K4YC ...........................................11

"Gun," 1 Samuel Johnson, *A Dictionary of the English
   Language* (1755) ....................................................................11

## Miscellaneous Authorities                              **Page(s)**

"Gun," *A New Law-Dictionary* (G. Jacob comp.; enlarged eds. 1744, 1756, 1762, 1782). ...................................................... 11

Herbert Broom, *A Selection of Legal Maxims* 400 (10th ed. 1939) ...................................................... 10

John F. Hart, *Colonial Land Use Law and Its Significance for Modern Takings Doctrine*, 109 Harv. L. Rev. 1252 (1996) ............... 14

"Local Items," *Talent News* (Nov. 1, 1893)................................................ 7

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 58 (2d ed. 1871) .................................................5, 8-9

## PRELIMINARY STATEMENT

The New York State law at issue in this case prohibits a person from entering others' private property with a firearm when he knows or reasonably should know that the owner or lessee has not expressly consented to the presence of firearms on the property. *See* Penal Law § 265.01-d. In finding the law unconstitutional under the Second and Fourteenth Amendments, the district court failed to adequately consider new historical evidence presented by the State and did not apply the standard for Second Amendment challenges clarified by the U.S. Supreme Court in *United States v. Rahimi*, which requires courts to "consider[] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition," rather than to search for a historical "dead ringer" or "twin." 602 U.S. 680, 692 (2024) (emphasis added). This Court should reverse.

As the State explained in its opening brief, there is a robust historical tradition of laws from nine States or their colonial precursors, dating from before the Founding and through the adoption of the Fourteenth Amendment, all of which forbade carrying guns onto others' property without their permission. In response, plaintiffs insist that

these laws applied only with respect to unauthorized hunting, but that argument ignores the plain and unambiguous text of these statutes. Moreover, plaintiffs fail to rebut the State's historical evidence demonstrating that historical prohibitions on the unauthorized possession of firearms on private property applied broadly to properties otherwise open to the public.

Plaintiffs' remaining arguments have already been foreclosed by this Court. For example, plaintiffs urge the Court to ignore historical evidence from the Reconstruction era, even though this Court has recognized that it is a focal point in the analysis of state firearms laws. *See Antonyuk v. Chiumento*, 89 F.4th 271, 304 (2d Cir. 2023*)*.[1] Accordingly, this Court should reverse the district court's ruling and permit the State to enforce a law that is consistent with historic firearms regulation and is a critical tool to promote public safety.

---

[1] As in the State's opening brief, the State cites this Court's original *Antonyuk* opinion throughout this brief. See State Br. 7 n.1.

## ARGUMENT

### THE PRIVATE-PROPERTY PROVISION COMPORTS WITH THE HISTORICAL TRADITION OF FIREARM REGULATION

**A.  The Private-Property Provision Is Supported by Numerous Relevantly Similar Historical Analogs.**

**1.  The historical analogs and the private-property provision share common purposes.**

As the State explained in its opening brief (State Br. 17-18), the private-property provision is relevantly similar to the State's historical analogs because it was enacted with the same purposes: (i) to enhance public safety and (ii) to ensure that property owners are empowered to determine whether they wish to allow the carrying of firearms on their property.

At the outset, plaintiffs miss the mark in arguing (Br. of Pls.-Appellees (Br.) 44-47) that "public safety" is too broad a purpose to serve as a point of relevant similarity. To the contrary, this Court and the Supreme Court have consistently recognized that modern laws are relevantly similar to historical laws because they aim to protect public safety in a particular context, such as a sensitive public place, *see New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022); *Antonyuk*, 89 F.4th at 361. Here too, the private-property provision was enacted to

3

prevent the same specific threat to public safety addressed by the State's historical analogs, namely the "grievous Injury" and "great Danger of the Lives" of citizens (J.A. 1238-1239 (1763 New York statute)) caused by people carrying guns on private property without the owner's knowledge and permission. (*See also* J.A. 1228 (1721 Pennsylvania statute); 1234 (1722 New Jersey statute).)

Plaintiffs further contend that the private-property provision does not in fact advance the interests of property owners (Br. 47-48), but that contention would not, even if true, prove that the private-property provision is not *intended* to advance such interests. Moreover, as the State explained in its opening brief (State Br. 18-20), requiring consent does in fact advance the interests of property owners: it greatly empowers them by allowing them to decide who may carry firearms on their property and when they will be allowed to do so.

Plaintiffs are equally unsuccessful in arguing that the scope of the historical analogs cited by the State is not sufficiently analogous to the private-property provision. Specifically, plaintiffs contend that the historical statutes identified by the State prohibit only unauthorized hunting and poaching on private property, rather than the unauthorized

4

possession of firearms on such property for purposes other than hunting. Br. 27-39. As the State explained in its opening brief, that is incorrect. State Br. 20-23. Four of the historical analogs—New Jersey's 1771 law and the laws from Louisiana, Texas, and Oregon—did not refer to hunting at all (J.A. 1242, 1252, 1259, 1266) but rather, "simply prohibited the carry of firearms on private property without consent." *Wolford v. Lopez*, 116 F.4th 959, 995 (9th Cir. 2024). As the Ninth Circuit recognized, laws like these "are historical 'dead ringers'" for contemporary private-property laws like New York's. *Id.*

Plaintiffs' contention that these laws must be understood, contrary to their plain text, as laws regulating hunting is untenable. For example, plaintiffs do not dispute that § 1 of New Jersey's 1771 law made it unlawful "to carry any Gun" on any property on which the owner paid taxes (J.A. 1242), which included businesses open to the public. Plaintiffs nonetheless argue that § 1 should be understood as exclusively regulating hunting because other provisions of the same law regulate hunting. *See* Br. 36-37. However, that approach ignores the long-standing requirement that courts must, if possible, give independent effect to each word and provision of a written instrument. *See, e.g.*, Thomas M. Cooley, *A Treatise*

*on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 58 (2d ed. 1871) ("[C]ourts must . . . lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory."). Here, § 2 of New Jersey's 1771 law made it unlawful "to hunt or watch for Deer with a Gun" on land on which the owner pays taxes. (J.A. 1242.) According to plaintiffs, § 1 and § 2 carry no independent meaning, as any conduct prohibited by § 2 would likewise be prohibited by § 1. By contrast, reading § 1 to prohibit "carry[ing] any Gun" and § 2 to prohibit "hunt[ing]" creates two independent, albeit potentially overlapping, categories of prohibited behavior, while giving effect to the words of each provision. *See also Wolford*, 116 F.4th at 995 (recognizing that the reference to hunting in § 2 does not change the meaning of § 1). That interpretation is also consistent with the dual purposes of the act, "to prevent trespassing with Guns" and "for the Preservation of Deer and other Game." (J.A. 1737-1738.)

Likewise, as to the Louisiana, Texas, and Oregon laws, plaintiffs contend that they were intended to regulate only hunting—despite making no reference to hunting—because of their potential effect on

6

hunters. For example, plaintiffs cite newspaper articles announcing that the passage of Oregon's law may effect hunters. Br. 56-57. But simply because it was recognized at the time that the law might have an effect on hunters does not mean that the law regulated only hunting. To the contrary, contemporaneous accounts indicate that the Oregon law applied much more broadly. For example, an 1893 newspaper reported that "boys of leisure" had been "prowling about the school house, discharging firearms etc" and noted that these "lawless boys" should be informed that "there is a law against discharging firearms . . . within any incloser or near any house without permission," a clear reference to Oregon's 1893 law. *See* "Local Items," *Talent News* (Nov. 1, 1983).

Plaintiffs also misread several laws that regulate both carrying of firearms and hunting. *See* Br. 29-30. For example, Pennsylvania's 1721 law made it illegal to "*carry any gun* or hunt" on private property absent consent (J.A. 1228 (emphasis added)), as did New Jersey's 1722 law (J.A. 1234). New York's 1763 law similarly provided that no one shall "*carry, shoot, or discharge* any Musket, Fowling-Piece, or other Fire-Arm whatsoever" on private property without the owner's consent. (J.A. 1239 (emphasis added).) As explained by Professor Hendrik Hartog, an expert

7

on the interpretation of eighteenth and nineteenth century statutes, it was common for historical statutes to contain multiple prohibitions serving multiple purposes. State Br. 21. Moreover, many contemporaneous regulations *did* regulate hunting with a firearm and *not* carrying a firearm, indicating that legislatures were capable of drawing a distinction in appropriate circumstances. State Br. 21-23.

Plaintiffs contend that the best way to construe these statutes is as restricting the unauthorized carrying of firearms only for the purposes of hunting. Br. 27-29, 33-35, 39-40. But once again, that approach ignores the plain text of these historical analogs and turns well-established principles of statutory construction on their heads. *See* Cooley, *supra*, at 61. As the State explained, in a prosecution under each of these laws, it would be no defense for a violator accused of unlawfully carrying a gun to argue that they were not liable because they did not intend to hunt. State Br. 22. As courts recognized at the time these statutes were enacted, "[i]t would be dangerous in the extreme, to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation." *Sturges v. Crowninshield*, 17 U.S. 122, 202 (1819) (Marshall, C.J.). Here, the words of the State's

historical analogs "expressly provide," *id.*, for carrying a gun or firearm, and cannot be ignored.

Plaintiffs' reliance on canons of statutory interpretation is similarly misplaced. Br. 28. Historically, as is the case today, courts turned to these canons only when a statute was ambiguous. *See* Cooley, *supra*, at 57-58; *United States v. Fisher*, 6 U.S. 358, 399 (1805) ("Where a law is plain and unambiguous . . . the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction."). Each of the State's historical analogs unambiguously prohibits the carrying of firearms without permission, in addition to prohibiting hunting, and thus leaves no room for further interpretation.

In any event, the canons plaintiffs invoke (Br. 27-28) do not support their interpretation of these historical laws as limited to hunting. For example, ejusdem generis has long applied only where a drafter has used a general term at the end of a list of a list of specific terms. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 202-206 (2012); *id.* at 202 n.17 (citing Stewart Rapalje & Robert L. Lawrence, *A Dictionary of American and English Law* 435 (1888).) None of the State's historical analogs employ "carry a gun" in this manner.

Many list "carry a gun" as the first prohibition. For instance, Pennsylvania's 1721 law made it unlawful "to carry any gun or hunt" (J.A. 1228) and New York's 1763 law made it unlawful to "carry, shoot, or discharge" any firearm (J.A. 1239). While Maryland's 1715 law lists "carry a gun" last, it is best read as providing a list of three separate prohibitions, only one of which deals with hunting—"shoot," "kill or hunt," or "be seen to carry a gun," (J.A. 1223)—rather than a specific list followed by a general catch-all. *Contra* Br. 28.

Likewise, plaintiffs invoke noscitur a sociis, but that doctrine was historically understood to stand for the broad proposition that "the meaning of a word . . . being ascertained by refer[e]nce to the context." *Neal v. Clark*, 95 U.S. 704, 709 (1877) (quotation marks omitted). It was typically applied, just as ejusdem generis was, to a list of specific terms falling into the same category. *See id.*; *see also* Herbert Broom, *A Selection of Legal Maxims* 400 (10th ed. 1939) (noscitur a sociis, like ejusdem generis, applies to words "referable to the same subject-matter"). Here, as noted, "carry a gun" and "hunt" are used as separate prohibitions, not related examples in a list.

Finally, plaintiffs are also incorrect in contending (Br. 30) that some of the State's historical analogs are not relevantly similar because they applied only to long guns used for hunting. As the State explained in its opening brief (State Br. 38-39), while plaintiffs and the district court rely on a single dictionary definition of "gun" from 1828, that definition was published long after nearly all of the historical analogs that use the word "gun" exclusively (*see* J.A. 1223, 1228, 1234, 1242 (statutes enacted between 1715 and 1771)).[2] Eighteenth century dictionaries, by contrast, defined "gun" broadly to include handguns. Samuel Johnson's 1755 dictionary defines "gun" as "[*t*]*he general name for firearms*; the instrument from which shot is discharged by fire." 1 Samuel Johnson, *A Dictionary of the English Language* (1755) (emphasis added). Four editions of the preeminent legal dictionary in that era, published by Giles Jacob between 1744 and 1782, similarly refer to a "gun" broadly as a "*Gun*, Hand gun, &c." *A New Law-Dictionary* (G. Jacob comp.; enlarged eds. 1744, 1756,

---

[2] The blog post cited by plaintiffs (Br. 32) similarly focuses on the meaning of "gun" in the nineteenth and twentieth centuries, *see* Catie Carberry, *What's in a Name? The Evolution of the Term "Gun,"* Duke Ctr. for Firearms L. (July 24, 2019) (last visited March 18, 2025). (Full URL appears in the Table of Authorities.)

1762, 1782). Plaintiffs argue that the Court should ignore Johnson's definition because Johnson was not an American, but the Supreme Court has previously relied on Johnson in cases interpreting the Second Amendment, *see District of Columbia v. Heller,* 554 U.S. 570, 581 (2008), and both Johnson's and Jacob's dictionaries have been recognized as among "the most useful and authoritative" for interpreting American legal sources from the period 1750 to 1800, *see* Scalia & Garner, *supra*, at 419-20.

### 2. The historical analogs and the private-property provision impose comparable burdens on the Second Amendment right.

The historical analogs cited by the State impose a burden comparable to the private-property provision because they prohibit carrying firearms in businesses open to the public absent prior consent from the owner. As the State explained in its opening brief, New Jersey's 1771 law applied to *all* private property "for which the Owner pays Taxes," which included shops, mills, brew houses, and other businesses open to the public similar to the gas stations and hardware stores Christian seeks to visit today. State Br. 23-24. Similarly, the State's remaining historical analogs used language to describe the covered

private property that encompassed businesses open to the public, such as "improved or enclosed land" and "premises or plantations." State Br. 24-34. The historical evidence presented by the State in support of summary judgment, including from historical dictionaries, contemporaneous case law, and other historical regulations, demonstrates that these terms were understood at the time to apply to businesses open to the public as well as to property closed to the public. See State Br. 27-34.

Plaintiffs do not address the State's historical evidence about the meaning of these terms. Instead, plaintiffs point to a red herring: the history of opening *unenclosed* and *unimproved* land to public hunting, fishing, and grazing in colonial and Founding-era America. Br. 22-26. Specifically, plaintiffs argue that in many jurisdictions, individuals were permitted to hunt, fish, and graze animals on undeveloped lands, in contrast to the common law tradition in England, where hunting, fishing, and grazing on all private property, including undeveloped private property, were prohibited. Setting aside whether plaintiffs' account of

13

this history is accurate, it is not relevant to the question before this Court.[3]

The businesses Christian seeks to visit in this as-applied challenge to the State's private-property provision are not analogous to unimproved and unenclosed lands where the owner had no right to exclude in some Founding-era jurisdictions. As plaintiffs concede (Br. 22-26), unimproved and unenclosed lands generally referred to uncultivated and undeveloped forests, fields, and other wilderness areas, which the law essentially treated as public land irrespective of ownership. Indeed, some colonial jurisdictions had regulations providing that property owners forfeited title to land that was not improved or enclosed within a certain time period. *See* John F. Hart, *Colonial Land Use Law and Its Significance for*

---

[3] Plaintiffs oversimplify the historical record in arguing that there was clear evidence of a uniform practice on this point in the Founding era. Br. 25. A Supreme Court decision examining the historical record found that any physical intrusion on private property at the time of the Founding would have been considered a trespass. *See United States v. Jones*, 565 U.S. 400, 404-05 (2012); *id.* at 420 (Alito, J., concurring).

In any event, as plaintiffs acknowledge, at least one State *allowed* landowners to exclude hunters from unenclosed land and at most, six States authorized hunting on open (i.e., unenclosed or unimproved) land without the permission of the landowner. Br. 25. It therefore appears that many States simply had not addressed the issue.

*Modern Takings Doctrine*, 109 Harv. L. Rev. 1252, 1259-64 (1996). By contrast, as the State explained in its opening brief, businesses open to the public on private property would have been included historically in the definitions of "improved and enclosed" land and "premises or plantations"—i.e., private property on which carrying a firearm was prohibited without the express permission of the owner, under the State's historical analogs.

Nor does the historical authorization to hunt, fish, and graze on unimproved and unenclosed land suggest that statutes addressing carrying a firearm on *improved* or *enclosed* land applied exclusively to private property closed to the public. That reading would render the historical statutes virtually meaningless, because there is no evidence that any jurisdiction ever endorsed a rule permitting hunting on enclosed or improved property.

Plaintiffs are also wrong to argue that this Court should disregard historical analogs from Louisiana, Texas, and Florida on the grounds that those facially neutral laws were enacted by racist state legislatures with

15

racist purposes.[4] *See* Br. at 49-56. As an initial matter, the history of gun regulation in southern States after the Civil War is more complex than plaintiffs acknowledge. Although racist legislatures used gun regulations in a racially targeted manner, Republican forces also used racially neutral gun regulations to promote public safety. In fact, military orders issued by the occupying federal forces during Reconstruction, while reaffirming the right of all to bear arms, reflect the same private-property limit on the right to bear arms embodied in the Texas, Florida, and Louisiana laws. An 1866 order stated: "'[T]he constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed . . . to authorize any person to enter with arms on the premises of another against his consent.'" (J.A. 1750.)

There is no indication that the ratifiers of the Fourteenth Amendment would have understood neutral laws prohibiting the carrying of firearms on private property, neutrally enforced, to violate the Second

---

[4] Plaintiffs' argument does not address Oregon's 1893 law, which is virtually identical in substance to the Louisiana, Texas, and Florida laws, and was enacted in the same time period. (*See* J.A. 1266.)

Amendment. To the contrary, the ratifiers endorsed such laws in the name of public safety.[5]

In any event, the unfortunate reality is that the eighteenth- and nineteenth-century laws to which *Bruen* directs the Second Amendment inquiry were often enacted by racist legislatures and codified prejudices that existed at the time. This has not prevented courts from treating such laws as relevant to the historical inquiry. *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated on other grounds by Bruen*, 597 U.S. 1. Disregarding historical precedents on the ground of possible racist motivation or attitudes would result in "afford[ing] legislatures less regulatory authority than the original understanding and historical traditions of the Second Amendment would otherwise permit." Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 541-42 (2022). The State does not endorse any racist motivations behind certain historical gun regulations;

------

[5] Likewise, to the extent that plaintiffs argue that the Louisiana, Texas, and Florida laws were intended solely to limit hunting rights (Br. 52-53), the adoption of the same private-property limitation in the 1866 order shows the implausibility of that construction.

it merely cites these laws to show the public understanding of the Second Amendment's limitation (or lack thereof) on a State's ability to regulate.

**B.    Plaintiffs' Remaining Challenges to the State's Evidence Have Been Squarely Rejected by This Court and by the Supreme Court.**

Plaintiffs' remaining challenges to the State's extensive historical evidence have already been rejected by this Court and by the Supreme Court.

*First*, plaintiffs miss the mark in arguing that the State must identify a historical tradition of regulations virtually identical to the private-property provision. Br. 18-19. As the Supreme Court cautioned in *Rahimi*, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." 602 U.S. at 692. While the government must identify historical analogs "consistent with the principles that underpin our regulatory tradition," they need be "by no means identical." *Id.* at 692, 698.

For example, in *Rahimi*, the Supreme Court relied on historical regulations such as "going armed" laws that prohibited carrying arms openly to the terror of the people as historical support for the modern regulation disarming individuals subject to domestic violence restraining

18

orders—despite differences between the historical and modern regulations—because the historical regulations support the principle that the Second Amendment permits restrictions on use of arms by individuals who are a threat to others' safety. *Id.* at 698-700. The modern provision was relevantly similar to the historical going armed laws even in the absence of evidence that going armed laws were enacted to prevent domestic violence, as the modern provision was.

Here, the State identified nine historical regulations that are closely related to the private-property provision, including several that are "dead ringers." *Wolford*, 116 F.4th at 995. The State also submitted evidence of a historical tradition of regulating firearms in many public places. State Br. 35-37. For example, three States or territories prohibited carrying firearms in any "place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen." (J.A. 1571 (1870 Texas law); *see* J.A. 1587 (1889 Arizona law); J.A. 1284 (1890 Oklahoma law).) And four additional jurisdictions broadly prohibited the carrying of firearms in public gatherings. (*See* J.A. 1567-1568 (1869 Tennessee law); J.A. 1575 (1870 Georgia law); J.A. 1579 (1883 Missouri

19

law); J.A. 1583 (1889 Idaho law).) As the State explained, there appears to have been no dispute about the constitutionality of these provisions. State Br. 36-37. Taken together, this record provides ample evidence that the principles underlying the private-property provision are consistent with the historical tradition of firearm regulation.[6]

*Second*, plaintiffs argue that this Court should reject wholesale evidence from close in time to the ratification of the Fourteenth Amendment, including the State's historical analogs from Texas, Louisiana, Florida, and Oregon. Br. 13-17, 49, 56-57. But this Court has already foreclosed that argument, holding that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points" in the analysis of state laws like the private-property provision.[7] *Antonyuk*, 89 F.4th at 304.

---

[6] Plaintiffs reference various quibbles about specific items of historical evidence (Br. 57-60), but this Court has already cited many of the very same provisions as support for upholding restrictions on firearms in certain "sensitive" locations. *See Antonyuk*, 89 F.4th at 356-59; *see also Wolford*, 116 F.4th at 988 (relying on the same provisions to recognize a tradition of barring firearms at places of social gathering).

[7] Plaintiffs rely on cases involving Second Amendment challenges to *federal*—rather than State—laws. *See United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023), *cert. granted, judgment vacated*, No. 23-

(*continued on the next page*)

In any event, as to the private-property provision, there is a consistent and unbroken historical tradition spanning "time periods in close proximity," *id.*, to both dates. (*See* J.A. 1223, 1228, 1234, 1239, 1744 (laws enacted from 1715 to 1790) *and* J.A. 1252, 1259, 1536, 1266 (laws enacted from 1865 to 1893).) As the Supreme Court made clear in *Bruen* and *Rahimi*, a "long, unbroken line" of consistent history supporting a contemporary firearm law provides important support for such a law. *Bruen*, 597 U.S. at 35; *see Rahimi*, 602 U.S. at 693-98. Thus, where, as here, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same," there can be no dispute that history from both periods may be considered.[8] *Bruen*, 597 U.S. at 38; *see also id.* at 82 (Barrett, J., concurring) (consistency of

---

376, 2024 WL 3259662 (U.S. July 2, 2024); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). The period when the right to bear arms was incorporated against the States through the Fourteenth Amendment is not so clearly and directly relevant to those federal laws, as it is in the case of state laws like the private-property provision.

[8] Plaintiffs rely on *Lara v. Commissioner Pa. State Police*, 91 F.4th 122, 133 (3d Cir.), *cert. granted, judgment vacated*, 145 S. Ct. 369 (2024), but there, the court identified a conflict between Reconstruction-era history and Founding-era history that does not exist here. *See also Lara v. Commissioner Pa. State Police*, 125 F.4th 428, 439 & n.17 (3d Cir. 2025) (identifying the same conflict on remand).

historical evidence in Founding and Reconstruction eras "makes it unnecessary to choose between them").

*Third*, plaintiffs are incorrect that a historical analog must be "broadly applicable and widely accepted" to establish a historical tradition. Br. 17. As this Court recognized, "[t]here are many reasons why the historical record may not evince statutory prohibitions on a given practice" and therefore, "it is not necessarily the case that, if no positive legislation from a particular place is in the record, it must be because the legislators there deemed such a regulation inconsistent with the right to bear arms." *Antonyuk*, 89 F.4th at 301; *see Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring). To the contrary, comparable historical regulations from just three States can be sufficient to establish a historical tradition. *Antonyuk*, 89 F.4th at 339. In any event, the State here identified regulations from nine jurisdictions, each of which "appear to have existed without constitutional qualms or challenges." *Id.* at 320.

*Fourth*, plaintiffs argue that the private-property provision must be found unconstitutional because it is "a modern novelty." Br. 60-63. That argument is both legally irrelevant and factually incorrect. As an initial matter, plaintiffs are incorrect that a modern provision violates the

Second Amendment simply because it takes a novel approach to regulating firearms. The Second Amendment does not require "a law trapped in amber." *Rahimi*, 602 U.S. at 691. The Supreme Court has recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and further underscored that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 27-28.

In any event, New York is not alone in regulating concealed carry on private property. *See* Br. of Amici District of Columbia, et al. at 15-18. To the contrary, Hawaiʻi has enacted a law nearly identical to the private-property provision, *see* Haw. Rev. Stat. Ann. § 134-9.5(a)-(b), which was upheld by the Ninth Circuit, *see Wolford*, 116 F.4th at 995. Connecticut similarly requires express consent to bring an "assault weapon" onto private property. Conn. Gen. Stat. § 53-202d(f)(1). And States across the country require affirmative consent from the owner to carry a firearm in someone's residence. *See, e.g.*, Alaska Stat. Ann. § 11.61.220(a)(1)(B); La. Stat. Ann. § 40:1379.3(O); S.C. Code Ann. § 23-31-225; *see also* D.C. Code Ann. § 7-2509.07(b)(1).

## CONCLUSION

This Court should reverse the district court's order granting a permanent injunction against enforcement of the private-property provision as to property open to the public.

Dated:  New York, New York
       June 24, 2025

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellant


By:  */s/ Sarah Coco*
     SARAH COCO
     Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
SARAH COCO
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-6312

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Ava Mortier, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 4,699 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Ava Mortier*