24-2847; 25-384
*Christian v. James*

# United States Court of Appeals
## for the Second Circuit

———————————————————

August Term 2024

Argued: June 25, 2025    Decided: May 18, 2026

Nos. 24-2847; 25-384

———————————————————

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC., SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellees*,

JOHN BORON,

*Plaintiff,*

— v. —

STEVEN G. JAMES, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE NEW YORK STATE POLICE,

*Defendant-Appellant,*

MICHAEL J. KEANE, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY FOR THE COUNTY OF ERIE, NEW YORK,

*Defendant.*

———————————————————

BRETT CHRISTIAN, FIREARMS POLICY COALITION, SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellants,*

JOHN BORON,

*Plaintiff,*

— v. —

STEVEN G. JAMES, MICHAEL J. KEANE, ACTING DISTRICT ATTORNEY,

*Defendants-Appellees.*

_____

Before:      BIANCO, MENASHI, AND LEE, *Circuit Judges*.

These two appeals involve Plaintiffs' Second Amendment challenge to New York's Concealed Carry Improvement Act ("CCIA") provisions prohibiting firearm possession in two types of locations:  (1) private property "where [a] person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of [guns] on their property is permitted or by otherwise giving express consent[,]" N.Y. Penal L. § 265.01-d(1) (the "Private Property Provision"); and (2) "sensitive locations," including "public parks," *id.* § 265.01-e(2)(d) (the "Public Parks Provision").  Plaintiffs challenge the Private Property Provision, as applied to private property open to the public.  Plaintiffs asserted only a facial challenge to the Public Parks Provision in the district court, but now also seek to raise an as-applied challenge based upon its application to rural parks.

The district court (John L. Sinatra, Jr., *Judge*) permanently enjoined Defendant Steven G. James, the Superintendent of the New York State Police (the "State"), from enforcing the Private Property Provision, as applied to private property open to the public, deeming it unconstitutional because it is inconsistent

with our Nation's historical tradition of firearms regulation. However, the district court granted summary judgment in favor of the State on the Public Parks Provision, concluding that it is facially constitutional because it is relevantly similar to the historical analogues proffered by the State.

We conclude that the Private Property Provision, as applied to private property open to the public, is unconstitutional because the State did not carry its burden of demonstrating that the restriction falls within our Nation's historical tradition of gun regulations, as required under the framework set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). On the other hand, we conclude that the Public Parks Provision survives Plaintiffs' facial challenge because the State has carried its burden of showing that regulation is consistent with our Nation's historical tradition of banning gun possession in urban public parks. Finally, we decline to address any as-applied challenge to the Public Parks Provision, to the extent it applies to rural parks, because Plaintiffs failed to raise that challenge in the district court.

Accordingly, we **AFFIRM** the permanent injunction against the Private Property Provision, as applied to private property open to the public, and **AFFIRM** the judgment in favor of the State on the Public Parks Provision.

Judge Menashi concurs in part and dissents in part in a separate opinion.

> PETER A. PATTERSON (David H. Thompson and William V. Bergstrom, *on the brief*), Cooper & Kirk, PLLC, Washington, District of Columbia; Nicolas J. Rotsko, Fluet & Associates PLLC, Tysons, Virginia, *for Plaintiffs-Appellees and Plaintiffs-Appellants*.

> SARAH COCO, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Ester Murdukhayeva, Deputy Solicitor General, *on the brief*), for Letitia James, Attorney General for the State of New York, New York, New York, *for Defendant-Appellant and Defendant-Appellee*.

JOSEPH F. BIANCO, *Circuit Judge*:

These two appeals involve Plaintiffs' Second Amendment challenge to New York's Concealed Carry Improvement Act ("CCIA") provisions prohibiting firearm possession in two types of locations: (1) private property "where [a] person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of [guns] on their property is permitted or by otherwise giving express consent[,]" N.Y. Penal L. § 265.01-d(1) (the "Private Property Provision"); and (2) "sensitive locations," including "public parks," *id*. § 265.01-e(2)(d) (the "Public Parks Provision"). Plaintiffs challenge the Private Property Provision, as applied to private property open to the public. Plaintiffs asserted only a facial challenge to the Public Parks Provision in the district court, but now also seek to raise an as-applied challenge based upon its application to rural parks.

The district court (John L. Sinatra, Jr., *Judge*) permanently enjoined Defendant Steven G. James, the Superintendent of the New York State Police (the "State"), from enforcing the Private Property Provision, as applied to private property open to the public, deeming it unconstitutional because it is inconsistent

4

with our Nation's historical tradition of firearms regulation. However, the district court granted summary judgment in favor of the State on the Public Parks Provision, concluding that it is facially constitutional because it is relevantly similar to the historical analogues proffered by the State.

We conclude that the Private Property Provision, as applied to private property open to the public, is unconstitutional because the State did not carry its burden of demonstrating that the restriction falls within our Nation's historical tradition of gun regulations, as required under the framework set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). On the other hand, we conclude that the Public Parks Provision survives Plaintiffs' facial challenge because the State has carried its burden of showing that regulation is consistent with our Nation's historical tradition of banning gun possession in urban public parks. Finally, we decline to address any as-applied challenge to the Public Parks Provision, to the extent it applies to rural parks, because Plaintiffs failed to raise that challenge in the district court.

Accordingly, we **AFFIRM** the permanent injunction against the Private Property Provision, as applied to private property open to the public, and **AFFIRM** the judgment in favor of the State on the Public Parks Provision.

5

**BACKGROUND**

In July 2022, the New York State Legislature passed a sweeping set of new gun regulations through the CCIA. As relevant to this appeal, the CCIA criminalizes gun possession in "restricted locations," which it defines as "private property where [a] person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or by otherwise giving express consent." N.Y. Penal L. § 265.01-d(1). This provision does not apply to certain law-enforcement officers, military personnel, certain security guards, or persons lawfully hunting. *Id.* § 265.01-d(2). The CCIA also prohibits gun carriage in certain "sensitive locations," which includes, among other locations, "public parks."[1] *Id.* § 265.01-e(2)(d). The provisions became effective on September 1, 2022.

---

[1] The definition of "public parks" under this provision does "not include (i) any privately held land within a public park not dedicated to public use or (ii) the forest preserve as defined in subdivision six of [S]ection 9-0101 of the [E]nvironmental [C]onservation [L]aw." *Id.*

Plaintiffs—Brett Christian and two gun advocacy organizations, Firearms Policy Coalition and Second Amendment Foundation[2]—filed this lawsuit on September 13, 2022. Relevant to these appeals, Plaintiffs brought a claim, pursuant to 42 U.S.C. § 1983, alleging that the Private Property Provision, as applied to places open to the public, and the Public Parks Provision, on its face, are unconstitutional under the Second and Fourteenth Amendments.

Plaintiffs then moved for a preliminary injunction. The district court granted the motion with respect to the Private Property Provision, as applied to private property open to the public, but stayed the resolution of the motion with respect to the Public Parks Provision. The State filed an interlocutory appeal of the preliminary injunction against the Private Property Provision.

On December 8, 2023, in a consolidated opinion addressing four appeals, a panel of this Court affirmed the district court's preliminary injunction decision, explaining that "the State has failed to situate [the Private Property Provision]," as applied to private property open to the public, within the Nation's historic tradition of firearms regulation. *Antonyuk v. Chiumento*, 89 F.4th 271, 386 (2d Cir.

---

[2] An additional plaintiff, John Boron, entered a notice of voluntary dismissal on September 28, 2022.

2023) ("*Antonyuk I*"), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, 144 S. Ct. 2709 (2024), *and reinstated in part by Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ("*Antonyuk II*").[3] The panel also concluded in the same opinion that the Public Parks Provision was likely to survive a facial challenge because, at least as it applies to urban parks, the State "carried its burden by placing the regulation within a National tradition of regulating firearms in often-crowded public squares, including, specifically, city parks." *Antonyuk I*, 89 F.4th at 363; *accord Antonyuk II*, 120 F.4th at 1026 (same). The panel emphasized that the "affirmance or vacatur of the district courts' [preliminary] injunctions does not determine the ultimate constitutionality of the challenged CCIA provisions, which await further briefing, discovery, and historical analysis, both in these cases as they proceed and perhaps in other cases." *Antonyuk I*, 89 F.4th at 388 n.116.

---

[3] The plaintiffs in *Antonyuk* filed a petition for certiorari with the Supreme Court following our decision in *Antonyuk I*. After the Supreme Court decided *United States v. Rahimi*, 602 U.S. 680 (2024), it granted the petition, vacated our judgment, and remanded the case for further consideration in light of that opinion. We substantially reaffirmed our *Antonyuk I* decision in a subsequent opinion, *Antonyuk II*. As we explained in *Antonyuk II*, because the parties in this case did not petition for certiorari before the Supreme Court, the Supreme Court's summary vacatur of *Antonyuk I* "did not vacate the judgment[]" with respect to this case. 120 F.4th at 955 n.3. Thus, *Antonyuk I* "remains binding on the parties in" this case with respect to the Private Property Provision. *Id.* Accordingly, our discussion of the Private Property Provision below principally quotes from *Antonyuk I*, while elsewhere in this opinion we quote and rely on *Antonyuk II*.

After the case was remanded to the district court, the parties cross-moved for summary judgment on the Private Property and Public Parks Provisions. On October 10, 2024, the district court granted summary judgment in favor of the Plaintiffs on their Private Property Provision claim and permanently enjoined the State from enforcing that provision. *See generally Christian v. James*, 753 F. Supp. 3d 273 (W.D.N.Y. 2024) ("*Christian I*"). Based on the expanded summary judgment record, it concluded, as we did in *Antonyuk I* on a preliminary record, that the State failed to establish that the Private Property Provision, as applied to private property open to the public, fell within our Nation's historical tradition of gun regulations. *Id.* at 292.

A few months later, the district court granted summary judgment in favor of the State on the Public Parks Provision. *See generally Christian v. James*, No. 22-cv-695 (JLS), 2025 WL 50413, at *1 (W.D.N.Y. Jan. 8, 2025) ("*Christian II*"). The district court concluded that our determination in *Antonyuk II* that a facial challenge to the provision was unlikely to succeed "require[d] that Plaintiffs' motion be denied as to the parks issue and Defendants' corresponding cross motion be granted." *Id.* at *1. Although Plaintiffs argued in their summary judgment motion for the first time that they also brought an as-applied challenge

9

against the Public Parks Provision as it applied to rural parks, the district court declined to consider that claim and instead stated that it "is best presented to the Second Circuit for [] resolution." *Id.* It subsequently entered final judgment on the Public Parks Provision claim pursuant to Federal Rule of Civil Procedure 54(b).

The State appeals from the district court's permanent injunction order. The Plaintiffs, in turn, appeal from the district court's judgment in favor of the government on the Public Parks Provision.

## DISCUSSION

"We review a district court's grant of a permanent injunction for abuse of discretion." *Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir. 2004). "A district court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Id.* "We review a district court's order granting summary judgment *de novo*, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-moving party." *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016).

## I. Second Amendment Principles

The Second Amendment guarantees that "the right of the people to keep and bear [a]rms [] shall not be infringed," U.S. CONST. amend. II, and is made

applicable to the States through the Fourteenth Amendment, *see McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

We follow a two-step framework to evaluate Second Amendment challenges, as articulated by the Supreme Court in *Bruen*. Under that framework, the plaintiff bears the initial burden of establishing that "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If the plaintiff makes that showing, the burden shifts to the government to prove that the challenged law is "consistent with the Nation's historical tradition of firearm regulation." *Id*.

Under the historical tradition analysis at step two, we "must ascertain whether the [challenged] new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (alteration adopted) (internal quotation marks and citation omitted). "Why and how the regulation burdens the right are central to this inquiry." *Id.* This analogical reasoning "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*" or a "dead ringer." *Bruen*, 597 U.S. at 30 (emphases in original).

We further clarified the proper methodology for this inquiry in opinions of our own. In *Antonyuk II*, we explained that "courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction." *Antonyuk II*, 120 F.4th at 970; *see Bruen*, 597 U.S. at 27 ("[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."). Thus, a lack of similar historical regulations during one or more of those time periods "may not be reliably dispositive in Second Amendment challenges to laws addressing modern concerns." *Antonyuk II*, 120 F.4th at 970. It may simply be the "natural consequence" of the absence of the particular issue during those time periods. *Frey v. City of New York*, 157 F.4th 118, 136 (2d Cir. 2025). "Reasoning from historical silence is [also] risky" because "[l]egislatures past and present have not generally legislated to their constitutional limits[,]" and it is thus "not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such regulation inconsistent with the right to bear arms." *Antonyuk II*, 120 F.4th at 969 (footnote omitted).

We also underscored that it is "not dispositive whether comparable

12

historical regulations exist in significant numbers." *Id.* at 971 (emphasis omitted). "[W]here there is a lack of constitutional dispute regarding a type of gun regulation, or if courts during that period upheld similar governmental practices against similar constitutional challenges, comparable historical laws need not proliferate to justify a modern prohibition." *Frey*, 157 F.4th at 128 (internal quotation marks and citation omitted).

We have further held that, "[b]ecause the CCIA is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis," and that "[t]he time periods in close proximity to 1791 and 1868 are also relevant to our analysis." *Antonyuk II*, 120. F.4th at 972–73 (footnote omitted). We have since clarified that, even where there is an absence of Founding-era evidence supporting a historical tradition, "we may focus on later evidence, especially from the Reconstruction era, to ascertain [the] scope" of the Second Amendment right. *Frey*, 157 F.4th at 131 (footnote omitted). We explained this is so because the dearth of evidence "does not point with some certainty in one direction or another" as to the existence of a historical tradition. *Id.* at 130. Making conclusions based on later evidence therefore cannot "be characterized as *contradicting* the understanding of the right in 1791." *Id.* (emphasis in original).

13

Moreover, relying chiefly on later history is perfectly consistent with "the originalist and liquidation theories espoused by the [Supreme] Court in *Heller* and *Bruen*." *Id.*; *see id.* (explaining that 19th century evidence is "instructive" to the original meaning as understood in 1791 and may settle debates on ambiguous constitutional terms through liquidation); *see also Rahimi*, 602 U.S. at 738 (Barrett, *J.*, concurring) (explaining that "postenactment history can be an important tool" because "it can reinforce our understanding of the Constitution's original meaning; liquidate ambiguous constitutional provisions; [and] provide persuasive evidence of the original meaning") (internal quotation marks and citation omitted).

Bearing these principles in mind, we analyze the constitutionality of the Private Property and Public Parks Provisions.

## II.     Private Property Provision

We first address the constitutionality of the Private Property Provision as applied to private property held open to the public. Section 265.01-d(1) makes it a class E felony to possess firearms in a "restricted location":

> A person is guilty of criminal possession of a weapon in a restricted
> location when such person possesses a firearm, rifle, or shotgun and
> enters into or remains on or in private property where such person

14

knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or by otherwise giving express consent.

N.Y. Penal Law § 265.01-d(1). In other words, this provision "create[s] a default presumption that carriage on any private property is unlawful . . . unless the property owner has indicated by 'clear and conspicuous signage' or express verbal consent that carriage is allowed." *Antonyuk I*, 89 F.4th at 379. Plaintiffs challenge the constitutionality of Section 265.01-d(1) only as it applies to private property that is held open to the public, like a gas station or grocery store.

We have previously held that, "to the extent the [Private Property Provision] applies to private property open to the public, the regulated conduct falls within the Second Amendment right to carry firearms in self-defense outside the home." *Antonyuk I*, 89 F.4th at 383. The State does not dispute this conclusion. The burden is therefore on the State to demonstrate a historical tradition that supports the Private Property Provision.

The State comes forward with ten statutes from nine states that it argues are relevantly similar to the Private Property Provision: (1) a 1715 Maryland law barring people "convicted of [certain crimes] . . . or . . . of evil fame, or a vagrant,

15

or dissolute liver," from "shoot[ing], kill[ing] or hunt[ing], or . . . carry[ing] a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave," Joint App'x at 1223 (1715 Md. Laws 90); (2) a 1721 Pennsylvania law and 1722 New Jersey law that both prohibit gun carriage or hunting "on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation," *id.* at 1228 (1721 Penn. Laws 255); *see also id.* at 1234 (1722 N.J. Laws 101); (3) a 1763 New York law prohibiting "carry[ing], shoot[ing] or discharg[ing]" any firearm in any "Orchard, Garden, Corn-Field, or other inclosed Land . . . without License in Writing" from the owner, *id.* at 1239 (1763 N.Y. Laws 442); (4) a 1771 New Jersey law making it unlawful for anyone "to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner," *id.* at 1242 (1771 N.J. Laws 344); (5) a 1790 Massachusetts law prohibiting the possession of "any gun or guns upon" certain islands, "except such as shall have the special license of the proprietors of the said islands," *id.* at 1744 (1790 Mass. Acts 259); (6) an 1865 Louisiana law and 1866 Texas law prohibiting carriage on the "premises or plantations of any citizen, without the consent of the owner or proprietor," *id.* at 1252 (1865 La. Acts 14); *see id.* at 1259

16

(1866 Tex. Gen. Laws 1321); (7) an 1865 Florida law making it unlawful to "hunt or range with a gun within the enclosed land or premises of another without the permission of the owner," *id.* at 1536 (1865 Fla. Laws 27); and (8) an 1893 Oregon law prohibiting anyone "other than an officer on lawful business, being armed . . . [from] go[ing] or trespass[ing] upon any enclosed premises or lands without the consent of the owner," *id.* at 1266 (1893 Or. Laws 79).

In *Antonyuk I*, we reviewed seven of these statutes and preliminarily concluded that they were not relevantly similar to the Private Property Provision, as applied to private property open to the public. *See* 89 F.4th at 382 (listing the 1715 Maryland law, the 1721 Pennsylvania law, the 1722 New Jersey law, the 1763 New York law, the 1865 Louisiana law, the 1866 Texas law, and the 1893 Oregon law). We determined that three of these statutes—the 1721 Pennsylvania statute, the 1722 New Jersey statute, and the 1763 New York Statute—"were explicitly motivated by a substantially different reason (deterring unlicensed hunting) than the [Private Property Provision] (preventing gun violence)." *Id.* at 385. We also pointed out that the 1715 Maryland Statute prohibited only "convicted criminals from carrying a firearm on 'any person's land, whereon there shall be a seated plantation, without the owner's leave.'" *Id.*. We further observed that all of these

17

proffered analogues "appear to, by their own terms, have created a default presumption against carriage only on private lands *not open to the public*," and that "[t]he State has produced no evidence that those terms were in fact otherwise understood to apply to private property open to the public or that the statutes were in practice applied to private property open to the public." *Id.* at 385–86 (emphasis in original). Therefore, we concluded that "the State's analogues fail to establish a National tradition motivated by a similar 'how' or 'why' of regulating firearms in property open to the public in the manner attempted by § 265.01-d." *Id.* at 386.

As we explain below, having considered the additional evidence and arguments the State has proffered on summary judgment, we reaffirm our conclusion in *Antonyuk I* that the Private Property Provision, as applied to private property open to the public, does not fall within our Nation's historical tradition of gun regulations.

First, the pre-ratification statutes cited by the State are not relevantly similar in their "why." We discern a statute's purpose through its plain text and structure. *See Alexander v. Sandoval*, 532 U.S. 275, 288 (2001) ("We . . . begin . . . our search for [the legislature's] intent with the text and structure of [the statute]."). The text and

structure of the State's pre-ratification analogues make clear that the purpose of those statutes was to deter unlawful or unlicensed hunting. *See Antonyuk I*, 89 F.4th at 385 (reading the statutes as "motivated by a substantially different reason (deterring unlicensed hunting) than the [Private Property Provision] (preventing gun violence)"). Each of the laws prohibits gun carriage in the context of forbidding hunting on certain property. For example, the 1715 Maryland law begins with the prefatory clause that the law is aimed at "prevent[ing] the abusing, hurting or worrying of any stock of hogs, cattle or horses," and then proceeds to prohibit "shoot[ing], killing[ing] or hunt[ing], or . . . carry[ing] a gun" on another's plantation without the owner's leave. Joint App'x at 1223. Thus, the plain purpose of prohibiting the carriage of guns on another's land was to curb the hunting of livestock on that land. The other laws similarly prohibited carriage in the context of banning hunting on certain lands. *See id.* at 1228 (the 1721 Pennsylvania law prohibited a person from "carry[ing] any gun or hunt[ing]"); *id.* at 1234 (same for the 1722 New Jersey law); *id.* at 1238–39 (the 1763 New York Law prohibited "carry[ing], shoot[ing], or discharg[ing]" firearms in order to more effectively "punish and prevent" persons from "hunt[ing] with Fire-Arms"). Moreover, although the prohibition on the carriage of "any Gun on any Lands not his own"

19

in the 1771 New Jersey law appears in a standalone section of the statute, *id.* at 1242, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *see also King v. Burwell*, 576 U.S. 473, 486 (2015) ("Our duty, after all, is to construe statutes, not isolated provisions.") (internal quotation marks and citation omitted).  In the New Jersey law, the above-referenced provision, which is heavily relied upon by the State, sits among other sections that are all aimed at preventing unlawful hunting.  *See* Joint App'x at 1242–44 (other sections including those prohibiting the "hunt[ing] or watch[ing] for Deer with a Gun . . . on any Lands not his own," listing the penalties for killing or destroying deer, explaining who may hunt on unimproved lands, the penalties for setting traps, and the rewards for destroying such traps).

That the purpose of these statutes was to regulate hunting is further buttressed by the titles or preambles of these statutes.  *See Bittner v. United States*, 598 U.S. 85, 98 n.6 (2023) ("A preamble, purpose clause, or recital is a permissible indicator of meaning.") (quoting A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 217 (2012)).  The 1721 Pennsylvania law, for

20

example, is titled "An Act to Prevent the Killing of Deer Out of Season, and Against Carrying of Guns or Hunting by Persons Not Qualified," and explains that the "abuses, damages and inconveniences" the statute seeks to remedy "have arose by persons carrying guns and presuming to hunt on other people's lands." Joint App'x at 1227–28; *see id.* at 1233–34 (the 1722 New Jersey law has an identical title and seeks to remedy the "great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to hunt on other Peoples Land"); *id.* at 1238 (the 1763 New York law is titled "An Act to prevent hunting with Fire-Arms in the City of New York, and the Liberties thereof" and the purpose clause explains that the statute seeks to prevent "disorderly Persons in and about the City of New-York . . . [from] hunt[ing] with Fire-Arms"); *id.* at 1737–38 (the 1771 New Jersey Law contains a statement of purpose in a preamble recognizing that previous laws in New Jersey "for the Preservation of Deer and other Game, and to prevent trespassing with Guns, Traps and Dogs, have, by Experience, been found insufficient."); *id.* at 1743 (the 1790 Massachusetts law is titled "An Act for the Protection of the Sheep and other Stock" on certain islands and the preamble states its concern with the "great depredations made by gunners and hunters [on these islands] by which great numbers of sheep and deer have been killed"). It is thus

21

confirmed by the statutory context that these prohibitions on gun carriage were prophylactic measures to more effectively prevent the abuse of unlawful hunting on another's land.

In addition, these pre-ratification laws differed in their "how." As we explained in *Antonyuk I*, we read these laws as applying to "private lands *not open to the public*." 89 F.4th at 385 (emphasis in original). These laws, by their terms, prohibited hunting and gun carriage on, for example, "plantation[s]," Joint App'x at 1223, "improved or inclosed lands of any plantation other than his own," *id.* at 1228; *accord id.* at 1234, or "any Lands not his own," *id.* at 1242. The word "plantation" denotes a "cultivated estate" or a "farm." *Plantation*, WEBSTER'S AM. DICTIONARY OF THE ENGLISH LANG. (1828), *available at* https://webstersdictionary 1828.com/Dictionary/plantation [https://perma.cc/6DG8-QTFQ]. The State does not offer persuasive evidence that privately owned estates or farms were traditionally held open to the public. In addition, the reference to "lands" is specific to those "other than his own" or "not his own," which also suggests that the premises at issue are those that an ordinary individual would possess—that is, one's own private home or farm, rather than a property generally open to the public, such as an inn or shop.

22

Similarly, the 1771 New Jersey law, on which the State places great weight, was aimed at preventing "*trespassing* with Guns, Traps and Dogs." *Christian I*, 753 F. Supp. 3d at 289 (emphasis added) (internal quotation marks and citation omitted). However, at common law, it was not a trespass to enter into properties held open to the public, such as "an inn or public house, without the leave of the owner first specially asked; because, when a man professes the keeping of such inn or public house, he thereby gives a general licence to any person to enter his doors." 3 WILLIAM BLACKSTONE, COMMENTARIES *212; *cf. State v. Boone*, 256 S.E.2d 683, 687 (N.C. 1979) (overturning a felonious entry conviction because the "defendant entered the store at a time when it was open to the public" and therefore had "consent, implied if not express, of the owner"); *State v. Martin*, 147 S.E. 606, 614 (S.C. 1929) (noting that "the general public have an implied license to enter a retail store, and, perhaps, many other places of business"), *overruled on other grounds by State v. Belcher*, 685 S.E.2d 802 (S.C. 2009). The statute's reference to trespass therefore indicates that the 1771 New Jersey law was focused on trespass on private property that was *not* open to the public.

Although the State cites dictionary definitions and *other* statutes in an attempt to persuade us that these statutory terms *could* also encompass private

23

property open to the public, we decline to read these words in isolation and out of context. *See, e.g.*, *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (declining to assess a statutory term "in isolation," as "the cardinal rule [is] that statutory language must be read in context [since] a phrase gathers meaning from the words around it") (internal quotation marks and citation omitted). Moreover, the State has failed to point to any contemporaneous evidence that these laws were understood or enforced in that expansive manner. This "barren record of enforcement" is "one additional reason to discount [the] relevance" of these pre-ratification statutes. *Bruen*, 597 U.S. at 58 n.25.

Our conclusion that none of the State's pre-ratification statutes are relevantly similar does not necessarily doom the State's case. As we explained in *Frey*, because silence in the Founding-era does not provide a full measure of clarity into the existence or absence of historical tradition in "this Nation's *whole* tradition," the State may still rely on post-enactment history to demonstrate an established tradition. 157 F.4th at 130 (emphasis in original) (internal quotation marks and citation omitted); *see id.* (explaining that post-enactment history can "provide persuasive evidence of original meaning" and also liquidate the meaning of an ambiguous constitutional term) (internal quotation marks and citation

24

omitted).

However, the State's four 19th-century laws are not enough to carry the day. To begin with, the 1866 Florida law, like the pre-ratification laws we rejected *supra*, plainly applies to hunting. The section at issue is titled "Persons may not hunt on the premises of another without permission," and prohibits a person from "hunt[ing] or rang[ing] with a gun within the enclosed land or premises of another." Joint App'x at 1536. The 1893 Oregon law also suffers from the same flaw as the 1771 New Jersey law in that it prevents "*trespass* upon any enclosed premises or lands without the consent of the owner." *Id.* at 1266 (emphasis added). Thus, as explained above, this law prohibits gun carriage on those private properties *not* open to the public, where an individual could commit trespass.

That leaves the State with just the 1865 Louisiana law and the substantially similar 1866 Texas law. Plaintiffs contend that these two laws were passed after the Civil War as part of the South's attempt "to limit the rights of former slaves and to reduce them, as nearly as possible, to their former state." Plaintiffs-Appellees' Br. at 52. They argue that because, "[a]fter 1866, the states could no longer enact explicitly racial laws," they instead "used the pretense of game laws to restrict hunting and fishing by blacks. Laws requiring landowner permission

25

were the most transparent limits." Brian Sawers, *Race and Property After the Civil War: Creating the Right to Exclude*, 87 MISS. L.J. 703, 749 (2018); *see also McDonald*, 561 U.S. at 771 ("After the Civil War, many of the over 180,000 African-Americans who served in the Union Army returned to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks."). Although the State suggests that "the history of gun regulation in southern States after the Civil War is more complex than plaintiffs acknowledge," they later concede that "the unfortunate reality" is that these laws were "often enacted by racist legislatures and codified prejudices that existed at the time." State-Appellant's Reply Br. at 16–17. Nevertheless, they contend that courts should treat "such laws as relevant to the historical inquiry." *Id.* at 17.

We disagree that the facially neutral but racially motivated laws at issue here can properly serve as meaningful analogues for our historical inquiry. To be sure, we have relied on historical precedents "rooted in prejudiced stereotypes and racial, religious, or class bigotry" that are "offensive to contemporary morals" as analogies for "class-based prohibitions on firearms." *Zherka v. Bondi*, 140 F.4th 68, 90 (2d Cir. 2025). However, those historical laws were relevant in that context because they evinced a "historical tradition of broad categorical restrictions on

firearms possession" based on people the legislature perceived, even if wrongly so, as dangerous to society. *Id.* By contrast, facially neutral laws born from racial animus are often enforced in ways that predictably—and perhaps exclusively—fall on the very racial groups the legislature set out to target. Thus, they do not necessarily evince a historical tradition of limiting the right against *all* individuals across the board in the same manner. Instead, unless the government can show that these laws were enforced equally against all citizens, they merely tend to highlight this sorry history of *departing* from norms and traditions when racial minorities are in the legislature's crosshairs. *Cf. Bruen*, 597 U.S. at 58 (noting that an enforcement record exclusively "involving black defendants who may have been targeted for selective or pretextual enforcement" was "surely too slender a reed on which to hang a historical tradition"). Here, the State has failed to demonstrate that the 1865 Louisiana law and the substantially similar 1866 Texas law were part of some broader effort to restrict firearms possession against all individuals in the same manner, rather than targeting a racial minority for selective enforcement. Thus, we do not view these statutes as providing support for the State's position. In any event, even if the statutes were given some weight, we doubt that two statutes alone, without more, are sufficient to evince a robust

national tradition. *See Bruen*, 597 U.S. at 46 ("[W]e doubt that three colonial regulations could suffice to show a tradition of public-carry regulation.") (emphasis omitted).

To the extent the State relies on the Ninth Circuit's decision in *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), reversing the district court's decision to enjoin a Hawaii law similar to the Private Property Provision that bans carrying firearms on private property held open to the public unless the owner or operator of that property consents orally, in writing, or by posting an appropriate sign, we respectfully disagree with the analysis set forth in that opinion.[4] There, the Ninth Circuit determined that "the Nation has an established tradition" that the states "freely arrang[ed] the default rules" for regulating the "carrying of firearms onto private property." *Wolford*, 116 F.4th at 995. In support of its determination, the Ninth Circuit explained that Section 1 of the 1771 New Jersey law and the 1865

---

[4] Hawaii's version of the Private Property Provision provides that "[a] person carrying a firearm pursuant to a license . . . shall not intentionally, knowingly, or recklessly enter or remain on private property of another person while carrying a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, unless the person has been given express authorization to carry a firearm on the property by the owner, lessee, operator, or manager of the property," through "[u]nambiguous written or verbal authorization" or "[t]he posting of clear and conspicuous signage at the entrance of the building or on the premises." Haw. Rev. Stat. § 134-9.5(a), (b).

Louisiana law were "dead ringers" for this national tradition because, in its view, consistent with Hawaii's law, the New Jersey and Louisiana laws "simply prohibited the carry of firearms on private property without consent," without reference to another purpose, such as regulating hunting or poaching. *Id.*

As an initial matter, we disagree with the Ninth Circuit's analysis regarding whether portions of the 1771 New Jersey and the 1865 Louisiana law demonstrate a national tradition of regulating the carrying of firearms onto private property without consent. As we explained *supra*, although we agree that Section 1 of the 1771 New Jersey law makes no reference to hunting or game, as the Ninth Circuit recognizes, Section 2 of that same law does, and these sections must be read together to properly determine the law's overall purpose. In any event, Section 1's reference to trespass indicates that New Jersey's law was focused on private property that was not open to the public, not *any* private property, as the Ninth Circuit suggests. *See id.* (concluding that "New Jersey's 1771 law applied to *all* private property") (emphasis in original).

As for the 1865 Louisiana law, the Ninth Circuit failed to consider how the racial animus imbued in that law makes it a troubling analogue for our historical inquiry and ignored the Supreme Court's caution that reliance on such a law "is

surely too slender a reed on which to hang a historical tradition." *Bruen*, 597 U.S

at 58. Thus, we disagree with the Ninth Circuit that these state laws are "dead

ringers" and that there is, on this record, a national tradition in support of such

regulations.

Indeed, not only is this type of regulation not readily identifiable in the

context of our Nation's long history of protecting the "general right to public carry

arms for self-defense" under the Second Amendment, *id.* at 31, but also the likely

practical effect of the enforcement of the Private Property Provision will be to

significantly hinder the ability of individuals to meaningfully exercise that Second

Amendment right to defend themselves in public. In other words, because many

private property owners will likely not post signs indicating whether firearms are

permitted or forbidden on their premises, rules like the ones promulgated by New

York and Hawaii will effectively prohibit individuals from carrying firearms on

any private property, even private property that is open to the general population.

Thus, "only those who aimlessly wander streets and sidewalks without ever

planning to enter a store, park, or other private or public establishment will be able

to carry a firearm." *Wolford v. Lopez*, 125 F.4th 1230, 1235–36 (9th Cir. 2025)

(VanDyke, *J.*, dissenting from denial of rehearing *en banc*). Such a rule could

"dramatically curtail[] an individual's practical ability to be prepared in public to defend themselves—'the *central component* of the Second Amendment right.'" *Id.* (alteration adopted) (emphasis in original) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)).

In sum, we conclude that the State did not carry its burden of establishing a national tradition of regulating firearms in the manner attempted by the Private Property Provision, as it applies to private property open to the public. Accordingly, we affirm the district court's permanent injunction against the enforcement of the Private Property Provision.

## III. Public Parks Provision

We turn next to Plaintiffs' facial challenge to the Public Parks Provision. As explained *supra*, that provision makes it a class E felony to possess firearms "in a sensitive location," which, as relevant here, includes "public parks." N.Y. Penal Law § 265.01-e(2)(d).

As with the Private Property Provision, there is no dispute that the Public Parks Provision implicates conduct that falls within the plain text of the Second Amendment. We therefore proceed to the historical analysis under step two of *Bruen*.

31

In support of the Public Park Provision's constitutionality, the State has amassed a record of more than one hundred historical laws it asserts are relevantly similar. Chief among them are more than sixty regulations from cities and towns in more than twenty States, spanning from 1858 to the early 1900s, that expressly forbade carriage of firearms in public parks. *See* Joint App'x at 374, 399 (1858 N.Y.C., N.Y.); 375, 413 (1867 Brooklyn, N.Y.); 418 (1868 Phila., Pa.); 424 (1872 S.F., Cal.); 429 (1866 Chi., Ill.); 436 (1874 Buffalo, N.Y.); 443 (1875 Hyde Park, Ill.); 449 (1878 Phoenixville, Pa.); 468 (1883 Danville, Ill.); 463 (1883 St. Louis, Mo.); 472 (1886 Bos., Mass.); 479 (1887 Reading, Pa.); 485 (1888 St. Paul, Minn.); 490 (1888 Salt Lake City, Utah); 493 (1890 Trenton, N.J.); 498 (1890 Berlin, Wis.); 506 (1890 Williamsport, Pa.); 510 (1891 Grand Rapids, Mich.); 516 (1891 Milwaukee, Wis.); 521 (1891 Springfield, Mass.); 525 (1892 Cincinnati, Ohio); 530 (1891 Lynn, Mass.); 534 (1892 Peoria, Ill.); 540 (1892 Spokane, Wash.); 544 (1893 Pittsburgh, Pa.); 552 (1893 Wilmington, Del.); 562 (1894 Canton, Ill.); 569 (1895 Detroit, Mich.); 575 (1896 Centralia, Ill.); 579 (1896 Indianapolis, Ind.); 586 (1896 Rochester, N.Y.); 596 (1898 Kan. City, Mo.); 601 (1898 New Haven, Conn.); 605 (1898 Boulder, Colo.); 611 (1902 Hartford, Conn.); 616 (1902 New Bedford, Mass.); 622 (1902 Springfield, Ill.); 628 (1903 Lowell, Mass.); 633 (1903 N.Y.C., N.Y.); 637 (1903 Pasadena, Cal.); 643 (1903

32

Troy, N.Y.); 649 (1904 Hou., Tex.); 655 (1904 Neligh, Neb.); 663 (1904 Pueblo, Colo.); 671 (1905 Harrisburg, Pa.); 676 (1905 Haverhill, Mass.); 682 (1905 Saginaw, Mich.); 694 (1906 Denver, Colo.); 702 (1906 L.A., Cal.); 708 (1907 Portland, Or.); 713 (1907 Oil City, Pa.); 719 (1907 Olean, N.Y.); 728 (1907 Seattle, Wash.); 747 (1909 Memphis, Tenn.); 754 (1909 Oakland, Cal.); 762 (1909 Paducah, Ky.); 768 (1910 Jacksonville, Ill.); 773 (1910 Staunton, Va.); 778 (1911 Colo. Springs, Colo.); 819 (1917 Birmingham, Ala.); 825 (1917 Joplin, Mo.); 840 (1921 Burlington, Vt.); 845 (1922 Chattanooga, Tenn.).  In addition, the State puts forward statutes from nine states that it contends together establish a tradition of prohibiting firearms in quintessentially crowded places and public forums.  *See* Defendants-Appellees' Br. at 23 (citing 1792 North Carolina law, 1786 Virginia law, 1869 Tennessee law, 1870 Texas law, 1870 Georgia law, 1889 Arizona law, 1883 Missouri law, 1889 Idaho law and 1890 Oklahoma law).

In *Antonyuk II*, we found that these state statutes were part of a "long, unbroken line" indicating "that the tradition of regulating firearms in often-crowded public forums is part of the immemorial custom of this Nation."  120 F.4th at 1021 (internal quotation marks and citations omitted).  We further concluded that the eight local ordinances banning firearms in urban public parks

33

that were part of the preliminary record demonstrated that "[w]ith the rise of urban America, cities continued this tradition and began regulating firearms in a newly emerging public forum: the urban park." *Id.* at 1023. We concluded that whether the Public Parks Provision, at least as applied to urban parks, "is consistent with this Nation's tradition is a straightforward inquiry" because "[i]t is obvious that [the provision] burdens Second Amendment rights in a distinctly similar way (*i.e.*, by prohibiting carriage) and for a distinctly similar reason (*i.e.*, maintaining order in often-crowded public squares) as do the plethora of regulations provided by the State." *Id.* at 1024. This conclusion was enough to defeat plaintiffs' facial challenge to the Public Parks Provision, we explained, because "[t]o mount a successful facial challenge, the plaintiff must establish that no set of circumstances exists under which the law would be valid." *Id*. at 1026 (alteration adopted) (internal quotation marks and citation omitted).

As a threshold matter, Plaintiffs urge us to flip the facial challenge standard on its head. They contend that we should hold the Public Parks Provision facially unconstitutional so long as they can demonstrate that it "exceeds in its scope *any* possible historical justification." Plaintiffs-Appellants' Reply Br. at 26 (emphasis added). That argument is squarely foreclosed by *Rahimi* as well as our Circuit

34

precedents.

In *Rahimi*, the Supreme Court made clear that to succeed on a facial challenge in the Second Amendment context, the challenger must, as in other contexts, "establish that no set of circumstances exists under which the Act would be valid." 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Indeed, in reversing the Fifth Circuit's conclusion that Section 922(g)(8) violated the Second Amendment, the Court noted that the Fifth Circuit "did not correctly apply our precedents governing facial challenges" because "[r]ather than consider the circumstances in which Section 922(g)(8) was most likely to be constitutional, the panel instead focused on hypothetical scenarios where Section 922(g)(8) might raise constitutional concerns. That error left the panel slaying a straw man." *Id.* at 701 (internal citations omitted).

Following *Rahimi*, we have applied this facial challenge standard repeatedly in our Second Amendment cases. *See Antonyuk II*, 120 F.4th at 983 ("To mount a successful facial challenge, the plaintiff must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep.") (alteration adopted) (internal quotation marks and citations omitted); *Giambalvo v. Suffolk Cnty.*, 155 F.4th 163, 182 (2d Cir. 2025) (same); *Frey*,

35

157 F.4th at 141 (same).  We therefore continue to apply here this well-established standard for a facial challenge.[5]

In the alternative, Plaintiffs contend that they also brought a challenge to the Public Parks Provision as applied to "parks outside of urban settings."  Plaintiffs-Appellants' Br. at 51–52.  Their complaint plainly does not raise such a challenge. The complaint seeks a "declaratory judgment that N.Y. Penal Law []§ 265.01-e(2)(d) (public parks) . . . infringe[s] upon Plaintiffs' right to bear arms," and "[i]njunctive relief restraining Defendants . . . from enforcing N.Y. Penal Law []§ 265.01-e(2)(d) (public parks)."  Joint App'x at 42; *see John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (explaining that a claim has "as applied" characteristics if it "does not seek to strike [the statute down] in all its applications").  This is in stark contrast to the as-applied relief Plaintiffs seek with respect to the Private Property

---

[5] Plaintiffs also counter that applying this standard to the facial challenges in *Heller* and *Bruen* would have prevented the Court in those cases from striking down the statutes at issue on their face.  *See* Plaintiffs-Appellants' Reply Br. at 27 (contending that "the fact that there were *certain* handguns that might have been lawfully banned by D.C. consistent with history did not save the law in *Heller* from facial invalidation" (emphasis in original)).  However, neither *Heller* nor *Bruen* directly addressed the proper facial challenge standard.  Moreover, a law may also be struck down as unconstitutional on its face if it "lacks a plainly legitimate sweep."  *Antonyuk II*, 120 F.4th at 983 (internal quotation marks and citation omitted).  Plaintiffs do not contend here that the Public Parks Provision lacks a plainly legitimate sweep.

Provision in the same breath. *See* Joint App'x at 42 (seeking a "declaratory judgment that N.Y. Penal Law []§ . . . 265.01-d (default anti-carry rule) *with respect to places open to the public* . . . infringe[s] upon Plaintiffs' right to bear arms," and "[i]njunctive relief restraining Defendants . . . from enforcing N.Y. Penal Law []§ . . . 265.01-d (default anti-carry rule) *with respect to places open to the public*") (emphases added). Nor did Plaintiffs articulate an as-applied theory in their preliminary injunction motion. Indeed, it was not until after the summary judgment stage, and after we decided *Antonyuk II*, that Plaintiffs indicated for the first time that they were also bringing an as-applied challenge to the Public Parks Provision. The district court declined to consider that challenge in granting summary judgment in favor of the State. *See Christian II*, 2025 WL 50413, at *1. We, too, decline to consider such a challenge.[6]

---

[6] Plaintiffs contend that nothing forecloses us from considering such a challenge *sua sponte*. For that proposition, Plaintiffs cite *Citizens United v. FEC*, 558 U.S. 310, 331 (2010), with no explanation. However, *Citizens United* involved the converse question—whether the Court could *sua sponte* consider a facial challenge to a statute where the plaintiffs brought only an as-applied challenge. *See id.* Faced with that question, the Supreme Court concluded that "no general categorical line bars a court from making broader pronouncements of invalidity in properly as-applied cases." *Id.* (internal quotation marks and citation omitted). *Citizens United* therefore provides no support for considering an as-applied challenge where a complaint brings only a facial one and, in any event, we decline to exercise our discretion to do so here, especially where the issue— including the definition of a "rural park"—has not been adequately developed.

Plaintiffs cannot "establish that no set of circumstances exists under which [the Public Parks Provision] would be valid," *Rahimi*, 602 U.S. at 693 (quoting *Salerno*, 481 U.S. at 745), because the State has demonstrated that the Public Parks Provision as applied to urban parks is part of a well-established tradition of prohibiting firearms in those parks. *See id*. ("[T]o prevail, the Government need only demonstrate that [the provision] is constitutional in some of its applications."). The more than sixty regulations that directly prohibit firearm carriage in urban public parks across the country alone are "dead ringers" that evidence such a robust historical tradition. Starting in 1858, with the plan to build Central Park in New York City, came a regulation requiring signage that it was "forbidden . . . [t]o carry fire-arms" inside the park. Joint App'x at 399–400.

> [F]ollowing the success of [New York's] Central Park, cities across the United States began building parks to meet recreational needs of residents[;] and during the second half of the 19th century, [Frederick Law] Olmsted and his partners [who planned Central Park] designed major parks or park systems in thirty cities.

*Antonyuk II*, 120 F.4th at 1022 (first alteration added) (internal quotation marks and citation omitted). With the explosion of urban parks came contemporaneous regulations that, like the Central Park regulation, flat out prohibited gun carriage inside those parks. *See, e.g.*, Joint App'x at 413 (1867 Prospect Park ordinance

38

forbidding persons from "carry[ing] firearms"); 418 (1868 Pennsylvania law prohibiting persons from "carry[ing] fire arms" in Philadelphia's Fairmount Park); 443 (1875 Hyde Park law stating that "[a]ll persons are forbidden to carry fire arms"). As we noted in *Antonyuk II*, "[n]one of those city ordinances were invalidated by any court; indeed, we have not located any constitutional challenges to any of them." 120 F.4th at 1022. This "deliberate and sustained course of post-enactment action" spanning over 60 years in major urban areas without any known constitutional challenge comfortably "settle[s] the meaning of" whether the scope of the Second Amendment right can be limited in this way. *Frey*, 157 F.4th at 129; *see also Antonyuk II*, 120 F.4th at 1023 (explaining that the eight regulations in the preliminary record covered "five of the most populous cities" with a total population of almost 5 million people, "resulting in at least 37.7% of the urban population living in cities where firearms were prohibited in their parks"); *Wolford*, 116 F.4th at 982–83 ("As soon as green spaces began to take the shape of a modern park, in the middle of the 19th century, municipalities and other governments imposed bans on carrying firearms into the parks. . . . Because many laws prohibited carrying firearms in parks, and the constitutionality of those laws was not in dispute, we agree with the Second Circuit and several district

39

courts that the Nation's historical tradition includes regulating firearms in parks.")

(citations omitted).

Plaintiffs do not seriously quarrel with whether this mountain of regulations

is relevantly similar to the Public Parks Provision. In passing, Plaintiffs suggest

that some of the State's proffered restrictions "are not similar in 'why' they restrict

the right to carry arms in public" because the regulations' motivations "appear[]

almost always to have been for the protection of wildlife or birds in the park."

Plaintiffs-Appellants' Br. at 50. Plaintiffs point out, for example, that the "many

firearms restrictions were paired with prohibitions on shooting birds." *Id.*

However, read in context, these lists of prohibitions, which also forbade

"throw[ing] ston[e]s or other missiles," Joint App'x at 418, were meant to keep

urban public parks as peaceable recreational spaces. That is at least one purpose

for the enactment of the Public Parks Provision. *See* State-Appellee's Br. at 17–18

(stating that the purpose of the Public Parks Provision is "to protect public safety

and order and to ensure that public parks remain peaceable spaces for

contemplation of nature and recreation").

Instead, Plaintiffs' main contention is that these regulations, which began to

proliferate starting from 1858, came too late, and that post-Founding era history

40

"cannot alone establish the historical tradition of regulation required by *Bruen*." Plaintiffs-Appellants' Br. at 20. However, we expressly rejected such a view in *Frey*. There, we explained that the absence of Founding-era law is not dispositive because "it is not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such a regulation inconsistent with the right to bear arms." *Frey*, 157 F.4th at 130 (quoting *Antonyuk II*, 120 F.4th at 969). We may rely on later history to discern the historical tradition because it can "provide persuasive evidence of the original meaning" in 1791. *Id.* (quoting *Rahimi*, 602 U.S. at 738 (Barrett, *J.*, concurring)). Later history is also relevant under a liquidation theory, we explained, because a "regular course of practice may settle a constitutional debate at *any* point in our history." *Id.*

Moreover, the lack of Founding-era history is an especially weak indicator of constitutionality where, as here, the case concerns "new circumstances" and "modern regulations that were unimaginable at the founding." *Antonyuk II*, 120 F.4th at 970 (quoting *Bruen*, 597 U.S. at 27–28). As explained above, the lack of similar regulations prior to 1858 is a "natural consequence" of the fact that modern urban public parks in the mold of Olmstead's Central Park did not yet exist in

41

significant numbers before that time. *See* Joint App'x at 363–66 (the State's expert witness opining that "America's tradition of public parks was launched in the 1850s" and discussing the rise of urban public parks in the latter half of the 19th century). Plaintiffs rejoin that, at the Founding, there were in fact urban spaces, such as the Boston Common, that were used for recreational purposes. Plaintiffs-Appellants' Br. at 43. However, Plaintiffs also acknowledge that "Boston Common's long history show a variety of uses, both practical and recreational." *Id.* Indeed, "cattle and sheep continued to roam the [Boston] Common . . . until the 1830s," and public executions were believed to have continued there until the early 1800s. *See Boston Common*, NAT'L GALLERY OF ART, https://heald.nga.gov/mediawiki/index.php/Boston_Common [https://perma.cc/ARC5-BDVR]. The Boston Common therefore is not akin to the Olmstead vintage of urban parks that were principally created as dedicated spaces for peaceful recreation and quiet contemplation of natural scenery. *See* Joint App'x 364–68; *Wolford*, 116 F.4th at 982 ("[M]odern parks differ from the green spaces that existed in 1791. Plaintiffs point to Boston Common as an example of a 'park' at the time of the Founding, but the record . . . establishes that Boston Common was used primarily for grazing animals and for holding military exercises and was not akin to modern parks. Nor

42

does the record . . . contain evidence of any other public green space akin in use and purpose to a modern park. We agree with the Second Circuit, and at least one district court, that such examples from the Founding were not relevantly similar to parks in their modern form.").

In short, the State has more than carried its burden, by demonstrating a long, unbroken history of prohibiting gun carriage in urban public parks and placing the Public Parks Provision, at least as applied to urban parks, within that tradition.[7] We therefore conclude that the Public Parks Provision is facially constitutional because the State has demonstrated that it "is constitutional in some of its applications." *Rahimi*, 602 U.S. at 693. Accordingly, we affirm the district court's judgment in favor of the State on the Public Parks Provision claim.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the permanent injunction against the enforcement of the Private Property Provision and **AFFIRM** the judgment of the district court with respect to the Public Parks Provision.

---

[7] We therefore need not consider the State's additional arguments that the Public Parks Provision falls within a historical tradition of prohibiting firearms in quintessentially crowded places and public forums, or locations frequented by children.

43